JOSH A. KREVITT, SBN 208552
  jkrevitt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, California 94301-1744
Telephone:    650.849.5300
Facsimile:    650.849.5333

ORIN SNYDER (*pro hac vice forthcoming*)
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035

JAMES L. ZELENAY, JR., SBN 237339
  jzelenay@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

ELIZABETH K. MCCLOSKEY, SBN 268184
  emccloskey@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, California 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

*Attorneys for Defendant Archer Aviation Inc.*

BRADFORD NEWMAN, SBN 178902
  bradfordnewman@eversheds-sutherland.com
EVERSHEDS SUTHERLAND (US) LLP
101 California Street, Suite 4750
San Francisco, California 94111-5872
Telephone:    415.521.1701
Facsimile:    415.506.4859

*Attorney for Defendant George Kivork*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Joby Aero, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Archer Aviation Inc., and George Kivork, <br><br> Defendants. | CASE NO. 5:25-cv-10703 <br><br> **DECLARATION OF JAMES L. ZELENAY, JR. IN SUPPORT OF DEFENDANTS ARCHER AVIATION INC. AND GEORGE KIVORK'S JOINT NOTICE OF REMOVAL** <br><br> [Removal from the Superior Court of California, County of Santa Cruz, Case No. 25CV03722] |

1

DECLARATION OF JAMES L. ZELENAY, JR. IN SUPPORT OF DEFENDANTS ARCHER AVIATION INC. AND GEORGE KIVORK'S JOINT NOTICE OF REMOVAL
CASE NO.

Gibson, Dunn & Crutcher LLP

I, James L. Zelenay, Jr. hereby declare and state:

1.      I am an attorney duly licensed to practice law before all the courts of the State of California as well as the United States District Court for the Northern District of California.  I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, and am one of the attorneys representing Archer Aviation Inc. ("Archer") in the above-entitled action.  I make this declaration in support of Defendants Archer Aviation Inc. and George Kivork's Joint Notice of Removal.  Unless otherwise stated, I have personal knowledge of the matters stated herein, and if asked to testify thereto, I would do so competently.

2.      Attached hereto as Exhibits A–E are true and correct copies of the Docket, Complaint, Summons, Civil Case Cover Sheet and Case Management Conference Notice filed in Case No. 25CV03722 in the Superior Court of California for the County of Santa Cruz.  In accordance with 28 U.S.C. § 1446(a), Exhibits A–E constitute "all process, pleadings, and orders served upon" Archer and co-defendant George Kivork ("Mr. Kivork"), and otherwise filed, submitted, or entered in the state court action.

3.      As shown in Exhibit A, Plaintiff Joby Aero, Inc. filed the Complaint on November 19, 2025.  As shown in Exhibit F, Archer was served on November 26, 2025.  As shown in Exhibit G, Mr. Kivork's then-counsel agreed to accept electronic service on November 28, 2025.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and that I executed this Declaration on December 16, 2025, at Los Angeles, California.

/s/  James L. Zelenay, Jr.
James L. Zelenay, Jr.

2

DECLARATION OF JAMES L. ZELENAY, JR. IN SUPPORT OF DEFENDANTS ARCHER AVIATION INC. AND GEORGE KIVORK'S JOINT NOTICE OF REMOVAL
CASE NO.

# Exhibit A

Superior Court of California, County of Santa Cruz

## Case Summary

### Case No. 25CV03722

| | | |
|---|---|---|
| **JOBY AERO, INC. vs GEORGE KIVORK, et al** | § | Location: **Civil** |
| | § | Judicial Officer: **Schmal, Timothy** |
| | § | Filed on: **11/19/2025** |

---

### Case Information

File Date  11/19/2025

| **Cause of Action** | **Description/Remedy** |
|---|---|
| Complaint | Action |

Case Type: (07) Unlimited Business Tort / Unfair Business Practice

Case Status: **11/19/2025  Active**

---

### Party Information

**Plaintiff**  **JOBY AERO, INC.**    **Kapgan, Yury**
*Retained*

**Defendant**  **ARCHER AVIATION INC.**

**KIVORK, GEORGE**

---

### Causes of Action

11/19/2025  **Cause of Action** Complaint
Action Type   Action

---

### Case Events

11/19/2025
Complaint Filed
Party:   Plaintiff JOBY AERO, INC.

11/19/2025
Summons Issued / Filed
Party:   Plaintiff JOBY AERO, INC.

11/19/2025
Civil Case Cover Sheet
Party:   Plaintiff JOBY AERO, INC.

---

### Hearings

03/20/2026
**Case Management Conference**  (8:30 AM)  (Judicial Officer: Schmal, Timothy)

# Exhibit B

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro *(pro hac vice forthcoming)*
  alexspiro@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
Telephone:    (212) 849-7000
Facsimile:    (213) 849-7100

Sara Pollock (Bar No. 281076)
  sarapollock@quinnemanuel.com
Michael F. LaFond (Bar No. 303131)
  michaellafond@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

Yury Kapgan (Bar No. 218366)
  yurykapgan@quinnemanuel.com
Patrick Schmidt (Bar No. 274777)
  patrickschmidt@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

ELECTRONICALLY FILED
Superior Court of California
County of Santa Cruz
11/19/2025 1:06 PM
Clerk of the Court by Deputy,
Karen Broughton

*Attorneys for Joby Aero, Inc.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SANTA CRUZ

Joby Aero, Inc.,

                    Plaintiff,

        v.

Archer Aviation Inc., and
George Kivork,

                    Defendants.

CASE NO: _____25CV03722_____

**COMPLAINT**
1. **BREACH OF CONTRACT**
2. **INDUCEMENT OF BREACH OF CONTRACT**
3. **MISAPPROPRIATION OF TRADE SECRETS**
4. **VIOLATION OF CAL. PEN. CODE § 502**
5. **BREACH OF FIDUCIARY DUTY**
6. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
7. **BREACH OF DUTY OF LOYALTY**
8. **AIDING AND ABETTING BREACH OF DUTY OF LOYALTY**
9. **INTERFERENCE WITH CONTRACT**
10. **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
11. **VIOLATION OF B&PC § 17200**

**DEMAND FOR JURY TRIAL**

COMPLAINT

Plaintiff Joby Aero, Inc. ("Joby") hereby brings this complaint for misappropriation of trade secrets pursuant to 18 U.S.C. § 1836, tortious interference with contract, and tortious interference with prospective economic advantage against Defendant Archer Aviation Inc. ("Archer") and Defendant George Kivork ("Kivork"); breach of contract, violation of California Penal Code § 502, breach of fiduciary duty, and breach of duty of loyalty against Kivork; and inducement of breach of contract, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty, and unfair competition pursuant to California Business and Professions Code § 17200 *et seq*. against Archer.

**INTRODUCTION**

1.      In summer 2025, Archer recruited George Kivork, Joby's then U.S. State and Local Policy Lead.  By virtue of his position with Joby, Kivork had access to confidential and proprietary information regarding Joby's strategic partnerships, regulatory strategies, technical information, and communications with stakeholders, among other sensitive information that would be valuable for a competitor.  As a competitor operating in the same field as Joby, Archer knew that Kivork had access to exactly that kind of information.  Two days before announcing his resignation, Kivork exfiltrated a cache of highly valuable Joby files containing confidential partnership terms, business and regulatory strategies, infrastructure strategies for vertiports and airport access, and technical information about Joby's aircraft and operations.  Less than three weeks later, an external strategic partner to Joby reported that Archer had approached them with detailed knowledge about the confidential terms of that partner's exclusive agreement with Joby—information known to Kivork and contained in the files he stole.  Archer brazenly used that stolen information to interfere with Joby's exclusive strategic partnership.  Significant amounts of other Joby confidential information remain at risk in Kivork and/or Archer's possession.  This is corporate espionage, planned and premeditated.  Kivork and Archer's behavior has left Joby with no choice but to bring this action to protect Joby's valuable confidential and proprietary information.  The eVTOL sector is an emerging one with significant potential for the field and the world.  It is imperative that the innovative work done by Joby in this field—representing billions of dollars and innumerable man hours over the course of nearly two decades—is protected from this type of espionage to allow the sector to thrive.

2.    Joby was founded in 2009 with seven engineers working together in the mountains above Santa Cruz to pioneer electric vertical takeoff and landing ("eVTOL") aircraft technology. The goal was to develop aircraft powered entirely by electricity that would take off vertically like a helicopter, but much quieter, and transition to flying like a traditional airplane.  In 2012, NASA selected Joby to collaborate on groundbreaking electric flight projects, providing crucial government validation and technical resources.  By 2015, Joby was flying subscale prototypes.  Joby progressed to flying full-scale unmanned prototypes in 2017, and created a working production prototype in 2019.  In 2020, Joby became the first eVTOL company to sign a certification basis agreement with the FAA—the foundational agreement defining the safety standards that would apply to its aircraft—and to receive airworthiness approval from the U.S. Air Force as part of the Agility Prime program.  The following year, Joby became a publicly traded company on the NYSE through a merger with a special purpose acquisition company.  In February 2024, Joby became the first eVTOL company to complete Stage 3 of the FAA's five-stage type certification process, cementing its leadership in the field.  Indeed, Joby is currently the first eVTOL company to enter the final stage of the certification process, with Joby's TIA-ready aircraft now beginning power-on testing.  By November 2025, Joby had completed more than 50,000 miles of test flights across multiple aircraft, including demonstration flights in New York City, Japan, Korea, and the United Arab Emirates.

