JOSH KREVITT, SBN 208552
  jkrevitt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, CA 94301-1744
Telephone:    650.849.5300
Facsimile:    650.849.5333

ORIN SNYDER, *(pro hac vice)*
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:    212.351.4035

JAMES L. ZELENAY JR., SBN 237339
  jzelenay@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:    213.229.7000

*Attorneys for Defendant and Counterclaimant
Archer Aviation Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| JOBY AERO, INC.,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>ARCHER AVIATION INC. and George Kivork.<br><br>　　　　　　　Defendants.<br><br>――――――――――――――<br><br>ARCHER AVIATION INC.,<br><br>　　　　　　　Counterclaimant,<br><br>　　v.<br><br>JOBY AERO, INC.<br><br>　　and<br><br>JOBY AVIATION, INC.,<br><br>　　　　　　　Counter-Defendants. | Case No.: 5:25-CV-10703-SVK<br><br>**DEFENDANT ARCHER AVIATION INC.'S ANSWER TO COMPLAINT AND COUNTERCLAIMS AGAINST JOBY AERO, INC. AND JOBY AVIATION, INC. FOR:**<br><br>1) **VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.***<br><br>2) **FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)(B)**<br><br>**DEMAND FOR JURY TRIAL** |

GIBSON, DUNN &
CRUTCHER LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

## ARCHER AVIATION'S COUNTERCLAIMS

Counterclaimant Archer Aviation Inc. ("Archer") brings these counterclaims against plaintiff and counterclaim defendant Joby Aero, Inc., and against counterclaim defendant Joby Aviation, Inc. (together, "Joby") and alleges as follows:

1. This action arises from a calculated, years-long scheme by Joby Aero, Inc. and Joby Aviation, Inc. (collectively, "Joby") to defraud the U.S. government, the public, and its main competitor. Joby has falsely presented itself as a domestically rooted, American-made, fully vertically integrated aviation company while covertly relying on its Chinese manufacturing subsidiary, sourcing critical components from Chinese suppliers—including its own subsidiary—that have apparent Chinese Communist Party ("CCP") ties, and receiving through its Chinese subsidiary technology-development grants directly from the Chinese government. As part of its efforts to conceal its deep ties to China, based on information and belief, Joby and/or its agents fraudulently misclassified thousands of pounds of Chinese-origin aircraft materials as consumer goods—labeling them "hair clips," "socks," and "photo albums"—in an apparent effort to evade U.S. tariffs and foreign-influence oversight.

2. Wrapping itself in the American flag and marketing its aircraft as "Committed to American Innovation," Joby has secured hundreds of millions of dollars in funding from the United States government, including U.S. Air Force contracts, and has positioned itself to be a key player in President Trump's effort to accelerate the integration of air taxis in the United States under the 2025 "Unleashing American Drone Dominance" Executive Order. It accomplished this while scrubbing its website of evidence of its extensive ties to China and suppressing information that would have triggered additional national-security scrutiny. Archer, on the other hand, has spent the last seven years investing billions in domestic engineering, manufacturing, and supply-chain infrastructure in genuine alignment with U.S. national-security priorities. Joby's unlawful conduct has inflicted direct, concrete, and ongoing competitive harm on Archer—including artificial cost disadvantages, lost regulatory standing, and diminished access to government programs. Archer brings these counterclaims to expose Joby's fraud, halt its anticompetitive misconduct, and obtain full relief.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

**INTRODUCTION**

3.     The electric vertical take-off and landing ("eVTOL") aircraft market represents a transformative segment of the next generation of aviation technology, with the current focus on commercializing battery-powered aircraft for short-range passenger transport as air taxis.  These advanced aircraft combine helicopter-like vertical lift with airplane efficiency through the use of distributed electric propulsion.  Distributed electric propulsion is an innovative approach to designing an aircraft-propulsion system that uses multiple electrically powered propulsors (such as propellers) distributed across the airframe, rather than relying on one or only a few large engines and propellors.  This approach leverages electric motors, batteries, or hybrid systems to generate thrust, allowing for greater design flexibility, improved aerodynamic efficiency, and enhanced control.  Distributed electric propulsion can be fully electric, turboelectric (where gas turbines generate electricity for motors), or hybrid.

4.     The United States government, through the National Aeronautics and Space Administration ("NASA"), has been at the forefront of the research and development work around distributed electric propulsion, focusing on reducing fuel consumption, emissions, and noise while enabling new aircraft configurations.  Key contributions from the U.S. government include conceptual designs, testbeds, and flight demonstrators that have paved the way for today's budding commercial applications.

5.     The U.S. Air Force has also been pivotal in advancing eVTOL technology, primarily through its AFWERX innovation arm and the Agility Prime program.  Launched in April 2020, Agility Prime represented a collaborative initiative to accelerate the commercial eVTOL industry by bridging government resources with private-sector innovation.

6.     Over the last decade, the sector has evolved into a geopolitical race between the United States and China, mirroring other technology industry competitions between the two countries, such as electric vehicles ("EVs"), drones, and semiconductors.  Similar to these other industries, China holds advantages in speed-to-market and in the ability to scale production volume, while the United States has led in terms of innovation and safety standards.  The U.S. leaders in this space face supply challenges as they look to commercialize this technology.  China, by contrast,

Gibson, Dunn & Crutcher LLP

3

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

has surged ahead, fueled by subsidies and tolerance for high-volume experimentation.  By mid-2025, China's operational head start—routine flights vs. U.S. trials—sparked warnings of a "sky race" that China is winning.  These concerns have required eVTOL technology companies to choose their allegiances carefully.  In an attempt to ensure that the United States leads in the "third revolution in aerospace" (following the fixed-wing and rotorcraft eras), the U.S. government has put forth several initiatives.

7.     For example, the United States's Advanced Air Mobility ("AAM") National Strategy, announced in December 2025, envisions exporting U.S.-built aircraft to allies, combatting China's lead in EVs and drone production.  Amid rising U.S.-China tensions, the U.S. government has focused on ensuring that the U.S. companies building eVTOL technology are not susceptible to vulnerabilities that result from Chinese-sourced components (*e.g.*, batteries with potential backdoors), as it is paramount that eVTOLs used by the United States and its allies, whether in urban air mobility, logistics, or defense, are not compromised.

8.     Additionally, in 2025, the Trump Administration pushed for U.S. eVTOL companies to conduct their research and development and their production domestically due to national-security concerns over China's dominance in drone and related component supply chains (such as batteries and electronics).  The June 2025 Unleashing American Drone Dominance Executive Order required federal agencies to prioritize eVTOL aircraft and technologies developed or offered by U.S.-based entities in programs like the eVTOL Integration Pilot Program ("eIPP"), which explicitly favors domestic manufacturing to reduce reliance on foreign—especially Chinese—sources that could pose risks of theft of U.S. technology or supply disruptions.  Furthermore, the December 2025 AAM National Strategy put forth by the U.S. Department of Transportation ("DOT") and Federal Aviation Administration ("FAA") further reinforces this by encouraging U.S.-based supply chains for avionics, advanced composites, batteries, and other components, aiming to enhance economic competitiveness, create high-skilled jobs, and secure critical infrastructure amid broader restrictions on Chinese tech imports and procurement bans.

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

9. Archer and Joby are the two leading U.S.-based developers of eVTOL technology, racing to launch commercial air-taxi services and win programs of record with the U.S. military and its allies to purchase these advanced aircraft for military-use cases.

10. Archer has raised and spent billions of dollars premised on this strategy: a U.S.-centric focus to research and development, supply chain, and manufacturing capabilities—aligning its approach with U.S. national-security priorities. Archer's key U.S. facilities and operations include its engineering headquarters and initial manufacturing capabilities in Silicon Valley, California; its flight-test facilities in Central California; an airport and advanced composite manufacturing facility in Southern California; and a high-volume manufacturing facility just outside Atlanta, Georgia.

11. Joby—a U.S. government contractor—has led the market and U.S. government to think it is doing the same while trying to hide its key dependency on China. Joby publicly wraps itself in claims of vertically integrated domestic manufacturing, repeatedly emphasizing facilities in Ohio and California and asserting that it "designs, builds, and tests its aircraft in the US." Joby further markets itself as "Committed to American Innovation," representing to the public—and to the U.S. government in connection with defense contracting—that it is "ready to make sure that the commercial and defense aircraft that define the future of flight are built right here in America." These representations are, at best, misleading. In reality, Joby depends heavily on Chinese-sourced components that it uses to reduce costs and accelerate production in pursuit of commercial advantage. Joby omits from these public representations its Chinese factory facilities and its use of Chinese components sourced from Joby Aviation's subsidiary, Joby Metal Shenzhen Co. Ltd. ("Joby China"), a company with apparent CCP ties. Knowing the U.S. government subjects foreign-sourced military technology to additional scrutiny, Joby has, on information and belief, attempted to conceal the origin of certain of its imports. Joby has removed webpages documenting its ties to China, suppressed information concerning its Chinese supply dependency in order to gain advantage over Archer, and, on information and belief, knowingly benefited from the tariff misclassification of aircraft-related imports from China as ordinary consumer goods.

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

12.     While some of the imports Joby has received from its Chinese subsidiary appear consistent with imports from a metal supplier, others raise alarm bells.  The following chart shows the tons of imports Joby has received, including those from its Chinese subsidiary, Joby China:

*Note: The source of this information is from third-party shipping records aggregators and public import databases last visited March 7, 2026.*

| Joby China's Shipments to Joby in the United States | | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Suppliers** | **Product Description** | **HS Code** | **Weight (approx.)** | **Country of Origin** | **Bills of Lading** |
| 12/19/2025 | Wuxi Jiaqing Youpin E Commerce Co | Aluminum Honeycomb Panel | **N/A** | 278 kg | China | **House:** EXDO6396009731 **Master:** COSU6436363773 |
| 10/11/2025 | Tuv Rheinland China Ltd | Joby Charge Handle | **9303.90 -** Arms and ammunition; parts and accessories thereof; Other firearms and similar devices which operate by the firing of an explosive charge (for example, sporting shot-guns and rifles, muzzle-loading firearms, Very pistols and other devices designed to project only signal flares, pistols and revolvers for firing blank ammunition, captive-bolt humane killers, line-throwing guns); Other | 104 kg | China | **House:** DMERDFS037003934 **Master:** CMDUTJN0752490 |
| 9/9/2025 | Shenzhen Infypower Co. Ltd. | Charger Charger Module | **8414.59 -** Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Air or vacuum pumps, air or other gas compressors and fans; ventilating or recycling hoods incorporating a fan, whether or not fitted with filters; gas-tight biological safety | 1,031 kg | China | **House:** DMERDFS045088893 **Master:** EGLV149505373467 |

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| Date | Shipper | Product | HTS Code / Description | Weight | Origin | Bill of Lading |
|---|---|---|---|---|---|---|
| | | | cabinets, whether or not fitted with filters; parts thereof; Fans; Other | | | |
| 9/2/2025 | Taizhou Dehao Technology Co. Ltd. | Floating Dockfloating Dock | **8909.0 -** Ships, boats and floating structures ; Vessels and other floating structures for breaking up (scrapping) | 9,790 kg | China | **House:** SZLOVLSZ25080086 **Master:** COSU6426585630 |
| 08/10/2025 | Joby Metal Shenzhen Co. Ltd. | Napkin | **4803.00** - Toilet or facial tissue stock, towel or napkin stock and similar paper of a kind used for household or sanitary purposes, cellulose wadding and webs of cellulose fibers, whether or not creped, crinkled, embossed, perforated, surface-colored, surface-decorated or printed, in rolls or sheets | 2,549 lbs (1,156 kg) | China | **House:** WMIDMAY25071260 **Master:** MATS3450990000 |
| 1/5/2025 | Joby Metal Shenzhen Co. Ltd. | Socks | **6115.99** - Pantyhose, tights, stockings, socks and other hosiery, including graduated compression hosiery (for example, stockings for varicose veins), and footwear without applied soles, knitted or crocheted – Other – Of other textile materials | 10,849 lbs (4,921 kg) | China | **House:** WMIDMAY24120748 **Master:** MATS5465630000 |
| 03/27/2024 | Joby Metal Shenzhen Co. Ltd. | Mold | **8480.41** - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Molding boxes for metal foundry; mold bases; molding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics; Molds for metal or metal | 2,965 lbs (1,345 kg) | China | **House:** KYSILSAP2400150 **Master:** ONEYSZPE33182400 |

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

| Date | Importer | Product | HTS | Weight | Country | Bill of Lading |
|---|---|---|---|---|---|---|
| | | | carbides; Injection or compression types | | | |
| 01/02/2024 | Joby Metal Shenzhen Co. Ltd. | Hair Clip | **3305.30** - Essential oils and resinoids; perfumery, cosmetic or toilet preparations – Preparations for use on the hair – Hair lacquers | 6,138 lbs (2,784 kg) | China | **House:** WMIDMAY23120554 <br><br> **Master:** MATS4534366000 |
| 11/15/2023 | Joby Metal Shenzhen Co. Ltd. | Aisi Stainless Steel Aluminum | **7219.14** - Flat-rolled products of stainless steel, of a width of 600 mm or more – Not further worked than hot-rolled – Of a thickness of less than 4.75 mm | 6,634 lbs (3,009 kg) | China | **House:** NAQANAP2300112 <br><br> **Master:** HDMUSZPM63461800 |
| 11/13/2022 | Joby Metal Shenzhen Co. Ltd. | Bed Canopy | **6302.10** - Bed linen, table linen, toilet linen and kitchen linen – Bed linen – Of cotton | 5,335 lbs (2,420 kg) | China | **House:** WMIDMAY22110124 <br><br> **Master:** MATS3522874000 |
| 01/26/2022 | Joby Metal Shenzhen Co. Ltd. | Photo Albums | **4820.50** - Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles – Albums for samples or for collections | 5,666 lbs (2,570 kg) | China | **House:** MNQOSHA012200333 <br><br> **Master:** MATS3896222004 |
| 05/02/2021 | Joby Metal Shenzhen Co. Ltd. | Battery Explosion Proof Test Chamber | **9031.20** - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof; Measuring or checking instruments, appliances and machines, not specified or included elsewhere in this chapter; profile projectors; parts and accessories thereof; Test benches | 5,952 lbs (2,700 kg) | China | **House:** MLQDSHA042100367 <br><br> **Master:** MATS6734406010 |

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

| | | | | | | |
|---|---|---|---|---|---|---|
| 06/17/2020 | Joby Metal Shenzhen Co. Ltd. | Metal Printer | **8471.60** - Automatic data-processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data – Input or output units, whether or not containing storage units in the same housing | 4,941 lbs (2,241 kg) | China | **House:** CHKMSOA005082205 **Master:** ONEYHKGA62017300 |
| 08/30/2019 | Joby Metal Shenzhen Co. Ltd. | Polishing Machine Microscopes Precision Cutting Machine Ultrasonic Cleaner Electronic Scale Vacuum Chamber | **8456.20** - Machine tools for working any material by removal of material, by laser or other light or photon beam, ultrasonic, electro-discharge, electro-chemical, electron beam, ionic-beam or plasma arc processes – Operated by ultrasonic processes | 933 lbs (423 kg) | China | **House:** CHKMSOA907040976 **Master:** ONEYHKGVC2567600 |
| 06/13/2019 | Joby Metal Shenzhen Co. Ltd. | Printing Machine | **9006.10** - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof; Photographic (other than cinematographic) cameras; photographic flashlight apparatus and flashbulbs other than discharge lamps of heading 8539; parts and accessories thereof | 5,357 lbs (2,430 kg) | China | **House:** HYSLFSZX19051259 **Master:** ONEYHKGV89063900 |
| 12/03/2018 | Joby Metal Shenzhen Co. Ltd. | Pkgs Ceramic Fiber Paper | **6914.90** - Ceramic products; Other ceramic articles; Other | 990 lbs (449 kg) | China | **House:** NAQA1817819S **Master:** APLU751058352 |

13.     There is no reasonable explanation for Joby to have imported thousands of pounds of napkins, hosiery, hair clips, bed canopies, and photo albums from its Chinese metal-supplier subsidiary. Based on information and belief, Joby and/or agents acting on its behalf and for its benefit has misclassified imports from its Chinese subsidiary and thereby hidden its use of Chinese

Gibson, Dunn & Crutcher LLP

9

components and avoided higher tariff duties. Misclassification of imports to avoid tariffs and other import controls is both anticompetitive and criminal, under 19 U.S.C. § 1592 and 18 U.S.C. § 545, among other statutes (*e.g.*, 18 U.S.C. § 1001). These apparent false statements and acts of tariff evasion constitute unfair competition, as Joby has obtained an unlawful benefit in not paying required duties on materials imported from China, giving Joby an illegal, unfair advantage over Archer.

14.   Not only has Joby sourced components from China, and done so under false and misleading pretenses, but it has been building and continues to develop key manufacturing capabilities in China. Joby has been investing in these capabilities in China for almost 15 years through its Chinese subsidiary Joby China. This is not surprising, as Joby was founded by JoeBen Bevirt, who reportedly started Joby as a side project when he was trying to learn about manufacturing in China.

15.   Joby China has applied for and, on information and belief, received numerous grants from the Chinese government aimed at supporting its research and development and manufacturing operations in China.  Joby China also employs at least one individual designated in China as "returned overseas-educated personnel," who, on information and belief, received housing and living subsidies from the Chinese government following study in the United States—reflecting government involvement and influence. The Chinese government has a track record of intellectual-property theft through these types of avenues. Once U.S. companies operate in China, aggressive efforts to access proprietary technology routinely follow. The below images are from Joby China's website before Joby attempted to erase it from the internet as it prepared to go public.

Gibson, Dunn &
Crutcher LLP

10

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK



16.    Over the last couple of years, Joby has doubled down on its work in China as it fails to build out its promised state-of-the-art facility in Dayton, Ohio.



17.    In September 2023, Joby promised to spend over $475 million to build out that state-of-the-art facility (artist rendering depicted above) in Dayton, Ohio by 2025.  It was supposed to employ over 2,000 workers.  But as of 2026 Joby has made hardly any progress on the promised facility.  Depicted below is a satellite image of the location of the promised facility.



DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn &
Crutcher LLP

18.    Rather than constructing its promised facility, Joby has leased a former U.S. Postal Service facility for less than $15,000 per year.[1]

19.    None of this is surprising.  Joby's go-public transaction was led by Reid Hoffman, who once said that "I believe that the next Silicon Valley is … undoubtedly China."  Hoffman joined Joby's board of directors upon the deal's completion in August 2021 and remained on that board until mid-2024 leading up to the Trump Administration taking office.

20.    In 2009 JoeBen Bevirt founded Joby, which the *San Francisco Business Times* reported "began as a side project in which Bevirt was trying to learn about manufacturing in China."[2]  Bevirt has publicly supported China's development of its low-altitude economy over the last couple years.  In November 2024, he spoke at the International Electric Aviation (Kunshan) Forum under the theme "Low Altitude Pioneers, Leading the Future."[3]



---

[1] *See* Cornelius Frolik and Lynn Hulsey, *Under agreement, Joby Aviation would lease former post office facility at Dayton airport*, Dayton Daily News (Feb. 20, 2024), https://www.daytondailynews.com/local/joby-aviation-wants-to-lease-former-post-office-facility-at-dayton-international-airport/XBWTPGK3IRDS7NFGSKXPYKGFRI/ (last visited Mar. 7, 2026).

[2] Patrick Hoge, *Inveterate Inventor JoeBen Bevirt Makes Good*, San Francisco Bus. Times (Mar. 22, 2009), https://www.bizjournals.com/sanfrancisco/stories/2009/03/23/story6.html (last visited Mar. 7, 2026).

[3] *See Joby et al. Take the Stage at the International Electric Aviation (Kunshan) Forum*, China eVTOL News (Nov. 27, 2024), https://www.chinaevtolnews.com/p/joby-et-al-take-the-stage-at-the (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

21.     More recently, it was reported online that Mr. Bevirt visited China and spent time meeting with XPeng AeroHT, an affiliate of XPeng Motors, which is a leading Chinese EV manufacturer founded in 2014, headquartered in Guangzhou, Guangdong.  XPeng specializes in EVs integrated with advanced autonomous driving technology, but has branched out into humanoid robotics and eVTOL technology.[4]



22.     Bevirt has been quoted in a Chinese-language article published on *Zhihu*, one of China's largest online knowledge communities, that "China is not only the largest market, but also the starting point for redefining future transportation," and reportedly described Joby's strategy to include technical cooperation with China's top battery manufacturers; having an established research-and-development center in Shenzhen, China; and building a localized China supply chain system.[5]

---

[4]     *See*    @pazjj1987,    X    (Nov.    18,    2024,    3:12    PM), https://x.com/pazjj1987/status/2021251169344205091 (last visited Mar. 7, 2026); Phillip Klein, Post on LinkedIn (Feb. 11, 2026, 1:42 PM), https://www.linkedin.com/posts/phillipklein_how-one-visit-in-china-exposed-a-major-opportunity-activity-7427467092251205632-WoMk (last visited Mar. 7, 2026).

[5] *Joby Aviation: Opening the Chinese Market, How Aircraft Will Reshape Future Mobility*, Zhihu (Jan. 11, 2025), https://zhuanlan.zhihu.com/p/17762289713 (last visited Mar. 7, 2026) (a certified English translation is attached hereto as Exhibit A).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

23.    Through deliberate deception, Joby has cultivated a misleading "Made in the USA" image, securing at least $131 million in contracts through the U.S. Air Force's AFWERX Agility Prime program, and being further considered for the eIPP, established by President Trump's "Unleashing American Drone Dominance" Executive Order in June 2025,[6] while circumventing heightened national-security and foreign-influence standards.  This Executive Order and the eIPP are intended to protect against foreign control or exploitation of the U.S. eVTOL and drone supply chain; protect critical infrastructure, military installations, and public spaces from the "weaponization" of unmanned aircraft systems; and accelerate the safe, lawful, and secure deployment of AAM aircraft, such as air taxis and cargo drones.

24.    Yet, not only does Joby's supply chain apparently include its manufacturing subsidiary in Shenzhen, China, on information and belief Joby China has received direct technology-development grants from the Chinese government and employs and is currently hiring engineers in China, demonstrating a profound, undisclosed foreign dependency.  Specifically, on information and belief, Joby China was designated by the Chinese government as a "National High and New Technology Enterprise" ("NHNTE"), with associated tax breaks and funding.  The U.S. District Court for the District of Columbia upheld the designation of drone-maker DJI's Shenzhen, China subsidiary—SZ DJI Technology Co.—as a "Chinese Military Company" under Section 1260H of the National Defense Authorization Act based on similar Chinese national-level recognition, where DJI had been recognized as a National Enterprise Technology Center ("NETC") by China's National Development and Reform Commission ("NDRC").

25.    The Chinese NETC and NHNTE and the U.S. eIPP both fundamentally reflect a government-led approach to supporting the domestic, high-end, next-generation transport sector, and both aim to increase the speed of technological adoption.  Joby China's designation and benefit under the NHNTE is at odds with its participation under the eIPP and with its applications for and contracts with other U.S. government and military programs.  Joby's calculated, anticompetitive, and illegal actions have inflicted concrete, direct, and substantial financial and competitive injury

---

[6] Exec. Order No. 14,307, *Unleashing American Drone Dominance*, 90 Fed. Reg. 24,727 (June 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/unleashing-american-drone-dominance (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

upon Archer in the regulator-gated, effectively zero-sum eVTOL market, in which competitors must compete for finite regulatory approvals, governmental attention, and institutional support. On information and belief, by fraudulently manipulating its cost basis and unlawfully avoiding tariffs, Joby obtained artificial advantages in cost, timing, and regulatory positioning that directly impaired Archer's certification progress, government engagement, and competitive standing. Joby's regulatory gain, born from its deception and fraud, is Archer's material, demonstrable loss, even while Joby seeks to benefit from both U.S. and Chinese government programs, obscuring and hiding its relationship with and reliance on China.

26. These unlawful advantages diverted regulatory focus away from Archer, negatively impacted Archer's certification and commercialization timeline, distorted investor and partner perceptions, and forced Archer to incur additional costs and expenses while losing business opportunities. Joby's conduct therefore did not merely benefit Joby; it foreseeably and proximately harmed Archer by distorting competition in a market where regulatory advancement by one participant necessarily disadvantages others.

27. On information and belief, Joby has relied on Chinese-sourced components and materials—including, most significantly, the batteries that power its aircraft—because of cost, availability, and technical constraints that make domestic substitution difficult or impractical in the near term. Joby understood that if customers—particularly the United States government—were aware of how integral Chinese components and supply-chain dependencies are to Joby's aircraft, such disclosure would trigger substantially heightened national-security diligence, sourcing scrutiny, and regulatory review. That additional scrutiny would slow Joby's progress and jeopardize its eligibility for certain programs, elevating the other leading competitor: Archer.

28. Faced with that reality, Joby chose concealment over disclosure. On information and belief, Joby has covered up the depth of its China ties by removing webpages referencing its fourteen-year-old manufacturing subsidiary in Shenzhen and removing any reference to Joby China from its annual SEC reporting, while simultaneously amplifying promotional materials focused on its U.S. facilities. At the same time, Joby continued to market itself as a "proudly American" and

vertically integrated aerospace company, omitting any meaningful disclosure of its Chinese supply-chain dependencies.

29. The FAA's oversight of aviation in general and more specifically eVTOLs is resource-constrained: increased regulatory attention to one applicant necessarily reduces the attention available to its direct competitors because the FAA has a finite amount of resources it deploys to its priorities. In fact, the FAA path for certification for this new form of aircraft is as a "powered lift" aircraft, which is the first completely new category of civil aircraft since helicopters were introduced in the 1940s.[7] By misrepresenting or failing to fully and accurately disclose its China-based sourcing and relationships, Joby has positioned itself to advance through the certification process more quickly than it otherwise could, thereby gaining a material advantage over Archer—its misconduct has diverted scarce FAA resources away from Archer and towards Joby. Joby's gains, in this regulatory environment, are Archer's losses.

30. As will be shown at trial, Joby's anticompetitive campaign has been deceitful. It has been coordinated. And it has been illegal. What Joby could not win in the marketplace, Joby has attempted to win through illegality, going so far as to put U.S. national security at risk by covering up its dependence on China manufacturing of China-sourced components

## Parties

31. Counterclaimant Archer is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 190 W. Tasman Dr., San Jose, California 95134.

32. On information and belief, Joby Aero, Inc. is a corporation organized under the laws of Delaware. Joby Aero, Inc.'s principal place of business is 333 Encinal St., Santa Cruz, CA 95060.

33. On information and belief, Joby Aviation, Inc. is a corporation organized under the laws of Delaware. Joby Aviation, Inc.'s principal place of business is 333 Encinal St., Santa Cruz, CA 95060.

---

[7] FAA, With New Rule, *FAA is Ready for Air Travel of the Future* (Oct. 22, 2024), https://www.faa.gov/newsroom/new-rule-faa-ready-air-travel-future (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

34.     Joby Aviation, Inc. is a publicly traded Delaware corporation and the ultimate parent company of a consolidated group of companies.  This includes wholly owned subsidiaries Joby Aero and Joby Metal Shenzhen Co., Ltd. ("Joby China"), organized under the laws of the People's Republic of China.[8]  As reflected in the 2024 Annual Report on Form 10-K, Joby Aviation consolidates the results, assets, and liabilities of Joby Aero and Joby China, among others, in its financial statements.[9]

35.     Joby Aviation, Inc. is the parent and alter ego and/or successor in interest to Joby Aero, Inc., and is properly joined as an additional party to these counterclaims pursuant to Fed. R. Civ. P. 13(h), 19, and 20 because it participated in, directed, authorized, ratified, and benefited from the conduct alleged herein.  In the alternative, and to the extent applicable, Joby Aviation and Joby Aero operated as a single enterprise with respect to the challenged conduct.

36.     Joby Aviation, Joby Aero, and Joby China have acted in concert and as a unified enterprise in carrying out the conduct alleged herein.  Joby Aviation, as the parent company, directs and controls the operations of Joby Aero and Joby China, including manufacturing, sourcing, and import activities.  Joby Aero and Joby China function as instrumentalities of Joby Aviation, executing corporate strategy and supply-chain operations under common ownership.  The coordinated conduct of these entities was undertaken for their shared commercial benefit and is properly attributable to each of them.  Public sources indicate that JoeBen Bevirt serves as the Chief Executive Officer of both Joby Aviation and Joby Aero—reflecting his executive control over both the parent company and its operating subsidiary.[10]

**Jurisdiction and Venue**

37.     Counterclaimant Archer is and at all times mentioned in this countercomplaint was a Delaware corporation, with its principal place of business in San Jose, California.

---

[8] *See* Joby Aviation, Inc., Annual Report (Form 10-K) at Ex. 21.1 (Feb. 27, 2025) (listing significant subsidiaries).

[9] *Id.*

[10] *See* JoeBen Bevirt, MarketScreener, https://www.marketscreener.com/insider/JOEBEN-BEVIRT-A07XNU (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

38. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 of this countercomplaint, as this is a civil case arising under the Lanham Act, 15 U.S.C. § 1121, and has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367 because all claims herein form part of the same case or controversy under Article III of the United States Constitution.

39. Further, because this Court has original jurisdiction over Joby's third claim for relief, a claim asserted under federal trade secret law, it may exercise supplemental jurisdiction over all counterclaims that are part of the same case or controversy under 28 U.S.C. § 1367(a).

40. Joby Aviation is joined as an additional counterclaim defendant pursuant to Fed. R. Civ. P. 13(h) and 20, as the claims asserted arise out of the same transactions and occurrences and involve common questions of law and fact.

41. Archer is informed and believes and thereon alleges that jurisdiction over Joby is proper because Joby Aviation and Joby Aero at all times mentioned in this Complaint have maintained their principal place of business in Santa Cruz, California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

42. Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Joby Aviation and Joby Aero are residents of the State of California and residents of this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District.

43. This action is properly assigned to the San Jose Division of this District under Civil Local Rule 3-2(c) because a substantial part of the events or omissions giving rise to Archer's claims occurred in Santa Clara County, which is served by the San Jose Division.

## FACTS COMMON TO ALL CLAIMS

44. As set forth herein, on information and belief, Joby has engaged in unfair competition through apparent tariff evasion of imports from China. Additionally, Joby has engaged in false and misleading advertising regarding its pervasive connections to and reliance on China for its equipment's component parts. Archer brings these counterclaims to seek redress for, and halt, Joby's misconduct.

Gibson, Dunn & Crutcher LLP

## I.      The Emerging eVTOL Industry

### A.      The Opportunity To Revolutionize Urban Transportation and National Defense

45.      The eVTOL market represents a transformative segment of the next generation of aviation technology.  Once certified by the FAA, eVTOLs stand to transform travel through cities by providing a means of transportation akin to an air taxi.  Instead of sitting in traffic or relying on public transportation and ride-sharing services, city dwellers will be able to hail an air taxi to bring them to their destination.

46.      eVTOL vehicles take off and land vertically like a helicopter, but fly horizontally with wings like a plane, utilizing battery power.  While different companies have built eVTOL configurations, all companies remain pre-certification and commercialization in the United States.  eVTOL technologies aim to revolutionize aviation and defense, providing quiet, efficient, and safe modes of vertical-lift aerial transportation in urban and other locations.  Analysts have estimated that the eVTOL market will be worth $1.5 trillion by 2040.[11]

47.      The emerging eVTOL industry stands to transform short-haul transportation by enabling safe, quiet, zero-operational-emissions aircraft to connect people and goods across and between cities.  Air-taxi services are intended to complement existing transit—linking airports, business districts, medical centers, and communities—while reducing time lost to traffic congestion.  The promise is faster, more reliable aerial mobility at a fraction of the footprint and noise of legacy helicopters.

48.      eVTOLs have military applications as well.  For instance, they can transport troops, goods, and other supplies.  Further, the promise of unmanned eVTOL aircraft creates the opportunity for numerous defense applications.  For this reason, the United States government has been focused on advancing eVTOL technology to develop distributed electric propulsion to enable new advanced aircraft configurations that provide for greater operational flexibility at a much lower

---

[11] *See Flying Cars Market Size, Share & Industrial Analysis, By Product Type (Flying Cars and Passenger Drones), By Application Type (Military, Commercial and Civil), and Regional Forecast, 2024-2040*, Fortune Business Insights (Feb. 9, 2026), https://www.fortunebusinessinsights.com/flying-cars-market-105378 (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

cost than existing legacy options. For example, the U.S. Air Force has advanced eVTOL technology through its AFWERX innovation arm and the Agility Prime program, an initiative promoting collaboration with the commercial eVTOL industry.

49.    Moreover, the eVTOL sector has become a geopolitical race between the United States and China. China holds advantages in its ability to authorize products for market and in its ability to scale production volume, while the United States has led in terms of innovation and safety standards. The U.S. companies leading in this area face supply challenges as they endeavor to commercialize this technology. China, by contrast, has relied on subsidies and tolerated experimental designs. In an attempt to ensure that the United States leads in the eVTOL market, the President put forth the June 2025 Unleashing American Drone Dominance Executive Order. And the United States's AAM National Strategy, launched in December 2025, envisions exporting U.S.-built aircraft to allies, undercutting China's lead in EVs and drone production.[12] The U.S. government has also focused on ensuring that the U.S. companies building eVTOL technology are not susceptible to vulnerabilities that result from Chinese-sourced components, as it is essential that eVTOLs used by the United States and its allies are not vulnerable to such risks.

50.    Realizing that the eVTOL opportunity requires extraordinary investment, engineering rigor, and public-private coordination, numerous entities—including manufacturers, suppliers, airlines, airports, and infrastructure partners—are building an industrial base around eVTOL production and operations, subject to stringent safety certification and operational approvals. The result is a rapidly developing ecosystem with the potential to create high-skilled jobs, catalyze advanced manufacturing, expand regional connectivity, and deliver tangible consumer and environmental benefits.

51.    This new global eVTOL market is destined to be highly profitable. Market analysts estimate the global eVTOL market will be worth as much as $30 billion by 2030. By 2040, the industry could eclipse $1.5 trillion in value.

---

[12] Dept. of Transp., *The Advanced Air Mobility National Strategy: A Bold Policy Vision for 2026-2036* (Dec. 17, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-12/AAM%20National%20Strategy%202025.pdf (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

52. The manufacturer that achieves certification first—or even maintains expected progress toward certification—secures decisive competitive advantages in capital access, strategic partnerships, regulatory credibility, customer commitments, and market share. Conversely, any unexpected delay in the certification timeline can undermine an eVTOL manufacturer's business, as investors, commercial partners, and regulators turn their attention to perceived frontrunners. In this environment, a disruption to expected certification progress can cause irreparable reputational, financial, and competitive harm.

53. Thus, for eVTOL manufacturers like Archer in this winner-take-most race, misconduct by a competitor like Joby that hinders its certification progress imposes irreversible damage on their market position, enterprise value, and ability to commercialize their aircraft.

**B.      Archer's Position in the eVTOL Industry**

54. Archer is a U.S. aviation company founded in 2018, established with the core focus of finding the most efficient path to commercializing eVTOL technology. Archer is headquartered in San Jose, California, with its manufacturing and flight-test operations based in the United States.

55. Since its inception, Archer has outpaced many pre-existing players—assembling a world-class engineering team, securing strategic partners and suppliers, investing in U.S. manufacturing, and designing a practical, certifiable aircraft optimized for near-term service.

56. Archer's flagship eVTOL aircraft, Midnight, is designed to carry four passengers and a pilot across urban corridors of up to roughly 100 miles, with a focus on safe, quick, quiet, and zero-emission operation. Midnight (pictured below) employs its proprietary "12-tilt-6" configuration—six tilting rotors at the front for both lift and forward thrust and six fixed rotors at the rear for vertical lift. It is designed to cruise at speeds of up to 150 miles per hour. The aircraft is powered by Archer's proprietary distributed electric-propulsion system with redundant power and fly-by-wire flight-control systems for enhanced safety. Constructed primarily of lightweight composite materials, Midnight is targeted to carry up to a 1,000-pound payload and quickly recharge between flights, supporting high-frequency urban air taxi operations.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

57.     To bring its aircraft to market, Archer is pursuing a dual-track strategy combining manufacturing and commercial air-mobility operations.  It is currently working through the FAA-certification process for Midnight, with flight testing and data collection underway at its facilities in the United States.

