QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
  alexspiro@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Yury Kapgan (Bar No. 218366)
  yurykapgan@quinnemanuel.com
Patrick Schmidt (Bar No. 274777)
  patrickschmidt@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

Sara Pollock (Bar No. 281076)
  sarapollock@quinnemanuel.com
Michael F. LaFond (Bar No. 303131)
  michaellafond@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

*Attorneys for Plaintiff Joby Aero, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Joby Aero, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Archer Aviation Inc., and George Kivork, <br><br> Defendants. | **Case No. 5:25-cv-10703-SVK** <br><br> **FIRST AMENDED COMPLAINT** <br>   1. **BREACH OF CONTRACT** <br>   2. **INDUCEMENT OF BREACH OF CONTRACT** <br>   3. **MISAPPROPRIATION OF TRADE SECRETS** <br>   4. **VIOLATION OF B&PC § 17200** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **Judge:**    Hon. Susan van Keulen |

Plaintiff Joby Aero, Inc. ("Joby") brings this complaint for misappropriation of trade secrets pursuant to 18 U.S.C. § 1836 against Defendant Archer Aviation Inc. ("Archer") and Defendant George Kivork ("Kivork"); breach of contract against Kivork; and inducement of breach of contract and unfair competition pursuant to California Business and Professions Code § 17200 *et seq*. against Archer.

## INTRODUCTION

1.     In summer 2025, Archer recruited George Kivork, Joby's then U.S. State and Local Policy Lead.  By virtue of his position with Joby, Kivork had access to confidential and proprietary information regarding Joby's strategic partnerships, regulatory strategies, technical information, and communications with stakeholders, among other sensitive information that would be valuable for a competitor.  As a competitor operating in the same field as Joby, Archer knew that Kivork had access to exactly that kind of information.  Two days before announcing his resignation, Kivork exfiltrated a cache of highly valuable Joby files containing confidential partnership terms, business and regulatory strategies, infrastructure strategies for vertiports and airport access, and technical information about Joby's aircraft and operations.  Less than three weeks later, an external strategic partner to Joby reported that Archer had approached them with detailed knowledge about the confidential terms of that partner's exclusive agreement with Joby—information known to Kivork and contained in the files he stole.  Archer brazenly used that stolen information to interfere with Joby's exclusive strategic partnership.  Significant amounts of other Joby confidential information remain at risk in Kivork and/or Archer's possession.  This is corporate espionage, planned and premeditated.  Kivork and Archer's behavior has left Joby with no choice but to bring this action to protect Joby's valuable confidential and proprietary information.  The eVTOL sector is an emerging one with significant potential for the field and the world.  It is imperative that the innovative work done by Joby in this field—representing billions of dollars and innumerable man hours over the course of nearly two decades—is protected from this type of espionage to allow the sector to thrive.

2.     Joby was founded in 2009 with seven engineers working together in the mountains above Santa Cruz to pioneer electric vertical takeoff and landing ("eVTOL") aircraft technology. The goal was to develop aircraft powered entirely by electricity that would take off vertically like a

helicopter, but much quieter, and transition to flying like a traditional airplane.  In 2012, NASA selected Joby to collaborate on groundbreaking electric flight projects, providing crucial government validation and technical resources.  By 2015, Joby was flying subscale prototypes.  Joby progressed to flying full-scale unmanned prototypes in 2017, and created a working production prototype in 2019.  In 2020, Joby became the first eVTOL company to sign a certification basis agreement with the FAA—the foundational agreement defining the safety standards that would apply to its aircraft—and to receive airworthiness approval from the U.S. Air Force as part of the Agility Prime program.  The following year, Joby became a publicly traded company on the NYSE through a merger with a special purpose acquisition company.  In February 2024, Joby became the first eVTOL company to complete Stage 3 of the FAA's five-stage type certification process, cementing its leadership in the field.  Indeed, Joby is currently the first eVTOL company to enter the final stage of the certification process, with Joby's TIA-ready aircraft now beginning power-on testing.  By November 2025, Joby had completed more than 50,000 miles of test flights across multiple aircraft, including demonstration flights in New York City, Japan, Korea, and the United Arab Emirates.

3.      Over the last sixteen years, Joby has developed valuable technical expertise related to the manufacture and operation of eVTOL aircraft, as well as commercial and regulatory strategies, critical infrastructure strategies for vertiports and airport access, and deals with strategic partners that reflect years of refinement and participation in the eVTOL market.  To protect its substantial investments in its business relationships and intellectual property, Joby employs robust security measures, including confidentiality agreements with Joby employees and non-disclosure agreements with partners.

4.      Arriving nine years after Joby entered the eVTOL market, Archer was founded in October 2018 by two individuals with no background in aviation.  The company built its initial team by hiring engineers from other companies—and previously became embroiled in litigation involving trade secret misappropriation as a result.

5.      On July 20, 2025, Kivork informed Joby that he was leaving for a position at Archer.  To provide for a "cooling off period" that would separate Kivork's work between the competing

companies, Joby set Kivork's last working day at Joby as July 22, 2025, although he remained employed by Joby until August 3, 2025.

6.     On August 5, 2025, Joby received a troubling communication from one of its strategic partners, major real estate developer ███████████████████ (hereafter the "Developer"). Months after Joby and the Developer had executed a binding agreement, which included an exclusivity provision, Archer reached out to the Developer and proposed a deal. But Archer had not made the approach with a blank slate. In an email sent to Joby, the Developer stated that Archer knew, not just about the existence of Joby's confidential strategic partnership with the Developer, but also specific—and highly confidential—terms of the Developer's agreement with Joby. Indeed, Archer's proposed deal was deliberately calibrated to undercut Joby's agreement with the Developer. This led the Developer to tell Joby that the disclosure of those highly confidential terms must have been made by Kivork, with whom the Developer had worked while he was at Joby.

7.     Alarmed by this interference with Joby's business relationship with the Developer and the improper disclosure and use of its confidential information, Joby hired an outside vendor to conduct a forensic investigation of Kivork's now-deactivated Joby accounts and Joby-issued laptop. The results of that investigation were disturbing. Two days before Kivork announced his resignation from Joby, Kivork downloaded dozens of files from Joby's systems. That same day, Kivork also sent additional files to one of his personal email accounts.

8.     As Joby's investigation continued, it also learned that Kivork had surreptitiously changed the security permissions for hundreds of files on Joby's systems, such that they would recognize one of Kivork's personal email accounts as an "owner" of those files. That change allowed Kivork to use the login credentials for his personal email account to continue accessing Joby confidential and proprietary files at a later date, without Joby's permission or knowledge. It was also a violation of Joby's employee confidentiality policies, which explicitly forbid employees from forwarding or otherwise sharing work emails or documents, including cloud-based files, to their personal devices and accounts.

9.     In addition to information about Joby's agreement with the Developer, the files Kivork downloaded (or granted his personal email account access to) also contained highly valuable

trade secret information about Joby's aircraft and operations, business and regulatory strategy, infrastructure development plans, and site analyses for potential vertiports and airport access. Kivork had no legitimate business purpose to download those files, much less email them to a personal account—particularly because Kivork doubtlessly knew he would be resigning just two days later.