3.    Over the last sixteen years, Joby has developed valuable technical expertise related to the manufacture and operation of eVTOL aircraft, as well as commercial and regulatory strategies, critical infrastructure strategies for vertiports and airport access, and deals with strategic partners that reflect years of refinement and participation in the eVTOL market.  To protect its substantial investments in its business relationships and intellectual property, Joby employs robust security measures, including confidentiality agreements with Joby employees and non-disclosure agreements with partners.

4.    Arriving nine years after Joby entered the eVTOL market, Archer was founded in October 2018 by two individuals with no background in aviation.  The company built its initial team

by hiring engineers from other companies—and previously became embroiled in litigation involving trade secret misappropriation as a result.

5.      On July 20, 2025, Kivork informed Joby that he was leaving for a position at Archer. To provide for a "cooling off period" between competing companies, Joby set Kivork's last working day at Joby as July 22, 2025, although he remained employed by Joby until August 3, 2025.

6.      On August 5, 2025, Joby received a troubling communication from one of its strategic partners, a major real estate developer (the "Developer").  Months after Joby and the Developer had executed a binding agreement, which included an exclusivity provision, Archer reached out to the Developer and proposed a deal.  But Archer had not made the approach with a blank slate.  In an email sent to Joby, the Developer stated that Archer knew, not just about the existence of Joby's confidential strategic partnership with the Developer, but also specific—and highly confidential—terms of the Developer's agreement with Joby.  Indeed, Archer's proposed deal was specifically calibrated to undercut Joby's agreement with the Developer.  This led the Developer to tell Joby that the disclosure of those highly confidential terms must have been made by Kivork, with whom the Developer had worked while he was at Joby.

7.      Alarmed by this interference with Joby's business relationship with the Developer and the improper disclosure and use of its confidential information, Joby hired an outside vendor to conduct a forensic investigation of Kivork's now-deactivated Joby accounts and Joby-issued laptop. The results of that investigation were disturbing.  Two days before Kivork announced his resignation from Joby, Kivork downloaded dozens of files from Joby's systems.  That same day, Kivork also sent additional files to one of his personal email accounts.

8.      In addition to information about Joby's agreement with the Developer, the files Kivork stole also contained highly valuable trade secret information about Joby's aircraft and operations, business and regulatory strategy, infrastructure strategy, and site analysis for potential vertiports and airport access.  Kivork had no legitimate business purpose to download those files, much less email them to a personal account—particularly because Kivork doubtlessly knew he would be resigning just two days later.

-4-

COMPLAINT

9. Nor was Kivork's misbehavior limited to downloading files or sending files to his personal email account. Joby's investigation separately determined that Kivork had changed the security permissions for hundreds of files within Joby's systems to recognize another of Kivork's personal email accounts—which Joby did not control—as an additional "owner" of those files. That change allowed Kivork to use the login credentials for his personal email account to continue accessing Joby confidential and proprietary files at a later date, without Joby's permission or knowledge. It was also a violation of Joby's employee confidentiality policies.

10. On August 11, 2025, Joby demanded that Kivork and Archer immediately cease using and return Joby's trade secret and other proprietary information. Responding through his attorney, Kivork obfuscated and repeatedly refused Joby's demands to return the stolen files. Meanwhile, Archer denied any wrongdoing and claimed to have performed a forensic investigation of Kivork's devices. But Archer also repeatedly refused to provide Joby with the results of that "investigation" and has provided no explanation for how it learned of the existence of the agreement with the Developer, or terms of that agreement, which were confidential.

11. For the sake of the success of the burgeoning eVTOL industry, and to ensure fair competition, Joby now brings this action to stop any further disclosures of trade secret and other proprietary information likely to irreparably damage Joby and remedy the damage that Archer and Kivork have already caused.

## **PARTIES**

12. Plaintiff Joby Aero, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business located at 333 Encinal Street, Santa Cruz, California 95060.

13. Defendant George Kivork is an individual residing in Burbank, California.

14. Defendant Archer Aviation Inc. is a corporation organized and existing under the laws of the State of Delaware. Archer's quarterly filing with the SEC for the period ending September 30, 2025 lists its principal place of business as 190 West Tasman Drive, San Jose, California 95134.

COMPLAINT

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction over the subject matter of this action pursuant to Article VI, Section 10 of the California Constitution and California Code of Civil Procedure § 410.10, because this action asserts claims arising under the laws of the State of California, as well as claims arising under federal law that are not within the exclusive jurisdiction of any other court or tribunal.

16.     This Court has personal jurisdiction over Kivork pursuant to California Code of Civil Procedure § 410.10 because his unlawful acts giving rise to the causes of the action brought in this Complaint occurred in Santa Cruz, California.  Furthermore, pursuant to the forum selection clause in Kivork's Employment Agreement, Kivork has consented to be sued within the courts of the state of California located in Santa Cruz in connection with any dispute related to his employment with Joby.

17.     This Court has personal jurisdiction over Archer pursuant to California Code of Civil Procedure § 410.10 because Archer's principal office is located in San Jose, California, as indicated in Archer's filings with the California Secretary of State.  Additionally, Archer has intentionally interfered with Joby's contracts, among other things, and thus has directed its unlawful conduct towards California.

18.     Venue is proper in this Court pursuant to California Code of Civil Procedure § 395 as to the claims against Kivork because the parties agreed to litigate this dispute in the courts of the State of California located in Santa Cruz County.  Further, the Proprietary Information and Inventions Agreement ("PIIA") entered into by Kivork and Joby was executed within Santa Cruz County and contemplated performance within Santa Cruz County, the location of Joby's principal place of business.

19.     Venue is proper in this Court pursuant to California Code of Civil Procedure § 395.5 as to the claims against Archer, including because the PIIA and the Agreement entered into by Joby and the Developer were executed within Santa Cruz County and contemplated performance in part within Santa Cruz County.  Thus, Archer's liability for interference with these contracts arose in Santa Cruz County.

COMPLAINT

**FACTS COMMON TO ALL CLAIMS**

20.     Joby is a leader in the race to develop eVTOL aircraft.  Founded in 2009, Joby has already logged approximately 50,000 flight miles with its full-scale prototype aircraft.  Joby employs over two thousand engineers and other professionals in its offices and workshops in Santa Cruz and San Carlos, California, Washington, D.C., and Munich, Germany.  Joby is also developing a world-class manufacturing facility in Marina, California.

**The eVTOL Market**

21.     eVTOL aircraft use electric power to take off and land vertically, hover in place, and fly horizontally.  Developments in battery technology and electric propulsion have launched a race to create and commercialize eVTOL air taxis, which will provide travelers with a quieter, cleaner, and faster option for short-hop urban commutes.  In 2021, Morgan Stanley estimated that the total global addressable market for urban air mobility could be conservatively valued at $1 trillion dollars by 2040 and $9 trillion dollars by 2050.  As a leader in developing eVTOL aircraft, Joby is positioned to enjoy a significant share of the emerging market for urban air mobility, while providing consumers with a more efficient and environmentally friendly commuting option than currently exists.

**Joby's Substantial Efforts and Investments in Developing Proprietary Information**

22.     Joby has spent over sixteen years developing its eVTOL aircraft.  In that time, Joby has invested countless hours of research, labor, and flight testing and made significant investments in research and development, regulatory and business strategy, and building relationships with strategic business partners—including negotiating and executing exclusive contractual relationships like the one at issue in this lawsuit.  Through substantial effort, Joby has developed a host of valuable confidential intellectual property.

23.     For example, and directly relevant here, in 2022, Joby first began cultivating the contractual relationship with the Developer, which Archer then interfered with in 2025.  In 2022, Joby began reaching out to the Developer to discuss both (i) Joby's potential use of existing facilities, and (ii) the possibility of developing vertiports at those facilities, or elsewhere in the area. Access to the Developer's properties would be extremely valuable to any eVTOL company, because

COMPLAINT

of both the locations of the Developer's properties and the Developer's substantial and continuing infrastructure investments.  For a period of approximately eighteen months, through the end of 2024, Joby made significant efforts to build a strategic partnership with the Developer, including regular meetings between their respective employees.

24.    After months of negotiations, Joby and the Developer executed an agreement dated March 12, 2025 involving an exclusive strategic partnership (the "Agreement").  The Agreement contained the key economic terms for the parties' planned projects, and granted Joby the exclusive right to design, build, and operate skydecks at certain of the Developer's properties.

25.    The Agreement's exclusivity term provided that Joby and the Developer shall work together exclusively for 18 months to negotiate a more comprehensive partnership agreement.  It further stated that, during the exclusivity period, the Developer shall not enter into any similar agreements or arrangements with other participants in the eVTOL market without Joby's consent.  And, for the avoidance of doubt, the Agreement also states that the exclusivity term constitutes a legally binding agreement between the Developer and Joby.