58.     Beyond its manufacturing partnerships, Archer has established strategic relationships with major transportation and aerospace players, including United Airlines, which has placed conditional orders for hundreds of Midnight aircraft and plans to integrate them into its regional mobility network.

59.     Archer has also announced plans and partnerships with a number of other leading brands to launch its air-taxi operations in the United Arab Emirates, India, Japan, and Korea.

60.     Archer plans to generate revenue from both selling aircraft to partners such as airlines and operating its own aerial ridesharing service.  Archer's competitive strategy emphasizes a combination of its proprietary advanced electric propulsion technology, safety-driven design, and partnerships with government and private stakeholders to support infrastructure, regulation, and adoption.

61.     On September 17, 2021, Archer became a public company through merger with a special purpose acquisition company, and trades on the New York Stock Exchange under the symbol ACHR.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

**C.      Archer Progresses Toward FAA Certification in A Fraction of the Time as Joby**

62.     Although Archer is a relatively young company, its Midnight aircraft has achieved multiple developmental and regulatory milestones and is engaged in partnerships with major aerospace, automotive, and airline partners.  Archer's rapid progress, high-profile partnerships, and regulatory momentum, when not hindered by Joby's diversion of scarce regulatory resources, directly challenge Joby's first-mover advantage.

63.      Before eVTOL aircraft designers can commercialize their aircraft, they must go through the FAA type-certification process.  The FAA's type-certification process for powered-lift aircraft includes different stages, with the Type Inspection Authorization ("TIA") marking the entry to the for-credit testing phase with FAA participation, after which a type certification would be issued if successfully completed.

64.     Archer has advanced from initial design to full-scale flight testing, progressed through FAA type-certification gates, and obtained multiple operational approvals that position it to be one of the first companies in the United States to launch air-taxi service using an eVTOL aircraft.

65.     In May 2024, Archer achieved a major milestone when the FAA issued the final airworthiness criteria for Midnight, making Archer one of only two eVTOL companies to reach this critical stage of the FAA's type-certification process (with Joby being the other who reached it, doing so just months ahead of Archer).  In June 2024, Archer received its Part 135 Air Carrier Certificate, legally authorizing it to operate on-demand commercial passenger flights and allowing the Company to develop and refine critical processes that it will employ when its Midnight aircraft is able to enter into service following type certification by the FAA.  And in February 2025, Archer's pilot-training academy was certified under Part 141, letting the Company train and qualify pilots in an FAA-approved curriculum ahead of Midnight's entry into service.

66.     Archer is backed by strategic relationships with, among others, the U.S. Air Force, United Airlines, and Anduril Industries, Inc.  Operating at the critical intersection of national

security, technological innovation, and commercial aviation, Archer is positioning the United States to lead the global race to deploy advanced air-mobility solutions.

67.    Joby, by contrast, has existed for nearly twenty years and has yet to find a path to commercialize its eVTOL technology. Founded in 2009, Joby is still stuck trying to get through to certification of its eVTOL aircraft and still does not have an eVTOL product that can carry passengers. Joby sees Archer getting its aircraft to type certification first as an existential threat. Since Archer was founded in 2018, Archer has rapidly closed the gap between itself and Joby in the race to obtain final FAA type certification and be the first eVTOL on the U.S. market—a critical inflection point and an achievement that may determine market success. In fact, in less than half the time it took Joby, Archer achieved flight of a final subscale aircraft, built a pre-production prototype, acquired critical FAA certifications, and conducted flight-test campaigns that tested the aircraft's performance and safety for future urban air mobility. The chart below shows the comparative progress of the two companies against certain key milestones:

| Milestone | Years from Founding to Completion[13] | | Relative Velocity |
|---|---|---|---|
| | Joby<br><br>Founded in **2009** | ARCHER<br><br>Founded in **2018** | |
| Full scale demonstrator first flight | **8** years | **3** years | Archer **2.67X** faster |
| Pre-Production prototype | **10** years | **5** years | Archer **2X** faster |
| First piloted flight | **14** years | **7** years | Archer **2X** faster |
| G-1 Certification Basis signed | **11** years | **3** years | Archer **3.67X** faster |
| Part 135 Certificate received | **13** years | **6** years | Archer **2.17X** faster |
| Part 141 Certificate received | **15** years | **7** years | Archer **2.14X** faster |
| Part 145 Certificate received | **15** years | **6** years | Archer **2.5X** faster |

---

[13] The numbers in this chart are approximate and derived from publicly available information.

24

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

68.    Meanwhile, Joby has faced criticism and self-inflicted setbacks. In 2022, a Joby prototype crashed due to a propeller blade separation during testing, which triggered a cascading failure of multiple motor assemblies and loss of control. It remains unclear to this day whether Joby has solved this propeller issue and who manufactures Joby's propellers. And Joby has been repeatedly sued by former employees for retaliation in response to whistleblowing unsafe and unethical behavior, including relating to "Joby's departures from FAA safety regulations and its own safety protocols" and "concerns that Joby was making dangerous sacrifices to pilot and passenger safety to meet unreasonable deadlines" because Joby is chiefly "interested in releasing products quickly and with fanfare."[14]

69.    By late 2022, only four years after Archer was founded, Joby had taken notice of Archer's tremendous progress. Seeing Archer as a serious competitor, Joby CEO JoeBen Bevirt approached Archer CEO Adam Goldstein about Joby purchasing Archer. Goldstein, not believing Bevirt had the financial backing and seeing nothing to gain from selling the rapid progress it was making and would continue to make, declined Joby's proposal. Archer wants to be its own company and bring what it believes is a superior product to market.

70.    Joby did not take rejection well. It could not buy Archer. And, on information and belief, growing more and more concerned that it would not be able to out-compete in the market, Joby took a different tack—it doubled down on illegal conduct to try to slow down Archer's progress.

71.    As a result, Archer's superiority still exceeds the pace of its regulatory progress because Joby's false and misleading statements have enabled it to divert government resources away from Archer and instead to Joby.

**D.    Joby–The Legacy Player Threatened By Archer's Rise**

72.    Joby has been developing its eVTOL concept since 2009, when it was formed in the mountains outside Santa Cruz, California. Since its early years, the company has been known to

---

[14] Complaint at ¶¶ 1-2, 16, *Eastwood v. Joby Aviation, Inc.*, No. 25CV03794 (Cal. Super. Ct. Santa Cruz Cnty.); *see also Gesellschap v. Joby Aero, Inc.*, No. 5:25-cv-09905 (N.D. Cal.).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn &
Crutcher LLP

focus more on research and development than actual commercialization, including operating from a commune-like environment in its early years.

73.    Joby's progress since 2009 has been slow relative to Archer.  It was not until 2017 that Joby moved to flying a fullscale demonstrator prototype, still in an experimental phase.  In 2020, Joby signed a certification basis agreement for its S-4 eVTOL aircraft with the FAA.

74.    In August 2021, Joby was taken public on the New York Stock Exchange via a merger with a special purpose acquisition company led by LinkedIn founder Reid Hoffman.  Joby is presently operated in substantial part by Hoffman's close partner and associate, Joby director Michael Thompson.  On information and belief, Thompson works closely with JoeBen Bevirt, Oliver Walker Jones, Joby's Head of Marketing, Communications & Brand, and Greg Bowles, Joby's Chief Policy Officer.[15]

75.    Joby's plans to go public were announced months after Archer announced its own plans to do so; indeed, Joby's approach was extremely similar to Archer's.  As part of that transaction, Joby and Reinvent Technology Partners ("RTP"), a Cayman Islands exempted company and special purpose acquisition company, completed a merger and other transactions pursuant to which a subsidiary of RTP was merged with and into Joby Aero, and Joby Aero survived as a wholly owned subsidiary of RTP.  Then, in connection with the transactions, RTP changed its name to Joby Aviation, Inc., with Joby Aero now a wholly owned subsidiary of Joby Aviation.

76.    Since that time, Joby's early-mover market position relative to Archer has eroded— and, on information and belief, prompted Joby to engage in illegal conduct to regain the advantage.

77.    As of today, more than sixteen years after its founding, Joby has yet to commercialize its eVTOL technology.

## II.    Joby's Business Relies on China

78.    This case arises from Joby's systematic effort to conceal and misrepresent its deep operational, manufacturing, and supply-chain ties to China while simultaneously holding itself out

---

[15] *See* Citizens Podcast, Ep. 277, "Michael Thompson," at 35:07, https://youtu.be/k-pLgJR_gq8?si=EMYIksXGzGImtZpf ("This is a very active Board … .  It's almost like an operating committee, frankly.") (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

as an American-made, vertically integrated aerospace company. In a regulator-gated, zero-sum eVTOL market—where access to FAA resources, defense eligibility, and government credibility are finite—Joby's China misconduct was not incidental. It was strategic.

79.    As detailed below, Joby has maintained and relied upon a Chinese subsidiary and China-based manufacturing capabilities for years, and on information and belief has been importing large volumes of aircraft-related materials and components from China while obscuring their true nature through false and misleading classifications. At the same time, Joby affirmatively markets itself to U.S. regulators, investors, customers, and government agencies as a domestic manufacturer with a secure, vertically integrated U.S. supply chain—statements that are materially misleading in light of Joby's actual dependence on China.

**A.    Joby's Longstanding and Pervasive Ties To China**

80.    Joby's deep ties to China did not arise recently; rather, they trace back to the company's earliest years under the leadership of founder and CEO JoeBen Bevirt. For more than a decade, Bevirt and Joby publicly embraced and promoted China-facing technological development, manufacturing relationships, and international collaboration when doing so aligned with Joby's commercial and engineering objectives. On information and belief, Bevirt was living in China and developing his business when in 2007 he posted on X (then Twitter): "[C]hina is locked and loaded."[16]







---

[16] *See* @joeben, X (May 14, 2007, 12:33 PM), https://x.com/joeben/status/88362922 (last visited Mar. 7, 2026); @joeben, X (Jan. 12, 2009, 10:23 PM), https://x.com/joeben/status/165789362 (last visited Mar. 7, 2026); and @joeben, X (Mar. 8, 2010, 8:17 PM), https://x.com/joeben/status/410220222 (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

81.    Bevirt was again in China in 2009 developing his business ties when he was interviewed for a *Stanford Magazine* profile discussing Joby's founding and its initial technologies.[17]

82.    And more recently, Bevirt is quoted in a Chinese-language article published in *Zhihu* stating that "China is not only the largest market, but also the starting point for redefining future transportation."[18]  The *Zhihu* article reports that Joby's plans for the Chinese market include "By 2025, deploy[ing] 1,000 aircraft in China by 2025; [b]uilding a charging network in 5 major city clusters; [r]ecruit[ing] the first batch of 3,000 pilots," and selecting its first four cities for aircraft deployment in Shenzhen, Hainan, Chengdu, and Hangzhou.[19]

83.    But the article stated that, because of what Bevirt termed "China speed," Joby has had to "make rapid adjustments to its Chinese market strategy," including "technical cooperation with top Chinese battery manufacturers; [e]stablish[ing] an R&D center in Shenzhen; [and] [b]uild[ing] a localized supply chain system."[20]  And it noted that Joby is "utilizing China's BeiDou Satellite Navigation System to enhance aircraft precision" and "announced that it has reached a strategic cooperation with a Chinese technology giant."[21]

84.    Indeed, for more than a decade, Joby has operated a wholly owned Chinese subsidiary, Joby China.  First registered on February 9, 2012, Joby China is a wholly owned subsidiary of Joby Aviation that, according to an archived version of its website, is engaged in "research and development work on motor, toy plane, electronic products, [and] machinery manufacturing equipment," and has developed power "generator equipment [that] has been

---

[17]    *See Flexible Thinking*, Stanford Magazine (January/February 2009), https://stanfordmag.org/contents/flexible-thinking (last visited Mar. 7, 2026).

[18] *Joby Aviation: Opening the Chinese Market, How Aircraft Will Reshape Future Mobility*, Zhihu (Jan. 11, 2025), https://zhuanlan.zhihu.com/p/17762289713 (last visited Mar. 7, 2026) (a certified English translation is attached hereto as Exhibit A).

[19] *Id.*

[20] *Id.*

[21] *Id.*

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

exported to Europe and the United States."[22] Joby China's website has since been taken down, but based on information and belief the business remains active, having published and/or updated over fifteen new job postings between February and December 2025 in Shenzhen and being named in public bidding records in 2025.

85. These recent job postings include a number of highly technical engineering positions which require "Good English" to "[i]nterface with overseas engineers regarding aircraft parts and new tooling"[23] and "participate the design and execution of the manufacturing processes in China," as these new employees located in China "help [Joby] build the future of urban air mobility" and develop the "technological backbone of Joby's operations" by "participat[ing in] the design and execution of the manufacturing processes in China, Germany and the United States."[24]

86. Joby China is also actively developing intellectual property in China. Public patent records show that Joby China has been granted multiple utility-model patents in China as recently as November and December 2025, including CN223643298U, CN223616768U, CN223604109U, and CN223610836U, each issued by the China National Intellectual Property Administration in late 2025.[25] These patents cover manufacturing and measurement technologies relevant to aerospace component production—including clamping devices, additive-manufacturing support structures, and precision measurement instruments for use in testing of aeronautical components.[26]

---

[22] Joby Metal (Shenzhen) Co., Ltd., Internet Archive Wayback Machine (June 20, 2018, 10:12 AM), https://web.archive.org/web/20180620101234/http://www.jobymetal.com/ (last visited Mar. 7, 2026).

[23] Senior Manufacturing Engineer (高级数控工程师), Joby Metal (Shenzhen) Co., Ltd., Liepin (猎聘), https://www.liepin.com/job/1978092495.shtml (last visited Mar. 7, 2026).

[24] Power Platform Developer/Engineer (制造工程师), Job Posting, Joby Metal (Shenzhen) Co., Ltd., Liepin (猎聘), https://www.liepin.com/job/1978060035.shtml (last visited Mar. 7, 2026).

[25] *See* CN223643298U (issued Dec. 9, 2025), CN223616768U (issued Dec. 2, 2025), CN223604109U (issued Nov. 28, 2025), CN223610836U (issued Nov. 28, 2025), China Nat'l Intell. Prop. Admin. (CNIPA) Patent Publication System, https://epub.cnipa.gov.cn (last visited Mar. 7, 2026).

[26] *Id.*

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

87.    Indeed, Joby's effort to take down the Joby China website illustrates the lengths to which Joby has gone in recent years to mask its ties to China.  The images below are from the archives of Joby China's since-taken-down website.  They show Joby's China manufacturing operations, producing component parts that, on information and belief, it exports to the United States and that include vital components of Joby's eVTOL aircraft.





88.    Since 2018, Joby China's only customer appears to have been its parent, Joby, in the United States.

89.    It also appears that Joby has not complied with the mandate that it protect U.S. technologies from undue influence or access by China.  Based on information and belief, Joby personnel operating out of Joby China utilize "jobyaviation.com" email addresses, indicating that there is overlap in the company's information technology infrastructure between the U.S. Joby parent entity and its Chinese subsidiary, making it susceptible to access by the Chinese government.  Such an approach is inconsistent with best practices for U.S. companies operating in China, which typically do full segregation.  Joby's apparent lack of industry-accepted safeguards

in its China operations makes it an easier target for cyber theft and, on information and belief, likely puts Joby in violation of its contracts with the U.S. Government.

90.    Moreover, based on information and belief, Joby's deep ties to China have been foundational to its progress towards developing its aircraft, and Joby China is deeply ingrained with the Chinese government and the CCP. PRC Company Law, Article 18, requires companies in China to permit the establishment of CCP organizations ("party branches"). Additionally, the CCP Constitution (Chapter V, Article 30) requires the formation of a party branch if three or more CCP members are employed in a private enterprise. CCP party branches are installed to ensure the company follows CCP directives and may report back to party superiors. The potentially current or future presence of a party committee within Joby China could give the CCP insight into internal operations or leverage over strategic decisions.

91.    China commentators have confirmed that Shenzhen is at the "forefront" of the Chinese government's initiative to develop what its State Council has termed the "low-altitude economy."[27]

92.    At the national level, China's NDRC—an "organ of the [Chinese State Council's] military industrial planning apparatus," according to the Department of War ("DoW"),[28] has an entire department dedicated to formulating, organizing, and implementing China's "strategic" plans for the "low-altitude economy."[29] In addition to the NDRC, China's "Ministry of Industry and Information Technology," "Ministry of Science and Technology," "Ministry of Finance," and "Civil Aviation Administration" are reportedly engaged in similar efforts to implement the State Council's directive.[30]

---

[27] Fan Yang, *City in the Sky: Drones, Shenzhen, and the 'Low-Altitude Economy'*, 10 Made in China J. 38 (2025), https://madeinchinajournal.com/2025/08/12/city-in-the-sky-drones-shenzhen-and-the-low-altitude-economy/ (last visited Mar. 7, 2026).

[28] *SZ DJI Tech. Co. v. U.S. Dep't of Def.*, 2025 WL 2761210, at *8 (D.D.C. Sept. 26, 2025).

[29] Press Release, Xinhua, *China's Top Economic Planner Sets Up Department to Boost Low-Altitude Economy*, State Council P.R.C. (Dec. 28, 2024), https://english.www.gov.cn/news/202412/28/content_WS676fb6afc6d0868f4e8ee567.html (last visited Mar. 7, 2026).

[30] Yang, *supra*, *City in the Sky*.