10.     On August 11, 2025, Joby demanded that Kivork and Archer immediately cease using and return Joby's trade secret and other proprietary information.  Responding through his attorney, Kivork obfuscated and repeatedly refused Joby's demands to return the stolen files. Meanwhile, Archer denied any wrongdoing and claimed to have performed a forensic investigation of Kivork's devices.  But Archer also repeatedly refused to provide Joby with the results of that "investigation" and has provided no explanation for how it learned of the existence of the agreement with the Developer, or terms of that agreement, which were confidential.

11.     For the sake of the success of the burgeoning eVTOL industry, and to ensure fair competition, Joby now brings this action to stop any further disclosures of trade secret and other proprietary information likely to irreparably damage Joby and remedy the damage that Archer and Kivork have already caused.

### PARTIES

12.     Plaintiff Joby Aero, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business located at 333 Encinal Street, Santa Cruz, California 95060.

13.     Defendant George Kivork is an individual residing in Burbank, California.

14.     Defendant Archer Aviation Inc. is a corporation organized and existing under the laws of the State of Delaware.  Archer's April 2, 2026 Statement of Information, as filed with the California Secretary of State, lists its principal office as 190 West Tasman Drive, San Jose, California 95134.

### JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 & 1367, and 18 U.S.C. § 1836(c) because this action asserts claims under the federal Defend

-4-                           Case No. 5:25-cv-10703-SVK
FIRST AMENDED COMPLAINT

Trade Secrets Act (the "DTSA"). This Court has supplemental jurisdiction over the state law claims asserted herein because they are related to, arise from a common nucleus of operative facts as, and are part of the same case and controversy as Joby's federal claims.

16. Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial portion of the events or omissions giving rise to the claims occurred in this judicial district, and the trade secrets that are the subject of this suit are situated in this judicial district. Additionally, Archer has consented to venue in this District by filing an answer without raising objections to venue. *See* Dkt. 38.

17. This Court has personal jurisdiction over Kivork pursuant to Fed. R. Civ. P. 4(k) and California's long-arm statute, Cal. Civ. Proc. Code § 410.10 because several of his unlawful acts, which give rise to the causes of action brought in this Complaint, occurred in Santa Cruz, California. Additionally, Kivork resides in the State of California, the same state where this Court is located.

18. This Court has personal jurisdiction over Archer pursuant to Fed. R. Civ. P. 4(k) and Cal. Civ. Proc. Code § 410.10. Additionally, Archer has availed itself of the courts of this District by virtue of removing this lawsuit to the federal courts of this District. *See* Dkt. 1.

## FACTS COMMON TO ALL CLAIMS

19. Joby is a leader in the race to develop eVTOL aircraft. Founded in 2009, Joby has already logged approximately 50,000 flight miles with its full-scale prototype aircraft. Joby employs over two thousand engineers and other professionals in its offices and workshops in Santa Cruz and San Carlos, California, Washington, D.C., and Munich, Germany. Joby is also developing a world-class manufacturing facility in Marina, California.

### The eVTOL Market

20. eVTOL aircraft use electric power to take off and land vertically, hover in place, and fly horizontally. Developments in battery technology and electric propulsion have launched a race to create and commercialize eVTOL air taxis, which will provide travelers with a quieter, cleaner, and faster option for short-hop urban commutes. In 2021, Morgan Stanley estimated that the total global addressable market for urban air mobility could be conservatively valued at 1 trillion dollars by 2040 and 9 trillion dollars by 2050. As a leader in developing eVTOL aircraft, Joby is positioned

to enjoy a significant share of the emerging market for urban air mobility, while providing consumers with a more efficient and environmentally friendly commuting option than currently exists.

**Joby's Substantial Efforts and Investments in Developing Proprietary Information**

21. Joby has spent over sixteen years developing its eVTOL aircraft. In that time, Joby has invested countless hours of research, labor, and flight testing and made significant investments in research and development, regulatory and business strategy, and building relationships with strategic business partners—including negotiating and executing exclusive contractual relationships like the one at issue in this lawsuit. Through substantial effort, Joby has developed a host of valuable confidential intellectual property.

22. For example, and directly relevant here, in 2022, Joby first began cultivating the contractual relationship with the Developer by reaching out to discuss both (i) Joby's potential use of existing facilities, and (ii) the possibility of developing vertiports at those facilities, or elsewhere in the area. Access to the Developer's properties would be extremely valuable to any eVTOL company, because of both the locations of the Developer's properties and the Developer's substantial and continuing infrastructure investments. For a period of approximately eighteen months, through the end of 2024, Joby made significant efforts to build a strategic partnership with the Developer, including regular meetings between employees of both companies.

23. After months of negotiations, Joby and the Developer executed an agreement dated March 12, 2025 involving an exclusive strategic partnership (the "Agreement"). The Agreement contained the key economic terms for the parties' planned projects, and granted Joby the exclusive right to design, build, and operate skydecks at certain of the Developer's properties.

24. The Agreement's exclusivity term provided that Joby and the Developer shall work together exclusively for 18 months to negotiate a more comprehensive partnership agreement. It further stated that, during the exclusivity period, the Developer shall not enter into any similar agreements or arrangements with other participants in the eVTOL market without Joby's consent. And, for the avoidance of doubt, the Agreement also states that the exclusivity term constitutes a legally binding agreement between the Developer and Joby.

25.    Critically, the Agreement, including all of its provisions, was kept confidential.  This confidentiality was intentional and economically beneficial to Joby, including because it kept the exact terms of Joby's hard-won exclusive deal from the prying eyes of competitors who may have otherwise attempted to undercut Joby.  The Agreement's terms are thus valuable, proprietary information.

26.    And, while the Agreement is (and remains) highly valuable, there is a vast amount of additional, valuable Joby intellectual property, stolen by Kivork, that is at risk of misuse by Kivork and Archer, as explained below.

**Kivork's Employment at Joby and Access to Joby Information**

27.    Kivork held the position of Joby's U.S. State and Local Policy Lead for nearly four years, before leaving for Archer in the summer of 2025.

28.    In this senior position, Kivork's core responsibilities included exercising discretion in representing Joby in discussions with local, state, and federal government officials, as well as with high-level executive employees working for strategic business partners and other key stakeholders.  Kivork was also responsible for advising Joby's leadership on regulatory strategy, which is critical to a company's success in the eVTOL market.

29.    Because of the importance and prominence of Kivork's position, as well as the trust Joby placed in him, Kivork was given access to highly sensitive and valuable Joby information. Like other Joby employees, Kivork was required to sign an Employment Agreement, along with a Proprietary Information and Inventions Agreement ("PIIA"), as a condition of his employment.

30.    Kivork was obligated to keep certain nonpublic Joby information confidential.  For example, Joby's Confidentiality Policy, which applies to all Joby employees including Kivork, states: "Provided that it's not already public information, everything that we work on, learn about, or observe in our work about Joby Aviation should be treated as Confidential Information and should not be shared, posted, or discussed publicly. Please reach out to the Legal and Compliance ('Legal Team') If you are unsure if information is public."  The policy also cautions employees to "keep in mind that [their] confidentiality obligations remain in place even if [they] are no longer working at Joby Aviation."

31. Upon stating his intent to resign from Joby, Kivork was also provided with a Proprietary Information and Continuing Obligations letter that stated: "Under applicable law and under the terms of the Proprietary Information and Inventions Agreement, dated 08/13/2021, with [Joby], you are required to keep all Proprietary Information confidential and not to use it to the detriment of [Joby].  In particular, you may not use it for, or disclose it to your new employer that is, or may[]be, a competitor to [Joby]."