26.    Critically, the Agreement, including all of its provisions, was kept confidential.  This confidentiality was intentional and economically beneficial to Joby, including because it kept the exact terms of Joby's hard-won exclusive deal from the prying eyes of competitors who may have otherwise attempted to undercut Joby.  The Agreement's terms are thus valuable, proprietary information.

27.    And, while the Agreement is (and remains) highly valuable, there is a vast amount of additional, valuable Joby intellectual property, stolen by Kivork, that is at risk of misuse by Kivork and Archer, as explained below.

**Kivork's Employment at Joby and Access to Joby Information**

28.    Kivork held the position of Joby's U.S. State and Local Policy Lead for nearly four years, before leaving for Archer in the summer of 2025.

29.    In this senior position, Kivork's core responsibilities included exercising discretion in representing Joby in discussions with local, state, and federal government officials, as well as with high-level executive employees working for strategic business partners and other key

-8-

COMPLAINT

stakeholders.  Kivork was also responsible for advising Joby's leadership on regulatory strategy, which is critical to a company's success in the eVTOL market.

30.    Because of the importance and prominence of Kivork's position, as well as the trust Joby placed in him, Kivork was given access to highly sensitive and valuable Joby information.

31.    Like other Joby employees, Kivork was required to sign an Employment Agreement, along with a Proprietary Information and Inventions Agreement ("PIIA"), as a condition of his employment.  He signed both agreements on August 19, 2021, and began his employment on September 16, 2021.

32.    Kivork's PIIA provides in pertinent part: "I agree that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I develop, learn or obtain during the term of my employment that relate to [Joby] or the business or demonstrably anticipated business of [Joby] or that are received by or for [Joby] in confidence, constitute 'Proprietary Information.'  I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information."  By signing the PIIA, Kivork further agreed that this obligation to hold Joby's information in confidence "shall continue in effect after termination or expiration of my employment, regardless of the reason or reasons for termination."

33.    The PIIA further obligated Kivork, "[u]pon termination of [his] employment," to "promptly return to [Joby] all items containing or embodying Proprietary Information (including all copies)."

34.    As a further protection for Joby's Proprietary Information, Kivork "agree[d] that during the term of [his] employment with [Joby] (whether or not during business hours), [he] will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of [Joby], and [he] will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of [Joby]."

35.    As part of his position at Joby, Kivork was involved in Joby's early negotiations with the Developer.  As one of Joby's representatives, Kivork was tasked with developing strategy for government affairs matters relevant to Joby's exclusive agreement with the Developer, including

site permitting.  As a result of his involvement, Kivork was given access to the terms of the exclusive deal.

**Kivork Steals Joby's Confidential Information and Leaves for Archer**

36.    On July 20, 2025, Kivork informed Joby that he intended to resign and had already accepted an offer of employment at Archer.

37.    In an effort to secure its confidential and proprietary information, including the trade secrets at issue in this litigation, Joby set Kivork's last working day as July 22, 2025, and shut off Kivork's access to company email and other computer systems the following morning.  However, Kivork's employment with Joby did not end until August 3, 2025.  The gap between July 22 and August 3 was intended to create a "cooling off period," wherein Kivork would still be available if needed, while minimizing the risk to Joby's confidential information and intellectual property.

38.    On July 22, Joby conducted an exit interview with Kivork.  Joby reminded Kivork of his continuing confidentiality obligations.  Kivork's "offboarding packet" from Joby included written reminders of his contractual obligations to the company that continue after his employment ends.  Kivork was also provided with a "Proprietary Information and Continuing Obligations" letter that stated: "Under applicable law and under the terms of the Proprietary Information and Inventions Agreement, dated 08/13/2021, with [Joby], you are required to keep all Proprietary Information confidential and not to use it to the detriment of [Joby].  In particular, you may not use it for, or disclose it to your new employer that is, or may[]be, a competitor to [Joby]."

39.    The Proprietary Information and Continuing Obligations letter specifically identified "contract terms" and "commercial relationships," as well as "engineering and design data and specifications," as among Joby's "highly sensitive and confidential technical and business information" that Kivork was prohibited from disclosing or taking with him from the company.  The letter further stated: "By signing this letter below, you confirm that you have not taken such items."

40.    Kivork countersigned the Proprietary Information and Continuing Obligations letter on July 22, 2025.  Kivork's signature appears directly below an Acknowledgement that reads: "I confirm that I have not taken any documents, records, information, software, or any other property

COMPLAINT

of [Joby]. I also confirm that I will not disclose or use any [Joby] Proprietary Information for any purpose, whatsoever."

41. Unbeknownst to Joby, on July 18, 2025, a Friday evening, and two days before informing Joby that he intended to resign, Kivork secretly downloaded dozens of Joby's files from Joby's electronic Microsoft SharePoint ("SharePoint") repository.

42. Among the files Kivork downloaded from SharePoint are high-value documents containing Joby's confidential and proprietary information. In his final days at the company, there was no legitimate business purpose for which Kivork would have needed any of these documents.

43. Kivork's eleventh-hour SharePoint batch download included a file titled "20250116 – [Developer] - Strategic Partnership Counter Proposal" that contained details of the negotiation between Joby and the Developer, as well as the deal terms.

44. Kivork also downloaded other files related directly to Joby's strategic partnership with the Developer, including technical analyses of the projected impact of Joby aircraft operations on the Developer's properties and an internal Joby business and regulatory strategy document related to aircraft operational acoustics at the Developer's properties. Each of these files included a notation that the information it contained was either confidential or proprietary.

45. Other files Kivork exfiltrated reflect highly confidential technical specifications, analysis, and know-how developed by Joby, commercial strategy development, regulatory strategies, and infrastructure strategy for vertiports and airport access, as well as information about joint activities with high-value Joby partners. The information contained in these files is the product of considerable investments of financial and human resources by Joby and reflect years of effort and research.

46. Kivork's exfiltration of Joby's confidential information on July 18, 2025, was not limited to the SharePoint downloads. Along with those downloads, Kivork emailed other confidential Joby files to his personal email account. The files Kivork sent to himself—outside of Joby's networks—included confidential and proprietary site analysis for potential vertiports and airport access, high-level land use development strategy, and high-level commercial launch strategies for sites in California.

-11-

COMPLAINT

47. Along with containing confidential and proprietary information, many of the files that Kivork sent outside the company to his personal email account contain Joby information that is attorney-client privileged or otherwise protected attorney work product.

48. Like any company in a nascent technology sector, Joby enjoys a competitive advantage from maintaining the confidentiality of its technological advancements, commercial and regulatory strategies, infrastructure plans, and deal structures and terms. The information stolen by Kivork thus represents a treasure chest of competitive secrets: a competitor would save significant resources, including time and employee hours, by improperly obtaining and using Joby's confidential information to develop an eVTOL business. And it is an unquestionable advantage for a competitor to know Joby's deal terms when that competitor seeks to interfere with Joby's existing and prospective partnerships.

49. In addition to his theft of Joby's proprietary information via downloads and emails to external accounts, Kivork also altered the security settings for hundreds of Joby files in a manner that could have allowed Kivork to access those files after leaving Joby.

50. Joby maintains a Google Drive ("Drive") repository that is separate from the SharePoint repository discussed above. Joby configured its Drive security settings such that Joby employees can only access information stored on Drive by using their single sign on ("SSO") credentials (which include a username and password) as discussed below. When an employee leaves Joby, their SSO credentials are disabled, and they can no longer access information stored on Drive.

51. On occasion, Joby also uses Drive to securely share files with third parties, such as contractors or vendors who are subject to nondisclosure agreements. To share a file with a third party, Joby will change the security settings on that particular file to allow the third party to access the file using the third party's own login credentials. This is referred to as adding the third party as an "owner" of the shared document.

52. Before he left Joby, Kivork added his own personal email account as an "owner" to hundreds of files stored on Drive. Kivork did this without Joby's knowledge or permission, and in contravention of Joby's employee confidentiality policies. By adding his personal email account as

COMPLAINT

an owner, Kivork could have used his personal email login to access those files, allowing him to circumvent Joby's security measures after he left Joby's employ.

53. Importantly, as an owner of those files on Drive, Kivork—through his personal email account—would have had access to new information developed by Joby and added to those files, even *after* Kivork left Joby. Thus, by adding his personal email account as an owner to the files, Kivork gave himself a method to learn new information developed by Joby that did not exist at the time Kivork left Joby.

54. On information and belief, Kivork added his personal email account as the owner to hundreds of files stored on Drive for the benefit of both himself and Archer. To the extent Kivork used information in those files to advance his career at Archer, that would benefit Kivork. And, Archer would similarly benefit from Kivork using a competitor's information in his work for Archer. On information and belief, by adding his email address as an owner to those files, Kivork was preparing to compete with Joby in the marketplace in an illicit manner, and Kivork did so in concert with Archer.

**Joby Employs Significant Security Measures to Protect Its Proprietary Information**

55. Joby employs extensive information technology ("IT") security measures, physical security measures, and legal precautions, to protect its valuable proprietary information. Kivork was only able to steal Joby's information by abusing his position as a trusted Joby employee to overcome those measures.