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn &
Crutcher LLP

93.    At the local level, no municipal government has "heeded the [State Council's] call to develop the low-altitude economy" more than Shenzhen's,[31] which has engaged Chinese government actors, including the local outpost of the NDRC, to "position Shenzhen as a 'Global Leading City for the Low-Altitude Economy.'"[32]

94.    In sum, the eVTOL "manufacturing powerhouse of the Shenzhen cluster" reflects, on information and belief, a "tightly coordinated public policy" directed by China's military-industrial planning apparatus.[33]

95.    Joby China is, unsurprisingly, enmeshed in this military-industrial public policy.  Joby China has, on information and belief, received direct technology grants and support from the Chinese government and is listed in Shenzhen's Prospective Technology-Based Small Medium Enterprise Registry—a registry specifically designed to align private enterprises with CCP-directed innovation and military-civil fusion programs.

96.    Further, on information and belief, the CCP's Ministry of Industry and Information Technology, Ministry of Commerce, and Ministry of Finance have provided Joby China with multiple monetary grants as well as tax incentives, subsidized interest on bank loans, extended loss carry-forward allowances, preferential treatment in innovation projects, and brand promotion.

97.    Moreover, based on information and belief, one of Joby China's employees is listed as number 214 on an official Shenzhen government roster of "returned overseas-educated personnel" who received housing and living subsidies from the State after studying in the United States—an indicator of CCP-linked talent recruitment and technology acquisition programs.[34]

---

[31] *See id.*

[32] China eVTOL News, *Shenzhen Low-Altitude Aircraft Takeoff and Landing Facilities Layout Plan (2026–2035)*, China eVTOL News (Nov. 1, 2025), https://www.chinaevtolnews.com/p/shenzhen-low-altitude-aircraft-takeoff (last visited Mar. 7, 2026).

[33] Enrique Dans, *The Low-Altitude Leap: How China Is Owning the Sky Below 1,000 Meters*, Medium (Oct. 23, 2024), https://medium.com/enrique-dans/the-low-altitude-leap-how-china-is-owning-the-sky-below-1-000-meters-322c35bbbf0f (last visited Mar. 7, 2026).

[34] *See* Alex Joske, *Hunting the Phoenix: The Chinese Communist Party's Global Search for Technology and Talent*, Australian Strategic Policy Institute (Aug. 20, 2020), https://www.aspi.org.au/report/hunting-phoenix/ (last visited Mar. 7, 2026).

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

98.    These types of red flags have caused other companies in the aerospace industry to be proscribed by the DoW as "Chinese military companies," unsuitable for grants, contracts, loans, partnerships, or other support from the federal government.[35]

99.    For example, a drone manufacturer based in Shenzhen has been proscribed as a "Chinese military company" for years owing to the "assistance" (*e.g.*, subsidies, tax breaks, favorable treatment, *etc.*) it has received "through science and technology efforts" of "Chinese governmental entities" associated with the "Chinese military industrial planning apparatus," such as the NDRC.[36]

100.    Apparently unconcerned by these ever-present risks, Joby has continued to develop its close China ties—even as it obscures and omits them in its actions and statements on this side of the Pacific Ocean.  In November 2024, CEO JoeBen Bevirt presented at a conference held in China—the International Electric Aviation Forum in Kunshan—where he shared information about Joby's technologies and programs.

101.    A February 9, 2026 post on social media platform X by account "GUTE_RachelHan" (claiming to be a curator of tech and industry data and CEO of LabX) reported that Bevirt recently visited the Chinese eVTOL developer XPeng, which is developing a "Land Aircraft Carrier" modular flying car expected to start deliveries in late 2026.[37]  A video included in the post showed Bevirt flying in the XPeng prototype.  The X post posited that Bevirt's visit to the Chinese company was "not just a simple visit, but a strategic exploration with the possibility of future collaboration in mind."[38]

102.    The post noted that "the current situation is a 'reverse consideration,' with Joby seeking solutions from China with "the possibility of combining China's strong manufacturing and

---

[35] *SZ DJI Tech. Co.*, 2025 WL 2761210, at *1-4, *21; *see also* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1260H, 134 Stat. 3388, 3965 (2021) (codified as a note to 10 U.S.C. § 113).

[36] *SZ DJI Tech.*, 2025 WL 2761210, at *3, *7–11.

[37] @guteslax, X (February 9, 2026, 11:04 PM), https://x.com/guteslax/status/2021118046438621248 (last visited Mar. 7, 2026) (a certified English translation is attached hereto as Exhibit B).

[38] *Id.*

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

supply chain capabilities with the US certification framework, [to create] a synergy that is viewed as further accelerating the commercialization of the flying car industry."[39]  The post further reported that the "most likely" reason behind Joby's visit to XPeng was "to secure the supply chain" for Joby's own eVTOL aircraft.[40]

103.    The following is a screenshot of the video included with the @guteslax X post showing Bevirt flying in the XPeng prototype.

### B.    Playing Both Sides of the Pacific

104.    Joby has attempted to play both sides of the Pacific—presenting one narrative to Chinese regulators and partners while simultaneously advancing a contradictory narrative to U.S. regulators, defense stakeholders, and the investing public.  When engaging in China, Joby has been candid about its openness to Chinese manufacturing, technological development, and collaboration.  But when seeking U.S. government certification and military-adjacent opportunities, Joby has portrayed itself as a "vertically integrated" American aerospace company.  It repeatedly highlights vertically integrated manufacturing operations in Ohio and California and represents that it "designs, builds, and tests" its aircraft in the United States through

[39] Id.

[40] Id.

a "vertically integrated" supply chain. These statements were crafted to convey to the U.S. government, business partners, and investors that Joby's aircraft are fundamentally American-made and domestically sourced, thereby positioning Joby as a secure, compliant, and preferred U.S. aviation partner—particularly for government and defense programs, including at least $131 million in contracts awarded through the U.S. Air Force's AFWERX Agility Prime program. Participation in AFWERX and similar programs carries an implicit national-security endorsement and signals compliance with U.S. sourcing requirements, supply-chain integrity standards, and foreign-influence safeguards.

105. This bifurcated strategy allowed Joby to extract benefits from both regulatory regimes while concealing the extent to which its aircraft and supply chain depend on China, thereby distorting competition and undermining the integrity of U.S. regulatory and procurement processes.

106. Most recently, Joby has tried to bury its ties to China. As noted previously, Joby has taken down the Joby China website. And beginning with its most recent annual filing, Joby altered the way it identifies its subsidiaries in its SEC disclosures. In its Form 10-K for the year ended December 31, 2025 (filed Feb. 27, 2026), Joby's list of "Significant Subsidiaries" in Exhibit 21.1 identifies only Joby Aero and no longer lists Joby China—which had appeared in the same exhibit for the previous four years.[41] This abrupt change—removing the Shenzhen manufacturing entity from Joby's public subsidiary list, and stating in only one buried reference that Joby has operations in Shenzhen, China—further evinces Joby's efforts to obscure its ties to China.

107. At the same time, Joby has repeatedly proclaimed to the world—and in particular to the U.S. government—that its manufacturing of eVTOLs is and will be vertically integrated, producing its component parts and aircraft domestically in the United States. It has publicly asserted that it plans to participate in the White House eIPP based on its promise that Joby pursues a "vertical integration strategy" under which "Joby designs, tests and builds nearly every aspect of its aircraft and air taxi service in-house."[42]

---

[41] *See* Joby Aviation, Inc., Annual Report (Form 10-K) Ex. 21.1 (Feb. 27, 2026); *cf.* Joby Aviation, Inc., Annual Report (Form 10-K) Ex. 21.1 (Feb. 27, 2025).

[42] Joby Aviation, Press Release, *Joby Plans to Jumpstart US Operations through White House eVTOL Integration Program* (Sept. 12, 2025), https://ir.jobyaviation.com/news-events/press-

Gibson, Dunn & Crutcher LLP

108.    Bevirt claimed in May 2025 that Joby's air taxi "is designed, manufactured and assembled here in the US, and we are a proudly American company, employing engineers and other experts across 40 different US states."[43]  On July 15, 2025, Joby announced expansion of its manufacturing facilities in California and Ohio, claiming that, "[d]rawing on top talent at its California and Ohio facilities, Joby designs, builds, and tests its aircraft in the US," and again touting the "[a]dvantage[s] of [its] Vertical Integration" through which "Joby handles nearly every aspect of its aircraft and air taxi service in-house, from design and manufacturing to pilot training and operations."[44]  And on January 7, 2026, Bevirt reiterated: "we're ready to make sure that the commercial and defense aircraft that define the future of flight are built right here in America."[45]  For his part, Reid Hoffman has claimed Joby is "creating a vehicle that could be a pinnacular example of American innovation."[46]

109.    The "technology" section of Joby's website still asserts the misleading claim that "Joby is a vertically-integrated company, meaning we design, engineer, test and manufacture our critical aircraft components in-house" and that it is "An American Company" whose eVTOL aircraft is "[d]esigned, engineered, built and tested in America."  Website, Joby Aviation, https://www.jobyaviation.com/technology (last visited Mar. 7, 2026).  These misleading statements intentionally create the false impression that Joby is a fully vertically integrated American company.  These proclamations, however, are designed to conceal the truth that Joby is still reliant

---

releases/detail/144/joby-plans-to-jumpstart-us-operations-through-white-house (last visited Mar. 7, 2026).

[43] Joby Aviation, Press Release, *Joby Flies Two Aircraft Simultaneously in Testing Milestone* (May 11, 2025), https://www.jobyaviation.com/news/joby-flies-two-aircraft-simultaneously/ (last visited Mar. 7, 2026).

[44] Joby Aviation, Press Release, *Joby Expands Manufacturing Capacity in California and Ohio, Adds New Aircraft to Its Fleet* (July 15, 2025) https://ir.jobyaviation.com/news-events/press-releases/detail/133/joby-expands-manufacturing-capacity-in-california-and-ohio (last visited Mar. 7, 2026).

[45] Joby Aviation, Press Release, *Joby to Expand Manufacturing Footprint with Acquisition of Second Ohio Facility* (Jan. 7, 2026), https://www.jobyaviation.com/news/joby-to-expand-manufacturing-footprint-with-acquisition-of-second-ohio-facility/ (last visited Mar. 7, 2026).

[46] Joby Aviation, Inc., Registration Statement (Form S-1) 146 (Aug. 2, 2021), https://www.sec.gov/Archives/edgar/data/1819848/000119312521225907/d145933ds1.htm (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

on China-sourced technology and components and a Chinese subsidiary, even as it publicly obscures that dependence.

110.    Indeed, the available data on Joby China's imports to Joby in the United States present a concerning picture: Joby has imported some shipments from Joby China that appear in line with Joby's aviation business and Joby China's metals business, such as stainless steel and aluminum goods.  But, on information and belief, other import records indicate Joby has engaged in tariff evasion.

**III.    Joby Has Engaged in Unlawful Tariff Evasion As Part Of Its Unlawful Competition**

111.    An importer must classify merchandise in accordance with the Harmonized Tariff Schedule ("HTS") of the United States (19 U.S.C. § 1202).  Misclassification and misdeclaration of HTS codes by an importer is a violation of 19 C.F.R. Part 152.11, as an evasion of tariffs.  This includes both knowingly or negligently providing false descriptions or incorrect HTS codes to secure lower duty rates (or duty-free treatment), and is classified as Import-Misclassification Fraud.  Importers engaged in import-misclassification fraud face civil liability under, among other statutes, 19 U.S.C. § 1592 (Section 592 of the Tariff Act of 1930) for civil penalties (negligence, gross negligence, or fraud).  An importer may also be criminally charged with smuggling under 18 U.S.C. § 545 for importing merchandise through the customhouse using any false, forged, or fraudulent invoice, or other document or paper.  18 U.S.C. § 1001 also criminalizes false statements and falsifying, concealing, or covering up by any trick, scheme, or device a material fact in a matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States.

112.    Upon information and belief, public records reveal that Joby is in violation of 19 U.S.C. § 1592 and 18 U.S.C. §§ 545 and 1001, and that Joby violated these civil and criminal statutes and used its connections with its Chinese subsidiary to unfairly compete with Archer.  Specifically, publicly available records within the global Harmonized System ("HS") that subsume the more specific U.S. HTS codes show that, on information and belief, Joby has imported from Joby China what appear to be thousands of pounds of fraudulently labeled goods.  This includes thousands of pounds of products imported by Joby from Joby China that, upon information and

belief, have been fraudulently misclassified by Joby and/or its agents as "photo albums," "bed canopies," "hair clips," and "socks." The following chart (reproduced above) shows the tons of imports Joby has received, including from its Chinese subsidiary:

*Note: The source of this information is from third-party shipping records aggregators and public import databases last visited March 7, 2026.*

| Joby China's Shipments to Joby in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Date | Suppliers | Product Description | HS Code | Weight (approx.) | Country of Origin | Bills of Lading |
| 12/19/2025 | Wuxi Jiaqing Youpin E Commerce Co | Aluminum Honeycomb Panel | **N/A** | 278 kg | China | **House:** EXDO6396009731<br><br>**Master:** COSU6436363773 |
| 10/11/2025 | Tuv Rheinland China Ltd | Joby Charge Handle | **9303.90 -** Arms and ammunition; parts and accessories thereof; Other firearms and similar devices which operate by the firing of an explosive charge (for example, sporting shot- guns and rifles, muzzle-loading firearms, Very pistols and other devices designed to project only signal flares, pistols and revolvers for firing blank ammunition, captive-bolt humane killers, line-throwing guns); Other | 104 kg | China | **House:** DMERDFS037003934<br><br>**Master:** CMDUTJN0752490 |
| 9/9/2025 | Shenzhen Infypower Co. Ltd. | Charger Charger Module | **8414.59 -** Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Air or vacuum pumps, air or other gas compressors and fans; ventilating or recycling hoods incorporating a fan, whether or not fitted with filters; gas-tight | 1,031 kg | China | **House:** DMERDFS045088893<br><br>**Master:** EGLV149505373467 |

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| Date | Manufacturer | Product | HTS Code | Weight | Origin | Bill of Lading |
|---|---|---|---|---|---|---|
| | | | biological safety cabinets, whether or not fitted with filters; parts thereof; Fans; Other | | | |
| 9/2/2025 | Taizhou Dehao Technology Co. Ltd. | Floating Dockfloating Dock | **8909.0 -** Ships, boats and floating structures; Vessels and other floating structures for breaking up (scrapping) | 9,790 kg | China | **House:** SZLOVLSZ25080086 **Master:** COSU6426585630 |
| 08/10/2025 | Joby Metal Shenzhen Co. Ltd. | Napkin | **4803.00 -** Toilet or facial tissue stock, towel or napkin stock and similar paper of a kind used for household or sanitary purposes, cellulose wadding and webs of cellulose fibers, whether or not creped, crinkled, embossed, perforated, surface-colored, surface-decorated or printed, in rolls or sheets | 2,549 lbs (1,156 kg) | China | **House:** WMIDMAY25071260 **Master:** MATS3450990000 |
| 1/5/2025 | Joby Metal Shenzhen Co. Ltd. | Socks | **6115.99 -** Pantyhose, tights, stockings, socks and other hosiery, including graduated compression hosiery (for example, stockings for varicose veins), and footwear without applied soles, knitted or crocheted – Other – Of other textile materials | 10,849 lbs (4,921 kg) | China | **House:** WMIDMAY24120748 **Master:** MATS5465630000 |
| 03/27/2024 | Joby Metal Shenzhen Co. Ltd. | Mold | **8480.41 -** Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Molding boxes for metal foundry; mold bases; molding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics; Molds for metal or metal carbides; Injection or compression types | 2,965 lbs (1,345 kg) | China | **House:** KYSILSAP2400150 **Master:** ONEYSZPE33182400 |

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

| 01/02/2024 | Joby Metal Shenzhen Co. Ltd. | Hair Clip | **3305.30** - Essential oils and resinoids; perfumery, cosmetic or toilet preparations – Preparations for use on the hair – Hair lacquers | 6,138 lbs (2,784 kg) | China | **House:** WMIDMAY23120554 <br><br> **Master:** MATS4534366000 |
|---|---|---|---|---|---|---|
| 11/15/2023 | Joby Metal Shenzhen Co. Ltd. | Aisi Stainless Steel Aluminum | **7219.14** - Flat-rolled products of stainless steel, of a width of 600 mm or more – Not further worked than hot-rolled – Of a thickness of less than 4.75 mm | 6,634 lbs (3,009 kg) | China | **House:** NAQANAP2300112 <br><br> **Master:** HDMUSZPM63461800 |
| 11/13/2022 | Joby Metal Shenzhen Co. Ltd. | Bed Canopy | **6302.10** - Bed linen, table linen, toilet linen and kitchen linen – Bed linen – Of cotton | 5,335 lbs (2,420 kg) | China | **House:** WMIDMAY22110124 <br><br> **Master:** MATS3522874000 |
| 01/26/2022 | Joby Metal Shenzhen Co. Ltd. | Photo Albums | **4820.50** - Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles – Albums for samples or for collections | 5,666 lbs (2,570 kg) | China | **House:** MNQOSHA012200333 <br><br> **Master:** MATS3896222004 |
| 05/02/2021 | Joby Metal Shenzhen Co. Ltd. | Battery Explosion Proof Test Chamber | **9031.20** - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof; Measuring or checking instruments, appliances and machines, not specified or included elsewhere in this chapter; profile projectors; parts and accessories thereof; Test benches | 5,952 lbs (2,700 kg) | China | **House:** MLQDSHA042100367 <br><br> **Master:** MATS6734406010 |
| 06/17/2020 | Joby Metal Shenzhen Co. Ltd. | Metal Printer | **8471.60** - Automatic data-processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data – Input or output units, whether or not containing | 4,941 lbs (2,241 kg) | China | **House:** CHKMSOA005082205 <br><br> **Master:** ONEYHKGA62017300 |

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | storage units in the same housing | | | |
| 08/30/2019 | Joby Metal Shenzhen Co. Ltd. | Polishing Machine Microscopes Precision Cutting Machine Ultrasonic Cleaner Electronic Scale Vacuum Chamber | **8456.20** - Machine tools for working any material by removal of material, by laser or other light or photon beam, ultrasonic, electro-discharge, electro-chemical, electron beam, ionic-beam or plasma arc processes – Operated by ultrasonic processes | 933 lbs (423 kg) | China | **House:** CHKMSOA907040976 **Master:** ONEYHKGVC2567600 |
| 06/13/2019 | Joby Metal Shenzhen Co. Ltd. | Printing Machine | **9006.10** - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof; Photographic (other than cinematographic) cameras; photographic flashlight apparatus and flashbulbs other than discharge lamps of heading 8539; parts and accessories thereof | 5,357 lbs (2,430 kg) | China | **House:** HYSLFSZX19051259 **Master:** ONEYHKGV89063900 |
| 12/03/2018 | Joby Metal Shenzhen Co. Ltd. | Pkgs Ceramic Fiber Paper | **6914.90** - Ceramic products; Other ceramic articles; Other | 990 lbs (449 kg) | China | **House:** NAQA1817819S **Master:** APLU751058352 |

113.   There is no reasonable explanation for Joby to have imported thousands of pounds of products described as napkins, socks, hair clips, bed canopies, and photo albums from its Chinese metal-supplier subsidiary.