32. The Proprietary Information and Continuing Obligations letter further identified "contract terms" and "commercial relationships," as well as "engineering and design data and specifications," as among Joby's "highly sensitive and confidential technical and business information" that Kivork was prohibited from disclosing or taking with him from the company.  The letter further stated: "By signing this letter below, you confirm that you have not taken such items."

33. Kivork countersigned the Proprietary Information and Continuing Obligations letter on July 22, 2025.  Kivork's signature appears directly below an Acknowledgement that reads: "I confirm that I have not taken any documents, records, information, software, or any other property of [Joby].  I also confirm that I will not disclose or use any [Joby] Proprietary Information for any purpose, whatsoever."

34. Pursuant to the PIIA, Kivork also agreed that "[u]pon termination of [his] employment," he would "promptly return to [Joby] all items containing or embodying Proprietary Information (including all copies)."  Joby's employee confidentiality policies also set forth the following restriction: "[d]o not forward work emails to your personal email account. For the avoidance of doubt, this includes forwarding messages, sharing documents (e.g., Google Docs or other cloud-based files), downloading or exporting emails, saving attachments externally, or transferring any work information via USB drives, personal devices, personal cloud accounts, or similar methods."

35. As a further protection for Joby's Proprietary Information, Kivork "agree[d] that during the term of [his] employment with [Joby] (whether or not during business hours), [he] will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of [Joby], and [he] will not assist any other person or organization in competing

-8-                          Case No. 5:25-cv-10703-SVK
FIRST AMENDED COMPLAINT

or in preparing to compete with any business or demonstrably anticipated business of [Joby]." As part of his position at Joby, Kivork was involved in Joby's early negotiations with the Developer. As one of Joby's representatives, Kivork was tasked with developing strategy for government affairs matters relevant to Joby's exclusive agreement with the Developer, including site permitting. As a result of his involvement, Kivork was given access to the terms of the exclusive deal.

**Kivork Steals Joby's Confidential Information and Leaves for Archer**

36. On July 20, 2025, Kivork informed Joby that he intended to resign and had already accepted an offer of employment at Archer.

37. In an effort to secure its confidential and proprietary information, including the trade secrets at issue in this litigation, Joby set Kivork's last working day as July 22, 2025, and shut off Kivork's access to company email and other computer systems the following morning. However, Kivork's employment with Joby did not end until August 3, 2025. The gap between July 22 and August 3 was intended to create a "cooling off period," wherein Kivork would still be available if needed, while minimizing the risk to Joby's confidential information and intellectual property.

38. On July 22, 2025, Joby conducted an exit interview with Kivork. Joby reminded Kivork of his continuing confidentiality obligations. Kivork's "offboarding packet" from Joby included written reminders of his contractual obligations to the company that continue after his employment ends, including the Proprietary Information and Continuing Obligations letter, discussed above.

39. Unbeknownst to Joby, on July 18, 2025, a Friday evening, and two days before informing Joby that he intended to resign, Kivork secretly downloaded dozens of Joby's files from Joby's electronic Microsoft SharePoint ("SharePoint") repository. He then emailed certain Joby files to a personal email account that is not within Joby's control.

40. In addition to downloading SharePoint files and emailing certain confidential files to an external account, Kivork also altered the security settings for hundreds of Joby files in a manner that would allow him to access those files after leaving Joby.

41. Joby maintains a Google Drive ("Drive") repository that is separate from the SharePoint repository. Joby configured its Drive security settings such that Joby employees can

only access information stored on Drive by using their single sign on ("SSO") credentials (which include a username and password) as discussed below.  When an employee leaves Joby, their SSO credentials are disabled, and they can no longer access information stored on Drive.

42.    On occasion, Joby also uses Drive to securely share files with third parties, such as contractors or vendors who are subject to nondisclosure agreements.  To share a file with a third party, Joby will change the security settings on that particular file to allow the third party to access the file using the third party's own login credentials.  This is referred to as adding the third party as an "owner" of the shared document.

43.    Before he left Joby, Kivork added his own personal email account as an "owner" to hundreds of files stored on Drive.  Kivork did this without Joby's knowledge or permission, and in contravention of Joby's employee confidentiality policies.  By adding his personal email account as an owner, Kivork could have used his personal email login to access those files, allowing him to circumvent Joby's security measures after he left Joby's employ.

44.    Importantly, as an owner of those files on Drive, Kivork—through his personal email account—would have had access to new information developed by Joby and added to those files, even *after* Kivork left Joby.  Thus, by adding his personal email account as an owner to the files, Kivork gave himself a method to learn new information developed by Joby that did not exist at the time Kivork left Joby.

45.    Between Kivork's downloads, emails, and alterations to Joby's Google Drive security settings, Kivork maintained illicit access to hundreds of Joby files even after he stopped working for Joby.  The hundreds of files Kivork exfiltrated included the following 27 files:

- 20240625 Vertiports – Copy.pptx
- 20250116 – ███ Strategic Partnership Counter Proposal.pptx
- Joby Policy Strategy - State & Local (2021-Q4).docx
- State & Local Policy Report (Q4 2024).pptx
- ███ Outreach Plan 2025.docx
- LA Launch Proposal.pptx
- Presentation.pptx

-10-                    Case No. 5:25-cv-10703-SVK

- 240806 – ███████ call.pptx
- APAC Demos.pptx
- ████████████████ Next Steps_28FEB2025.pptx
- Acoustics_████████.pptx
- Acoustics_███████_W_ENE.pptx
- ██████-Joby Noise.pptx
- Official_Gov Affairs Contact List.xlsx
- Copy of IMAX SJ Master Invitation List.xlsx
- IMAX SJ Master Invitation List.xlsx
- CSC IMAX – Master Tracking.xlsx
- Marina KOAR Public Presentation.pptx[1]
- ████████████ Outreach Targets.xlsx
- ██ Vertiport Community Engagement_15.xlsx
- █████ Stakeholder Targets.xlsx
- SoCal September Showcase.xlsx
- Policy Strategy.docx
- ████████████████ Engagement.pptx
- Hydrogen Presentation _███████████_7.9.24 (1).pptx
- ███████ Apr-29-24.pptx
- Joby PowerForward pitch.pptx

46.    There was no legitimate business purpose for which Kivork would have needed these documents (most of which he downloaded on Friday night two days before resigning) during his last hours working for Joby.  He certainly did not need them after he ceased working for Joby.

---

[1]  Despite the phrase "public presentation" in this document's title, Joby has determined that it was not actually presented in a public setting.