56. **Information Technology Security.** Joby secures its confidential and proprietary information with IT security infrastructure and best practices. Among Joby's IT policies and practices:

a. Joby limits access to its systems to Joby employees, who must use a single sign on ("SSO") system to access applications and files. Administered by Joby through the Microsoft identity management platform Entra, the SSO process uses Microsoft Authenticator for two-factor authentication; only Joby employees are provided with the QR code needed to link the authentication application to a Joby account.

-13-

COMPLAINT

b.      Joby does not automatically grant every employee permission to access all systems and files.  Instead, access is provided based on an employee's role at the company.

c.      Joby's corporate documents are stored using a SharePoint document repository.  Employees cannot access SharePoint without secure log-in credentials managed by Joby's information technology security team ("IT Security").

d.      Joby corporate email can be accessed only with an SSO and two-factor authentication, including through mobile email applications.

e.      Access to Joby's servers generally requires a user to either be present in Joby's offices, or to connect to Joby's virtual private network ("VPN").  Access to the Joby VPN requires use of Joby SSO and two-factor authentication.  The VPN logs the user's activity and the device being used.

57.      **Security Measures at Joby Facilities.**  Joby has implemented a range of physical security measures at both Joby offices and production facilities.  For example, Joby employees are required to wear unique identification badges while present in a Joby facility.  Access to sensitive locations within Joby's facilities is controlled by these employee badges, which must be swiped on a badge-reader to gain access.  And Joby does not provide universal access to all parts of its facilities to all employees, but instead grants access to physical spaces based on an employee's role at the company.  In addition, Joby uses closed circuit cameras to monitor its facilities and facility access, with a high concentration of cameras in and around production facilities.

58.      **Confidentiality Agreements.**  Joby requires all employees to sign a "Proprietary Information and Inventions Agreement," which requires Joby employees to maintain the confidentiality of Joby's confidential information and intellectual property, and to the extent allowed by law, to assign Joby all intellectual property developed in the course of employment, as a condition of employment.  Joby also requires departing employees to participate in an "exit interview," and to certify during that interview that they have returned all of Joby's confidential information, as required by the Proprietary Information and Inventions Agreement.

-14-

COMPLAINT

**Archer Misappropriates Joby's Information Through Kivork**

59.    In late July and into early August, of 2025, Joby and the Developer were preparing to publicly announce the Agreement.  This resulted in a flurry of activity including regular, daily communications between Joby's head of strategic partnerships and his counterpart at the Developer as both parties prepared a public relations package.  But that changed during the last few days of Kivork's employment when the Developer's representatives suddenly went silent.

60.    On August 5, 2025, the Developer reported to Joby that Archer had approached the Developer about a business relationship.  That timing of Archer's approach was highly suspicious: the Agreement had been negotiated months earlier, in March 2025, and was due to be publicly announced in just a few weeks.  The Developer also expressed concern because Archer's pitch indicated that Archer knew not only of the existence of the Agreement, but also the key terms from the Agreement—even though the Agreement's terms were confidential.  As for where Archer learned the information about the deal, the Developer did not mince words: "presumably . . . former employee George [Kivork]."

61.    Moreover, the Developer stated, in no uncertain terms, that Archer had offered a more lucrative deal.  On information and belief, Archer was only able to offer a more lucrative deal because Archer, acting through Kivork, gained illicit knowledge of the Agreement's terms and leveraged those terms in its own negotiations with the Developer.  Had Archer competed fairly, it would have had to spend months negotiating with the Developer to build an agreement from scratch, just as Joby did.  And during those negotiations, Archer would have had no guarantees that its offers would be more lucrative than Joby's.  By exploiting Kivork's theft, Archer was able to skip over the negotiations and unfairly guarantee that its offer would beat Joby's.

62.    On August 21, 2025, the Developer purported to exercise its right to terminate the Agreement effective immediately, because the Developer claimed that the disclosure attributed to Kivork was a breach of the Agreement's confidentiality provision.  The Developer reiterated that "the leak of information about our discussions and [Agreement]" was "by Joby's employee."

63.    When Joby quickly acted to demand that Kivork and Archer cease using and return Joby's proprietary information, Kivork and Archer refused to cooperate.  Kivork first falsely

-15-

claimed that he had not accessed or retained Joby confidential files. Yet he then promised he would delete any Joby confidential information in his possession—without explaining how he would be able to delete files he claimed not to have in the first instance. In response to Kivork's threat to delete valuable evidence, Joby repeatedly reminded Kivork of his obligation to return any confidential information to Joby—and that deleting the files would be a breach of that obligation, as well as his preservation obligations. Despite that reminder, and ignoring Joby's demand that he return the stolen files, on November 12, 2025, Kivork provided a list of Joby files he intended to delete. But the list was obviously incomplete: at a minimum, it omitted Kivork's downloads from SharePoint. Given Kivork's lack of candor and refusal to return Joby's files, Joby has every reason to believe that Kivork intends to continue his illicit use of Joby's proprietary information.

64. In response to Joby's request that Archer help Joby resolve the concerning theft of confidential information by Archer's employee Kivork, Archer stonewalled. While claiming to have exonerated itself through an investigation, Archer refused to provide Joby with any information about its purported investigation. Additionally, Archer has not provided any explanation as to how it learned of the existence and terms of the Agreement.

65. On information and belief, Archer used the information it improperly obtained from its recently recruited employee Kivork for its own benefit in complete disregard of Joby's contractual agreements with Kivork and the Developer, as well as Joby's intellectual property rights, by offering the Developer a deal with Archer on more favorable terms.

66. Kivork stole dozens of files containing Joby's valuable, confidential, and proprietary information. In response to Joby's requests to return the files, Kivork not only refused, but also dissembled by omitting the full scope of his downloads while purporting to "come clean." And at least one of the files Kivork stole—which substantially contained the terms of the Agreement—has already been used for the benefit of Archer, Kivork's new employer. Joby has every reason to fear that Kivork and Archer's misappropriation of Joby's trade secrets and improper use and disclosure of confidential information will continue. Joby is thus forced to bring this lawsuit, including for the sake of the nascent eVTOL industry, to enjoin Kivork and Archer from improperly using Joby's intellectual property, and further ordering its return to Joby.

-16-

COMPLAINT

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against Kivork)

67. Joby hereby incorporates paragraphs 1 through 66 as though fully set forth herein.

68. As a condition of his employment at Joby, Kivork entered into a valid and enforceable PIIA, in the form of Exhibit A, attached hereto. These obligations were periodically reinforced by Joby throughout Kivork's employment.

69. The PIIA obligated Kivork to hold in confidence and not disclose or use any of Joby's Proprietary Information, which the PIIA defined to include "all business, technical and financial information" that Kivork developed, learned, or obtained during his employment that related to Joby or its business, including "contract terms" and "commercial relationships."

70. The PIIA expressly provided that these obligations "shall continue in effect after termination or expiration of [his] employment, regardless of the reason or reasons for termination."

71. The PIIA further obligated Kivork to "promptly return to [Joby] all items containing or embodying Proprietary Information (including all copies)" upon termination of his employment.

72. By signing the PIIA, Kivork further promised that "during the term of [his] employment with [Joby]" he would "not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of [Joby], and [he would] not assist any other person or organization in competing or preparing to compete with any business or demonstrably anticipated business of [Joby.]"

73. On July 22, 2025, in connection with his departure from Joby, Kivork signed a letter acknowledging these obligations and falsely certifying: "I confirm that I have not taken any documents, records, information, software, or any other property of the Company. I also confirm that I will not disclose or use any [Joby] Proprietary Information for any purpose, whatsoever."

74. Joby performed all its obligations under the PIIA.

75. Kivork breached the PIIA by failing to return Joby's confidential and proprietary information, including the files he downloaded and emailed to his personal email account on July 18, 2025; by disclosing Joby's confidential information to Archer, a direct competitor of Joby, or

-17-

COMPLAINT

its consultants without legal justification or excuse; by using Joby's confidential information for purposes outside his Joby employment and for the benefit of Archer; by falsely certifying that he had not taken any Joby documents; and by refusing Joby's demand that he return the exfiltrated and retained files even after these issues came to light.

76.     Kivork further breached the PIIA by adding his personal email address as an owner to hundreds of documents stored on Drive, which he did while still employed by Joby.  By adding his personal email address as an owner to certain documents stored on Drive, Kivork would be able to access those documents even after leaving Joby's employ.  Additionally, and on information and belief, Kivork added his personal email address as an owner to those documents so that he could assist his future employer—Archer—in competing against Joby.  Accordingly, Kivork further breached his obligation not to "assist any other person or organization in competing or preparing to compete with any business or demonstrably anticipated business of [Joby.]"

77.     As a direct and proximate result of Kivork's breaches, Joby has been damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Inducement of Breach of Contract

### (Against Archer)

78.     Joby hereby incorporates paragraphs 1 through 66, as well as paragraphs 67 through 77, as though fully set forth herein.

79.     Archer knew or should have known of the standard practice of employee confidentiality agreements in the eVTOL industry and the ongoing confidentiality obligations to Joby to which Kivork was subject upon his hiring by Archer.

80.     Kivork improperly exfiltrated and retained files containing trade secret and confidential information after his employment with Joby was terminated, and Archer knew, or at a minimum had reason to know, that Kivork had improperly retained those files from his employment at Joby.