114.   Based on information and belief, Joby and/or its agents have misclassified imports from its Chinese subsidiary to conceal Joby's imports of metal, technical, or other parts from China.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

115.    Joby's apparent tariff evasion constitutes acts of unfair competition.  On information and belief, Joby has obtained an unlawful benefit in not paying required duties on materials imported from China, giving Joby an illegal, unfair competitive advantage.

**IV.    Joby Is a U.S. Government Contractor and Its Status as Such Is Central to Its Business**

116.    Joby is, and at all relevant times has been, a U.S. government contractor, having entered into multiple contracts and agreements with agencies of the United States government, including the U.S. Air Force and agencies within the DoW, pursuant to federally administered programs for advanced aerospace research, testing, and evaluation.

117.    Joby has publicly represented to investors, regulators, and the market that these government contracts validate its technology and competitive standing, and Joby has relied upon its status as a U.S. government contractor to obtain credibility, funding, and strategic advantage.

**A.    U.S. Air Force – AFWERX Agility Prime Programs**

118.    Launched in April 2020, AFWERX Agility Prime is the U.S. Air Force's collaborative initiative to work with the industrial base on testing and experimentation, accelerating development of the commercial eVTOL industry, and enabling resilient distributed logistics and sustainable mobility.[47]  Agility Prime's goal is to accelerate the development of eVTOL aircraft through funding for early flight testing and experimentation, access to facilities such as wind tunnels or airspace, and access to uniquely capable aerospace subject-matter experts of the DoW.

119.    In or about October 2020, the U.S. Air Force, through AFWERX and the Agility Prime program, selected Joby to participate in Agility Prime.  AFWERX "entered [into] an agreement with Joby Aviation to gain insight into and ultimately support flight testing and FAA certification of the Joby eVTOL aircraft."[48]  "This agreement supports Joby's commercial business

---

[47] Air Force Research Laboratory, *AFWERX Agility Prime – A New Era of Aerospace* (Nov. 22, 2012),    https://www.afrl.af.mil/News/Article/2850369/afwerx-agility-prime-a-new-era-of-aerospace (last visited Mar. 7, 2026); Air Force, *Agility Prime to hold virtual launch event* (Apr. 14, 2020),    https://www.af.mil/News/Article-Display/Article/2147892/agility-prime-to-hold-virtual-launch-event/ (last visited Mar. 7, 2026).

[48] Air Force Research Laboratory, Press Release, *As AFWERX Agility Prime celebrates two years, partner Joby Aviation announces acoustic data from NASA testing* (May 17, 2022),

Gibson, Dunn & Crutcher LLP

goals while simultaneously assessing utility against a variety of future Government use cases."[49]  As part of Joby's participation, Joby entered into Small Business Innovation Research ("SBIR") and/or Other Transaction Authority ("OTA") agreements with the U.S. Air Force, thereby formally becoming a DoW contractor.  The purpose and scope of these agreements were limited to research, testing, modeling, simulation, and demonstration of Joby's aircraft for exploratory military use cases, including logistics, cargo transport, and personnel movement.

120.    These early agreements involved incremental, task-based funding, subject to performance milestones and government discretion.  Upon information and belief, Joby's obligations under these agreements included, among other things: providing access to aircraft, simulations, and technical data; conducting flight tests and demonstrations under military oversight; and complying with DoW safety, reporting, and data-rights requirements.

121.    Participation in the AFWERX Agility Prime Program required Joby to complete the U.S. Air Force's SBIR Proposal Submission Instructions.  The Proposal Submission Instructions include a specific disclosure regarding its foreign affiliations: "[s]mall business concerns must complete the Disclosures of Foreign Affiliations or Relationships to Foreign Countries webform in Volume 7 of the DSIP proposal submission."[50]

122.    The SBIR Proposal Submission Instructions further state that the U.S. Air Force "will review all proposals submitted in response to this BAA to assess security risks presented by small business concerns seeking a Federally funded award.  The [US]AF will use information provided by the small business concern in response to the Disclosure of Foreign Affiliations or Relationships to Foreign Countries and the proposal to conduct a risk-based due diligence review on the cybersecurity practices, patent analysis, employee analysis, and foreign ownership of a small business concern, including the small business concern and employees of the small business

---

https://www.afrl.af.mil/News/Article-Display/Article/3034496/as-afwerx-agility-prime-celebrates-two-years-partner-joby-aviation-announces-ac/ (last visited Mar. 7, 2026).

[49] *Id.*

[50] Dep't of the Air Force, *SBIR Phase I Proposal Submission Instructions*, Air Force 25.4 Solicitation, Vol. 7 (Disclosures of Foreign Affiliations or Relationships to Foreign Countries) (2025), https://www.dodsbirsttr.mil/submissions (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

concern to a foreign country, foreign person, foreign affiliation, or foreign entity."[51]  The Disclosure of Foreign Affiliations or Relationships to Foreign Countries form specifically asks whether the applicant has a "parent company, joint venture, or subsidiary, of the applicant or awardee that is based in or receives funding from, any foreign country of concern," which includes "the People's Republic of China."[52]

123.    The SBIR and STTR Extension Act of 2022 ("Extension Act"), Public Law 117–183 (Sep. 30, 2022), amended section 9 of the Act, 15 U.S.C. § 638(g)(13)–(17), (o)(17)–(21), and (vv), to require small businesses applying for SBIR or Small Business Technology Transfer program awards to disclose information about the applicant's investment and foreign ties and specifically identify ties to "foreign countries of concern."  Per the Extension Act, the term "foreign country of concern" has been defined to include at present four countries, one of which is the PRC.

124.    Thus, as a participant in the U.S. Air Force's AFWERX Agility Prime Program, Joby had an affirmative obligation to disclose all ties to the PRC.

125.    Joby's third quarter of 2022 Form 10-Q filed with the U.S. Securities and Exchange Commission ("SEC") includes the executed July 28, 2022 SBIR contract between Joby and the U.S. Air Force committing almost $20 million in funds to Joby in which Joby agreed, among other things, that "access to important technology developments under this Agreement by Foreign Firms or Institutions must be carefully controlled," and that Joby "shall comply with all applicable provisions of the International Traffic in Arms Regulations (22 C.F.R. Part 120, *et seq.*), the National Security Program Operating Manual (NISPOM) (DoD 5220.22-M), and the Department of Commerce's Export Administration Regulations (15 C.F.R. Part 730, *et seq.*)."[53]  Joby likewise agreed that it was required to "immediately deliver to the cognizant security office and [Agreements

---

[51] *Id.* (Air Force Proposal Evaluations) (emphasis added).

[52] U.S. Small Bus. Admin., *Small Business Innovation Research (SBIR) & Small Business Technology Transfer (STTR) Program Policy Directive—Appendices app. III (Required Disclosures of Foreign Affiliations or Relationships to Foreign Countries)* (May 2023), https://www.sbir.gov/sites/default/files/SBA%20SBIR_STTR_FINAL_APPENDICES_MAY2023.pdf (last visited Mar. 7, 2026).

[53] *See* Joby Aviation, Inc., Quarterly Report (Form 10-Q), at 32 (Nov. 4, 2022), https://ir.jobyaviation.com/sec-filings/quarterly-reports/content/0001819848-22-000187/0001819848-22-000187.pdf (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

Officer], a written notice of any change in the extent and nature of foreign ownership, control or influence over [Joby]."[54]  On information and belief, Joby did not fully and accurately make required disclosures concerning China's access to technology developed under the SBIR contract or China's influence over Joby, which Joby obfuscated through its apparent misclassification of imports from China and failure to properly disclose the risks created by its reliance on its Chinese subsidiary.

126.    Another executed SBIR contract between Joby and the U.S. Air Force prohibits Joby from using any equipment related to an "unmanned aircraft system" from, among other covered foreign countries, "The People's Republic of China."[55]  On information and belief, Joby did not fully and accurately disclose its use of equipment related to an unmanned aircraft system that it imported from China, including through the apparent misclassification of the true nature of the imported materials and products

127.    Joby's omissions allowed it to bypass the heightened scrutiny to which it otherwise would have been subject by the U.S. Air Force in reviewing its applications.

**B.    Expanded U.S. Air Force – AFWERX Agility Prime Contracts**

128.    On April 25, 2023, Joby publicly announced that it had been awarded an expanded Agility Prime contract with the U.S. Air Force, described by Joby as having a value of $55 million and potentially expanding Joby's total AFWERX Agility Prime contracts "up to [approximately] $131 million" (which Joby has publicly characterized as even higher in total value when aggregated with prior phases).[56]  This award constituted an OTA framework agreement with a maximum funding ceiling, not a guaranteed or fully funded contract.

---

[54] *Id.* at 35.

[55] *See* Joby Aviation, Inc., Exhibit 10.1 to Quarterly Report (Form 10-Q) (Nov. 4, 2025), https://ir.jobyaviation.com/sec-filings/all-sec-filings/content/0001819848-25-000596/joby-20250930x10qxexx10_1.htm (last visited Mar. 7, 2026).

[56] Joby Aviation, Press Release, *Joby Aviation to Deliver Aircraft to Edwards Air Force Base as Part of Department of Defense Contract Valued up to $131 Million* (Apr. 25, 2023), https://ir.jobyaviation.com/news-events/press-releases/detail/60/joby-aviation-to-deliver-aircraft-to-edwards-air-force-base (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

129.    At the time of the deal's announcement, Joby publicly represented that the new agreement "provides the company with access to testing facilities, early operational experience for government customers, as well as a partial offset to its research and development costs."[57]

130.    In or about August 2024, Joby announced that it had delivered an eVTOL aircraft to the U.S. Air Force.  In February 2025, Joby announced that a second aircraft was delivered to Edwards Air Force Base in January to expand ongoing flight testing with the U.S. Air Force.[58]  Joby also announced that it completed a training program covering the maintenance of its aircraft, having previously trained four U.S. Air Force pilots to fly it.

131.    On September 3, 2025, the Air Force Research Laboratory issued a public statement confirming that "AFWERX awarded Small Business Innovation Research [SBIR] Phase II and III contracts to support flight trials of Joby's autonomous technology."[59]

132.    The AFWERX Phase II contract, which is memorialized through the execution of an Other Transaction Prototype Agreement ("OTPA"), incorporates by reference a number of Federal Acquisition Regulation ("FAR") and Defense Federal Acquisition Regulation Supplement ("DFARS") terms which require defense contractors like Joby to comply with additional contractual terms focusing on national security, data protection, and cybersecurity.

133.    For example, Article VIII of the OTPA titled "Foreign Access to Technology" states that "[t]he Parties agree that research findings and technology developments arising under this Agreement may constitute a significant enhancement to the national defense, and to the economic vitality of the United States.  Accordingly, access to important technology developments under this Agreement by Foreign Firms or Institutions must be carefully controlled."

---

[57] *Id.*

[58] *See* Joby Aviation, Press Release, *Joby Reports Record Certification Progress and Delivery of Second Aircraft to US Air Force at Edwards Air Force Base* (Feb. 25, 2025), https://www.jobyaviation.com/news/joby-reports-record-certification-progress-delivery-second-aircraft-edwards/ (last visited Mar. 7, 2026).

[59] Press Release, Air Force Research Laboratory, *Autonomous aircraft capabilities showcased by AFWERX, Joby at Department-Level Exercise* (Sept. 3, 2025), https://www.afrl.af.mil/News/Article-Display/Article/4291163/autonomous-aircraft-capabilities-showcased-by-afwerx-joby-at-department-level-e (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

134.    Article IX of the OTPA titled "Foreign Ownership, Control, or Influence" states that "Foreign Ownership, Control, or Influence (FOCI) means the situation where the degree of ownership, control, or influence over a Performer by a foreign interest is such that a reasonable basis exists for concluding that compromise of classified information may result. The Performer shall immediately deliver to the cognizant security office and AO, a written notice of any change in the extent and nature of foreign ownership, control or influence over the Performer. In addition, any notice of changes in ownership or control which are required to be reported to the Securities and Exchange Commission, the Federal Trade Commission, or the Department of Justice, shall also be furnished concurrently to the Agreements Officer."

135.    The AFWERX Phase II OTPA also expressly confirms that Joby must comply with applicable U.S. national-security and export-control regimes, including the International Traffic in Arms Regulations ("ITAR"), the National Industrial Security Program Operating Manual ("NISPOM"), and the Export Administration Regulations ("EAR") (collectively, the "Export Control and Security Requirements"). These Export Control and Security Requirements restrict the access, transfer, and disclosure of controlled technical data and technology—including to foreign persons and foreign affiliates—and impose affirmative safeguarding, monitoring, and reporting obligations in connection with performance of the AFWERX-funded work.

136.    Again, Joby's continued participation in the U.S. Air Force's AFWERX Agility Prime Program created an affirmative obligation to accurately disclose ties to China within Joby's business, and Joby's deliberate concealment allowed it to bypass the heightened scrutiny to which it otherwise would have been subject by the U.S. Air Force and/or SBIR in reviewing its applications. They likewise obligated Joby to comply with DoW's and the U.S. Air Force's FAR and DFARS requirements as well as Export Control and Security Requirements such as ITAR, NISPOM, and EAR. If Joby was and is sharing via deemed exports and technology transfers to Joby China for the design and development of aircraft parts, batteries, and manufacturing equipment, among other things, that could require export licenses to authorize transfer. On information and belief, Joby provided information to Joby's China subsidiary in violation of U.S. export requirements and failed to fully and accurately disclose its ties to China, thereby avoiding

Gibson, Dunn & Crutcher LLP

47

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

additional compliance costs and delays it would have incurred if it had been forthcoming about its use of aircraft components manufactured in and sourced by Joby from China.

**C.      Joby's NASA Research Collaboration**

137.    Joby has also participated in research collaborations with NASA, including programs related to AAM, noise testing, and airspace integration.  Joby itself stated that it was the "first company to fly an all-electric vertical takeoff and landing (eVTOL) aircraft as part of NASA's Advanced Air Mobility (AAM) National Campaign."[60]

138.    Joby's public representations regarding its NASA collaboration further underscore the materiality of its regulatory and export-control compliance obligations.  Under its Umbrella Nonreimbursable Space Act Agreement with NASA Ames Research Center (SAA2-403721) ("Space Act Agreement"), Joby expressly agreed—pursuant to Article 16—to comply with all applicable United States export control laws and regulations, including ITAR (22 C.F.R. Parts 120–130), and EAR (15 C.F.R. Parts 730–774).[61]  These obligations require strict controls on the access, transfer, and disclosure of technical data, defense articles, and dual-use technologies, including restrictions on access by foreign nationals, foreign subsidiaries, and foreign-controlled entities.  Specifically, Joby agreed that "technical data" which is "subject to the export laws and regulations of the United States provided to Partner … must not be given to foreign persons or transmitted outside the United States without proper U.S. Government authorization."[62]  Joby's Space Act Agreement further incorporates federal compliance expectations concerning export classification, licensing, technology transfer controls, and the safeguarding of sensitive aerospace data.  By entering into this Space Act Agreement, Joby represented to NASA that it maintains and

---

[60] Joby Aviation, Press Release, *Joby and NASA Collaborate to Measure Noise Footprint of Electric Air Taxi* (Sept. 1, 2021), https://ir.jobyaviation.com/news-events/press-releases/detail/17/joby-and-nasa-collaborate-to-measure-noise-footprint-of (last visited Mar. 7, 2026).

[61] Nonreimbursable Space Act Umbrella Agreement Between the National Aeronautics and Space Administration Ames Research Center and Joby Aero, Inc., SAA2-403721 (Dec. 20, 2022), https://www.nasa.gov/wp-content/uploads/static/saa/domestic/37414_SAA2-403721_Joby_Aero_NRUSAA_Agreement_Fully_Executed_122022.pdf (last visited Mar. 7, 2026).

[62] *Id.* § 10(G).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

enforces robust export-control compliance procedures, including mechanisms to prevent unauthorized foreign access to controlled technical information.

139.    These export-control commitments are not isolated to NASA engagement; they mirror the compliance obligations that attach to participation in federal procurement and defense-adjacent programs, including obligations under ITAR, EAR, and regulations administered by OFAC, as well as supply-chain integrity requirements applicable to government contractors.  Engagement with NASA and other federal agencies necessarily implicates heightened scrutiny of foreign ownership, control, influence, and sourcing—particularly where aerospace technology with potential defense applications is involved.  Joby's public portrayal of itself as a fully domestic, vertically integrated aerospace manufacturer was material in this context.

### D.    The White House eVTOL Executive Order and Announcement of the eIPP

140.    On June 6, 2025, the President of the United States issued the "Unleashing American Drone Dominance" Executive Order establishing a comprehensive federal policy governing unmanned aircraft systems ("UAS"), including eVTOL aircraft and other AAM technologies.[63]  The Executive Order expressly links the development, certification, and commercialization of eVTOL aircraft to national economic security, domestic manufacturing capacity, and protection of the United States supply chain.