47.    The foregoing files, among others, contain extensive confidential and trade secret information developed by Joby at great cost and over an extended period of time.  Specifically, the files reveal at least the following trade secrets.[2]

48.    **Joby's Analysis of Target Markets for an Air Taxi Service.**  As part of its business plans, Joby spent considerable time and effort identifying and analyzing specific potential markets for an eVTOL air taxi service.  Joby's analysis reflects confidential and proprietary data inputs—including data that Joby acquired in 2020 when it purchased Uber Technologies, Inc.'s "Uber Elevate" division.[3]  It also reflects the outputs of proprietary Joby financial and market models.  This trade secret is reflected in at least the following documents that Kivork exfiltrated:

- 20240625 Vertiports – Copy.pptx
- 20250116 – ███ Strategic Partnership Counter Proposal.pptx
- Joby Policy Strategy - State & Local (2021-Q4).docx
- State & Local Policy Report (Q4 2024).pptx
- ███ Outreach Plan 2025.docx
- LA Launch Proposal.pptx

49.    **Joby's Site Analyses for Potential Vertiports.**  In addition to analyzing markets for an air taxi business, Joby also identified and analyzed specific proposed vertiport locations within those markets.  Joby's analysis reflects proprietary financial modeling, as well as Joby's confidential efforts to develop relationships with regulators and potential partners within the target markets.  This trade secret is reflected in at least the following documents that Kivork exfiltrated:

- 20240625 Vertiports – Copy.pptx
- 20250116 – ███ Strategic Partnership Counter Proposal.pptx
- LA Launch Proposal.pptx

---

[2]  Joby notes that discovery in this litigation has already opened, and on April 20, 2026 Joby served interrogatory responses on both Archer and Kivork that identify its trade secrets in even greater detail than is provided here.

[3]  Established in 2016, Uber Elevate was an early attempt to develop an urban aerial ridesharing market, which was intended to include eVTOL aircraft.

-12-                    Case No. 5:25-cv-10703-SVK
FIRST AMENDED COMPLAINT

- Presentation.pptx

- Joby Policy Strategy - State & Local (2021-Q4).docx

- State & Local Policy Report (Q4 2024).pptx

50.    **Joby's Infrastructure Development Plans.**  After Joby identified potential vertiport locations, it developed specific infrastructure plans for those locations.  Those plans include cost estimates as well as estimates of potential use and business growth, and even renderings showing how the vertiports would be designed and built.  This trade secret is reflected in at least the following documents that Kivork exfiltrated:

- 240806 – ██████████.pptx

- 20240625 Vertiports – Copy.pptx

- 20250116 – ████ Strategic Partnership Counter Proposal.pptx

51.    **Joby's Vertiport Business Plan.**  Using its market analyses, vertiport analyses, and infrastructure plans, Joby developed a mature business plan for the use of vertiports in support of an air taxi business, complete with target and estimated metrics, including financial break-even points.  This trade secret is reflected in at least the following document that Kivork exfiltrated:

- 20250116 – ████ Strategic Partnership Counter Proposal.pptx

52.    **Joby's eVTOL Aircraft Manufacturing Business Plan.**  Separate from its vertiport business plans, Joby has also created business plans related to the manufacture of eVTOL aircraft. These include the identification of specific manufacturing sites and buildings intended to serve Joby's long-term manufacturing goals.  This trade secret is reflected in at least the following documents that Kivork exfiltrated:

- Joby PowerForward pitch.pptx

- Marina KOAR Public Presentation.pptx

53.    **Joby's Blueprint for APAC Flight Demonstrations.**   Joby created extensive logistical and regulatory plans that enabled it to showcase its eVTOL aircraft through two historic flight demonstrations, one in South Korea, and another in Japan.  Joby's internal plans could be used by a competitor to learn how to navigate the regulatory field in South Korea and Japan, as well as plan, organize, and successfully put on flight demonstrations in the region—which would be

especially valuable to a competitor who had not previously held flight demonstrations in the area. This trade secret is reflected in at least the following document that Kivork exfiltrated:

- APAC Demos.pptx

54. **Joby's ███████████████ Business Plan.** Joby developed a specific business plan intended to ██████████████████████████████████████████ ████████████████████████████. To the best of Joby's knowledge, it is the only eVTOL company that has ever attempted this. This trade secret is reflected in at least the following documents that Kivork exfiltrated:

- ████████████████ Next Steps_28FEB2025.pptx

55. **Joby's Policy and Regulatory Strategies.** Over many years, Joby developed proprietary strategies that it would use to interface with regulators. This included specific know-how and strategies for obtaining necessary permits and other approvals in order to operate eVTOL aircraft, an air taxi service, and vertiports, as well as strategies for achieving larger policy goals (including aircraft certification). These trade secrets are reflected in at least the following documents that Kivork exfiltrated:

- State & Local Policy Report (Q4 2024).pptx
- Policy Strategy.docx
- Joby Policy Strategy – State & Local (2021 – Q4).docx
- ████████████████ Engagement.pptx

56. **Joby's Strategy for Acoustic Mitigation.** Companies in the eVTOL space compete with one another to produce the quietest possible aircraft, and to reduce the acoustic impact of operations in a given area. Consistent with those goals, Joby has developed specific methods of acoustic mitigation that are proprietary and non-public. This trade secret is reflected in at least the following documents that Kivork exfiltrated:

- Acoustics_████████.pptx
- Acoustics_████████_W_ENE.pptx
- ██████-Joby Noise.pptx

FIRST AMENDED COMPLAINT

57. **The Terms of the Agreement with the Developer.** As described above, across many months Joby negotiated a binding Agreement with the Developer. The terms of that Agreement are confidential and proprietary. This trade secret is reflected in at least the following document that Kivork exfiltrated:

- 20250116 – █████ Strategic Partnership Counter Proposal.pptx

58. **Joby's Confidential Contact Lists.** Over many years, Joby developed confidential lists of stakeholder and regulatory contacts who were interested in working with Joby and various facets of the eVTOL industry. The contact lists include federal, state, and local politicians and government officials, as well as contacts at political organizations, private community organizations, and private corporations. The lists are substantial and represent years of effort: including notes about the interactions, notes from follow-ups, and areas of interest for future engagement. The contact lists are thus bespoke and cannot be replicated merely by consulting a directory. Joby's trade secret contact lists are reflected in at least the following documents Kivork exfiltrated:

- Official_Gov Affairs Contact List.xlsx
- IMAX SJ Master Invitation List.xlsx
- ████████████ Outreach Targets.xlsx
- ████ Vertiport Community Engagement_15.xlsx
- ████ Stakeholder Targets.xlsx
- SoCal September Showcase.xlsx
- CSC IMAX – Master Tracking.xlsx

59. **Technical Aspects of Joby's Prototype Hydrogen Electric eVTOL Aircraft.** Joby has developed and flown a prototype eVTOL aircraft that uses hydrogen-electric fuel cells. The technology behind this R&D prototype is highly confidential and stems from years of research and investment. The design of that aircraft is non-public, and proprietary to Joby. The design of specific components of that prototype, along with the designs of certain ground-support equipment, appear in at least the following documents exfiltrated by Kivork:

- Hydrogen Presentation _████████_7.9.24 (1).pptx

-15- Case No. 5:25-cv-10703-SVK

FIRST AMENDED COMPLAINT

- ███████ Apr-29-24.pptx

60.    **Technical Aspects of Joby's Powertrain.**  Over many years, Joby developed the powertrain used in its eVTOL aircraft.  The technical details of such powertrain are highly confidential, and could be replicated by a competitor who became privy to those details.  Those technical details appear in at least the following documents exfiltrated by Kivork:

- Joby PowerForward pitch.pptx
- ███████ Apr-29-24.pptx

61.    To the extent Kivork used the above-identified trade secrets, or any other information in the files he exfiltrated to advance his career at Archer, that would benefit Kivork.  And, Archer would similarly benefit from Kivork using a competitor's information in his work for Archer.  On information and belief, by exfiltrating Joby's files, Kivork was preparing to compete with Joby in the marketplace in an illicit manner, and Kivork did so in concert with Archer.  Additionally, on information and belief, because Archer benefited from Kivork's use of the exfiltrated documents, Archer induced Kivork to retain those documents after he left Joby, and in violation of Kivork's contractual obligations to Joby.