81.     On information and belief, Archer intended to induce and did induce Kivork to breach the PIIA and other confidentiality obligations by encouraging or directing him to use Joby's

confidential information to pursue the Developer, or, in the alternative, by encouraging or directing him to disclose Joby's confidential information to Archer so that Archer could pursue the Developer; by accepting and using information Archer knew or should have known was obtained in breach of the PIIA; by failing to instruct Kivork to return Joby's information; and by using Joby's confidential information about the Agreement to interfere with Joby's relationship with the Developer for Archer's own pecuniary gain.

82.    As evidenced by the Developer's communications to Joby, Archer contacted the Developer with knowledge of the Agreement's existence and key terms.

83.    On information and belief, Kivork would not have breached his confidentiality obligations absent Archer's inducement.

84.    On information and belief, the Developer would not have purported to terminate the Agreement absent Kivork's breach of his confidentiality obligations.

85.    Additionally, on information and belief, Archer induced Kivork to breach the PIIA and other confidentiality obligations by adding his personal email address as an owner to hundreds of documents stored on Drive, which Kivork did while still employed by Joby.  By adding his personal email address as an owner to certain documents stored on Drive, Kivork would be able to access those documents even after leaving Joby's employ.  On information and belief, Kivork added his personal email address as an owner to those documents so that he could assist his future employer—Archer—in competing against Joby.  On information and belief, Archer induced Kivork to add his personal email address as an owner to those documents for Archer's benefit, and in violation of the Kivork's obligation not to "assist any other person or organization in competing or preparing to compete with any business or demonstrably anticipated business of [Joby]" under the PIIA.

86.    Archer's conduct was a substantial factor in causing Joby's harm.

87.    As a direct and proximate result of Archer's actions, Joby has been damaged in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***

**(Against Kivork and Archer)**

88.    Joby hereby incorporates paragraphs 1 through 66 as though fully set forth herein.

89.    The information Kivork and Archer misappropriated constitutes protectable trade secrets owned by Joby, as defined by 18 U.S.C. § 1839.  Kivork and Archer have misappropriated at least the following trade secrets from Joby: technical specifications and analysis related to eVTOL aircraft and operations, commercial and regulatory strategy, infrastructure strategy, and business deal structures and specific terms for Joby strategic partnerships, including relating to the Agreement.

90.    On information and belief, Kivork's and Archer's misappropriation of Joby's trade secrets goes well beyond the specific examples of trade secrets identified here, as will be demonstrated after Joby receives discovery in this litigation.

91.    Joby has taken reasonable measures to protect the confidentiality of its trade secrets, including through the measures alleged above.  Joby does not and did not consent to the acquisition, use, or disclosure of any of its trade secrets by anyone other than authorized personnel using them within the scope of their duties for Joby.

92.    Joby's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosures or use of the information, including Joby's competitors in the eVTOL industry.

93.    Kivork and Archer misappropriated Joby's trade secrets using the improper and unlawful actions alleged herein.  Kivork's and Archer's misappropriation includes use of Joby's trade secrets to interfere with Joby's exclusive contract with a strategic partner.  Kivork and Archer used and otherwise disclosed the trade secret information knowing or having reason to know that knowledge of the trade secret was acquired through improper means or in breach of a duty to maintain secrecy.

-20-

COMPLAINT

94.     Kivork's and Archer's misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Kivork and Archer have attempted, and continue to attempt, to conceal their misappropriation and to obstruct Joby's efforts to remedy the misappropriation.

95.     On information and belief, if Kivork and Archer are not enjoined, they will continue to misappropriate and use Joby's trade secret information for their own benefit and to Joby's detriment, and may disseminate Joby's trade secrets to other third parties who have no right to access or use Joby's trade secrets.

96.     As a direct and proximate result of Kivork and Archer's conduct, Joby has suffered and, if Kivork's and Archer's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Joby's remedy at law is inadequate, Joby seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests.  Joby's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

### FOURTH CAUSE OF ACTION

**Violation of California Penal Code § 502**

(Against Kivork)

97.     Joby hereby incorporates paragraphs 1 through 66 as though fully set forth herein.

98.     The Google Drive ("Drive") repository maintained by Joby is made up of a system of devices that manage electronic data stored by Joby.  Drive manages who is allowed to access that data, and limits access to designated individuals (referred to as "owners") who are identified by their login credentials.  Drive also operates as a network, because it allows Joby employees to communicate with each other by providing and altering information stored within Drive.  For example, one Joby employee may write a memo, save it to Drive, and then send a hyperlink to that memo to another Joby employee.

99.     Joby employees can only access information stored on Drive by using their SSO credentials, which include a username and password, and only after being added as "owners" of that information.

-21-

COMPLAINT

100.    Joby occasionally uses Drive to share information with third parties, such as vendors or contractors who are subject to nondisclosure agreements.  When Joby uses Drive to share information with a third party, Joby adds the third party as an "owner" for the shared information. The third party can then access the shared information using the third party's own login credentials.

101.    Joby's employee confidentiality policies strictly limit sharing information with third parties, and expressly preclude Joby employees from using personal email accounts to share information with themselves.

102.    In violation of Joby's policies for both (i) employee confidentiality and (ii) sharing information with third parties, Kivork added his own personal email address as an "owner" to hundreds of files stored on Drive.  Kivork had not received permission from Joby to add his personal email address as an owner of those files, and had no right to do so.  Moreover, by adding his personal email address as an owner to those files, Kivork would have been able to access those files even after he left Joby's employ in circumvention of Joby's security measures.

103.    By adding his personal email address as an owner to hundreds of files, Kivork altered the security settings on those files within Drive.  That same action also  altered Drive's ownership logs, which record the owners of the files stored on Drive.  Additionally, Kivork was required to complete a process involving multiple steps to add himself as an owner to those files, meaning that Kivork did so knowingly.

104.    Kivork's actions constitute a violation of California Penal Code § 502, the California Comprehensive Data Access and Fraud Act (the "CDAFA"), because Kivork altered both data (the files) and a computer system or network (Drive) in order to wrongfully control Joby information even after Kivork left Joby's employ.

105.    Joby was injured by Kivork's actions, including because it was required to expend resources investigating those actions and re-setting the security settings that Kivork had altered. Additionally, to the extent that Kivork's actions may have made Joby information less secure, Joby may have been further harmed.

## FIFTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Kivork)

106.    Joby hereby incorporates paragraphs 1 through 66 as though fully set forth herein.

107.    As U.S. State and Local Policy Lead, Kivork's core responsibilities include representing Joby to government officials, high-level executive employees for strategic business partners, and other key stakeholders.  In this senior role, Kivork was also responsible for advising Joby's leadership on regulatory strategy, which is critical to a company's success in the eVTOL market.  Because of this position of trust and responsibility, which included the exercise of discretion, Kivork had a fiduciary duty to act in the best interests of Joby and its shareholders.

108.    Based on this fiduciary duty, Kivork owed Joby duties of good faith and fair dealing, which required him to refrain from competing with Joby, from assisting Joby's competitors, from acquiring benefits from third parties through use of his position, and from using or communicating Joby's confidential information for his own purposes or those of third parties.

109.    As alleged herein, while still employed by Joby, Kivork downloaded and shared externally confidential Joby documents, including documents containing information about the provisions of the Agreement, with the intent to use them for Archer's benefit.

110.    Kivork breached his fiduciary duty by downloading, sharing externally, and retaining Joby's confidential information while employed, by using his position to obtain confidential information for Archer's benefit, by disclosing Joby's confidential information to Archer or its consultants while bound by his duty of loyalty, and by taking actions adverse to Joby's interests while employed, including helping Archer compete for the Developer's business in the eVTOL market.

111.    Kivork separately breached his fiduciary duty by adding his personal email address as an owner to hundreds of documents stored on Drive, an action Kivork took while still employed by Joby.  By adding his personal email address as an owner to certain documents stored on Drive, Kivork would be able to access those documents even after leaving Joby's employ.  On information and belief, Kivork added his personal email address as an owner to those documents so that he could

-23-

assist his future employer—Archer—in competing against Joby. Kivork thus acted in a manner that made Joby's information Kivork was entrusted with as a fiduciary, less secure, breaching Kivork's duties to Joby.

112. Kivork's breach was willful, deliberate, and in conscious disregard of Joby's rights.

113. As a direct and proximate result of Kivork's breach of fiduciary duty, Joby has been damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Aiding & Abetting Breach of Fiduciary Duty

### (Against Archer)

114. Joby hereby incorporates paragraphs 1 through 66, as well as paragraphs 106 through 113, as though fully set forth herein.

115. As alleged herein, Kivork owed Joby fiduciary duties of good faith and fair dealing. Kivork's downloading, external sharing, disclosure, and use of Joby's confidential information for Archer's benefit, as well as his actions in adding his personal email address as an owner of documents saved in Joby's Drive repository, constituted breaches of those fiduciary duties.

116. On information and belief, Archer gave substantial assistance and encouragement to Kivork to breach his fiduciary duties to Joby, including by encouraging Kivork to exfiltrate and disclose confidential Joby information, by using the confidential information to pursue business with the Developer, and by encouraging Kivork to add his personal email address as an owner to documents stored in Joby's Drive repository.