141.    The Executive Order declares that UAS and eVTOL aircraft "enhance United States productivity, create high-skilled jobs, and are reshaping the future of aviation," and identifies eVTOL aircraft as "emerging technologies" that "promise to modernize methods for cargo delivery, passenger transport, and other advanced air mobility capabilities."[64]  The Order further states that "[t]he United States must accelerate the safe commercialization of drone technologies and fully integrate UAS into the National Airspace System," and it emphasizes that "[b]uilding a strong and secure domestic drone sector is vital to reducing reliance on foreign sources, strengthening critical

---

[63] Exec. Order No. 14,307, *Unleashing American Drone Dominance*, 90 Fed. Reg. 24,727 (June 6, 2025),    https://www.whitehouse.gov/presidential-actions/2025/06/unleashing-american-drone-dominance (last visited Mar. 7, 2026).

[64] *Id.* § 1.

Gibson, Dunn & Crutcher LLP

supply chains, and ensuring that the benefits of this technology are delivered to the American people."[65]

142. As a matter of binding federal policy, the Executive Order directs U.S.-government agencies to ensure continued American leadership in UAS and eVTOL aircraft development by:

a) "accelerating the safe integration of UAS into the National Airspace System";

b) "advancing the domestic commercialization of UAS technologies at scale, including their safe and secure manufacturing, production, and integration"; and

c) "strengthening the domestic drone industrial base and promoting the export of trusted, American-manufactured UAS."[66]

143. The Executive Order contains express mandates prioritizing U.S. manufacturing and supply-chain security. Section 7(a) provides that: "[a]ll agencies shall prioritize the integration of UAS manufactured in the United States over those made abroad to the maximum extent permitted by law."[67] Section 7(b) further explains that, "[i]n order to protect the integrity of America's drone supply chain and ensure our technology remains secure from undue foreign influence and exploitation," the federal government must identify foreign entities that pose supply-chain risks and take affirmative steps to secure domestic control over vital components.[68] Consistent with that objective, the Executive Order directs the Secretary of Commerce to take actions "to secure the United States drone supply chain against foreign control or exploitation."[69]

144. To implement these policies, the Executive Order directs the DOT, acting through the FAA, to establish the eIPP. The eIPP is designed to accelerate real-world eVTOL operations through structured public-private partnerships and operational testing. The Executive Order mandates that, within specified timeframes, the FAA must select at least five pilot projects, and that selection criteria "shall include, at a minimum, the use of eVTOL aircraft and technologies

---

[65] *Id.*

[66] *Id.* § 3(a)-(c).

[67] *Id.*

[68] *Id.* (emphasis added).

[69] *Id.* § 7(c).

developed or offered by a United States-based entity."[70]  The eIPP is an integral part of the White House's directive that eVTOL development should be free from the influence of foreign interests.

145.    In addition, the Executive Order updates DoW federal procurement eligibility by authorizing the DoW to "procure, integrate, and train using low-cost, high-performing drones manufactured in the United States" and update the Defense Innovation Unit's Blue UAS List to enable all authorized platforms to operate on military installations or ranges.  It also directs the DoW to prioritize the procurement of drones made by U.S. companies that are compliant with Section 848 of the FY 2020 National Defense Authorization Act.[71]  Section 848 generally restricts the DoW from procuring UAS that are manufactured in China or which contain components, data storage or network connectivity linked to China.  On information and belief, Joby is circumventing this restriction through its material misrepresentations and omissions concerning its heavy reliance on China components, making Joby aircraft sitting on some of the U.S.'s most strategically important Air Force bases a Trojan Horse threatening to compromise U.S. national security.

146.    When asked how the DOT/FAA will ensure that companies disclose the "types of details and evaluate proposals from companies that have established subsidiaries in China and/or received financial support from the Chinese government, and/or lack segregated data infrastructure to ensure sensitive information is not subject to foreign access or influence" and whether "such factors [will] be treated as disqualifying under the U.S.-based entity requirement and the EO's supply chain security mandate,"  DOT responded that "[t]he awarded OTAs will bar selected participants from working with adversarial nations and data protections language will also be included in the OTA.  The definition of [a] United States based company for purposes of this requirement is identified in the SIR."[72]

147.    Critically, the SIR defines a "United States based company" as an entity that (1) is organized or incorporated under the laws of a State, territory, or possession of the United States or

---

[70] *Id.* § 6(a)(ii).

[71] National Defense Authorization Act for Fiscal Year 2020 § 848, Pub. L. No. 116-92, 133 Stat. 1198, 1508 (2019).

[72] U.S. Gen. Servs. Admin., SAM.gov Contract Opportunity, *eIPP Questions and Answers*, https://sam.gov/workspace/contract/opp/4a6bff2fbfd8415b99f65f8a771df136/view (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

the District of Columbia; (2) has its principal place of business in the United States; and (3) is not directly or indirectly owned or controlled by a foreign entity." This definition makes clear that companies seeking to participate in the eIPP must demonstrate not only formal U.S. incorporation, but also freedom from foreign ownership or control—criteria specifically designed to ensure that eVTOL aircraft developed under the eIPP are genuinely American and insulated from foreign-adversary influence.

148.    The FAA's response underscores that eIPP participation hinges on whether an applicant is "directly or indirectly owned or controlled by a foreign entity." Given Joby's wholly owned Chinese subsidiary, Joby China, the assistance Joby China has received from the Chinese government, and Joby's reliance on China-sourced components and manufacturing, there is substantial reason to question whether Joby can satisfy this threshold eligibility criteria under the SIR's definition. If Joby's operations, supply chain, or critical aircraft components are directly or indirectly controlled or influenced by a foreign entity—including through Joby China's deep integration with CCP-linked programs—Joby should not qualify as a "United States based company" for purposes of the eIPP.

149.    These provisions make clear that the federal government views reliance on foreign-manufactured UAS or eVTOL components—particularly those with ties to China—as a material economic and national-security concern, and that regulatory and operational approvals are intended to reinforce domestic production and ensure trusted supply chains.

**E.    Joby's Intended Participation in the eIPP**

150.    As noted above, Joby has publicly asserted that it plans to participate in the eIPP based on its promise that it pursues a "vertical integration strategy" under which it "designs, tests and builds nearly every aspect of its aircraft and air taxi service in-house."[73] This assertion of "vertical integration" combined with Joby's repeated public pronouncements about its manufacturing and design work in the U.S. intentionally conveys specific, testable facts about

---

[73] Joby Aviation, Press Release, *Joby Plans to Jumpstart US Operations through White House eVTOL Integration Program* (Sept. 12, 2025), https://ir.jobyaviation.com/news-events/press-releases/detail/144/joby-plans-to-jumpstart-us-operations-through-white-house (last visited Mar. 7, 2026).

domestic sourcing and in-house manufacturing that are contradicted by Joby's reliance on China-sourced components and its Chinese subsidiary.

151. Yet the FAA's December 2025 Q&A guidance confirms that eligibility for the eIPP requires that an applicant be "not directly or indirectly owned or controlled by a foreign entity." Joby operates a wholly owned Chinese subsidiary that, upon information and belief, has received direct technology grants from the Chinese government, is listed in Shenzhen's Prospective Technology-Based Small Medium Enterprise Registry aligned with CCP-directed innovation programs, and employs individuals designated as "returned overseas-educated personnel" receiving government subsidiaries. These extensive ties to the Chinese government and CCP-linked programs raise serious questions as to the extent to which Joby is directly or indirectly owned or controlled by a foreign entity within the meaning of the SIR, and thus whether Joby can lawfully participate in the eIPP at all.

152. As set forth more fully above, upon information and belief Joby and/or its agents have misclassified imports from its Chinese subsidiary in order to hide its reliance on these China-sourced materials and ties to the CCP.

153. Joby's public-facing materials—including its website, press releases, investor communications, and statements by management—repeatedly and prominently emphasize California, Ohio, and the United States generally as the locations of its design, manufacturing, testing, workforce, and corporate identity. Joby frequently describes itself as an "American" aviation company committed to U.S. manufacturing, U.S. jobs, and the domestic industrial base. By contrast, Joby's public marketing materials and SEC filings no longer contain any substantive references to Joby China, despite the existence of a China-based subsidiary located in Shenzhen. And any discussion of supply-chain geography is limited to vague references to "global suppliers" in SEC risk disclosures that do not identify China by name.[74]

---

[74] *See, e.g.*, Joby Aviation, Inc., Annual Report (2025 Form 10-K), at 22 (Feb. 25, 2026) ("Despite our high degree of vertical integration, we still rely on purchased parts and materials for aircraft production and manufacturing equipment which we source from suppliers globally … ."), https://ir.jobyaviation.com/sec-filings/all-sec-filings/content/0001819848-26-000160/0001819848-26-000160.pdf (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

154. This pronounced mismatch whereby Joby publicly highlights its U.S. locations while omitting any mention of China creates a clear implied narrative that Joby's aircraft and supply chain—including its technology—are almost exclusively domestic, such that, if Joby were shown to materially import components from China or rely on China-based manufacturing, the omission of those facts would be materially misleading to investors, government partners, and other stakeholders evaluating Joby's supply-chain integrity, regulatory suitability, and national-security posture.

**F.      These U.S. Government Contracts Were Possible Only Because of Joby's Assurances That It Was Not Reliant on Chinese Imports**

155. On information and belief, Joby's contracts and research collaborations with U.S. agencies, including the U.S. Air Force, the DoW, and NASA, would not have occurred absent Joby's express and implied representations that it was vertically integrated, domestically controlled, and not reliant on China-sourced components, manufacturing, or infrastructure.

156. As described above, the federal programs in which Joby participated—AFWERX Agility Prime, OTPA and SBIR agreements with the U.S. Air Force, NASA research collaborations, and Joby's anticipated participation in the eIPP—are governed by statutory, regulatory, and policy frameworks that prioritize U.S.-manufactured aircraft, trusted domestic supply chains, and the exclusion of foreign adversary influence, particularly from China. Participation in these programs necessarily requires contractors to make representations concerning their manufacturing practices, supply chains, data handling, and corporate structure, either expressly or as a condition of eligibility.

157. Consistent with those requirements, Joby repeatedly represented to government agencies, investors, and the public that it pursued a "vertical integration strategy" under which it "designs, tests and builds nearly every aspect of its aircraft in-house." Joby further represented that its technology, manufacturing, and operations were domestically based and aligned with U.S. national-security and industrial-base priorities. These representations were not incidental; they were material to Joby's eligibility for participation in government-sponsored programs designed to

Gibson, Dunn & Crutcher LLP

54

foster trusted, American-developed aviation technologies and to avoid reliance on foreign supply chains.

158.    Upon information and belief, these representations are material to the selection of Joby for participation in Agility Prime and related OTA and SBIR agreements, to granting Joby access to sensitive facilities, airspace, data-sharing arrangements, and government expertise, and to engaging in ongoing testing and evaluation of Joby's aircraft.

159.    The materiality of Joby's representations is underscored by the June 6, 2025 Executive Order directing federal agencies to "prioritize the integration of UAS manufactured in the United States over those made abroad," to secure the U.S. drone and eVTOL supply chain against "foreign control or exploitation," and to exclude from federal programs aircraft and components tied to China.  In this regulatory and policy environment, a company that is materially reliant on China-sourced manufacturing, components, or subsidiaries will face heightened scrutiny, potential ineligibility, or disqualification from the very programs on which Joby relies to advance its technology and business.

160.    Nevertheless, as alleged herein, Joby's assurances of vertical integration and domestic sourcing were deliberately false and misleading.  Upon information and belief, Joby was reliant on imports from its Chinese subsidiary and other China-linked sources, and it affirmatively concealed that reliance through misclassification of imports.  Had Joby accurately and completely disclosed its China-related supply-chain dependencies, on information and belief it would not have been awarded funding in the DoW- and NASA-affiliated programs, nor could it credibly present itself as a preferred candidate for future federal initiatives such as the eIPP.  Indeed, given the FAA's confirmation that eIPP participants must not be "directly or indirectly owned or controlled by a foreign entity," Joby's concealment of its Chinese subsidiary and extensive reliance on China-sourced components suggests that Joby would fail to qualify for eIPP participation altogether if its true foreign dependencies were disclosed.

161.    Joby's concealment of its China-based supply chain allowed it to cut regulatory and diligence corners and move more quickly through the FAA's certification process than it otherwise could have.  And it likewise aided Joby's application for, and acquisition of, AFWERX

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

funding. Both of these processes are heavily influenced by representations concerning domestic manufacturing, supply-chain security, and freedom from foreign dependence. By falsely presenting itself as a vertically integrated, all-American manufacturer, Joby avoided heightened scrutiny that would have slowed its applications, delayed funding, or otherwise rendered it less competitive. In doing so, Joby secured AFWERX funding and related government resources that, absent its concealment, would have been directed to Archer—the only other viable American eVTOL competitor operating transparently within the same regulator-gated and zero-sum funding environment.

162. Upon information and belief, each of Joby's government contracts and collaborations were not merely coincidental to its public narrative of domestic, vertically integrated manufacturing; they were awarded to Joby *because of* Joby's misrepresentations and omissions concerning its supply chain and its freedom from reliance on China.

**V.    Joby Depends on a China Supplier with Significant Ties to the CCP**

163. On information and belief, Joby imports batteries that power its aircraft—arguably the single most important component in an electric vehicle—from suppliers in China. If this were widely known, it would expose the material falsity of Joby's frequently repeated claim that its research and development and manufacturing are vertically integrated and based in the United States. Several Chinese media articles have reported, for example, that Jiangsu Zenergy Battery Technologies Group Co., Ltd. ("Zenergy") became a battery partner of Joby in 2023.[75] On information and belief, Zenergy has deep ties to the CCP.

164. Zenergy's chairperson of the Board, Fang Cao, served as a director of Fuyao Glass Industry Group ("Fuyao Glass") from 1994 to 2014 and is the sister of Fuyao Glass's founder Dewang Cao. Referred to in the Oscar-winning documentary *American Factory* as "Chairman Cao," Dewang Cao is an indirect investor in Zenergy.[76] Zenergy's general manager Jicheng Chen

---

[75] *See, e.g.*, *Serving eVTOL Air Taxis! This TOP10 Power Battery Company Is About to Take To the Skies*, Sohu.com (Sept. 22, 2023), https://www.sohu.com/a/722671975_121124483 (last visited Mar. 7, 2026) (a certified English translation is attached hereto as Exhibit C).

[76] Lemon Zhao, *De Wang Cao's Indirectly Invested Company Goes Public in Hong Kong, Battery Capacity Expected to Reach 505 GWh by 2026*, Metal.com (Feb. 7, 2023), https://news.metal.com/newscontent/103165341-De-Wang-Caos-Indirectly-Invested-Company-

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

also held high-level positions at Fuyao from 2003 through 2016.[77]  Public reports indicate that the CCP has a longstanding presence at Fuyao Glass, a major Chinese automotive glass manufacturer with a significant plant in Moraine, Ohio that extends from the company's trade union to the highest echelons of its senior management.[78]  In 2024, federal law enforcement agents executed search warrants at dozens of Fuyao locations in Ohio related to potential money laundering, labor, and tax crimes.[79]

## VI.   But for Joby's Concealment of Its Relationship to China, the FAA Would Devote More Resources to Archer

165.   Joby's concealment of its China-based sourcing and relationships has artificially distorted the eVTOL competitive landscape along the FAA's type-certification process.

166.   Joby and Archer are the only two eVTOL manufacturers to have achieved the level of progress they have with the FAA as part of their efforts to achieve type certification of an eVTOL aircraft to allow them to enter into service.  On information and belief, all the other eVTOL developers are still well behind the FAA progress Joby and Archer have achieved.  Thus, this has been reduced to a two-horse race between Archer and Joby, and they compete directly and continuously for the FAA's limited pool of specialized personnel, technical expertise, and regulatory attention.  In this environment, the allocation of FAA resources is inherently zero-sum: time and attention devoted to Joby necessarily diminishes the resources available to Archer.

---

Goes-Public-in-Hong-Kong-Battery-Capacity-Expected-to-Reach-505-GWh-by-2026 (last visited Mar. 7, 2026).

[77] *Report on Zenergy (3677 HK)*, China Merchants Bank Int'l Co., Ltd. (Sept. 12, 2025), https://www.cmbi.com.hk/upload/202509/20250912610291.pdf (last visited Mar. 7, 2026).

[78] Zhang Hong, *Service for Influence? The Chinese Communist Party's Negotiated Access to Private Enterprises*, Made in China Journal (2019), https://www.proquest.com/openview/b88924f1f05c6bfeeaebb04cf9be5210/1?pq-origsite=gscholar&cbl=6464396 (last visited Mar. 7, 2026); *Setting an Employee Model for a Globalized Enterprise —Exploration by the Party Committee of Fuyao Group in Building the "Exemplary Strength of Party Members,"* People's Daily Online - CPC News Network (July 21, 2016), http://dangjian.people.com.cn/n1/2016/0721/c399425-28573726.html (last visited Mar. 7, 2026) (a certified English translation is attached hereto as Exhibit D).

[79] U.S. Dep't of Just., U.S. Att'y's Off. for the S. Dist. of Ohio, *United States Seizes Assets Related to $126 Million Illegal Staffing, Money Laundering Investigation* (Apr. 14, 2025), https://www.justice.gov/usao-sdoh/pr/united-states-seizes-assets-related-126-million-illegal-staffing-money-laundering (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

57

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

167. On information and belief, Joby has mischaracterized, minimized, or failed to disclose to the FAA the extent and significance of its connection to China, including the sourcing of materials, components, or manufacturing inputs from Chinese entities.

168. On information and belief, had Joby fully and accurately disclosed these China-based relationships, it would not consume nearly as much of the FAA's limited attention as it currently does. As a result, Joby would not advance through the FAA's certification process as quickly as it has. Meanwhile, Archer would progress through the regulatory process more quickly, commanding more of the FAA's attention if Joby's connection to China had properly come to light.

## VII. Archer's Injuries

169. The nascent eVTOL industry is not a conventional environment in which competitors can scale independently without constraint. Rather, it is a regulator-gated, zero-sum market in which a small number of companies—chiefly Archer and Joby—are competing for finite regulatory attention and government resources. This includes FAA type-certification bandwidth, specialized FAA policy and flight-test personnel, access to limited conformity and testing pathways, and participation in discrete DoW and other federal programs. Progress toward certification, operational approval, and government adoption depends not only on a company's internal execution, but on the allocation of scarce regulatory attention and institutional capacity.