62.    Like any company in a nascent technology sector, Joby enjoys a competitive advantage from maintaining the confidentiality of its technological advancements, commercial and regulatory strategies, infrastructure plans, and deal structures and terms.  The information stolen by Kivork thus represents a treasure chest of competitive secrets: a competitor would save significant resources, including years of research and development, expenditure of funds, and thousands of employee hours, by improperly obtaining and using Joby's confidential information to advance their own eVTOL business.  And it is an unquestionable advantage for a competitor to know Joby's deal terms when that competitor seeks to usurp Joby's existing and prospective partnerships.

**Joby Employs Significant Security Measures to Protect Its Proprietary Information**

63.    Joby employs extensive information technology ("IT") security measures, physical security measures, and legal precautions, to protect its valuable proprietary information.  Kivork was only able to steal Joby's information by abusing his position as a trusted Joby employee to overcome those measures.

64. **Information Technology Security.**  Joby secures its confidential and proprietary information with IT security infrastructure and best practices.  Among Joby's IT policies and practices:

a.    Joby limits access to its systems to Joby employees, who must use a single sign on ("SSO") system to access applications and files.  Administered by Joby through the Microsoft identity management platform Entra, the SSO process uses Microsoft Authenticator for two-factor authentication; only Joby employees are provided with the QR code needed to link the authentication application to a Joby account.

b.    Joby does not automatically grant every employee permission to access all systems and files.  Instead, access is provided based on an employee's role at the company.

c.    Joby's corporate documents are stored using a SharePoint document repository.  Employees cannot access SharePoint without secure log-in credentials managed by Joby's information technology security team ("IT Security").

d.    Joby corporate email can be accessed only with an SSO and two-factor authentication, including through mobile email applications.

e.    Access to Joby's servers generally requires a user to either be present in Joby's offices, or to connect to Joby's virtual private network ("VPN").  Access to the Joby VPN requires use of Joby SSO and two-factor authentication.  The VPN logs the user's activity and the device being used.

65. **Security Measures at Joby Facilities.**  Joby has implemented a range of physical security measures at both Joby offices and production facilities.  For example, Joby employees are required to wear unique identification badges while present in a Joby facility.  Access to sensitive locations within Joby's facilities is controlled by these employee badges, which must be swiped on a badge-reader to gain access.  And Joby does not provide universal access to all parts of its facilities to all employees, but instead grants access to physical spaces based on an employee's role at the company.  In addition, Joby uses closed circuit cameras to monitor its facilities and facility access, with a high concentration of cameras in and around production facilities.

-17-                    Case No. 5:25-cv-10703-SVK
FIRST AMENDED COMPLAINT

66.    **Confidentiality Agreements.**  Joby requires all employees to sign a "Proprietary Information and Inventions Agreement," which requires Joby employees to maintain the confidentiality of Joby's confidential information and intellectual property, and to the extent allowed by law, to assign Joby all intellectual property developed in the course of employment, as a condition of employment.  Joby also requires departing employees to participate in an "exit interview," and to certify during that interview that they have returned all of Joby's confidential information, as required by the Proprietary Information and Inventions Agreement.

**Archer Misappropriates Joby's Information Through Kivork**

67.    Kivork and Archer misappropriated Joby's trade secrets: Kivork misappropriated the trade secrets by disclosing them to Archer, and Archer misappropriated the trade secrets by using them to illicitly compete with Joby.

68.    After hiring Kivork, Archer announced that his job responsibilities would include "building relationships with local government and regulatory bodies while working with the community, in addition to overseeing infrastructure development."[4]  In other words, Archer hired Kivork to perform substantially the same regulatory and policy work he had performed at Joby, in addition to "overseeing infrastructure development."  Kivork was thus put into a position at Archer that would directly benefit from the use of Joby's trade secrets, including but not limited to trade secrets regarding infrastructure development, regulatory and policy strategy, and trade secret contact lists made up of regulatory and policy stakeholders.

69.    In the weeks and months after Kivork started working for Archer (while illicitly retaining possession of and/or access to Joby's documents) a pattern began to emerge.  In multiple instances, Archer appeared to be making business decisions on the basis of Joby's confidential trade secret information.

70.    For example, as early as 2023, Joby developed contacts at the Hawthorne airport in Los Angeles County.  Those contacts are listed in one of the files Kivork exfiltrated (Official_Gov

---

[4]  https://news.flyjets.com/article/joby-and-lyft-veteran-george-kivork-joins-archer-as-los-angeles-general-manager/

Affairs Contact List.xlsx) and Hawthorne is mentioned, along with other Southern California airports that could host vertiports in a second file Kivork exfiltrated (Joby Policy Strategy - State & Local (2021-Q4).docx).  In February and March of 2025, Joby reached out to its contacts at Hawthorne and discussed the possibility of using the Hawthorne airport as a vertiport for maintenance, repair, and operations ("MRO").  At the time, Kivork was still employed by Joby, and he was informed of those efforts.

71.    Then, on November 5, 2025, exactly three months after Kivork started working at Archer, Archer purchased a long-term lease for the Hawthorne airport,[5] and later announced that it would be used as an MRO vertiport.  In addition, the lease expressly names one of Joby's contacts, from an exfiltrated contact list, as a representative of the seller.  And Archer's announcement was surprising, because just one year earlier Archer had publicly released a map of its intended "air taxi network" in Los Angeles which showed various intended facilities in the area, but did not include any facility in Hawthorne.[6]

72.    Similarly, in June and July of 2025, Joby began discussing a possible sponsorship with the Los Angeles Dodgers.  On October 2, 2025, two months after Kivork joined Archer, the Dodgers contacted Joby and informed them that they had been outbid by a competitor who had "recently expressed interest"—which turned out to be Archer.  That would not be overly concerning, except that one of the contact lists exfiltrated by Kivork contains confidential contact information for a Dodgers executive.  Additionally, the Dodgers contacted Joby again in January of 2026, stated that Archer's sponsorship had not actually gone through, and invited Joby to make a further bid.  Archer's decision to outbid Joby in October 2025 (weeks after Kivork joined) but then not actually go through with the sponsorship suggests that Archer's true goal was disrupting Joby's plans rather than entering into a sponsorship.

73.    As another example: despite earlier failures, Archer was able to make additional inroads in South Korea and Japan, but only after hiring Kivork.  In November 2024 Joby completed

---

[5]  https://www.sec.gov/Archives/edgar/data/1824502/000182450225000016/exhibit_12.htm

[6]   https://investors.archer.com/news/news-details/2024/Archer-Unveils-Planned-Los-Angeles-Air-Taxi-Network-Ahead-Of-Major-Worldwide-Sporting-Events/default.aspx

the first international eVTOL exhibition flight in Japan, and then in December 2024 Joby became the first eVTOL company to conduct a flight in Korea's K-UAM Grand Challenge.[7]  Months earlier, Archer had announced that it too would participate in the 2024 K-UAM Grand Challenge.[8]  But despite its announcement, Archer ultimately dropped out and never conducted a flight demonstration in South Korea.  Archer then dropped out of a second planned flight demonstration at the Osaka World Expo in Japan, originally scheduled for July 2025.  To this day, on information and belief, Archer has yet to conduct a single exhibition flight in either South Korea or Japan.