117. On information and belief, Archer reached a conscious decision to participate in Kivork's tortious breach of fiduciary duty. On information and belief, Archer knew that Kivork's breach of fiduciary duty was for the purpose of wrongfully providing Archer with Joby's confidential information so that Archer could interfere with the Agreement and to obtain competitive advantage over Joby.

118. Archer's assistance and encouragement to Kivork to breach his fiduciary duties was willful, deliberate, and in conscious disregard of Joby's rights.

119.    Archer's conduct was a substantial factor in causing harm to Joby. As a direct and proximate result of Archer's aiding and abetting Kivork's breach of fiduciary duty, Joby has been damaged in an amount to be proven at trial. In addition, on information and belief, Archer has been unjustly enriched through its participation in Kivork's breach of fiduciary duty and should be required to disgorge all profits and forfeit any compensation derived from the breach.

### SEVENTH CAUSE OF ACTION

**Breach of Duty of Loyalty**

**(Against Kivork)**

120.    Joby hereby incorporates paragraphs 1 through 66 as though fully set forth herein.

121.    Prior to his resignation, Kivork was U.S. State and Local Policy Lead, with core responsibilities including representing Joby to government officials, high-level executive employees for strategic business partners, and other key stakeholders. In this role, Kivork was also responsible for advising Joby's leadership on regulatory strategy, which is critical to a company's success in the eVTOL market.

122.    As an employee and agent of Joby, Kivork owed Joby a duty of loyalty.

123.    While still employed at Joby, Kivork breached his duty of loyalty by downloading, sharing externally, and retaining Joby's confidential information, by using his position to obtain confidential information for Archer's benefit, by disclosing Joby's confidential information to Archer or its consultants, and by taking actions adverse to Joby's interests while employed, including helping Archer compete for the Developer's business in the eVTOL market.

124.    Kivork separately breached his duty of loyalty by adding his personal email address as an owner to hundreds of documents stored on Drive, an action Kivork took while still employed by Joby. By adding his personal email address as an owner to certain documents stored on Drive, Kivork would be able to access those documents even after leaving Joby's employ. On information and belief, Kivork added his personal email address as an owner to those documents so that he could assist his future employer—Archer—in competing against Joby. Kivork thus illicitly transferred his loyalty to Archer while he was still employed by Joby, and in the process Kivork breached his duty of loyalty to Joby.

125.    As a direct and proximate result of Kivork's breach of the duty of loyalty, Joby has been damaged in an amount to be proven at trial.

<strong><u>EIGHTH CAUSE OF ACTION</u></strong>

<strong>Aiding & Abetting Breach of Duty of Loyalty</strong>

<strong>(Against Archer)</strong>

126.    Joby hereby incorporates paragraphs 1 through 66, as well as paragraphs 120 through 125, as though fully set forth herein.

127.    As alleged herein, Kivork owed Joby a duty of loyalty.

128.    On information and belief, Archer knew that Kivork owed Joby duties of loyalty and that Kivork's downloading, external sharing, and disclosure of Joby's confidential information for Archer's benefit, as well as Kivork's actions in adding his personal email address as an owner to documents stored in Joby's Drive repository, constituted breaches of that duty of loyalty.

129.    On information and belief, Archer gave substantial assistance and encouragement to Kivork to breach his duty of loyalty by encouraging Kivork to obtain and disclose confidential Joby information that Archer knew Kivork was not authorized to disclose, by using that confidential information to pursue business with the Developer, and by encouraging Kivork to add his personal email address as an owner to hundreds of documents stored on Joby's Drive repository.

130.    On information and belief, Archer knew that Kivork was breaching his duty of loyalty owed to Joby.

131.    On information and belief, Archer's intention was to interfere with the Agreement and to obtain competitive advantage over Joby.

132.    Archer's assistance and encouragement to Kivork to breach his duty of loyalty was willful, deliberate, and in conscious disregard of Joby's rights.

133.    Archer's conduct was a substantial factor in causing harm to Joby.  As a direct and proximate result of Archer's aiding and abetting Kivork's breach of the duty of loyalty, Joby has been damaged in an amount to be proven at trial.  In addition, on information and belief, Archer has been unjustly enriched through its participation in Kivork's breach of the duty of loyalty and should be required to disgorge all profits and forfeit any compensation derived from the breach.

COMPLAINT

**NINTH CAUSE OF ACTION**

**Tortious Interference with Contract**

**(Against Kivork and Archer)**

134. Joby hereby incorporates paragraphs 1 through 66 as though fully set forth herein.

135. On March 12, 2025, Joby and the Developer entered into the Agreement, which is a valid and enforceable contract containing an exclusivity provision that expressly constituted a legally binding agreement.

136. On information and belief, Archer knew of the Agreement through information obtained from Kivork.

137. As alleged herein, Archer's conduct prevented performance of the Agreement, or made performance more expensive or difficult, including by using confidential information about Joby's strategic partnership with the Developer to offer the Developer more favorable terms, and attempting to negotiate a competing arrangement during the exclusivity period, thereby undermining the Developer's confidence in Joby.

138. In the alternative, even if Archer did not use confidential information about Joby's strategic partnership with the Developer to offer the Developer more favorable terms, it nonetheless interfered with Joby's contract by inducing the Developer to breach the contract's exclusivity term by negotiating with Archer.

139. On information and belief, Archer intended to disrupt performance of the Agreement or knew disruption was certain or substantially certain to occur.

140. Archer's interference with the Agreement was willful, deliberate, and in conscious disregard of Joby's rights.

141. Archer's conduct involved independently wrongful acts, including inducing Kivork to breach his contractual obligations, fiduciary duty, and duty of loyalty to Joby.

142. As evidenced by the Developer's communications with Joby and conduct, Archer's conduct resulted in disruption of Joby and the Developer's performance under the Agreement.

143. As a direct and proximate result, Joby has been damaged in an amount to be proven at trial.

COMPLAINT

**TENTH CAUSE OF ACTION**

**Tortious Interference with Prospective Economic Advantage**

**(Against Kivork and Archer)**

144.    Joby hereby incorporates paragraphs 1 through 66 as though fully set forth herein.

145.    Joby and the Developer were in an economic relationship that would have resulted in economic benefit to Joby through negotiation and execution of a comprehensive partnership agreement pursuant to the Agreement.  As alleged herein, the Agreement contained a binding exclusivity provision, and outlined the general structure of a comprehensive partnership agreement the parties were to negotiate, including financial and infrastructure resources that the Developer would provide to Joby.

146.    On information and belief, Archer knew of the Agreement and key terms of the Agreement through information obtained from Kivork.

147.    Kivork engaged in independently wrongful conduct by breaching his contractual obligations and fiduciary duty and duty of loyalty to Joby.

148.    On information and belief, Archer engaged in independently wrongful conduct by inducing Kivork to breach his contractual obligations and fiduciary duty and duty of loyalty, by knowingly using confidential information obtained through improper means to attempt to steal a strategic partner from Joby, and by attempting to interfere with the Agreement during the contractual exclusivity period.

149.    On information and belief, Archer intended to disrupt the relationship between Joby and the Developer, or knew disruption was certain or substantially certain to occur.

150.    Kivork's and Archer's interference with Joby's relationship with the Developer was willful, deliberate, and in conscious disregard of Joby's rights.

151.    As evidenced by the Developer's communications with Joby and conduct, Kivork's and Archer's conduct resulted in disruption of Joby and the Developer's performance under the Agreement.

152.    Archer's conduct was a substantial factor in causing Joby's harm.

COMPLAINT

153.    As a direct and proximate result, Joby has been damaged in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

### Unfair Competition Law

### (Against Archer)

154.    Joby hereby incorporates paragraphs 1 through 66, as well as 97 through 153, as though fully set forth herein.

155.    Archer has engaged in unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professions Code section 17200 *et seq*.

156.    Archer's conduct constitutes "unlawful" business practices because Archer has violated other laws, including inducing Kivork to breach his contractual obligations and his fiduciary duty and duty of loyalty, and tortiously interfering with Joby's contractual relationship and prospective economic advantage with the Developer.

157.    Archer's conduct constitutes "unfair" business practices because it violates public policy against inducing breaches of contract and fiduciary duty, is immoral, unethical, oppressive, and unscrupulous, causes harm to Joby that substantially outweighs any alleged benefits, and gave Archer an unfair competitive advantage through wrongful means.

158.    Archer engaged in these practices to obtain competitive advantage over Joby and secure business opportunities, including interfering with Joby's strategic partnership with the Developer.

159.    Joby has suffered injury in fact and has lost money and property as a result of Archer's unfair competition, including the value of the exclusive opportunity negotiated between Joby and the Developer, as well as expenses incurred in responding to Archer's wrongful conduct.

160.    Archer's violations are ongoing and continuing.  Unless enjoined, Archer will continue these practices, causing irreparable harm to Joby.

161.    Pursuant to California Business and Professions Code section 17203, Joby is entitled to equitable relief, including restitution and injunctive relief.