170. As a result, advantages unlawfully obtained by one eVTOL manufacturer necessarily impose corresponding delays and burdens on its direct competitors. In this environment, misconduct that accelerates one firm's regulatory progress or reduces its scrutiny does not merely confer a private benefit—it directly and predictably harms the rival firm competing for the same limited regulatory resources.

171. Joby's misconduct has caused, and continues to cause, concrete and particularized injury to Archer. Joby's concealment of its Chinese manufacturing footprint, misrepresentation of its supply chain, and unlawful avoidance of tariffs and regulatory scrutiny have distorted competition in the eVTOL market and conferred upon Joby unlawful cost, timing, and regulatory advantages at Archer's expense.

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

172.   *First*, Joby's misconduct has inflicted direct competitive and economic injury on Archer. By improperly mischaracterizing or concealing the sourcing of components and manufacturing support through its China-based operations, Joby reduced its production and development costs below lawful market levels. Thus, on information and belief, Joby avoided tariffs and other trade-related costs that Archer has borne or would be required to bear if it engaged in similar conduct. These unlawful cost savings enabled Joby to allocate additional capital to engineering, testing, marketing, lobbying, and regulatory engagement—thereby distorting their relative progress.

173.   *Second*, Joby's conduct caused regulatory and competitive displacement injury. The FAA's certification resources, DoW engagement, and related government attention are finite. By misrepresenting the origin and nature of its supply chain and obscuring China-based involvement that would have triggered heightened scrutiny, Joby unlawfully diverted scarce regulatory bandwidth and agency resources to itself. That diversion has necessarily delayed and burdened Archer's own certification progress, regulatory engagement, and access to government programs in a way that would not have occurred but for Joby's misconduct—imposing costs on Archer that it would not have had to expend through ordinary market competition.

174.   *Third*, Archer has suffered reputational and goodwill harm. Joby publicly positions itself as a domestic, secure, and compliant aerospace manufacturer while privately relying on China-based manufacturing and support inconsistent with those representations. In doing so, Joby falsely holds itself out to regulators, defense stakeholders, commercial partners, investors, and the public. Archer—whose operations and supply chain are transparent and domestically oriented—is unfairly disadvantaged by Joby's deception, losing goodwill, credibility, and competitive standing it otherwise would have retained.

175.   *Fourth*, Joby's misconduct caused lost business opportunities and increased costs to Archer. Joby's ill-gotten cost and timing advantages have enabled it to secure partnerships, demonstrations, and government engagements at Archer's expense.

176.   As a direct and proximate result of Joby's misconduct, Archer has suffered damages including, but not limited to: lost competitive position; unduly delayed regulatory progress;

Gibson, Dunn & Crutcher LLP

increased compliance and operational costs; lost business and partnership opportunities; diversion of management and engineering resources; and diminution of goodwill and market valuation. Archer seeks injunctive relief, restitution, disgorgement, and all other relief necessary to restore fair competition and prevent Joby from retaining the benefits of its unlawful conduct.

177. Joby's unlawful actions have caused and continue to cause significant financial damages and harm to Archer going forward, the actual and final amounts of which will be proven at trial.

### First Counterclaim

UNLAWFUL, UNFAIR, AND FRAUDULENT COMPETITION UNDER CALIFORNIA

BUSINESS & PROFESSIONS CODE § 17200 *et seq.*

178. Archer realleges and incorporates the preceding paragraphs as if fully set forth herein.

179. On information and belief, Joby has a wholly owned subsidiary in China called Joby China Metal Shenzhen Co. Ltd. ("Joby China"), which supplies metal parts for Joby's eVTOL aircraft. On information and belief, Joby is the sole customer of Joby China. As alleged above, Joby imported several shipments from Joby China that, on information and belief, fraudulently misclassify the contents of those shipments in documents submitted to the federal government.

a) On November 13, 2022, Joby imported from Joby China 2,420 kilograms of goods classified under the HS code 6302.10 ("bed linen, knitted or crocheted").

b) On January 2, 2024, Joby imported from Joby China Joby 2,784 kilograms of goods classified under the HS code 3305.30 ("hair lacquers").

c) On January 5, 2025, Joby imported from Joby China 4,921 kilograms of goods classified under the HS code 6115.99, which is part of the section covering "panty hose, tights, stockings, socks and other hosiery."

d) On August 10, 2025, Joby imported from Joby China 1,156 kilograms of goods classified under the HS code, which includes "toilet or facial tissue stock."

180. On information and belief, Joby knowingly submitted a materially false CBP Form 7501 or similar document containing an incorrect HTS code, derived from and subsumed within

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

the publicly available HS code describing the same category of goods, to the Department of Homeland Security ("DHS") for each of the above shipments. On information and belief, Joby and/or its agents knowingly submitted these false statements to DHS with the intent to defraud the United States by avoiding or defeating the U.S. customs laws. Accurate tariff classification is central to the admissibility of merchandise and determines whether the goods may lawfully enter the United States at all. Had Joby truthfully classified the imported shipments, they would have been assessed duties that Joby avoided through its apparent unlawful circumvention. As such, on information and belief, Joby's conduct violated 18 U.S.C. § 1001, 18 U.S.C. § 545, 18 U.S.C. § 541, and 19 U.S.C. § 1592.

181.    Joby's conduct in violation of these statutes constitutes an unlawful business practice as defined by California Business and Professions Code Section 17200.

182.    Joby's misclassification of imports and underpayment of import duties is also an unfair business practice under California Business and Professions Code Section 17200. Joby's acts pose a significant threat to competition by creating an uneven playing field within the U.S. eVTOL competitive landscape and the larger urban air mobility sector.

183.    Joby also deliberately, willfully, and intentionally has publicly disseminated and continues to publicly disseminate false and misleading statements regarding its vertical integration and domestic sourcing.

184.    Joby has publicly asserted that it plans to participate in the White House eVTOL Integration Pilot Program based on its promise that Joby pursues a "vertical integration strategy" under which "Joby designs, tests and builds nearly every aspect of its aircraft and air taxi service in-house."[80] JoeBen Bevirt claimed in May 2025 that Joby's air taxi "is designed, manufactured and assembled here in the US, and we are a proudly American company, employing engineers and

---

[80] Joby Aviation, Press Release, *Joby Plans to Jumpstart US Operations through White House eVTOL Integration Program* (Sept. 12, 2025), https://ir.jobyaviation.com/news-events/press-releases/detail/144/joby-plans-to-jumpstart-us-operations-through-white-house (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

other experts across 40 different US states."[81]  On July 15, 2025, Joby announced expansion of its manufacturing facilities in California and Ohio, claiming that, "[d]rawing on top talent at its California and Ohio facilities, Joby designs, builds, and tests its aircraft in the US," and again touting the "[a]dvantage[s] of [its] Vertical Integration" through which "Joby handles nearly every aspect of its aircraft and air taxi service in-house, from design and manufacturing to pilot training and operations."[82]  And on January 7, 2026, Bevirt reiterated: "we're ready to make sure that the commercial and defense aircraft that define the future of flight are built right here in America."[83]  The "technology" section of Joby's website asserts the misleading claim that "Joby is a vertically-integrated company, meaning we design, engineer, test and manufacture our critical aircraft components in-house" and that it is "An American Company" whose eVTOL aircraft are "[d]esigned, engineered, built and tested in America."[84]  Each misleading statement intentionally creates the false impression that Joby is a vertically integrated American company when in fact Joby relies on China-sourced technology and components, even as it publicly obscures that dependence.

185.    These and the other statements by Joby outlined above in this complaint are unlawful, unfair, and fraudulent business acts and practices as defined by California Business and Professions Code Section 17200.  They are likely to deceive prospective business partners, investors and consumers and constitute false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); they are unfair in that they are substantially injurious to consumers and competition by misrepresenting Joby's business operations; and they are likely to deceive the

---

[81] Joby Aviation, Press Release, *Joby Flies Two Aircraft Simultaneously in Testing Milestone*, https://www.jobyaviation.com/news/joby-flies-two-aircraft-simultaneously (last visited Mar. 7, 2026).

[82] Joby Aviation, Press Release, *Joby Expands Manufacturing Capacity in California and Ohio, Adds New Aircraft to Its Fleet*, https://ir.jobyaviation.com/news-events/press-releases/detail/133/joby-expands-manufacturing-capacity-in-california-and-ohio (last visited Mar. 7, 2026).

[83] Joby Aviation, Press Release, *Joby to Expand Manufacturing Footprint with Acquisition of Second Ohio Facility*, https://www.jobyaviation.com/news/joby-to-expand-manufacturing-footprint-with-acquisition-of-second-ohio-facility (last visited Mar. 7, 2026).

[84] Website, Joby Aviation, https://www.jobyaviation.com/technology (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

public, as Joby intended, and are part of the total mix of information that the government and other actual and potential business customers have considered in transacting with Joby.

186. On information and belief, Joby's tariff-related misclassifications and other false and materially misleading statements alleged herein are representations of fact about Joby's business operations, goods, or services that are made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, Joby's goods or services, or were made in the course of delivering Joby's goods or services.

187. On information and belief, Joby's tariff-related misclassifications and other false and materially misleading statements alleged herein were made with the intended audience of an actual or potential buyer or customer (including the U.S. government), or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or arose out of or within the context of a regulatory approval process or proceeding.

188. Archer suffered economic injury as a result of Joby's unlawful business practices of knowingly misclassifying goods that Joby imported into the United States and making false and misleading statements about Joby's purported vertical integration and domestic sourcing. On information and belief, the misclassification of Joby's imports allowed it to pay a lower duty to the federal government than would otherwise have been the case had it accurately classified the imports. On information and belief, underpaying the U.S. federal government conferred upon Joby an unwarranted economic benefit in the form of lower costs. Likewise, Joby's false and misleading presentation of its purported domestic sourcing and business was likely to deceive and did deceive the U.S. government and other business partners into choosing Joby for lucrative contracts at Archer's expense. Given that the U.S. eVTOL market consists of two companies leading the way—Archer and Joby—any unfair advantage that accrues to Joby has had, and will continue to have, a significant negative impact on Archer in its head-to-head competition with Joby.

189. Moreover, as a result of Joby's conduct, Archer's share of the nascent eVTOL market, as defined by their respective market capitalizations, has been negatively impacted. Due in part to the unwarranted economic benefit and lower costs Joby has obtained by avoiding import

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

duties owed, Joby's market capitalization has increased at a rate that outpaced Archer's, leaving Archer with a smaller share of the market in the wake of Joby's misconduct

190. Archer will continue to suffer harm as a result of Joby's actions. Archer seeks preliminary and permanent injunctive relief prohibiting Joby from continuing its unlawful, unfair, and fraudulent business practices in violation of California's Unfair Competition Law, restitution of the profits that Joby gained from its unlawful conduct, and all other equitable relief that the court deems just and proper.

### Second Counterclaim

FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)(B)

191. Archer realleges and incorporates the preceding paragraphs as if fully set forth herein.

192. Joby's actions were and are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

193. Joby deliberately, willfully, and intentionally has publicly disseminated and continues to publicly disseminate false and misleading statements regarding its vertical integration and domestic sourcing.

194. These statements, disseminated in commerce, include Joby's repeated assurances to consumers, expressly and through omission, that its materials and manufacturing are domestically sourced and that Joby is *not* reliant on materials and manufacturing from China.

195. In the regulator-gated eVTOL market, the relevant purchasing public includes U.S. government agencies (including the U.S. Air Force), defense stakeholders, and commercial partners, whose contracting and funding decisions are influenced by government-facing materials and investor and public relations communications. Joby disseminated these statements for the purpose of influencing procurement, funding, and partnership decisions.

196. These representations—*e.g.*, that Joby "designs, tests and builds nearly every aspect of its aircraft and air taxi service in-house"—are specific, factual statements that are capable of empirical confirmation or contradiction based on supply-chain and sourcing data.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

197.    These statements are false and misleading.  Joby's omissions regarding its China-based sourcing rendered its affirmative claims of "vertical integration," "American" manufacturing, and domestic sourcing materially misleading in their context, thereby deceiving the relevant purchasing public, including the U.S. government, business partners and investors.

198.    In reality, Joby is highly dependent on Chinese materials and manufacturing.  Indeed, Joby operates a wholly owned Chinese subsidiary in Shenzhen, China, that, on information and belief, supplies Joby with critical components of its eVTOL aircrafts and is deeply enmeshed with the Chinese government and the CCP—so much so that on information and belief it has affirmatively acted to conceal its reliance through misclassification and mischaracterization of its Chinese imports.

199.    As a sophisticated company that holds itself out as an expert provider of eVTOL goods and services, Joby knows or should know that these statements are false and misleading.  Joby knows, for example, that it operates a Chinese subsidiary that produces critical components of its eVTOL aircraft and therefore knows or should know that its representations to the contrary are untrue and are likely to mislead a reasonable consumer.

200.    Yet Joby continues to disseminate these statements because it knows that such statements are necessary to induce certain consumers of eVTOL products and services to purchase (or otherwise enter into obligations relating to) Joby's products and services.

201.    For example, the U.S. government, through programs like AFWERX, has adopted various measures to ensure that it does not purchase or otherwise enter into obligations relating to products or services that are dependent or otherwise influenced by foreign adversaries, such as China.  And because the industry is nascent and closely intertwined with national security, many other consumers of eVTOL goods and services are similarly unwilling to enter into obligations for eVTOL products sourced from or otherwise influenced by foreign adversaries.

202.    Likewise, the White House's eIPP is expressly designed to strengthen the domestic aerospace industrial base by prioritizing American manufacturers, U.S.-based supply chains, and secure, non-adversarial sourcing by creating operational pathways for the top American eVTOL companies.  Participation in eIPP requires eVTOL manufactures to represent that a company's

aircraft and core components are domestically manufactured or sourced in a manner consistent with U.S. national-security and industrial-policy objectives and to "ensure that vital components remain under American control and free from national security risks."

203. To evade these barriers and induce those consumers to enter into obligations regarding its eVTOL goods and services, Joby would have to disseminate false and misleading statements omitting its reliance on and embroilment with China. And, on information and belief, that is what Joby has done. For example, on April 25, 2023, Joby publicly announced that it had been awarded an expanded Agility Prime contract through AFWERX, allegedly expanding Joby's total Agility Prime contracts "up to approximately $131 million." On information and belief, the U.S. government relied on Joby's representations as to its domestic sourcing and manufacturing, since that contract would not have been awarded, renewed, or maintained absent Joby's material misrepresentations and omissions about its sourcing from China.

204. The challenged statements were made from within the United States and were received and acted upon by U.S.-based agencies and stakeholders, producing domestic effects in U.S. procurement, regulatory engagement, and competition. The challenged statements have a tendency to deceive consumers, including the U.S. Government, whose purchasing decisions were and would be affected if they knew the full truth about the depth of Joby's reliance on China materials and technology. On information and belief, it is not just Joby's China-dependency affecting those purchasing decisions but also Joby's efforts to mask that dependency through an apparent campaign of concealment, misdirection, and tariff evasion.

205. As a result, Archer has suffered economic injuries. The eVTOL market currently is functionally a zero-sum competition between two leading actors, Archer and Joby, so the economic benefit that Joby has secured through its false and misleading statements has necessarily come at Archer's expense. Indeed, Joby's statements, by having a tendency to deceive and inducing consumers (including business partners and contracting entities like the U.S. government) to make purchases and enter into obligations they otherwise would not, have diverted sales, contracts, financing, and business opportunities away from Archer. And those unwarranted economic benefits have caused further economic injury to Archer, since they have, in part, resulted in Joby's

market capitalization increasing at a rate that has outpaced Archer's, leaving Archer with a smaller share of the market.

206. Archer has suffered—and will continue to suffer—harm as a result of Joby's false and misleading representations.

## **DEMAND FOR JURY TRIAL**

207. Archer demands a jury trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Archer prays for judgment in its favor and against Joby as follows:

a) Dismiss Joby's Complaint with prejudice;

b) Enter a judgment in favor of Archer and against Joby on all claims in Joby's Complaint;

c) An award of damages to Archer, including punitive damages;

d) Injunctive relief to enjoin Joby from continuing its unlawful conduct, including misclassifying imports;

e) An order awarding Archer compensation for any and all damages, injury, or harm;

f) An order directing Joby to pay full restitution and/or disgorgement of all profits and benefits that may have been obtained as a result of its wrongful conduct;

g) An order awarding Archer its costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure;

h) Finding this case to be exceptional under 35 U.S.C. § 285 and awarding Archer its costs and reasonable attorney fees; and

i) An order awarding Archer such further relief as the Court may deem appropriate under the circumstances.

Gibson, Dunn & Crutcher LLP

67

## ARCHER AVIATION'S ANSWER

## GENERAL DENIAL

Except as expressly admitted in this Answer, Archer denies each and every allegation in the Complaint, including, without limitation, any allegations in the introduction, headings, subheadings, or footnotes of the Complaint, and specifically denies any liability to Joby. Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, moreover, allegations in the Complaint to which responsive pleading is required shall be deemed to be denied. Archer expressly reserves the right to seek to amend and/or supplement its Answer as may be necessary.[85]

## RESPONSE TO SPECIFIC ALLEGATIONS[86]

## INTRODUCTION

1.      To the extent Paragraph 1 of the Complaint implicates legal conclusions, no response is required. To the extent that a response is required, Archer admits that in summer 2025, George Kivork resigned from Joby and was hired by Archer. Archer denies the remaining allegations and characterizations contained in Paragraph 1.

2.      Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 2, and therefore denies them.

3.      Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 3, and therefore denies them.

4.      Archer admits that it was founded in October 2018. Except as expressly admitted, Archer denies the remaining allegations and characterizations contained in Paragraph 4, and specifically denies that it has committed any act of trade secret misappropriation.

5.      Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 5, and therefore denies them.

---

[85] Answers to each paragraph of the Complaint are made by Archer without waiving, but expressly reserving, all rights Archer may have to seek relief by appropriate motions directed to the allegations in the Complaint or any subsequent amended complaint.

[86] Archer denies each and every allegation contained in any and all headings, subheadings, footnotes, and appendices in the Complaint, to the extent any allegations are contained therein.