74.    Despite Archer's prior public failures in the APAC region, in October and November of 2025, just two and three months after Kivork left to join Archer, Archer suddenly made progress in APAC and announced new partnerships intended to bring its eVTOL business to South Korea[9] and Japan.[10]  As discussed above, one of the documents exfiltrated by Kivork contains instructions for operating eVTOL aircraft within the regulatory environments of South Korea and Japan (APAC Demos.pptx).

75.    Archer also appeared to change its mind about developing hydrogen electric aircraft after Kivork joined.  For years, Archer told the marketplace that it was making a deliberate decision to only develop all-electric aircraft and not pursuing hydrogen as a possible power source.  This is reflected in, for example, a January 2023 interview with Archer's Chief Engineer, Geoff Bower.[11]  However, in April 2026, and again after Kivork left Joby for Archer, the aviation press reported that

[7] A program sponsored by South Korea's Ministry of Land, Infrastructure and Transport ("MOLIT") to support the commercialization of air taxis in the Korean market

[8] https://investors.archer.com/news/news-details/2024/KakaoMobility-Selects-Archer-Aviation-As-Its-eVTOL-Partner-And-Will-Fund-Archers-Korean-Commercialization-Efforts-Together-They-Will-Conduct-Public-Flight-Demonstrations-As-Part-Of-Koreas-Grand-Challenge-As-Soon-As-Q42024/default.aspx

[9] https://investors.archer.com/news/news-details/2025/Korean-Air-Selects-Archer-as-its-Exclusive-Partner-to-Introduce-eVTOL-Aircraft-in-Korea/default.aspx

[10] https://www.investors.archer.com/news/news-details/2025/Tokyo-Metropolitan-Government-Selects-Japan-Airlines-Consortium-to-Join-First-Phase-of-eVTOL-Implementation-Program-Featuring-Archers-Midnight-Aircraft/default.aspx

[11] https://theverticalspace.net/episode/32-geoff-bower-archer-designing-and-commercializing-evtol-aircraft

Archer Aviation was "said to be exploring" hydrogen aircraft after all.[12]  And, as noted above, files exfiltrated by Kivork contained technical information about Joby's hybrid electric aircraft, including a hydrogen electric eVTOL prototype (Hydrogen Presentation ██████████_7.9.24 (1).pptx and ████████ Apr-29-24.pptx).

76.    Indeed, a third party has confirmed that Archer is using Joby's trade secrets: the Developer confirmed that Archer had used Joby's confidential information and had learned that information from Kivork.

77.    In late July and into early August of 2025, Joby and the Developer were preparing to publicly announce their Agreement.  This resulted in a flurry of activity including regular, daily communications between Joby's head of strategic partnerships and his counterpart at the Developer as both parties prepared a public relations package.  But that changed during the last few days of Kivork's employment when the Developer's representatives suddenly went silent.

78.    On August 5, 2025, the Developer reported to Joby that Archer had approached the Developer about a business relationship.  That timing of Archer's approach was highly suspicious: the Agreement had been negotiated months earlier, in March 2025, and was due to be publicly announced in just a few weeks.  The Developer also expressed concern because Archer's pitch indicated that Archer knew not only of the existence of the Agreement, but also the key terms from the Agreement—even though the Agreement's terms were confidential.  As for where Archer learned the information about the deal, the Developer did not mince words: "presumably . . . former employee George [Kivork]."

79.    Moreover, the Developer stated, in no uncertain terms, that Archer had offered a more lucrative deal.  On information and belief, Archer was only able to offer a more lucrative deal because Archer, acting through Kivork, gained illicit knowledge of the Agreement's terms and leveraged those terms in its own negotiations with the Developer.  Had Archer competed fairly, it would have had to spend months negotiating with the Developer to build an agreement from scratch,

---

[12]  https://www.aerotime.aero/articles/china-conducts-successful-liquid-hydrogen-flight-test-what-we-know-so-far

just as Joby did.  And during those negotiations, Archer would have had no guarantees that its offers would be more lucrative than Joby's.  By exploiting Kivork's theft, Archer was able to skip over the negotiations and unfairly guarantee that its offer would beat Joby's.

80.    On August 21, 2025, the Developer purported to exercise its right to terminate the Agreement effective immediately, because the Developer claimed that the disclosure attributed to Kivork was a breach of the Agreement's confidentiality provision.  The Developer reiterated that "the leak of information about our discussions and [Agreement]" was "by Joby's employee."

81.    When Joby quickly acted to demand that Kivork and Archer cease using and return Joby's proprietary information, Kivork and Archer refused to cooperate.  Kivork first falsely claimed that he had not accessed or retained Joby confidential files.  Yet he then promised he would delete any Joby confidential information in his possession—without explaining how he would be able to delete files he claimed not to have in the first instance.  In response to Kivork's threat to delete valuable evidence, Joby repeatedly reminded Kivork of his obligation to return any confidential information to Joby—and that deleting the files would be a breach of that obligation, as well as his preservation obligations.  Despite that reminder, and ignoring Joby's demand that he return the stolen files, on November 12, 2025, Kivork provided a list of Joby files he intended to delete.  But the list was obviously incomplete: at a minimum, it omitted Kivork's downloads from SharePoint.  Given Kivork's lack of candor and refusal to return Joby's files, Joby has every reason to believe that Kivork intends to continue his illicit use of Joby's proprietary information.

82.    In response to Joby's request that Archer help Joby resolve the concerning theft of confidential information by Archer's employee Kivork, Archer stonewalled.  Joby contacted Archer on August 11, 2025, with reasonable demands to have Kivork return Joby's confidential information, and provide Joby visibility into Archer's purported investigation (if any took place).  Furthermore, Joby pointed out that "Mr. Kivork has already acknowledged, through his attorney, that he is still in possession of materials that originated with Joby or that contain information that came from Joby."  Moreover, while Mr. Kivork has offered to "delete" those materials, doing so would be a breach of his continuing obligations to Joby, which required him to "promptly return"—not delete, but "return"—those materials to Joby.  While claiming to have exonerated itself through

an investigation, Archer refused to provide Joby with any information about its purported investigation. Additionally, Archer has not provided any explanation as to how it learned of the existence and terms of the Agreement. In another letter dated September 29, 2025, Joby stated "We note that your September 12 letter largely ignores the reasonable demands we made to Archer to address the situation with Mr. Kivork short of litigation. Archer has now twice refused our demands. Therefore, we assume that any reiteration of those demands would be futile. We will proceed accordingly."

83. On information and belief, Archer used the information it improperly obtained from its recently recruited employee Kivork for its own benefit in complete disregard of Joby's contractual agreements with Kivork and the Developer, as well as Joby's intellectual property rights, by offering the Developer a deal with Archer on more favorable terms.

84. Even if the Developer had not confirmed Archer and Kivork's misappropriation, on information and belief, and including as evidenced by Archer's acquisition of the Hawthorne airport lease, Archer's actions in South Korea and Japan, Archer's bidding on the same sponsorship as Joby and then dropping the sponsorship once it managed to outbid Joby, and Archer's change-of-course on developing hydrogen-powered aircraft, Kivork and Archer have misappropriated all of the trade secrets identified above, as will be shown by discovery in this matter.

85. Kivork stole dozens of files containing Joby's valuable, confidential, and proprietary information. In response to Joby's requests to return the files, Kivork not only refused, but also dissembled by omitting the full scope of his downloads while purporting to come clean. Moreover, Archer's own public announcements and actions all demonstrated, on information and belief, that Archer is using the files taken by Kivork. Joby has every reason to fear that Kivork and Archer's misappropriation of Joby's trade secrets and improper use and disclosure of confidential information will continue, and that even if some of the foregoing trade secrets were not yet misappropriated, the misappropriation of those trade secrets remains threatened by Kivork and Archer. Joby is thus forced to bring this lawsuit, including for the sake of the nascent eVTOL industry, to enjoin Kivork and Archer from improperly using Joby's intellectual property, and further ordering its return to Joby.

-23-                                      Case No. 5:25-cv-10703-SVK
                                          FIRST AMENDED COMPLAINT

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against Kivork)

86.    Joby hereby incorporates paragraphs 1 through 85 as though fully set forth herein.

87.    As a condition of his employment at Joby, Kivork entered into a valid and enforceable PIIA, in the form of Exhibit A, attached hereto.  These obligations were periodically reinforced by Joby throughout Kivork's employment.  Additionally, Kivork signed a Proprietary Information and Continuing Obligations letter that stated: "Under applicable law and under the terms of the Proprietary Information and Inventions Agreement, dated 08/13/2021, with [Joby], you are required to keep all Proprietary Information confidential and not to use it to the detriment of [Joby].  In particular, you may not use it for, or disclose it to your new employer that is, or may[]be, a competitor to [Joby]."

88.    The PIIA obligated Kivork to "promptly return to [Joby] all items containing or embodying Proprietary Information (including all copies)" upon termination of his employment. The PIIA defined Proprietary Information to include "all business, technical and financial information" that Kivork developed, learned, or obtained during his employment that related to Joby or its business, including "contract terms" and "commercial relationships."

89.    As a further protection for Joby's Proprietary Information, Kivork "agree[d] that during the term of [his] employment with [Joby] (whether or not during business hours), [he] will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of [Joby], and [he] will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of [Joby]."

90.    The PIIA expressly provided that these obligations "shall continue in effect after termination or expiration of [his] employment, regardless of the reason or reasons for termination."

91.    On July 22, 2025, in connection with his departure from Joby, Kivork signed a letter acknowledging these obligations and falsely certifying: "I confirm that I have not taken any documents, records, information, software, or any other property of the Company.  I also confirm that I will not disclose or use any [Joby] Proprietary Information for any purpose, whatsoever."

92. Joby performed all its obligations under the PIIA.

93. Kivork breached the PIIA by failing to return Joby's confidential and proprietary information, including the files he downloaded and emailed to his personal email account on July 18, 2025; by disclosing Joby's confidential information to Archer, a direct competitor of Joby, or its consultants without legal justification or excuse; by using Joby's confidential information for purposes outside his Joby employment and for the benefit of Archer; by falsely certifying that he had not taken any Joby documents; and by refusing Joby's demand that he return the exfiltrated and retained files even after these issues came to light.

94. Kivork further breached the PIIA by adding his personal email address as an owner to hundreds of documents stored on Drive, which he did while still employed by Joby. By adding his personal email address as an owner to certain documents stored on Drive, Kivork would be able to access those documents even after leaving Joby's employ. Additionally, on information and belief, Kivork added his personal email address as an owner to those documents so that he could assist his future employer—Archer—in competing against Joby. Accordingly, Kivork further breached his obligation not to "assist any other person or organization in competing or preparing to compete with any business or demonstrably anticipated business of [Joby.]"

95. As a direct and proximate result of Kivork's breaches, Joby has been damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Inducement of Breach of Contract

### (Against Archer)

96. Joby hereby incorporates paragraphs 1 through 95, as though fully set forth herein.

97. Because Archer has hired employees from Joby previously, Archer knew or should have known of terms of Joby's PIIA, including the item return provision, to which Kivork was subject upon his hiring by Archer. Indeed, Archer has admitted as much, and even specifically as to Kivork. Eric Lentell, Archer's Chief Legal Officer wrote to Joby on August 14, 2025:

> . . . Archer's onboarding procedures take into account the ongoing obligations employees may have to prior employers and other third parties. As part of that process, a law firm conducts independent

confidential interviews with and provides counsel to our future employees. The purpose of such interviews is two-fold: 1) to assist onboarding employees in understanding any post-employment obligations they may have to their prior employers and the importance of Archer's prohibitions on bringing third party proprietary information into the Archer workplace; and 2) to provide onboarding employees with guidance on best practices to avoid bringing any third party proprietary information into the Archer workplace. George completed this process.

98.    Notably, Archer made this affirmation in direct response to Joby's cease and desist letter (the "Letter") in which Joby put Kivork on notice that "You were, and are, subject to contractual and legal obligations to Joby with regard to ... the obligations set forth in your Proprietary Information and Inventions Agreement ... and your Acknowledgement of the terms in your employee offboarding packet [which] requires you to ... promptly return any items containing or embodying Joby's trade secrets ... upon termination of employment." The Letter demanded that Kivork "immediately return any property of Joby in your possession."   Mr. Lentell's response effectively admits that Archer was aware that Kivork had obligations to Joby, and further that Archer even interviewed him about such obligations – and that Archer knew all this *before* Archer or Kivork received Joby's Letter, meaning they were aware of such obligation at the very outset of Kivork's employment by Archer.   And despite having this knowledge, Archer willfully ignored such obligations and intentionally continued to use Joby's misappropriated trade secrets.

99.    Kivork improperly exfiltrated and retained files containing trade secret and confidential information after his employment with Joby was terminated, and Archer knew, or at a minimum had reason to know, that Kivork had improperly retained those files from his employment at Joby.

100.    On information and belief, Archer intended to induce and did induce Kivork to breach the PIIA by encouraging or directing him not to return Joby's confidential information upon the termination of Kivork's employment at Joby, so that Kivork could instead use said information to advance Archer's interests, *e.g.*, to pursue the Developer; as well as by accepting and using information Archer knew or should have known was not returned in breach of the PIIA; by failing to instruct Kivork to return Joby's information; and by using Joby's unreturned confidential and trade secret information about the Agreement for Archer's own pecuniary gain.

101.    As evidenced by the Developer's communications to Joby, Archer contacted the Developer with knowledge of the Agreement's existence and key terms.

102.    On information and belief, Kivork would not have breached his contractual obligations absent Archer's inducement.

103.    On information and belief, the Developer would not have purported to terminate the Agreement absent Kivork's breach of his contractual obligations.

104.    Additionally, on information and belief, Archer induced Kivork to breach the PIIA and other obligations by adding his personal email address as an owner to hundreds of documents stored on Drive, which Kivork did while still employed by Joby.  By adding his personal email address as an owner to certain documents stored on Drive, Kivork would be able to access those documents even after leaving Joby's employ.

105.    Archer's conduct was a substantial factor in causing Joby's harm.

106.    As a direct and proximate result of Archer's actions, Joby has been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

### (Against Kivork and Archer)

107.    Joby hereby incorporates paragraphs 1 through 106 as though fully set forth herein.

108.    The information Kivork and Archer misappropriated constitutes protectable trade secrets owned by Joby, as defined by 18 U.S.C. § 1839.  Kivork and Archer have misappropriated at least the following trade secrets from Joby: business deal structures and specific terms for Joby strategic partnerships, including relating to the Agreement; technical specifications and analysis related to eVTOL aircraft and operations; commercial, regulatory, and infrastructure strategy.

109.    For example, on information and belief, Archer is planning to develop a program for long-range high-altitude aircraft using confidential technical information from Joby's research and development projects.

110.    As another example, on information and belief, since Kivork abscondment to Archer with confidential regulatory files (which include technical data and analyses), regulatory programs

FIRST AMENDED COMPLAINT

such as government incentive programs have suddenly reneged on previous approvals of Joby's applications and abridged the scope of Joby's projected and consequential gain.

111. As a further example, on information and belief, Kivork's exfiltration of infrastructure strategy information about key vertiport locations that meet the financial, technical, and regulatory requirements for development allowed Archer to short-circuit its selection of one or more specific airports for leasing.

112. On information and belief, Kivork's and Archer's misappropriation of Joby's trade secrets goes well beyond the specific examples of trade secrets identified here, as will be demonstrated after Joby obtains discovery in this litigation.

113. Joby has taken reasonable measures to protect the confidentiality of its trade secrets, including through the measures alleged above. Joby does not and did not consent to the acquisition, use, or disclosure of any of its trade secrets by anyone other than authorized personnel using them within the scope of their duties for Joby.

114. Joby's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosures or use of the information, including Joby's competitors in the eVTOL industry.

115. Kivork and Archer misappropriated Joby's trade secrets using the improper and unlawful actions alleged herein. Kivork's and Archer's misappropriation includes use of Joby's trade secrets to interfere with Joby's exclusive contract with a strategic partner. Kivork and Archer used and otherwise disclosed the trade secret information knowing or having reason to know that knowledge of the trade secret was acquired through improper means or in breach of a duty to maintain secrecy.

116. Additionally, Kivork is an employee of Archer, and as alleged above, is using Joby's trade secrets within the scope of the work he is performing for Archer and for Archer's benefit. Archer is thus liable for Kivork's misappropriation.

117. Kivork's and Archer's misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Kivork and Archer have attempted, and continue to attempt, to conceal their misappropriation and to obstruct Joby's efforts to remedy the misappropriation.

118. On information and belief, if Kivork and Archer are not enjoined, they will continue to misappropriate and use Joby's trade secret information for their own benefit and to Joby's detriment, and may disseminate Joby's trade secrets to other third parties who have no right to access or use Joby's trade secrets.

119. Because Kivork wrongly refused to return the trade secrets after Joby demanded their return, Kivork threatens to commit further acts of misappropriation, including by continued disclosure and use of Joby's trade secrets in his work for Archer.

120. Because Archer has already misappropriated several of Joby's trade secrets, including its trade secrets regarding the Developer, the misappropriation of any remaining trade secrets by Archer is similarly threatened.

121. As a direct and proximate result of Kivork and Archer's conduct, Joby has suffered and, if Kivork's and Archer's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Joby's remedy at law is inadequate, Joby seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests.  Joby's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## FOURTH CAUSE OF ACTION

### Unfair Competition Law

### (Against Archer)

122. Joby hereby incorporates paragraphs 1 through 121, as though fully set forth herein.

123. Archer has engaged in unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professions Code section 17200 *et seq*.

124. Specifically, Archer has induced Kivork to maintain possession of confidential information that belongs to Joby.  For example, not only has neither Kivork nor Archer returned

-29-  Case No. 5:25-cv-10703-SVK

FIRST AMENDED COMPLAINT

confidential information relating to the Developer, but Archer has actively leveraged it in an attempt to usurp Joby's business opportunity with the Developer for itself. Archer's behavior can only be explained by a desire to use and continue to use the confidential information obtained by Kivork. Thus, Archer is incentivized to induce Kivork to not return what was stolen.

125.    Archer's conduct constitutes "unlawful" business practices because Archer has violated other laws, including inducing Kivork to breach his contractual obligations.

126.    Archer's conduct constitutes "unfair" business practices because it violates public policy against inducing breaches of contract and fiduciary duty, is immoral, unethical, oppressive, and unscrupulous, causes harm to Joby that substantially outweighs any alleged benefits, and gave Archer an unfair competitive advantage through wrongful means.

127.    Archer engaged in these practices to obtain competitive advantage over Joby and secure business opportunities, including interfering with Joby's strategic partnership with the Developer.

128.    Joby has suffered injury in fact and has lost money and property as a result of Archer's unfair competition, including the value of the exclusive opportunity negotiated between Joby and the Developer, as well as expenses incurred in responding to Archer's wrongful conduct.

129.    Archer's violations are ongoing and continuing.  Unless enjoined, Archer will continue these practices, causing irreparable harm to Joby.

130.    Pursuant to California Business and Professions Code section 17203, Joby is entitled to equitable relief, including restitution and injunctive relief.

## **PRAYER FOR RELIEF**

131.    Joby respectfully requests the following relief from the Court:

a.    That judgment be entered in favor of Joby and against Defendants, jointly and severally, on all of Joby's claims asserted in this Complaint;

b.    That the Court award to Joby such damages as may be proven at trial, and punitive, enhanced, and/or exemplary damages to the fullest extent available under applicable law, in accordance with each of the claims asserted in this Complaint;

c. That the Court further award to Joby double the damages proven at trial on Joby's trade secret claims to the fullest extent available under applicable law, including under 18 U.S.C. § 1836(b)(3)(C);

d. That the Court order disgorgement and restitution to the fullest extent available under applicable law;

e. That the Court issue preliminary and permanent injunctions against Defendants ordering the return of Joby's confidential, proprietary, and trade secret information, requiring removal and/or destruction of any and all of Joby's confidential, proprietary, and trade secret information in the possession, custody or control of Defendants, and enjoining Defendants, their successors, officers, agents, and employees, and anyone acting in concert with or at their behest, from further breaching their agreements with Joby and/or further accessing or using this information in any way and from any further misappropriation of Joby's confidential, proprietary, and trade secret information;

f. That the Court award to Joby attorneys' fees, costs and expenses incurred herein to the fullest extent available under applicable law, including under 18 U.S.C. § 1836(b)(3)(D);

g. That the Court award to Joby pre-judgment and post-judgment interest at the maximum legal rate; and

h. That the Court award to Joby such other and further relief as the Court deems just and proper.

## JURY DEMAND

132. Pursuant to Federal Rule of Civil Procedure 38, Joby hereby demands trial by jury of all issues properly triable thereby.

-31-                                    Case No. 5:25-cv-10703-SVK
FIRST AMENDED COMPLAINT

DATED: June 22, 2026

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By     */s/ Yury Kapgan*
       Yury Kapgan
       Alex Spiro
       Patrick Schmidt
       Sara Pollock
       Michael F. LaFond

       *Attorneys for Plaintiff Joby Aero, Inc.*