COMPLAINT

**PRAYER FOR RELIEF**

162.    Joby respectfully requests the following relief from the Court:

a.    That judgment be entered in favor of Joby and against Defendants, jointly and severally, on all of Joby's claims asserted in this Complaint;

b.    That the Court award to Joby such damages as may be proven at trial, and punitive, enhanced, and/or exemplary damages to the fullest extent available under applicable law, in accordance with each of the claims asserted in this Complaint;

c.    That the Court further award to Joby double the damages proven at trial on Joby's trade secret claims to the fullest extent available under applicable law, including under 18 U.S.C. § 1836(b)(3)(C);

d.    That the Court order disgorgement and restitution to the fullest extent available under applicable law;

e.    That the Court issue preliminary and permanent injunctions against Defendants ordering the return of Joby's confidential, proprietary, and trade secret information, requiring removal and/or destruction of any and all of Joby's confidential, proprietary, and trade secret information in the possession, custody or control of Defendants, and enjoining Defendants, their successors, officers, agents, and employees, and anyone acting in concert with or at their behest, from further breaching their agreements with Joby and/or further accessing or using this information in any way and from any further misappropriation of Joby's confidential, proprietary, and trade secret information;

f.    That the Court award to Joby attorneys' fees, costs and expenses incurred herein to the fullest extent available under applicable law, including under 18 U.S.C. § 1836(b)(3)(D) and Cal. Pen. Code § 502(e)(2);

g.    That the Court award to Joby pre-judgment and post-judgment interest at the maximum legal rate; and

h.    That the Court award to Joby such other and further relief as the Court deems just and proper.

COMPLAINT

## JURY DEMAND

163.    Pursuant to Cal. Code Civ. Proc. § 631, Joby hereby demands trial by jury of all issues properly triable thereby.

DATED: November 18, 2025

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By _____
Yury Kapgan
Alex Spiro
Patrick Schmidt
Sara Pollock
Michael F. LaFond

*Attorneys for Joby Aero, Inc.*

-31-

# Exhibit A

PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

The following confirms and memorializes an agreement that Joby Aero Inc, a Delaware corporation, (the "Company") and I, George Kivork, have had since the commencement of my employment (as used herein, "employment" and "employee" (i) refer to any form of working for the Company, including but not limited to, direct hire by the Company for full-time, part-time, consultancy or contract-based work, or indirect hire through a staffing agency or similar arrangement); and (ii) shall be deemed to include any relationship of service to the Company that I may have had prior to actually becoming an employee, as well as afterward) with the Company in any capacity and that is and has been a material part of the consideration for my employment by Company, and furthermore, for valuable consideration including the continued opportunity to work for the Company:

1. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement or my employment with the Company. I will not violate any agreement with or rights of any third party or, except as expressly authorized by Company in writing hereafter, use or disclose my own or any third party's confidential information or intellectual property when acting within the scope of my employment or otherwise on behalf of Company. Further, I have not retained anything containing any confidential information of a prior employer or other third party, whether or not created by me.

2. Company shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, sui generis database rights and all other intellectual property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by me during the term of my employment with Company to and only to the fullest extent allowed by California Labor Code Section 2870 (which is attached as Appendix A) (collectively "Inventions") and I will promptly disclose all Inventions to Company. Without disclosing any third party confidential information, I will also disclose anything I believe is excluded by Section 2870 so that the Company can make an independent assessment. I hereby make all assignments necessary to accomplish the foregoing. I shall further assist Company, at Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights specified to be so owned or assigned. I hereby irrevocably designate and appoint Company as my agent and attorney-in-fact, coupled with an interest and with full power of substitution, to act for and in my behalf to execute and file any document and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by me. If I wish to clarify that something created by me prior to my employment that relates to the Company's actual or proposed business is not within the scope of the foregoing assignment, I have listed it on Appendix B in a manner that does not violate any third party rights or disclose any confidential information. Without limiting Section 1 or Company's other rights and remedies, if, when acting within the scope of my employment or otherwise on behalf of Company, I use or (except pursuant to this Section 2) disclose my own or any third party's confidential information or intellectual property (or if any Invention cannot be fully made, used, reproduced, distributed and otherwise exploited without using or violating the foregoing), Company will have and I hereby grant Company a perpetual, irrevocable, worldwide royalty-free, non-exclusive, sub-licensable right and license to exploit and exercise all such confidential information and intellectual property rights.

3. To the extent allowed by law, paragraph 2 includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively "Moral Rights"). To the extent I retain any such Moral Rights under applicable law, I hereby ratify and consent to any action that may be taken with respect to such Moral Rights by or authorized by Company and agree not to assert any Moral Rights with respect thereto. I will confirm any such ratifications, consents and agreements from time to time as requested by the Company.

4. I agree that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I develop, learn or obtain during the term of my employment that relate to Company or the business or demonstrably anticipated business of Company or that are received by or for Company in confidence, constitute "Proprietary Information." I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information. However, I shall not be obligated under this paragraph with respect to information I can document is or becomes readily publicly available without restriction through no fault of mine. Upon termination of my employment, I will promptly return to Company all items containing or embodying Proprietary Information (including all copies), except that I may keep my personal copies of (i) my compensation records, (ii) materials distributed to shareholders generally and (iii) this Agreement. I also recognize and agree that I have no expectation of privacy with respect to Company's telecommunications, networking or information processing systems (including, without limitation, stored computer files, email messages and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice.

5. Until one year after the term of my employment, I will not encourage or solicit any employee or consultant of Company to leave Company for any reason (except for the bona fide firing of Company personnel within the scope of my employment).

6. I agree that during the term of my employment with Company (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Company, and I will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company.

7. I agree that this Agreement is not an employment contract for any particular term and that I have the right to resign and the Company has the right to terminate my employment at will, at any time, for any or no reason, with or without cause. In addition, this Agreement does not purport to set forth all of the terms and conditions of my employment, and, as an employee of Company, I have obligations to Company which are not set forth in this Agreement. However, the terms of this Agreement govern over any inconsistent terms and can only be changed by a subsequent written agreement signed by an authorized signatory of the Company.

8. I agree that my obligations under paragraphs 2, 3, 4 and 5 of this Agreement shall continue in effect after termination or expiration of my employment, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary on my part, and that Company is entitled to communicate my obligations under this Agreement to any future employer or potential employer of mine. My obligations under paragraphs 2, 3 and 4 also shall be binding upon my heirs, executors, assigns, and administrators and shall inure to the benefit of Company, its subsidiaries, successors and assigns.

9. Any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the State of California without regard to the conflict of laws provisions thereof. I further agree that if one or more provisions of this Agreement are held to be illegal or unenforceable under applicable California law, such illegal or unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms. This Agreement is fully assignable and transferable by Company, but any purported assignment or transfer by me is void. I also understand that any breach of this Agreement will cause irreparable harm to Company for which damages would not be an adequate remedy, and, therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond.

10. I acknowledge receipt of the following notice under 18 U.S.C § 1833(b)(1): "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal."

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY, IN DUPLICATE, WITH THE UNDERSTANDING THAT THE COMPANY WILL RETAIN ONE COUNTERPART AND THE OTHER COUNTERPART WILL BE RETAINED BY ME.

Effective: 9/16/2021

DocuSigned by:

*George Kivork*

C22DCFE519E64B9...
_____
Signature of Employee

George Kivork
_____
Name (Printed)

Accepted and Agreed to:
Joby Aero Inc

*JoeBe*

JoeBen Bevirt
CEO

APPENDIX  A

California Labor Code Section 2870.  Application of provision providing that the employee shall assign or offer to assign rights in invention to the employer.

A.  Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

>   (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

>   (2)  Result from any work performed by the employee for his employer.

B.  To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

APPENDIX B
PRIOR MATTER

# Exhibit C

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Archer Aviation Inc., and George Kivork,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Joby Aero, Inc.,

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Cruz
11/19/2025 1:06 PM
Clerk of the Court by Deputy,
Karen Broughton

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court of California,

Santa Cruz County, 701 Ocean Street, Santa Cruz, CA 95060

CASE NUMBER:
*(Número del Caso):*  25CV03722

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Yury Kapgan, Bar No. 218366, 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017, (213) 443-3000

| DATE: ~~November 18, 2025~~ | Clerk, by | , Deputy |
|---|---|---|
| *(Fecha)*    11/19/2025 | *(Secretario)* | *(Adjunto)* |

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100  [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
|---|---|---|

# Exhibit D

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Yury Kapgan, Bar No. 218366, 865 South Figueroa Street, 10th Floor,<br>Los Angeles, California 90017<br><br>TELEPHONE NO.: (213) 443-3000    FAX NO. : (213) 443-3100<br>EMAIL ADDRESS: yurykapgan@quinnemanuel.com<br>ATTORNEY FOR *(Name):* Plaintiff Joby Aero, Inc. | FOR COURT USE ONLY<br><br>ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Cruz<br>11/19/2025 1:06 PM<br>Clerk of the Court by Deputy,<br>Karen Broughton |
|---|---|

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CRUZ**
STREET ADDRESS: 701 Ocean Street
MAILING ADDRESS: 701 Ocean Street
CITY AND ZIP CODE: Santa Cruz, CA 95060
BRANCH NAME: Santa Cruz Courthouse

CASE NAME:
Joby Aero, Inc. v. Archer Aviation Inc., and George Kivork

| CIVIL CASE COVER SHEET<br>[x] **Unlimited**    [ ] **Limited**<br>(Amount demanded exceeds $35,000)    (Amount demanded is $35,000 or less) | Complex Case Designation<br>[ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>25CV03722<br><br>JUDGE:<br>DEPT.: |
|---|---|---|

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[x] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [x] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action *(specify):* 11
5. This case [ ] is  [x] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: November 18, 2025

Yury Kapgan
_____
(TYPE OR PRINT NAME)     (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

**Page 1 of 2**

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2024]
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
  Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
  domain, landlord/tenant, or
  foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner
    Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic
    relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

---

CM-010 [Rev. January 1, 2024]     **CIVIL CASE COVER SHEET**     **Page 2 of 2**

**For your protection and privacy, please press the Clear
This Form button after you have printed the form.**

| Print this form | Save this form | | Clear this form |

# Exhibit E

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA COUNTY OF SANTA CRUZ**  <br> Santa Cruz Branch · Watsonville Branch <br> 701 Ocean Street, Room 110 · 1 Second Street, Room 300 <br> Santa Cruz, CA 95060 · Watsonville, CA 95076 | *FOR COURT USE ONLY* <br> **FILED** <br> **Superior Court of California** <br> **County of Santa Cruz** <br> 11/20/2025 <br> Clerk of the Court by Deputy, <br> Karen Broughton |
| **JOBY AERO, INC.** <br> **vs** <br> **GEORGE KIVORK, et al** | |
| **CASE MANAGEMENT INFORMATION AND SETTING** | **Case Number:** 25CV03722 |

# DEFENDANT: YOU HAVE 30 CALENDAR DAYS TO FILE A WRITTEN RESPONSE WITH THE COURT ONCE YOU HAVE BEEN SERVED WITH THE SUMMONS AND COMPLAINT.

The date below is for a Case Management Conference. If you have not responded within 30 days, this hearing MAY NOT take place.

It is the duty of each party to be familiar with the California Rules of Court and the date, time and place of the first case management conference.

A written response is not always necessary. To make this determination it is important to seek legal advice and information. Some options are:

1. Santa Cruz County Bar Association Lawyer Referral Service: 831-425-4755 (Fee Based service)
2. Santa Cruz Superior Court Self Help Center: 1 Second Street, Room 301 Watsonville, CA 95076
   831-786-7200 option 4. www.santacruzcourt.org for hours.
3. Santa Cruz Law Library: 701 Ocean Street, Room 70 (Basement), Santa Cruz, CA 95060
   831-420-2205 www.lawlibrary.org for hours.
4. Watsonville Law Center: 831-722-2845

**PLAINTIFF:** This notice MUST be served with the summons on all defendants and cross-defendants. Notice of any other pending case management conference must be served on subsequently named defendants and cross defendants.

---

**YOUR CASE MANAGEMENT CONFERENCE DATE:**

**DATE:    03/20/2026             TIME:    8:30 A.M.        Santa Cruz Department 10**

**Address of the Court: 701 Ocean Street, Santa Cruz, California**

To appear remotely through **Zoom** at your Case Management Conference visit our court website
**https://www.santacruz.courts.ca.gov/online-services/participating-remotely-zoom**

---

**GET TEXT REMINDERS!**
Text case number to (831) 208-5170 for reminders about hearing dates and payment due dates.

# Exhibit F

 **CSC**

**Notice of Service of Process - Summons/Complaint - Doc ID: 46452284**

Pursuant to client instructions, we are forwarding this summary and Notice of Service of Process.

| | |
|---|---|
| **Document Type** | Summons/Complaint |
| **Matter Name** | Joby Aero, Inc. vs. Archer Aviation Inc. (18262589) |
| **Case Number** | 25CV03722 |
| **Court** | Santa Cruz County Superior Court, California |

**VIEW MY DOCUMENT**

| | |
|---|---|
| **Entity** | Archer Aviation Inc. |
| **Entity I.D. Number** | 4095172 |
| **Entity Served** | Archer Aviation Inc. |
| **Nature of Case** | Contract |
| **Jurisdiction Served** | California |
| **Date Served on CSC** | 11/26/2025 |
| **Answer or Appearance Due** | 30 Days |
| **Originally Served On** | CSC |
| **How Served** | Personal Service |

Sender Information:

Quinn Emanuel Urquhart & Sullivan, Llp

212-849-7000

Primary Contact:

Aileen Chou

Archer Aviation Operating Corp

Electronic copy provided to:

achou@archer.com

agoodman@archer.com

eric.lentell@archer.com

legal@archer.com

## What are your next steps?

Click the link to view and acknowledge your document

Contact your attorney to review

## Who is CSC?



CSC® is the world's leading provider of business, legal, tax and digital brand services to companies around the

globe. From keeping your business in compliance and streamlining operations, to protecting and promoting your brand online, we use our expertise and personal approach to help your business run smoother.

## What is SOP?

Service of Process (SOP) generally refers to the notice provided to a party at the initiation of a lawsuit. More broadly, in the context of a registered agent, it applies to documents related to litigation, wage garnishments, bankruptcies, foreclosures, subpoenas and other legal matters where your organization may be a party in some capacity.

## Why are we contacting you?

As your registered agent, CSC is responsible for receiving service of process (lawsuits, subpoenas, wage garnishments, etc.) on your organization's behalf. This notification provides some of the basic descriptive details related to a document that CSC has received in this capacity. Click the link above to view the full image of this document, so you can assess the required or appropriate responsive action.

**All service must be acknowledged. If you are unable to view the above link, click here to view other options.**

**To review other documents in this matter, please link to CSC's Matter Management Services at www.cscglobal.com**

**Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the document(s) and taking appropriate action.**

Copyright ©2021 Corporation Service Company.
All rights Reserved

Privacy    Legal    Browser Policy

251 Little Falls Drive
Wilmington, Delaware 19808-1674
(888)-690-2882
sop@cscglobal.com

# Exhibit G

**EFS-005-CV**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:  STATE BAR NO: 117892<br>NAME: Eugene Illovsky<br>FIRM NAME: Illovsky Gates & Calia, LLP<br>STREET ADDRESS: 1611 Telegraph Ave Ste 806<br>CITY: Oakland      STATE: CA    ZIP CODE: 94612<br>TELEPHONE NO.: 4155006643    FAX NO. :<br>E-MAIL ADDRESS: eugene@illovskygates.com<br>ATTORNEY FOR (name): Defendant George Kivork | *FOR COURT USE ONLY* |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Cruz<br>STREET ADDRESS:  701 Ocean Street<br>MAILING ADDRESS:  701 Ocean Street<br>CITY AND ZIP CODE:    Santa Cruz, CA 95060<br>BRANCH NAME:  Santa Cruz Courthouse | |
| Plaintiff/Petitioner: Joby Aero, Inc. | CASE NUMBER:<br>25CV03722 |
| Defendant/Respondent: Archer Aviation Inc., and George Kivork | JUDICIAL OFFICER:<br>Hon. Timothy Schmal |
| **CONSENT TO ELECTRONIC SERVICE AND NOTICE OF ELECTRONIC SERVICE ADDRESS** | DEPARTMENT: |

1. ☐ The following party  or  ☒ the attorney for:

   a. ☐ plaintiff *(name):*

   b. ☒ defendant *(name):* George Kivork

   c. ☐ petitioner *(name):*

   d. ☐ respondent *(name):*

   e. ☐ other *(describe):*

   consents to electronic service of notices and documents in the above-captioned action.

2. The electronic service address of the person identified in item 1 is *(specify):*
   Eugene@illovskygates.com

Date: November 28, 2025

Eugene Illovsky
TYPE OR PRINT NAME

▶ *(signature)*
(SIGNATURE OF PARTY OR ATTORNEY)

Page 1 of 2

**EFS-005-CV**

| | CASE NUMBER: |
|---|---|
| CASE NAME: Joby Aero, Inc. v. Archer Aviation Inc., and George Kivork | 25CV03722 |

(Note: *If you serve* Consent to Electronic Service and Notice of Electronic Service Address *by mail, you should use form POS-030,* Proof of Service by First-Class Mail–Civil, *instead of using this page.*)

## PROOF OF ELECTRONIC SERVICE

### *CONSENT TO ELECTRONIC SERVICE AND NOTICE OF ELECTRONIC SERVICE ADDRESS*

1. I am at least 18 years old.

   a. My residence or business address is *(specify):*

   b. My electronic service address is *(specify):*

2. I electronically served a copy of the *Consent to Electronic Service and Notice of Electronic Service Address* as follows:

   a. Name of person served:

   b. Electronic service address of person served:

      On behalf of *(name or names of parties represented, if person served is an attorney):*
      Joby Aero, Inc.

   c. On *(date):*

   d. At *(time):*

   ☐ Electronic service of the *Consent to Electronic Service and Notice of Electronic Service Address* on additional persons is described in an attachment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶

_____
(TYPE OR PRINT NAME OF DECLARANT)

_____
(SIGNATURE OF DECLARANT)