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

6. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 6, and therefore denies them.

7. Archer denies interference with Joby's business relationship with an unidentified developer or improper disclosure or use of confidential information. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in the remainder of Paragraph 7, and therefore denies them.

8. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 8, and therefore denies them.

9. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 9, and therefore denies them.

10. To the extent Paragraph 10 of the Complaint implicates legal conclusions, no response is required. To the extent that a response is required, Archer admits that it informed Joby that it had not engaged in any wrongdoing. Archer denies the remaining allegations and characterizations contained in Paragraph 10.

11. To the extent Paragraph 11 of the Complaint implicates legal conclusions, no response is required. Archer denies the remaining allegations and characterizations contained in Paragraph 11.

## PARTIES

12. Upon information and belief, Archer admits the allegations contained in Paragraph 12.

13. Upon information and belief, Archer admits the allegations contained in Paragraph 13.

14. Archer admits the allegations in Paragraph 14.

## JURISDICTION AND VENUE

15. Paragraph 15 implicates legal conclusions to which no response is required. To the extent a response is required, Archer admits that the United States District Court for the Northern District of California has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §

1836, and supplemental jurisdiction pursuant to 18 U.S.C. § 1367. Archer denies the remaining allegations and characterizations contained in Paragraph 15.

16. To the extent Paragraph 16 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 16, and therefore denies them.

17. To the extent Paragraph 17 implicates legal conclusions, no response is required. To the extent a response is required, Archer admits that its principal office is located in San Jose, California. Archer denies that it has committed or is committing any act complained of in the Complaint, and therefore denies the remaining allegations and characterizations contained in Paragraph 17.

18. To the extent Paragraph 18 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 18, and therefore denies them.

19. To the extent Paragraph 19 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies that it has committed or is committing any act complained of in the Complaint, and therefore denies the remaining allegations and characterizations contained in Paragraph 19.

### FACTS COMMON TO ALL CLAIMS

20. Archer denies Joby's characterizations in paragraph 20. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations contained in Paragraph 20, and therefore denies them.

21. Archer denies Joby's characterizations in Paragraph 21. Archer admits that eVTOL aircrafts use electric power to take off, hover, and land vertically, and fly forward. Archer admits there is a large potential market for eVTOL aircraft. Archer otherwise denies the remaining allegations and characterizations contained in Paragraph 21.

22. Archer denies the allegations and characterizations contained in Paragraph 22.

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

23.     Archer denies that it interfered with any contractual relationship as alleged in Paragraph 23. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations and characterizations contained in Paragraph 23, and therefore denies them.

24.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 24, and therefore denies them.

25.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 25, and therefore denies them.

26.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 26, and therefore denies them.

27.     To the extent Paragraph 27 implicates legal conclusions, no response is required. Archer denies Joby intellectual property is "at risk of misuse" by Archer. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations and characterizations contained in Paragraph 27, and therefore denies them.

28.     Archer admits that in summer 2025, Kivork joined Archer. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations and characterizations contained in Paragraph 28, and therefore denies them.

29.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 29, and therefore denies them.

30.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 30, and therefore denies them.

31.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 31, and therefore denies them.

32.     To the extent Paragraph 32 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 32, and therefore denies them.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

33.    To the extent Paragraph 33 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 33, and therefore denies them.

34.    To the extent Paragraph 34 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 34, and therefore denies them.

35.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 35, and therefore denies them.

36.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 36, and therefore denies them.

37.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 37, and therefore denies them.

38.    To the extent Paragraph 38 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 38, and therefore denies them.

39.    To the extent Paragraph 39 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 39, and therefore denies them.

40.    To the extent Paragraph 40 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 40, and therefore denies them.

41.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 41, and therefore denies them.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

42.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 42, and therefore denies them.

43.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 43, and therefore denies them.

44.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 44, and therefore denies them.

45.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 45, and therefore denies them.

46.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 46, and therefore denies them.

47.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 47, and therefore denies them.

48.    Archer denies Joby's characterizations in paragraph 48.  To the extent Paragraph 48 implicates legal conclusions, no response is required.  To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 48, and therefore denies them.

49.    To the extent Paragraph 49 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 49, and therefore denies them.

50.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 50, and therefore denies them.

51.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 51, and therefore denies them.

52.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 52, and therefore denies them.

53.    Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 53, and therefore denies them.

54.     To the extent Paragraph 54 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 54.

55.     To the extent Paragraph 55 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 55, and therefore denies them.

56.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 56, and therefore denies them.

57.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 57, and therefore denies them.

58.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 58, and therefore denies them.

59.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 59, and therefore denies them.

60.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 60 regarding an unidentified developer, and therefore denies them.  Archer otherwise denies the remaining allegations and characterizations contained in Paragraph 60.

61.     To the extent Paragraph 61 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 61 regarding an unidentified developer, and therefore denies them.  Archer otherwise denies the remaining allegations and characterizations contained in Paragraph 61.

62.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 62, and therefore denies them.

63.     Archer denies the allegations and characterizations contained in the first sentence of Paragraph 63. Archer lacks knowledge or information sufficient to form a belief regarding the truth

of the remaining allegations and characterizations contained in Paragraph 63, and therefore denies them.

64.    Archer denies the allegations and characterizations contained in Paragraph 64.

65.    Archer denies the allegations and characterizations contained in Paragraph 65.

66.    To the extent Paragraph 66 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 66, and specifically denies that it has misappropriated Joby's trade secrets and that it has benefited from any trade secrets purportedly misappropriated from Joby.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against Kivork)

67.    Archer incorporates by reference its responses to Paragraphs 1–66 of the Complaint.

68.    To the extent Paragraph 68 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 68, and therefore denies them.

69.    To the extent Paragraph 69 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 69, and therefore denies them.

70.    To the extent Paragraph 70 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 70, and therefore denies them.

71.    To the extent Paragraph 71 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 71, and therefore denies them.

72.     To the extent Paragraph 72 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 72, and therefore denies them.

73.     To the extent Paragraph 73 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 73, and therefore denies them.

74.     To the extent Paragraph 74 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 74, and therefore denies them.

75.     To the extent Paragraph 75 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 75.

76.     To the extent Paragraph 76 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 76, and therefore denies them.

77.     To the extent Paragraph 77 purports to summarize the damages sought by Joby, no response is required.  To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 77.

**SECOND CAUSE OF ACTION**

**Inducement of Breach of Contract**

**(Against Archer)**

78.     Archer incorporates by reference its responses to Paragraphs 1–77 of the Complaint.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

79.    To the extent Paragraph 79 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 79.

80.    To the extent Paragraph 80 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 80.

81.    To the extent Paragraph 81 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 81.

82.    Archer denies the allegations and characterizations contained in Paragraph 82.

83.    To the extent Paragraph 83 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 83.

84.    To the extent Paragraph 84 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 84, and therefore denies them.

85.    To the extent Paragraph 85 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 85.

86.    To the extent Paragraph 86 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 86.  Archer denies that it has caused any harm to Joby.

87.    To the extent Paragraph 87 purports to summarize the damages sought by Joby, no response is required.  To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 87.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

## THIRD CAUSE OF ACTION

### Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

### (Against Kivork and Archer)

88.    Archer incorporates by reference its responses to Paragraphs 1–87 of the Complaint.

89.    To the extent Paragraph 89 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 89, and specifically denies that it has committed or is committing any act of trade secret misappropriation.

90.    To the extent Paragraph 90 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 90, and specifically denies that it has committed or is committing any act of trade secret misappropriation.

91.    To the extent Paragraph 91 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 91, and therefore denies them.

92.    To the extent Paragraph 92 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 92, and therefore denies them.

93.    To the extent Paragraph 93 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 93.

94.    To the extent Paragraph 94 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 94.

Gibson, Dunn & Crutcher LLP

95.     To the extent Paragraph 95 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 95.

96.     To the extent Paragraph 96 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 96, and specifically denies that it has committed or is committing any act of trade secret misappropriation.

## FOURTH CAUSE OF ACTION

### Violation of California Penal Code § 502

### (Against Kivork)

97.     Archer incorporates by reference its responses to Paragraphs 1–96 of the Complaint.

98.     To the extent Paragraph 98 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 98, and therefore denies them.

99.     To the extent Paragraph 99 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 99, and therefore denies them.

100.     To the extent Paragraph 100 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 100, and therefore denies them.

101.     To the extent Paragraph 101 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 101, and therefore denies them.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

102. To the extent Paragraph 102 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 102, and therefore denies them.

103. To the extent Paragraph 103 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 103, and therefore denies them.

104. To the extent Paragraph 104 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 104, and therefore denies them.

105. To the extent Paragraph 105 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 105, and therefore denies them.

### <u>FIFTH CAUSE OF ACTION</u>

**Breach of Fiduciary Duty**

**(Against Kivork)**

106. Archer incorporates by reference its responses to Paragraphs 1–105 of the Complaint.

107. To the extent Paragraph 107 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 107, and therefore denies them.

108. To the extent Paragraph 108 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a

belief regarding the truth of the allegations and characterizations contained in Paragraph 108, and therefore denies them.

109.    To the extent Paragraph 109 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 109, and therefore denies them.

110.    To the extent Paragraph 110 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 110.

111.    To the extent Paragraph 111 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 111, and therefore denies them.

112.    To the extent Paragraph 112 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 112, and therefore denies them.

113.    To the extent Paragraph 113 purports to summarize the damages sought by Joby, no response is required.  To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 113.

**SIXTH CAUSE OF ACTION**

**Aiding & Abetting Breach of Fiduciary Duty**

**(Against Archer)**

114.    Archer incorporates by reference its responses to Paragraphs 1–113 of the Complaint.

115.    To the extent Paragraph 115 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 115, and

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

therefore denies them, and specifically denies the allegation that it has obtained or benefited from any confidential information purportedly misappropriated from Joby.

116. To the extent Paragraph 116 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 116.

117. To the extent Paragraph 117 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 117.

118. To the extent Paragraph 118 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 118.

119. To the extent Paragraph 119 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 119.

## SEVENTH CAUSE OF ACTION

### Breach of Duty of Loyalty

### (Against Kivork)

120. Archer incorporates by reference its responses to Paragraphs 1–119 of the Complaint.

121. To the extent Paragraph 121 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 121, and therefore denies them.

122. To the extent Paragraph 122 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 122, and therefore denies them.

123. To the extent Paragraph 123 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 123.

124. To the extent Paragraph 124 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 124.

125. To the extent Paragraph 125 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 125, and therefore denies them.

## EIGHTH CAUSE OF ACTION

### Aiding & Abetting Breach of Duty of Loyalty

### (Against Archer)

126. Archer incorporates by reference its responses to Paragraphs 1–125 of the Complaint.

127. To the extent Paragraph 127 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 127, and therefore denies them.

128. To the extent Paragraph 128 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 128.

129. To the extent Paragraph 129 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 129.

130. To the extent Paragraph 130 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 130.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

131. To the extent Paragraph 131 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 131.

132. To the extent Paragraph 132 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 132.

133. To the extent Paragraph 133 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 133.

## NINTH CAUSE OF ACTION

### Tortious Interference with Contract

### (Against Kivork and Archer)

134. Archer incorporates by reference its responses to Paragraphs 1–133 of the Complaint.

135. To the extent Paragraph 135 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 135, and therefore denies them.

136. To the extent Paragraph 136 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 136.

137. To the extent Paragraph 137 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 137.

138. To the extent Paragraph 138 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 138.

139.    To the extent Paragraph 139 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 139.

140.    To the extent Paragraph 140 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 140.

141.    To the extent Paragraph 141 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 141.

142.    To the extent Paragraph 142 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 142.

143.    To the extent Paragraph 143 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 143.

## TENTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

### (Against Kivork and Archer)

144.    Archer incorporates by reference its responses to Paragraphs 1–143 of the Complaint.

145.    To the extent Paragraph 145 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 145, and therefore denies them.

146.    To the extent Paragraph 146 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 146.

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

147. To the extent Paragraph 147 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 147, and therefore denies them.

148. To the extent Paragraph 148 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 148.

149. To the extent Paragraph 149 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 149.

150. To the extent Paragraph 150 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 150.

151. To the extent Paragraph 151 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 151.

152. To the extent Paragraph 152 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 152.

153. To the extent Paragraph 153 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 153.

## <u>ELEVENTH CAUSE OF ACTION</u>

### **Unfair Competition Law**

### **(Against Archer)**

154. Archer incorporates by reference its responses to Paragraphs 1–153 of the Complaint.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

155.    To the extent Paragraph 155 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 155.

156.    To the extent Paragraph 156 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 156.

157.    To the extent Paragraph 157 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 157.

158.    To the extent Paragraph 158 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 158.

159.    To the extent Paragraph 159 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 159.

160.    To the extent Paragraph 160 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 160.

161.    To the extent Paragraph 161 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 161.

## **PRAYER FOR RELIEF**

162.    Paragraph 162 sets forth the statement of relief requested by Joby to which no response is required. Archer denies that Joby is entitled to any relief against Archer and requests that the Court dismiss all claims with prejudice and order such further relief as the Court deems just and proper, including but not limited to attorneys' and expert fees pursuant to California Civil Code § 3426.4 and/or 18 U.S.C. § 1836(b)(3)(D).

# AFFIRMATIVE DEFENSES

163.    Archer asserts the following affirmative defenses, without assuming the burden of proving any fact, issue, or element of a claim where such burden properly belongs to Joby.  In addition to the affirmative defenses described below, Archer specifically reserves all rights to assert additional affirmative defenses as additional information becomes available.  Archer reserves the right to seek leave to amend its Answer to plead additional defenses and counterclaims and/or to supplement its existing defenses if information developed through discovery, trial, or otherwise, merits such additional defenses, counterclaims, or supplementation.  Pursuant to Federal Rule of Civil Procedure 8(c), Archer, without waiver, limitation, or prejudice, hereby asserts the following affirmative defenses:

## First Affirmative Defense

### Alleged Injury Caused by Others

Joby's claims are barred because damages sustained by Joby, if any, were actually and proximately caused by the conduct or misconduct of persons other than Archer.

## Second Affirmative Defense

### Defendant's Good Faith

Joby's claims are barred because Archer acted in good faith with respect to its actions.

## Third Affirmative Defense

### Joby's Bad Faith

Joby's claims are frivolous, unreasonable, groundless, and in bad faith and therefore, Joby is barred from any recovery for such claims.

## Fourth Affirmative Defense

### Adequate Remedy at Law

Joby is not entitled to injunctive relief, because, at a minimum, it has no irreparable injury and it has an adequate remedy at law.

Gibson, Dunn & Crutcher LLP

**Fifth Affirmative Defense**

**Failure to Allege Harm**

Joby has failed to demonstrate that it has suffered any damages resulting from the alleged wrongdoing, and even if it has, Joby fails to demonstrate that such damages were caused by any wrongdoing on the part of Archer.

**Sixth Affirmative Defense**

**Failure to Mitigate**

To the extent Joby may have suffered any damages, Joby has failed to take reasonable steps to mitigate such damages.

**Seventh Affirmative Defense**

**Not Unlawful, Unfair, or Fraudulent**

Joby's claims under California's Unfair Competition Law are barred in whole or in part because the alleged business practices are not unlawful, unfair, fraudulent, or likely to mislead consumers, within the meaning of Cal. Bus. & Prof. Code § 17200, or otherwise.

**Eighth Affirmative Defense**

**Failure to Plead with Particularity**

Joby's claims are barred in whole or in part because Joby fails to plead its claims with sufficient particularity.

**Ninth Affirmative Defense**

**No Willful or Knowing**

Joby's claims are barred, in whole or in part, and/or recovery is precluded, because Archer's alleged conduct was not willful/knowingly wrongful.

**Tenth Affirmative Defense**

**No Intentional Interference**

Joby's claim against Archer for tortious interference with prospective economic advantage is barred, in whole or in part, because Archer did not intentionally interfere with Joby's relationship with an unidentified developer.

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

## Eleventh Affirmative Defense

### No Independently Wrongful Conduct

Joby's claim against Archer for tortious interference with prospective economic advantage is barred, in whole or in part, because Joby has not alleged any independently wrongful conduct by Archer.

## Twelfth Affirmative Defense

### Readily Ascertainable

Joby's alleged trade secrets do not qualify for trade secret protection because they are readily ascertainable by proper means.

## Thirteenth Affirmative Defense

### Unclean Hands

Joby's claims for relief are barred, in whole or in part, by the doctrine of unclean hands.

## Fourteenth Affirmative Defense

### No Entitlement to Interest, Attorney's Fees or Costs

Joby is not entitled to interest, attorneys' fees, or costs in connection with this action.

## Fifteenth Affirmative Defense

### Unjust Enrichment

Joby's right to relief is barred by the doctrine of unjust enrichment because Joby would be unjustly enriched if allowed to recover the relief claimed to be due.

## Sixteenth Affirmative Defense

### Independently Conceived

Joby's claim against Archer for misappropriation of trade secrets is barred, in whole or in part, because Archer independently conceived of, and/or developed, the information Joby alleges Archer misappropriated.

## Seventeenth Affirmative Defense

### No Legally Protected Trade Secrets

Joby's claim against Archer for misappropriation of trade secrets is barred, in whole or in part, because Joby has failed to identify any specific, legally protected trade secrets.

Gibson, Dunn & Crutcher LLP

90

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

## Eighteenth Affirmative Defense

## No Independent Economic Value

Joby's claim against Archer for misappropriation of trade secrets is barred, in whole or in part, because the alleged trade secrets lack independent economic value.

## Nineteenth Affirmative Defense

## Failure to Ensure Secrecy

Joby's claim against Archer for misappropriation of trade secrets is barred, in whole or in part, because Joby has not exercised reasonable or sufficient efforts to keep the alleged trade secrets a secret.

## JURY DEMAND

Archer demands a trial by jury on all issues so triable.

Dated: March 9, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ James L. Zelenay Jr.
James L. Zelenay Jr.
Josh A. Krevitt
Orin Snyder (admitted *PHV*)

*Attorney for Defendant and
Counterclaimant Archer Aviation Inc.*

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK