JOSH KREVITT, SBN 208552
 jkrevitt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, CA 94301-1744
Telephone:    650.849.5300
Facsimile:    650.849.5333

*Attorneys for Defendant and Counterclaimant
Archer Aviation Inc.*

ORIN SNYDER, *(pro hac vice)*
 osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:    212.351.4035

JAMES L. ZELENAY JR., SBN 237339
 jzelenay@gibsondunn.com
MICHAEL H. DORE, SBN 227442
 mdore@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:    213.229.7000

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| JOBY AERO, INC.,<br><br>            Plaintiff,<br><br>    v.<br><br>ARCHER AVIATION INC. and George Kivork.<br><br>            Defendants.<br>———————————————<br>ARCHER AVIATION INC.,<br><br>            Counterclaimant,<br><br>    v.<br><br>JOBY AERO, INC.<br><br>    and<br><br>JOBY AVIATION, INC.,<br><br>            Counter-Defendants. | Case No.: 5:25-CV-10703-SVK<br><br>**DEFENDANT ARCHER AVIATION INC.'S AMENDED COUNTERCLAIMS AGAINST JOBY AERO, INC. AND JOBY AVIATION, INC. FOR:**<br><br>1) **VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.***<br><br>2) **FALSE PROMOTION UNDER THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)(B)**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**Judge:** Hon. Susan van Keulen |

## ARCHER AVIATION'S COUNTERCLAIMS

Counterclaimant Archer Aviation Inc. ("Archer") brings these counterclaims against plaintiff and counterclaim defendant Joby Aero, Inc. ("Joby Aero"), and against counterclaim defendant Joby Aviation, Inc. ("Joby Aviation," and collectively with Joby Aero, "Joby") and alleges as follows:

1.      This action arises from Joby's pattern of false and/or misleading statements to U.S. government decisionmakers concerning Joby's domestic manufacturing, vertical integration, and supply-chain practices. Joby portrays itself to government decision-makers responsible for government funding and resource deployment as an American-made, vertically integrated aviation company. Yet Joby omits and obfuscates its extensive ties to China, its reliance on parts from China and suppliers in China for critical components in its electric vertical take-off and landing ("eVTOL") aircraft, and the extent of the role of its wholly owned Chinese subsidiary, Joby Metal Shenzhen Co. Ltd. ("Joby China"), in Joby Aviation's manufacturing and supply chain.

2.      If Joby had been honest with the government, it would not have received the government resources and funding that it did—which instead would have been available to and gone to competitor Archer. In short, Joby's misstatements and misleading omissions to the government in connection with government programs had the capacity, likelihood, and tendency to mislead and deceive relevant decision-makers. Based on information and belief, Joby Aviation and Joby Aero knew or should have known their statements were false or, at the least, misleading in light of their China-based manufacturing operations and suppliers. Archer has been injured as a result of Joby's illegal misconduct, including through lost government-program opportunities, diversion of finite governmental resources, and lost business.

3.      Moreover, in the limited universe of only two companies who have made the most progress in the Federal Aviation Administration's ("FAA") eVTOL type certification process and are thus competing to be the first to commercialize eVTOL aircraft in the U.S. market, Joby's misstatements have enabled it to obtain government backing, which has led to a variety of anticompetitive effects. Joby's government backing provided it with foundational public-sector support, such as funding and access to test ranges and technical expertise that have aided its aircraft

Gibson, Dunn & Crutcher LLP

development program.  Joby's obtaining such funding and resources—under false pretenses—has improperly influenced investors, regulators, and the public to Joby's benefit and Archer's material disadvantage.

4.      Archer brings these claims to seek redress and halt Joby's misconduct.

**Parties**

5.      Counterclaimant Archer is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 190 W. Tasman Dr., San Jose, California 95134.

6.      On information and belief, Joby Aero, Inc. is a corporation organized under the laws of Delaware.  Joby Aero, Inc.'s principal place of business is 333 Encinal St., Santa Cruz, CA 95060.  Joby Aero is the operating subsidiary of Joby Aviation that entered into contracts and agreements with U.S. government agencies, including the U.S. Air Force, and participated in regulatory filings and government-program submissions concerning its aircraft, manufacturing, and supply-chain practices.

7.      On information and belief, Joby Aviation, Inc. is a publicly traded corporation organized under the laws of Delaware.  Joby Aviation, Inc.'s principal place of business is 333 Encinal St., Santa Cruz, CA 95060.  Joby Aviation is the ultimate parent company of a consolidated group of companies, including wholly owned subsidiaries Joby Aero, Inc. and Joby Metal Shenzhen Co., Ltd., organized under the laws of the People's Republic of China.  Joby Aviation is directly liable for the false and/or misleading statements alleged herein.

8.      In August 2021, Joby Aero was taken public on the New York Stock Exchange via a merger with a special purpose acquisition company led by LinkedIn founder Reid Hoffman.  Joby's plans to go public were announced months after Archer announced its own plans to do so.  As part of that transaction, Joby Aero and Reinvent Technology Partners ("RTP"), a Cayman Islands exempted company and special purpose acquisition company, completed a merger and other transactions pursuant to which a subsidiary of RTP was merged with and into Joby Aero, and Joby Aero survived as a wholly owned subsidiary of RTP.  Then, in connection with the transactions,

RTP changed its name to Joby Aviation, Inc., with Joby Aero now a wholly owned subsidiary of Joby Aviation.

9.      As reflected in the 2024 Annual Report on Form 10-K, Joby Aviation consolidates the results, assets, and liabilities of Joby Aero and Joby China, among others, in its financial statements.[1]

10.      Joby Aviation is the parent and alter ego and/or successor in interest to Joby Aero and is properly joined as an additional party to these counterclaims pursuant to Fed. R. Civ. P. 13(h), 19, and 20 because it participated in, directed, authorized, ratified, and benefited from the conduct alleged herein.  In the alternative, and to the extent applicable, Joby Aviation and Joby Aero operated as a single enterprise with respect to the challenged conduct.

11.      Joby Aviation, Joby Aero, and Joby China have acted in concert and as a unified enterprise in carrying out the conduct alleged herein.  Joby Aviation, as the parent company, directs and controls the operations of Joby Aero and Joby China—including manufacturing, sourcing, and import activities.  Joby Aero and Joby China function as instrumentalities of Joby Aviation, executing corporate strategy and supply-chain operations under common ownership.  Joby Aviation also controls and directs the representations Joby Aero makes to the applicable government agencies, as outlined herein.  The coordinated conduct of these entities was undertaken for their shared commercial benefit and is properly attributable to each of them.  Public sources indicate that JoeBen Bevirt serves as the Chief Executive Officer of both Joby Aviation and Joby Aero—reflecting his executive control over both the parent company and its operating subsidiary.[2] Likewise, Gregory Bowles serves as the Head of Government Affairs for Joby Aero and Chief Policy Officer for Joby Aviation.

**Jurisdiction and Venue**

12.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 of this countercomplaint, as this is a civil case arising under the Lanham Act, 15 U.S.C. § 1121, and has

---

[1] *See* Joby Aviation, Inc., Annual Report (Form 10-K) at 42 (Feb. 27, 2025).

[2] *See* JoeBen Bevirt, MarketScreener, https://www.marketscreener.com/insider/JOEBEN-BEVIRT-A07XNU (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

supplemental jurisdiction over Archer's claims brought under California Business and Professions Code § 17200 pursuant to 28 U.S.C. § 1367 because all claims herein form part of the same case or controversy under Article III of the United States Constitution.

13.     Further, because this Court has original jurisdiction over Joby Aero's third claim for relief, a claim asserted under federal trade-secret law, it may exercise supplemental jurisdiction over all counterclaims that are part of the same case or controversy under 28 U.S.C. § 1367(a).

14.     Joby Aviation is joined as an additional counterclaim defendant pursuant to Fed. R. Civ. P. 13(h) and 20, as the claims asserted arise out of the same transactions and occurrences and involve common questions of law and fact.

15.     Archer is informed and believes and thereon alleges that jurisdiction over both Joby Aviation and Joby Aero is proper because Joby Aviation and Joby Aero at all times mentioned in this Complaint have maintained their principal place of business in Santa Cruz, California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

16.     Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Joby Aviation and Joby Aero are residents of the State of California and residents of this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District.

17.     This action is properly assigned to the San Jose Division of this District under Civil Local Rule 3-2(c) because a substantial part of the events or omissions giving rise to Archer's claims occurred in Santa Clara County, which is served by the San Jose Division.

## FACTS COMMON TO ALL CLAIMS

18.     As set forth herein, on information and belief, Joby Aviation and Joby Aero have engaged in unfair competition and deceptive trade practices by making false and/or misleading statements regarding their supply chain to government regulators with respect to the U.S. Air Force AFWERX Agility Prime program and the White House and FAA's eVTOL Integration Pilot Program ("eIPP"), and by failing to disclose to those same entities their pervasive connections to and reliance on China for their equipment's component parts.

Gibson, Dunn & Crutcher LLP

**I.    The Emerging eVTOL Industry: An Opportunity to Revolutionize Urban Transportation and National Defense**

19.    The eVTOL market represents a transformative segment of the next generation of aviation technology.  Once certified by the FAA, eVTOL aircraft are poised to transform travel through cities by providing a means of transportation akin to a taxi of the skies.  Instead of sitting in traffic or relying on public transportation and ride-sharing services, city dwellers will be able to hail an air taxi to bring them to their destination.

20.    eVTOL vehicles take off and land vertically like a helicopter but fly horizontally with wings like a plane, utilizing battery power.  While different companies have built various eVTOL configurations, all companies remain pre-certification and pre-commercialization in the United States.  eVTOL technologies aim to revolutionize aviation and defense, providing quiet, efficient, and safe modes of vertical-lift aerial transportation in urban and other locations.

21.    The emerging eVTOL industry stands to transform short-haul transportation by enabling safe, quiet, zero-operational-emissions aircraft to connect people and goods across and between cities.  Air-taxi services are intended to complement existing transit—linking airports, business districts, medical centers, and communities—while reducing time lost to traffic congestion.  The promise is faster, more reliable aerial mobility at a fraction of the footprint and noise of legacy helicopters.

22.    eVTOL aircraft have military applications as well.  For instance, they can transport troops, goods, and other supplies.  Further, the promise of unmanned eVTOL aircraft creates the opportunity for numerous defense applications.  For this reason, the U.S. government has been focused on advancing eVTOL technology to develop distributed electric propulsion and enable new advanced aircraft configurations that provide for greater operational flexibility at a much lower cost than existing legacy options.  For example, the U.S. Air Force has advanced eVTOL technology through its AFWERX innovation arm and the Agility Prime program, an initiative promoting collaboration with the commercial eVTOL industry.

23.    Moreover, the eVTOL sector has become a geopolitical race between the United States and China.  China holds advantages in its ability to authorize products for market and in its

Gibson, Dunn & Crutcher LLP

7

ability to scale production volume, while the United States has led in terms of innovation and safety standards. In an attempt to ensure that the United States leads in the eVTOL market, the President issued the June 2025 Unleashing American Drone Dominance Executive Order. And the United States's Advanced Air Mobility ("AAM") National Strategy, launched in December 2025, envisions exporting U.S.-built aircraft to allies, undercutting China's lead in electric vehicles and drone production.[3] The U.S. government has also focused on ensuring that the U.S. companies building eVTOL technology are not susceptible to vulnerabilities that result from China-sourced components, as it is essential that eVTOLs used by the United States and its allies are not vulnerable to such risks. It is critical to the U.S. government and government agencies that they deal with honest brokers in this sector, and understand the role or influence China may have on manufacturing or technology.

24.    Realizing that the eVTOL opportunity requires extraordinary investment, engineering rigor, and public-private coordination, numerous entities—including manufacturers, suppliers, airlines, airports, and infrastructure partners—are building an industrial base around eVTOL production and operations, subject to stringent safety certification and operational approvals. The result is a rapidly developing ecosystem with the potential to create high-skilled jobs, catalyze advanced manufacturing, expand regional connectivity, and deliver tangible consumer and environmental benefits.

25.    This new global eVTOL market is destined to be highly profitable. A market analysis estimates the global eVTOL market will be worth nearly $30 billion by 2030.[4] By 2040, the industry could eclipse $1.5 trillion in value.[5]

---

[3] *See* Dept. of Transp., *The Advanced Air Mobility National Strategy: A Bold Policy Vision for 2026-2036* (Dec. 17, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-12/AAM%20National%20Strategy%202025.pdf (last visited June 26, 2026).

[4] *eVTOL Aircraft Market (2024-2030)*, Grand View Rsch. (July 2024), https://www.grandviewresearch.com/industry-analysis/evtol-aircraft-market-report (last visited June 26, 2026).

[5] *See Flying Cars Market Size, Share & Industrial Analysis, By Product Type (Flying Cars and Passenger Drones), By Application Type (Military, Commercial and Civil), and Regional Forecast, 2024-2040*, Fortune Business Insights (June 8, 2026), https://www.fortunebusinessinsights.com/flying-cars-market-105378 (last visited June 26, 2026).

26.     Since eVTOL aircraft have not yet been approved for private, commercial use, the domestic market for the aircraft and related services is currently dominated by government actors. The portion of the public that currently purchases eVTOL aircraft and services in the United States consists in large part of a pool of government agencies, namely the U.S. Air Force, the Department of War, and the Department of Transportation.  To promote products and services in this market, eVTOL manufacturers proceed through submissions, proposals, and presentations to the relevant government agencies, as well as through corporate websites, press releases, investor materials, and social media.  Use of these channels ensures that eVTOL promotions reach all or virtually all customers in the market.

27.     The manufacturer that achieves government-program sponsorship secures not only the benefits of that program, but also other competitive advantages in capital access, strategic partnerships, regulatory credibility, and market share.  Government acceptance in a program sends a message to interested parties that the business subject to the government program is credible and worthy of investment.

28.     Thus, for eVTOL manufacturers like Archer in this race to be the first to commercialize this technology, misconduct by its competitor that is dueling for that crown enables Joby to obtain unearned government program entry which imposes irreversible damage on Archer.

II.     **Joby's Undisclosed China-Dependent Supply Chain**

29.     Based on information and belief, Joby's misrepresentations and omissions to the U.S. government in connection with the U.S. Air Force AFWERX Agility Prime program and the White House and FAA's eIPP program as discussed below in Sections IV.A and IV.B are part and parcel of Joby's and its executives' ongoing attempts to deceptively cast the company and its aircraft as an "American" company that is vertically integrated, with U.S.-based manufacturing that does not substantially rely on foreign manufacturing by its subsidiary or imports from third parties. The reality is very different.

**A.    Joby's Connections to China, Including Joby Aviation's Wholly Owned Chinese Subsidiary with Ties to the People's Republic of China ("PRC"), That Joby Has Sought to Conceal**

30.    For years Joby has been reliant upon—and connected to—activity in China.  While Joby now attempts to walk away from and conceal these deep connections and, in the case of U.S. government programs, has deceptively failed to disclose the breadth and scope of these connections based on information and belief, Joby's ties to China have existed for more than a decade.

31.    First registered in 2012, Joby China is a wholly owned subsidiary of Joby Aviation that, according to an archived version of its website, has been engaged in "research and development work on motor, toy plane, electronic products, [and] machinery manufacturing equipment," and has developed power "generator equipment [that] has been exported to Europe and the United States."[6]  Based on information and belief, the business remains active, having published and/or updated over fifteen new job postings between February and December 2025 in Shenzhen and having been named in public bidding records in 2025.

32.    The images below are from the archives of Joby China's website, since-taken-down by Joby Aviation based on information and belief in an attempt to obscure Joby China's presence.  They show a glimpse into Joby's China manufacturing operations, including the production of component parts that, on information and belief, it exports to the United States and that include vital components of Joby's eVTOL aircraft.

---

[6] Joby Metal (Shenzhen) Co., Ltd., Internet Archive Wayback Machine (June 20, 2018, 10:12 AM), https://web.archive.org/web/20180620101234/http://www.jobymetal.com/ (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

33.    Since 2018, Joby China's only exports to the U.S. appear to have been to its sister company, Joby Aero, in the United States.

34.    The chart below indicates the imports Joby Aero has directly received from Joby China, showing Joby Aviation's and Joby Aero's deep reliance on materials from China.  It also shows various other suppliers and entities in China from which Joby Aero has received imports, contrary to Joby's "American" manufacturing claims.  and this chart does not even include the unknown number of imports of goods from China that Joby Aero may have received through other means (such as air imports) or indirectly, such as importation through other countries.  The full scope of Joby Aero's imports from China will be the subject of discovery.

*Note: The sources of this information are from third-party shipping records aggregators and public import databases last visited June 26, 2026.*

| Representative China-Origin Shipments Received by Joby Aero Relevant to Joby's eVTOL Supply Chain | | | | | | |
|---|---|---|---|---|---|---|
| Date | Suppliers | Reported Item or Shipment | HS Code | Weight (approx.) | Country of Origin | Shipment Records |
| 12/19/2025 | Wuxi Jiaqing Youpin E Commerce Co | Aluminum Honeycomb Panel | **3926.90 -** Plastics and articles thereof; Other articles of plastics and articles of other materials of headings 3901 to 3914 | 613 lbs (278 kg) | China | **House:** EXDO6396009731 **Master:** COSU6436363773 |

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| 10/11/2025 | Tuv Rheinland China Ltd | Joby Charge Handle | **8504.40** - Electrical machinery and equipment and parts thereof; sound recorders and reproducers, television image and sound recorders and reproducers, and parts and accessories of such articles; Electrical transformers, static converters (for example, rectifiers) and inductors; parts thereof; Static converters | 229 lbs (104 kg) | China | **House:** DMERDFS037003934 **Master:** CMDUTJN0752490 |
| 9/9/2025 | Shenzhen Infypower Co. Ltd. | Charger Charger Module | **8504.40** - Electrical machinery and equipment and parts thereof; sound recorders and reproducers, television image and sound recorders and reproducers, and parts and accessories of such articles; Electrical transformers, static converters (for example, rectifiers) and inductors; parts thereof; Static converters | 2,273 lbs (1,031 kg) | China | **House:** DMERDFS045088893 **Master:** EGLV149505373467 |
| 9/2/2025 | Taizhou Dehao Technology Co. Ltd. | Floating Dock | **3926.90** - Plastics and articles thereof; Other articles of plastics and articles of other materials of headings 3901 to 3914; Other | 21,583 lbs (9,790 kg) | China | **House:** SZLOVLSZ25080086 **Master:** COSU6426585630 |
| 08/10/2025 | Joby Metal Shenzhen Co. Ltd. | Napkin Or Aluminum Plating[7] | **4818.30** - Paper and paperboard; articles of paper pulp, of paper or of paperboard; Toilet paper and similar paper, cellulose wadding or webs of cellulose fibers, | 2,549 lbs (1,156 kg) | China | **House:** WMIDMAY25071260 **Master:** MATS3450990000 |

[7] The public record indicates this shipment consisted of "napkins," but Joby's Motion to Dismiss claims this was instead "aluminum plates." *See* Dkt. 44 at 9-10.

12

Gibson, Dunn & Crutcher LLP

| | | | of a kind used for household or sanitary purposes, in rolls of a width not exceeding 36 cm, or cut to size or shape; handkerchiefs, cleansing tissues, towels, tablecloths, table napkins, bed sheets and similar household, sanitary or hospital articles, articles of apparel and clothing accessories, of paper pulp, paper, cellulose wadding or webs of cellulose fibers; Tablecloths and table napkins<br><br>Or<br><br>**7606.12** – Of aluminum alloys | | | |
| 04/17/2025 | Qingdao Cc International Trade Co | Power Cable | **8544.42** - Electrical machinery and equipment and parts thereof; sound recorders and reproducers, television image and sound recorders and reproducers, and parts and accessories of such articles; Insulated (including enameled or anodized) wire, cable (including coaxial cable) and other insulated electric conductors, whether or not fitted with connectors; optical fiber cables, made up of individually sheathed fibers, whether or not assembled with electric conductors or fitted with connectors; Other electric conductors, for a voltage not exceeding 1,000 V; Fitted with connectors | 1129 lbs (512 kg) | China | **House:** EXDO62Y0269633<br><br>**Master:** COSU9501607260 |

Gibson, Dunn & Crutcher LLP

13

| Date | Importer | Product | HTS Code | Weight | Origin | Bill of Lading |
|---|---|---|---|---|---|---|
| 1/5/2025 | Joby Metal Shenzhen Co. Ltd. | Socks<br><br>Or<br><br>Plastic Photo Albums[8] | **6115.96** - Articles of apparel and clothing accessories, knitted or crocheted; Panty hose, tights, stockings, socks and other hosiery, including graduated compression hosiery (for example, stockings for varicose veins) and footwear without applied soles, knitted or crocheted; Other; Of synthetic fibers<br><br>Or<br><br>**3926.90** - Other articles of plastics and articles of other materials of headings 3901 to 3914; other | 10,849 lbs (4,921 kg) | China | **House:** WMIDMAY24120748<br><br>**Master:** MATS5465630000 |
| 09/22/2024 | Shenzhen Hanstar Technologies Co | Quilt | **9404.90** - Furniture; bedding, mattresses, mattress supports, cushions and similar stuffed furnishings; lamps and lighting fittings, not elsewhere specified or included; illuminated sign illuminated nameplates and the like; prefabricated buildings; Mattress supports; articles of bedding and similar furnishing (for example, mattresses, quilts, eiderdowns, cushions, pouffes and pillows) fitted with springs or stuffed or internally fitted with any material or of cellular rubber or plastics, whether or not covered; Other | 505 lbs (229 kg) | China | **House:** WMIDMAY24090494<br><br>**Master:** MATS6797304000 |

---

[8] The public record indicates this shipment consisted of "socks," but Joby's Motion to Dismiss claims this was instead "photo albums." *See* Dkt. 44 at 9-10.

14

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| 07/31/2024 | Shenzhen Infypower Co Ltd | Charger | **8504.40** - Electrical machinery and equipment and parts thereof; sound recorders and reproducers, television image and sound recorders and reproducers, and parts and accessories of such articles; Electrical transformers, static converters (for example, rectifiers) and inductors; parts thereof; Static converters | 1455 lbs (660 kg) | China | **House:** EXDO61N0861139<br><br>**Master:** EGLV149404486843 |
|---|---|---|---|---|---|---|
| 03/27/2024 | Joby Metal Shenzhen Co. Ltd. | Mold | **8480.41** - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Molding boxes for metal foundry; mold bases; molding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics ; Molds for metal or metal carbides; Injection or compression types | 2,965 lbs (1,345 kg) | China | **House:** KYSILSAP2400150<br><br>**Master:** ONEYSZPE33182400 |
| 01/22/2024 | Hanstar Tec[h]nologies Co Ltd | Mold | **8480.71** - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Molding boxes for metal foundry; mold bases; molding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics; Molds for rubber or plastics; Injection or compression types | 1202 lbs (545 kg) | China | **House:** MGNGOAK23C21104<br><br>**Master:** EGLV010301144182 |
| 01/02/2024 | Joby Metal Shenzhen Co. Ltd. | Hair Clip<br><br>Or | **3926.90** - Plastics and articles thereof ; Other articles of plastics and articles of other materials of headings 3901 to 3914; Other | 6,138 lbs (2,784 kg) | China | **House:** WMIDMAY23120554<br><br>**Master:** MATS4534366000 |

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| Date | Importer | Product | HTS Code | Weight | Origin | Bill of Lading |
|---|---|---|---|---|---|---|
| | | Notebooks[9] | Or<br><br>**4820.10** – Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles | | | |
| 11/15/2023 | Joby Metal Shenzhen Co. Ltd. | Aisi Stainless Steel Aluminum | **7219.14** - Flat-rolled products of stainless steel, of a width of 600 mm or more – Not further worked than hot-rolled – Of a thickness of less than 3 mm | 6,634 lbs (3,009 kg) | China | **House:** NAQANAP2300112<br><br>**Master:** HDMUSZPM63461800 |
| 04/03/2023 | Hanstar Tec[h]nologies Co Ltd | Key Chain | **3926.90** - Plastics and articles thereof; Other articles of plastics and articles of other materials of headings 3901 to 3914; Other | 1649 lbs (748 kg) | China | **House:** WMIDMAY23030677<br><br>**Master:** MATS1176624000 |
| 11/13/2022 | Joby Metal Shenzhen Co. Ltd. | Bed Canopy<br><br>Or<br><br>Industrial Mold Frames[10] | **6306.12** - Other made up textile articles; sets; worn clothing and worn textile articles; rags; Tarpaulins, awnings and sunblinds; tents (including temporary canopies and similar articles); sails for boats, sailboards or landcraft; camping goods; Tarpaulins, awnings and sunblinds ; Of synthetic fibers (669)<br><br>Or<br><br>**8480.41** - Molding boxes for metal foundry; mold bases; molding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral | 5,335 lbs (2,420 kg) | China | **House:** WMIDMAY22110124<br><br>**Master:** MATS3522874000 |

[9] The public record indicates this shipment consisted of "hair clips," but Joby's Motion to Dismiss claims this was instead "registers, accounting books, notebooks." *See* Dkt. 44 at 9-10.

[10] The public record indicates this shipment consisted of "bed canopies," but Joby's Motion to Dismiss claims this was instead "injection/compression mold frames." *See* Dkt. 44 at 9-10.

Gibson, Dunn & Crutcher LLP

16

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

| Date | Company | Product | HS Code Description | Weight | Country | Bill of Lading |
|---|---|---|---|---|---|---|
| | | | materials, rubber or plastics; Molds for metal or metal carbides; Injection or compression types | | | |
| 08/10/2022 | Dongguan Xin Bao Instrument Co Ltd | Temperature Test Chamber | **0803.90** - Edible fruit and nuts; peel of citrus fruit or melons ; Bananas and plantains, fresh or dried ; Other | 4407 lbs (1,999 kg) | China | **House:** CHKMSOA207004602 <br><br> **Master:** EGLV010200630252 |
| 07/27/2022 | Shiny Balls Ltd | Aisi Stainless Steel Hollow Ball | **7326.90** - Articles of iron or steel ; Other articles of iron or steel ; Other | 143 lbs (65 kg) | China | **House:** BNXCOAK2261088 <br><br> **Master:** EGLV010200705529 |
| 05/19/2022 | Neware Technology Limited | Testing Equipment | **9024.80** - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof ; Machines and appliances for testing the hardness, strength, compressibility, elasticity or other mechanical properties of materials (for example, metals, wood, textiles, paper, plastics), and parts and accessories thereof ; Other machines and appliances | 4299 lbs (1,950 kg) | China | **House:** MGNGOAK22413221 <br><br> **Master:** EGLV010200304371 |
| 03/08/2022 | Dongguan Xinbao Instrument Co Ltd | Battery Explosion Proof Test Chamber | **7326.90** - Articles of iron or steel ; Other articles of iron or steel ; Other | 10,582 lbs (4,800 kg) | China | **House:** FEVMSZXF22010222 <br><br> **Master:** EGLV149116337159 |
| 01/26/2022 | Joby Metal Shenzhen Co. Ltd. | Photo Albums | **3926.90** - Plastics and articles thereof ; Other articles of plastics and articles of other materials of headings 3901 to 3914 ; Other | 5,666 lbs (2,570 kg) | China | **House:** MNQOSHA012200333 <br><br> **Master:** MATS3896222004 |

Gibson, Dunn & Crutcher LLP

17

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

| 12/07/2021 | Dongguan Xinbao Instrument Co Ltd | Battery Explosion Proof Test Chamber | 7326.90 - Articles of iron or steel ; Other articles of iron or steel ; Other | 10,582 lbs (4,800 kg) | China | **House:** BSVJBSI21110264 <br><br> **Master:** CMDUSHZ4371046 |
| --- | --- | --- | --- | --- | --- | --- |
| 05/18/2021 | Neware Technology Limited | Alibration Kit Bts | **9030.39** - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof ; Oscilloscopes, spectrum analyzers and other instruments and apparatus for measuring or checking electrical quantities, excluding meters of heading 9028; instruments and apparatus for measuring or detecting alpha, beta, gamma, X-ray, cosmic or other ionizing radiations; parts and accessories thereof: | 505 lbs (229 kg) | China | **House:** NAQASZX2107833 <br><br> **Master:** EGLV149101760395 |
| 05/02/2021 | Joby Metal Shenzhen Co. Ltd. | Battery Explosion Proof Test Chamber | 7326.90 - Articles of iron or steel ; Other articles of iron or steel ; Other | 5,952 lbs (2,700 kg) | China | **House:** MLQDSHA042100367 <br><br> **Master:** MATS6734406010 |
| 11/25/2020 | Neware Technology Limited | Battery Test Machine Solid Wood | **3926.90** - Plastics and articles thereof ; Other articles of plastics and articles of other materials of headings 3901 to 3914 ; Other | 2,835 lbs (1,286 kg) | China | **House:** AMIGSZX2017734 <br><br> **Master**: HDMUHKWB8530390 |
| 11/02/2020 | Dongguan Xinbao Instrument Co Ltd | Battery Explosion Proof Test Chamber Temp Humidity Chamber | 7326.90 - Articles of iron or steel ; Other articles of iron or steel ; Other | 7857 lbs (3,564 kg) | China | **House:** PPILSZX27459 <br><br> **Master:** ZIMUSHH30316235 |

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| 06/17/2020 | Joby Metal Shenzhen Co. Ltd. | Metal Printer | **8443.99** - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof ; Printing machinery used for printing by means of plates, cylinders and other printing components of heading 8442; other printers, copying machines and facsimile machines, whether or not combined; parts and accessories thereof ; Parts and accessories ; Other | 4,941 lbs (2,241 kg) | China | **House:** CHKMSOA005082205 <br><br> **Master:** ONEYHKGA62017300 |
|---|---|---|---|---|---|---|
| 09/20/2019 | Dongguan Xinbao Instrument Co Ltd | Battery Explosion Proof Test Chamber | **7326.90** - Articles of iron or steel ; Other articles of iron or steel ; Other | 617 lbs (280 kg) | China | **House:** CHKMSOA909008006 <br><br> **Master:** ONEYHKGVE3773800 |
| 08/30/2019 | Joby Metal Shenzhen Co. Ltd. | Polishing Machine Microscopes Precision Cutting Machine Ultrasonic Cleaner Electronic Scale Vacuum Chamber | **7326.90** - Articles of iron or steel ; Other articles of iron or steel ; Other | 933 lbs (423 kg) | China | **House:** CHKMSOA907040976 <br><br> **Master:** ONEYHKGVC2567600 |
| 06/13/2019 | Joby Metal Shenzhen Co. Ltd. | Printing Machine | **8443.99** - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof ; Printing machinery used for printing by means of plates, cylinders and other printing components of heading 8442; other printers, copying machines and facsimile machines, whether or not combined; parts and accessories | 5,357 lbs (2,430 kg) | China | **House:** HYSLFSZX19051259 <br><br> **Master:** ONEYHKGV89063900 |

Gibson, Dunn & Crutcher LLP

19

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | thereof ; Parts and accessories ; Other | | | |
| 03/02/2019 | Dongguan Xinbao Instrument Co Ltd | Salt Spray Tester | **3926.90** - Plastics and articles thereof ; Other articles of plastics and articles of other materials of headings 3901 to 3914 ; Other | 816 lbs (370 kg) | China | **House:** MGNGOAK911615 <br><br> **Master:** HDMUYNWB1851588 |
| 12/03/2018 | Joby Metal Shenzhen Co. Ltd. | Pkgs Ceramic Fiber Paper | **6907.21** - Ceramic products ; Ceramic flags and paving, hearth or wall tiles; ceramic mosaic cubes and the like, whether or not on a backing; finishing ceramics ; Flags and paving, hearth or wall tiles, other than those of subheading 6907.30 and 6907.40 ; Of a water absorption coefficient by weight not exceeding 0.5% | 990 lbs (449 kg) | China | **House:** NAQA1817819S <br><br> **Master:** APLU751058352 |
| 03/19/2017 | Shenzhen Second Intelligent Equipme[nt] | Potting Machine | **9403.60 -** Furniture; bedding, mattresses, mattress supports, cushions and similar stuffed furnishings; lamps and lighting fittings, not elsewhere specified or included; illuminated sign illuminated nameplates and the like; prefabricated buildings ; Other furniture and parts thereof ; Other wooden furniture | 1080 lbs (490 kg) | China | **House:** CHKMSOA702024506 <br><br> **Master:** MOLU13020687480 |

35.     Joby China's recent job postings include a number of highly technical engineering positions which require "Good English" to "[i]nterface with overseas engineers regarding aircraft parts and new tooling"[11] as these employees located in China "help [Joby] build the future of urban air mobility" and develop the "technological backbone of Joby's operations" by "participat[ing in]

---

[11] Senior Manufacturing Engineer (高级数控工程师), Joby Metal (Shenzhen) Co., Ltd., Liepin (猎聘), https://www.liepin.com/job/1978092495.shtml (last visited June 26, 2026) (based on courtesy machine-generated English translation).

Gibson, Dunn & Crutcher LLP

the design and execution of the manufacturing processes in China, Germany and the United States."[12]

36.    Joby China is also actively developing intellectual property in China related to its aircraft manufacturing activities occurring there, based on information and belief.  Public patent records show that Joby China has been granted multiple patents in China as recently as November and December 2025, including CN223643298U, CN223616768U, CN223604109U, and CN223610836U, each issued by the China National Intellectual Property Administration in late 2025.[13]  These patents cover manufacturing and measurement technologies relevant to aerospace component production—including clamping devices, additive-manufacturing support structures, and precision measurement instruments for use in testing of aeronautical components.[14]

37.    Based on information and belief, Joby China personnel utilize "jobyaviation.com" email addresses, indicating overlap in the company's information technology infrastructure between the U.S. Joby Aviation parent entity and its Chinese subsidiary.

38.    Based on information and belief, Joby China is deeply ingrained with the Chinese government and the Chinese Communist Party ("CCP"), undisclosed to U.S. government agencies. Joby China, on information and belief, received direct technology grants and support from the Chinese government and is listed in Shenzhen's Prospective Technology-Based Small Medium Enterprise Registry—a registry specifically designed to align private enterprises with CCP-directed innovation and military-civil fusion programs.

39.    Further, on information and belief, the CCP's Ministry of Industry and Information Technology, Ministry of Commerce, and Ministry of Finance have provided Joby China with multiple monetary grants as well as tax incentives, subsidized interest on bank loans, extended loss carry-forward allowances, preferential treatment in innovation projects, and brand promotion.

---

[12] Power Platform Developer/Engineer (制造工程师), Job Posting, Joby Metal (Shenzhen) Co., Ltd., Liepin (猎聘), https://www.liepin.com/job/1978060035.shtml (last visited June 26, 2026) (based on courtesy machine-generated English translation).

[13] *See* CN223643298U (issued Dec. 9, 2025), CN223616768U (issued Dec. 2, 2025), CN223604109U (issued Nov. 28, 2025), CN223610836U (issued Nov. 28, 2025), China Nat'l Intell. Prop. Admin. (CNIPA) Patent Publication System, https://english.cnipa.gov.cn (last visited June 26, 2026).

[14] *Id.*

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

40.    Moreover, based on information and belief, one of Joby China's employees is listed as number 214 on an official Shenzhen government roster of "returned overseas-educated personnel" who received housing and living subsidies from the State after studying in the United States—an indicator of CCP-linked talent recruitment and technology acquisition programs.[15]

41.    China commentators have confirmed that Shenzhen, where Joby China is located, is at the "forefront" of the Chinese government's initiative to develop what its State Council has termed the "low-altitude economy."[16]  No municipal government has "heeded the [State Council's] call to develop the low-altitude economy" more than Shenzhen's,[17] which has engaged Chinese government actors, including the local outpost of China's National Development and Reform Commission ("NDRC"), to "position Shenzhen as a 'Global Leading City for the Low-Altitude Economy.'"[18]  The eVTOL "manufacturing powerhouse of the Shenzhen cluster" reflects a "tightly coordinated public policy" directed by China's military-industrial planning apparatus.[19]

42.    At the national level, China's NDRC—an "organ of the [Chinese State Council's] military industrial planning apparatus," according to the Department of War ("DoW"),[20] has an entire department dedicated to formulating, organizing, and implementing China's "strategic" plans

[15] *See* NATIONAL ACADEMIES OF SCIS., ENG'G & MED., INTERNATIONAL TALENT PROGRAMS IN THE CHANGING GLOBAL ENVIRONMENT 144 (Mark A. Barteau & Sarah M. Rovito eds., 2024), https://doi.org/10.17226/27787.  Further, PRC Company Law, Article 18, requires companies in China to permit the establishment of CCP organizations ("party branches"). The CCP Constitution (Chapter V, Article 30) requires the formation of a party branch if three or more CCP members are employed in a private enterprise.  CCP party branches are installed to ensure the company follows CCP directives and may report back to party superiors.  The potential current or future presence of a party committee within Joby China would also raise concerns to U.S. regulators.

[16] Fan Yang, *City in the Sky: Drones, Shenzhen, and the 'Low-Altitude Economy'*, 10 Made in China J. 38 (2025), https://madeinchinajournal.com/2025/08/12/city-in-the-sky-drones-shenzhen-and-the-low-altitude-economy/ (last visited June 26, 2026).

[17] *See id.*

[18] China eVTOL News, *Shenzhen Low-Altitude Aircraft Takeoff and Landing Facilities Layout Plan (2026–2035)*, China eVTOL News (Nov. 1, 2025), https://www.chinaevtolnews.com/p/shenzhen-low-altitude-aircraft-takeoff (last visited June 26, 2026).

[19] Enrique Dans, *The Low-Altitude Leap: How China Is Owning the Sky Below 1,000 Meters*, Medium (Oct. 23, 2024), https://medium.com/enrique-dans/the-low-altitude-leap-how-china-is-owning-the-sky-below-1-000-meters-322c35bbbf0f (last visited June 26, 2026).

[20] *SZ DJI Tech. Co. v. U.S. Dep't of Def.*, 2025 WL 2761210, at *8 (D.D.C. Sept. 26, 2025).

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

for the "low-altitude economy."[21]  In addition to the NDRC, China's "Ministry of Industry and Information Technology," "Ministry of Science and Technology," "Ministry of Finance," and "Civil Aviation Administration" are reportedly engaged in similar efforts to implement the State Council's directive.[22]

43.     Joby China also has been designated by the Chinese government as a "National High and New Technology Enterprise" ("NHNTE"), with associated tax breaks and funding.

44.     Notably, these types of activities by Joby China have caused other companies in the aerospace industry to be proscribed by the DoW as "Chinese military companies," unsuitable for grants, contracts, loans, partnerships, or other support from the federal government.[23]  For example, the U.S. District Court for the District of Columbia upheld DoW's designation of drone-maker DJI's Shenzhen, China subsidiary—SZ DJI Technology Co.—as a "Chinese Military Company" under Section 1260H of the National Defense Authorization Act based on similar Chinese national-level recognition, where DJI had been recognized as a National Enterprise Technology Center ("NETC") by the NDRC.  The drone manufacturer had received "assistance" from the Chinese government (*e.g.*, subsidies, tax breaks, favorable treatment).[24]

**B.      Joby's Connections to China Continue**

45.     Based on bills of lading data, the most recent of Joby Aero's imports from PRC-connected Joby China occurred just last year, in August 2025.  And Joby Aero's most recent import from any supplier in China based on the same information occurred in December 2025.  Joby's connections to China in general and Joby China in particular thus continue.

---

[21] Press Release, Xinhua, *China's Top Economic Planner Sets Up Department to Boost Low-Altitude Economy*, State Council P.R.C. (Dec. 28, 2024), https://english.www.gov.cn/news/202412/28/content_WS676fb6afc6d0868f4e8ee567.html (last visited June 26, 2026).

[22] Yang, *supra* note 16, City in the Sky.

[23] *SZ DJI Tech. Co.,* 2025 WL 2761210, at *1–4, *21; see also William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1260H, 134 Stat. 3388, 3965 (2021) (codified as a note to 10 U.S.C. § 113).

[24] *SZ DJI Tech.*, 2025 WL 2761210, at *3, *11.

Gibson, Dunn & Crutcher LLP

46. Further, in November 2024, Joby Aviation and Joby Aero CEO JoeBen Bevirt presented at a conference held in China—the International Electric Aviation Forum in Kunshan—where he shared information about Joby's technologies and programs.

47. And in 2025, Bevirt was quoted in a Chinese-language article published in *Zhihu* as stating that "China is not only the largest market, but also the starting point for redefining future transportation."[25] The *Zhihu* article reports that Joby's plans for the China market include "deploy[ing] 1,000 aircraft in China by 2025; [b]uilding a charging network in 5 major city clusters; [r]ecruit[ing] the first batch of 3,000 pilots," and selecting its first four cities for aircraft deployment in Shenzhen, Hainan, Chengdu, and Hangzhou.[26] The article also stated that, because of what Bevirt termed "China speed," Joby has had to "make rapid adjustments to its Chinese market strategy," including "technical cooperation with top Chinese battery manufacturers; [e]stablish[ing] an R&D center in Shenzhen; [and] [b]uild[ing] a localized supply chain system."[27] The article further noted that Joby Aviation is "utilizing China's BeiDou Satellite Navigation System to enhance aircraft precision" and had "announced that it has reached a strategic cooperation with a Chinese technology giant."[28]

48. A February 10, 2026 post on the social media platform X by account "GUTE_RachelHan" (claiming to be a curator of tech and industry data and CEO of LabX) further reported that Bevirt recently visited the Chinese eVTOL developer XPeng, which is developing a "Land Aircraft Carrier" modular flying car and is expected to start deliveries in late 2026.[29] A video included in the post showed Bevirt flying in the XPeng prototype. The X post posited that Bevirt's visit to the Chinese company was "not just a simple visit, but a strategic exploration with

---

[25] Chang Tai, *Joby Aviation: Opening the Chinese Market, How Aircraft Will Reshape Future Mobility*, Zhihu (Jan. 11, 2025), https://zhuanlan.zhihu.com/p/17762289713 (last visited Mar. 7, 2026) (a certified English translation can be found at Dkt. 38-1).

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] @guteslax, X (February 10, 2026, 11:04 PM), https://x.com/guteslax/status/202118046438621248 (last visited Mar. 7, 2026) (a certified English translation can be found at Dkt. 38-2).

the possibility of future cooperation in mind."[30]  The post noted that the current situation is a "reverse consideration," with Joby seeking solutions from China with "the possibility of combining China's strong manufacturing and supply chain capabilities with the US certification framework, [to create] a sinergy [sic] that is viewed as further accelerating the commercialization of the flying car industry."[31]  The post reported that the "most likely" reason behind Joby's visit to XPeng was "to secure the supply chain" for Joby's own eVTOL aircraft.[32]

49.    The following is a screenshot of the video included with the @guteslax X post showing Bevirt flying in the XPeng prototype.



他专程飞越太平洋
He made a special trip across the Pacific Ocean

### C.    Joby Relies Upon China for Its Batteries

50.    Joby's ties to China are not limited to Joby China.  Based on information and belief, Joby also imports batteries that power its aircraft—arguably the single most important component in an electric vehicle—from suppliers in China.  Chinese media articles have reported that Jiangsu Zenergy Battery Technologies Group Co., Ltd. ("Zenergy") became "an important battery partner"

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

of Joby in 2023.[33]  On information and belief, Zenergy—like Joby China—has deep ties to the CCP.

**III.    Joby Aviation Has Sought to Conceal its China Connections in Crafting its Public and Government-Facing Image as a Domestic eVTOL Company**

51.    Joby's misrepresentations and omissions to the government (*see* infra at Sections IV.A and IV.B), based on information and belief are consistent with the actions Joby has taken writ large to promote itself as an "American" company and obfuscate its connections to and reliance on China.  These actions by Joby became particularly prominent over the last several years when the U.S. Administration began taking a more critical look at relations with China.

52.    *First*, Joby has engaged in a carefully orchestrated, but deceptively false, image campaign, advertising and promoting itself as a "Made in America" company when the facts are to the contrary.  On its website, in press releases, and through statements by Joby Aviation and Joby Aero CEO JoeBen Bevirt, Joby Aviation's Chief Policy Officer and Joby Aero's Head of Government Affairs Gregory Bowles, and other executives, Joby has advanced a false profile of a vertically integrated, domestically sourced American manufacturer.  For instance:

- Since at least February 2026, Joby Aviation's website at JobyAviation.com/technology identifies Joby Aviation as "An American Company" whose eVTOL aircraft are "[d]esigned, engineered, built and tested in America."[34]  This statement is false and, at the least, misleading based upon Joby's substantial operations in China.

- In a January 7, 2026 press release, Joby Aviation CEO JoeBen Bevirt stated: "we're ready to make sure that the commercial and defense aircraft that define the future of flight are built right here in America."[35]  This statement is also false and, at the least, misleading, given Joby's substantial reliance on China-based suppliers and manufacturing inputs

---

[33] *See, e.g.*, *Serving eVTOL Air Taxis!  This TOP10 Power Battery Company Is About to Take To the Skies*, Sohu.com (Sept. 22, 2023), https://www.sohu.com/a/722671975_121124483 (last visited Mar. 7, 2026) (a certified English translation can be found at Dkt. 38-3).

[34] Joby Aviation, *Technology*, https://www.jobyaviation.com/technology (last visited June 26, 2026).

[35] Joby Aviation, Press Release, *Joby to Expand Manufacturing Footprint with Acquisition of Second Ohio Facility* (Jan. 7, 2026), https://www.jobyaviation.com/news/joby-to-expand-manufacturing-footprint-with-acquisition-of-second-ohio-facility/ (last visited June 26, 2026).

- In a September 12, 2025 press release, Joby Aviation stated it pursues a "vertical integration strategy" under which "Joby designs, tests and builds nearly every aspect of its aircraft and air taxi service in-house."[36]  This statement by Joby Aviation, disseminated through Joby Aviation's investor-relations website, is at minimum likely to mislead.  Joby Aero's materials are not made "in-house."  Joby imports critical components from China-based suppliers, including those with CCP ties, and relies on its Shenzhen-based subsidiary for manufacturing and engineering support.

- In a July 15, 2025 press release announcing manufacturing expansion, Joby Aviation stated: "[d]rawing on top talent at its California and Ohio facilities, Joby designs, builds, and tests its aircraft in the US," and touted the "[a]dvantage[s] of [its] Vertical Integration" through which "Joby handles nearly every aspect of its aircraft and air taxi service in-house, from design and manufacturing to pilot training and operations."[37]  This statement is false and/or misleading.  Joby's "California and Ohio" framing omits Joby Aviation's Chinese manufacturing footprint and the role of Joby China and other China-based suppliers in Joby's aircraft program.

- In a June 4, 2025 post on X, Joby stated: "'We're an American company. We've designed, built and tested this aircraft here.'  Today with @JTLonsdale on @AmOptimistShow, Joby CEO JoeBen Bevirt talks how we're building quieter, faster, and more efficient ways to move, and doing it in America. #MadeInAmerica."[38]  These statements are false and/or misleading, given Joby's substantial ties to China.

- In a May 11, 2025 press release, Joby Aviation CEO JoeBen Bevirt stated that Joby's air taxi "is designed, manufactured and assembled here in the US, and we are a proudly

---

[36] Joby Aviation, Press Release, *Joby Plans to Jumpstart US Operations through White House eVTOL Integration Program* (Sept. 12, 2025), https://ir.jobyaviation.com/news-events/press-releases/detail/144/joby-plans-to-jumpstart-us-operations-through-white-house (last visited June 26, 2026).

[37] Joby Aviation, Press Release, *Joby Expands Manufacturing Capacity in California and Ohio, Adds New Aircraft to Its Fleet* (July 15, 2025) https://ir.jobyaviation.com/news-events/press-releases/detail/133/joby-expands-manufacturing-capacity-in-california-and-ohio (last visited June 26, 2026).

[38] @Jobyaviation, X (June 4, 2025, 10:01 PM), https://x.com/jobyaviation/status/1930384552624562484 (last visited June 26, 2026).

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

American company, employing engineers and other experts across 40 different US states."[39]   This statement is false and/or misleading based upon the facts above.

- In its January 17, 2024 investor presentation, Joby Aviation claimed that it had a "vertically-integrated business model that sees us both manufacturing and operating the aircraft."[40] This statement is false and/or misleading.  Joby's "vertically-integrated" framing omits the role of Joby China and other China-based suppliers in Joby's aircraft program.

- In its February 26, 2024 Annual Report on Form 10-K for fiscal year 2023, Joby Aviation stated: "Our commitment to vertical integration and in-house development has allowed us to optimize systems and components across the aircraft, resulting in better energy efficiency, range, and speed than what would otherwise be available using commercial-off-the-shelf components."[41]   This statement is false and/or misleading. Joby's "vertical integration" and "in-house development" framing omits Joby Aviation's Chinese manufacturing footprint and the role of Joby China and other China-based suppliers in Joby's aircraft program.

- In its March 28, 2022 Annual Report on Form 10-K for fiscal year 2021, Joby Aviation stated: "Our commitment to vertical integration and in-house development has allowed for optimization of systems and components across the aircraft, resulting in better energy efficiency, range, and speed than what would otherwise be available using commercial-off-the-shelf ('COTS') componentry."[42]  This statement is false and/or misleading based upon the facts above.

[39] Joby Aviation, Press Release, *Joby Flies Two Aircraft Simultaneously in Testing Milestone* (May 11, 2025), https://www.jobyaviation.com/news/joby-flies-two-aircraft-simultaneously/ (last visited June 26, 2026).

[40] Joby Aviation, *Joby AAM Presentation* slide 8 (presented to the Los Angeles Board of Airport Commissioners, Jan. 17, 2024), https://www.lawa.org/sites/lawa/files/documents/1-17-24%20Joby%20AAM%20Presentation.pdf (last visited June 26, 2026).

[41] Joby Aviation, Inc., Annual Report (Form 10-K) (Feb. 26, 2024), https://www.sec.gov/Archives/edgar/data/1819848/000181984824000125/joby-20231231.htm (last visited June 26, 2026).

[42] Joby Aviation, Inc., Annual Report (Form 10-K) (Mar. 28, 2022), https://www.sec.gov/Archives/edgar/data/1819848/000095017022004706/joby-20211231.htm (last visited June 26, 2026).

- In its August 16, 2021 S-1 Registration Statement, Joby Aviation stated that: "Our commitment to vertical integration and in-house development has allowed for optimization of systems and components across the aircraft."[43]  This statement is false and/or misleading based upon the facts above.

- During its 2026 Electric Skies Tour through which Joby Aviation is conducting a public demonstration campaign throughout the U.S., Joby's convention-like product display features the large, contrasting banner: "Designed, engineered, manufactured, tested in America."  During the tour stop at the Reindustrialize Conference 2026 held in Detroit, Michigan, Joby Aviation's Chief Policy Officer and Joby Aero's Head of Government Affairs Gregory Bowles appeared in a video describing a conversation Joby Aviation Board member Michael Thompson had with Under Secretary of War for Research and Engineering Emil Michael where they discussed "reindustrializing the manufacturing base of the United States," and Bowles asserted that, "[a]t Joby, this is something that has been top of mind since the very beginning.  We make almost everything.  We're extremely vertical in nature with our own batteries, our own motors, our own high-power electronics."[44]   The video was posted by Joby Aviation, stating: "[w]e came to Reindustrialize 2026 to show what American aerospace manufacturing looks like up close."[45]  These statements are false and misleading.  Joby Aviation's materials are not made "in-house."  Based on information and belief, Joby imports critical components from China-based suppliers, including batteries, and relies on its Shenzhen-based subsidiary for manufacturing and engineering support.

53.     *Second,* showing the lengths Joby is willing to go to obfuscate its connection to China, Joby Aviation silently took down the Joby China website.  This website, formerly at

---

[43] Joby Aviation, Inc., Registration Statement (Form S-1) (Aug. 16, 2021), https://ir.jobyaviation.com/sec-filings/all-sec-filings/content/0001193125-21-248186/0001193125-21-248186.pdf  (last visited June 26, 2026).

[44] Joby Aviation, *We Came to Reindustrialize 2026 to Show What American Aerospace Manufacturing Looks Like* (Facebook video), Facebook, https://www.facebook.com/JobyAviation/videos/we-came-to-reindustrialize-2026-to-show-what-american-aerospace-manufacturing-lo/2404688899943354/ (last visited June 26, 2026).

[45] *Id.*

www.jobymetal.com, had for years documented Joby Aviation's subsidiary's manufacturing operations in Shenzhen—including photographs of its factory floor, descriptions of its metal-manufacturing and precision-machining capabilities, and statements that its "generator equipment has been exported to Europe and the United States." On information and belief, the website was taken down as a result of increasing public and governmental scrutiny of U.S.-China technology and supply-chain relationships, eliminating the most accessible public evidence of Joby China's active manufacturing operations and direct supply relationship with Joby Aero in the United States.

54.    *Third*, Joby has systematically scrubbed references to Joby China from its investor-facing and public marketing materials. Joby Aviation's website, press releases, and corporate presentations now highlight only its U.S. facilities—in California, Ohio, and other domestic locations—while making no mention of Joby China's Shenzhen operations, its Chinese patent portfolio, its engineering workforce in China, or its receipt of government grants in China. Based on information and belief, this selective presentation of Joby Aviation's geographic footprint was designed to create the false and/or misleading impression that Joby's design-to-manufacturing pipeline is domestic.

55.    *Fourth*, this litigation shows the three-card monte Joby is willing to play as to its operations in China. In Archer's original pleading, Archer cited publicly available bills of lading and import records reflecting that certain shipments from Joby China to Joby Aero were described as items such as socks, photo albums, hair products, napkins, and similar consumer goods—thousands of pounds of products that were inconsistent with being received from a metal supplier in China. *See* Dkt. 38 ¶¶ 12–13. Archer asserted that these public import records raised serious questions regarding the accuracy and transparency of Joby's import practices and disclosures.

56.    Joby and its senior executives did not explain these records; instead, they embraced them. Joby Aviation and Joby Aero CEO JoeBen Bevirt and other Joby-affiliated personnel launched a social-media campaign, repeatedly suggesting that the shipments in question from Joby China—Joby Aviation's China metal subsidiary—really were "socks" and related consumer products. Using the hashtag "#showusyoursocks," Joby personnel mocked the allegations that the

shipment descriptions were inaccurate and encouraged others to do the same.[46]  In one such post made right after Archer's counterclaims were filed, Bevirt posed beside a fireplace displaying socks, and his post was then re-posted by the official Joby Aviation account the following day: "[w]e can officially confirm that the only thing these socks are hiding is how incredibly comfortable they are."[47]



57.    Joby's story does not hold together.  At least some of the Joby "socks" are purportedly made in the U.S.A.[48]

58.    Moreover, when filing a pleading with this Court, Joby took yet another approach. In its Motion to Dismiss, Joby argued that Archer's pleading was incorrect because the shipments

[46]*See* @oliwalkerjones, X (March 10, 2026, 2:26 PM), https://x.com/oliwalkerjones/status/2031376256525386136?s=20 (last visited June 26, 2026); @blueskiesup, X (Mar. 10, 2026, 4:16 AM), https://x.com/blueskiesup/status/2031222632301953385 (last visited June 26, 2026).

[47]*See* @joeben, X (Mar, 10, 2026, 4:04 AM), https://x.com/joeben/status/2031219623740453087?s=20 (last visited June 26, 2026); @jobyaviation, X (Mar. 10, 2026, 2:26 PM), https://x.com/jobyaviation/status/2031376126111563988 (last visited June 26, 2026).

[48]    *See* @eVTOLbuzz, X (Oct. 5, 2025, 12:11 PM), https://x.com/eVTOLbuzz/status/1974915475651125637 (last visited June 26, 2026).

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

it received from China were ***not*** socks after all, and instead were aircraft-related manufacturing items that Joby claims it properly paid import duties on. *See* Dkt. 44 at 9–10 ("Archer then shifts to arguing that Joby has made 'misrepresentations' on customs forms to avoid paying tariffs, allegedly describing its imports as 'socks,' 'bed linens,' and 'hair clips.' But the Customs and Border Protection ('CBP') Form 7501s that Archer points to directly contradict the countercomplaint's allegations by showing Joby properly declared its imports as industrial molds, aluminum plating, and photo albums."). Nor did Joby ever explain CBP's "census warning" on Joby's Form 7501 for its January 5, 2025 import from China, which indicated a potential product misclassification. *See* Dkt. 61 at 16 (citing Dkt. 47-7).

59. Joby thus has at least three different versions of its story regarding imports from China: what is on publicly available bills of lading data, what Joby says on X, and what Joby says in court filings. Joby's willingness to advance whichever explanation is most advantageous to the audience of the moment—regardless of whether it is consistent with its prior statements or truthful—demonstrates Joby's deceptive and misleading conduct.

**IV.   Joby Aviation's and Joby Aero's Materially False and/or Misleading Statements to the U.S. Government and Program Decisionmakers**

60. Joby's deception and misconduct is particularly present in its government contracting work, leading to the claims at issue here.

61. Joby Aviation and its operating subsidiary, Joby Aero, are, and at all relevant times have been, U.S. government contractors. As a condition of eligibility for and continued participation in these programs, on information and belief they were required to make representations concerning manufacturing practices, supply chains, foreign affiliations, and corporate structure.

62. Joby made these representations about its eVTOL products and services principally to advance its economic interests and influence the purchasing decisions of U.S. agencies, directing government contracts and awards toward Joby and away from its direct competitor, Archer.

63. These representations had their desired effect. Joby's participation in U.S. government programs has been essential to its development, its advancement toward FAA

certification, and its ultimate commercialization strategy.  In a February 2022 press release, Joby Aviation described both the breadth and depth of its "close" relationship with the Department of War's Defense Innovation Unit ("DIU").[49]  Joby Aviation touted that its "relationship with DIU began in 2016" and that this contract with DIU provided Joby Aviation with "uninterrupted access to testing facilities" and allowed Joby Aviation "to conduct over a thousand test flights across multiple sub- and full-scale prototypes, enabling rapid iteration and validation of our design."[50] Joby Aviation noted that this "[a]ccess to DoD expertise, feedback, and facilities has and will continue to be an invaluable resource towards developing and certifying the Joby aircraft for broad DoD and commercial use."[51]  All of this was allegedly done by Joby Aviation to "help[] position the United States as the global leader in the eVTOL industry."[52]

64.    Joby's involvement with U.S. government agencies only grew through Joby's subsequent participation in the U.S. Air Force's AFWERX Agility Prime program, and most recently the White House's eIPP.  In December 2023, Joby Aviation's Chief Policy Officer Gregory Bowles explained that these U.S. government contracts were critical in helping Joby overcome the "valley of death"—the notoriously difficult chasm a startup faces when trying to transition a prototype into a commercially available product or DoW procurement contract: "DIU and Agility Prime together have kind of shown us a pathway to work with the government that doesn't take us directly over the valley of death. I think it kind of takes us around the valley of death."[53]

65.    As discussed below, in its procurement of each contract, based on information and belief, Joby made and relied upon false and/or misleading statements about its sourcing and supply chain, its "in house" vertical integration, and independence from foreign influences.  Based on

---

[49] Joby Aviation, Press Release, *Joby and the US Government Kickstart the Air Mobility Revolution* (Feb. 8, 2022), https://www.jobyaviation.com/news/joby-and-the-us-government-kickstart-the-air-mobility-revolution (last visited June 26, 2026).

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] Courtney Albon, *Pentagon's Commercial Tech Arm To Ramp Up Role in Military Innovation*, Beacon Global Strategies (Dec. 4, 2023), https://bgsdc.com/news_article/bgs-in-the-news-pentagons-commercial-tech-arm-to-ramp-up-role-in-military-innovation/ (last visited June 26, 2026) (brackets omitted).

Gibson, Dunn & Crutcher LLP

33

information and belief, what Joby did not disclose to these government agencies—and what would have mattered for purposes of government program and resource dedication—is that Joby is heavily connected to manufacturing in China, including reliant on a masked subsidiary in China that has imported thousands of pounds of materials to Joby in the U.S. Had the government been aware of the facts Joby concealed, Joby would not have received the same government benefits and resource allocation which would have instead gone to entities such as Archer. Each of these programs that Joby participated in were public-private programs designed to accelerate trusted American advanced-air-mobility technology, protect U.S. national-security interests, strengthen domestic supply chains, and prevent foreign-adversary influence—especially from the PRC. Thus, Joby's lack of disclosure was particularly critical.

### A. Joby Aviation's and Joby Aero's False and/or Misleading Statements in Connection with AFWERX Agility Prime

#### 1. The Purpose of AFWERX Agility Prime Was to Combat Foreign Influence and Advance American Technologies

66. Launched in April 2020, AFWERX Agility Prime is the U.S. Air Force's collaborative initiative to work with the industrial base on testing and experimentation, accelerating development of the commercial eVTOL industry, and enabling resilient distributed logistics and sustainable mobility.[54] The AFWERX program was not merely a grant program; it was a deliberate national-security and industrial-base initiative designed to use government testing resources, flight-test infrastructure, military use-case analysis, and early operational evaluation to accelerate the domestic AAM sector. AFWERX's purpose included funding early flight testing and experimentation, providing access to facilities such as wind tunnels and airspace, giving participants access to uniquely capable DoW aerospace subject-matter experts, and assessing military use cases including logistics, cargo transport, and personnel movement.

---

[54] Air Force Rsch. Lab'y ("AFRL"), *AFWERX Agility Prime – A New Era of Aerospace* (Nov. 22, 2021), https://www.afrl.af.mil/News/Article/2850369/afwerx-agility-prime-a-new-era-of-aerospace (last visited June 26, 2026); Daryl Mayer, *Agility Prime to Hold Virtual Launch Event, Air Force,* (Apr. 14, 2020), https://www.af.mil/News/Article-Display/Article/2147892/agility-prime-to-hold-virtual-launch-event/ (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

67.     A major purpose of the program is to combat foreign influence, particularly from China. AFWERX has described its mission in terms of connecting "American ingenuity" with U.S. Air Force challenges, expanding the defense industrial base for advanced technologies, creating a domestic industry and supply chain for AAM aircraft, bolstering U.S. technological advantage and supporting the U.S. defense industrial base against strategic competitors including China.[55]  Thus, AFWERX Agility Prime was particularly concerned with competition with (and therefore influence by) China.  According to a 2021 U.S. Air Force press release, AFWERX Agility Prime seeks to "create a domestic industry and supply chain" to support the development and production of advanced air mobility aircraft, including eVTOL.[56]

## 2.     Joby Aero Secures Multiple AFWERX Agility Prime Contracts

68.     In or about October 2020, the U.S. Air Force, through AFWERX and the Agility Prime program, first selected Joby Aero[57] to participate in Agility Prime.  (Joby Aero entered into a number of additional AFWERX Agility Prime agreements over the next five years, as discussed more fully below.)   AFWERX thereby "entered [into] an agreement with Joby Aviation to gain insight into and ultimately support flight testing and FAA certification of the Joby eVTOL aircraft."[58]  Joby Aviation and Joby Aero's CEO, JoeBen Bevirt, signed this next agreement on behalf of Joby Aero.[59]   "This agreement supports Joby's commercial business goals while simultaneously assessing utility against a variety of future Government use cases."[60]  As part of

[55]   AFWERX, *2023 Annual Report* (2024), at 4, 58 https://afwerx.com/wp-content/uploads/AFWERX_2023-Annual-Report-Final_CLEARED_AFRL-2024-4054_WEB.pdf.

[56] AFRL, *supra* note 59.

[57] The AFWERX agreement names Joby Aero as the counterparty.  The U.S. Air Force's press release announced the deal with "Joby Aviation."

[58] Katie Milligan, *As AFWERX Agility Prime Celebrates Two Years, Partner Joby Aviation Announces Acoustic Data from NASA Testing*, AFRL (May 17, 2022), https://www.afrl.af.mil/News/Article-Display/Article/3034496/as-afwerx-agility-prime-celebrates-two-years-partner-joby-aviation-announces-ac/ (last visited June 26, 2026)

[59] SBIR Phase III Agreement No. FA8614-22-9-0003, attached as Ex. 10.1 to Joby Aviation, Inc.'s Quarterly Report (Form 10-Q) (Nov. 4, 2022), https://www.sec.gov/Archives/edgar/data/1819848/000181984822000187/joby-20220930xex10_1.htm (last visited June 26, 2026),

[60] Kenneth McNulty, *AFWERX Agility Prime Partner Joby Aviation Announces Acoustic Data from NASA Testing*, Air Force Rsch. Lab'y (May 18, 2022), AFWERX Agility Prime partner Joby

Gibson, Dunn & Crutcher LLP

Joby Aero's participation, it entered into Small Business Innovation Research ("SBIR") and/or Other Transaction Authority ("OTA") agreements with the U.S. Air Force, thereby formally becoming a DoW contractor.  The purpose and scope of these agreements were the research, testing, modeling, simulation, and demonstration of Joby's aircraft for exploratory military use cases, including logistics, cargo transport, and personnel movement.  The AFWERX agreements, which have been amended several times through at least 2025, identified both Joby Aero and Joby Aviation as the "Performer" or "Contractor" under the agreements; thus, the obligations under the agreements applied to Joby enterprise-wide and to both Joby Aviation and Joby Aero.[61]

69.    These agreements involved incremental, task-based funding, subject to performance milestones and government discretion.  Oon information and belief, Joby Aero's obligations under these agreements included, among other things: providing access to aircraft, simulations, and technical data; conducting flight tests and demonstrations under military oversight; and complying with DoW safety, reporting, and data-rights requirements.

### 3.    These AFWERX Agility Prime Contracts Required Joby to Certify It Had No China Influences

70.    Critically, participation in the AFWERX Agility Prime Program required Joby Aero to complete the U.S. Air Force's SBIR Proposal Submission Instructions, as modified over time.  The SBIR and STTR Extension Act of 2022 ("Extension Act"), Public Law 117–183 (Sep. 30, 2022), amended section 9 of the Act, 15 U.S.C. § 638(g)(13)–(17), (o)(17)–(21), and (vv), to require small businesses applying for SBIR or Small Business Technology Transfer program awards to disclose information about the applicant's investment and foreign ties and specifically identify ties to "foreign countries of concern."  Per the Extension Act, the term "foreign country of concern" has been defined to include at present four countries, one of which is the PRC.  These requirements applied to all AFWERX Agility Prime Program awards applied for after the passing

---

Aviation announces acoustic data from NASA testing | Air Force Research Laboratory (last visited June 26, 2026).

[61] *See* SBIR Phase III Agreement No. FA8614-22-9-0003, attached as Ex. 10.1 to Joby Aviation, Inc.'s    Quarterly    Report    (Form    10-Q),    at    5    (Nov.    4,    2022), https://www.sec.gov/Archives/edgar/data/1819848/000181984822000187/joby-20220930xex10_1.htm (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

of the Extension Act, including at least Joby's 2022 SBIR Phase III Agreement and 2025 amendment of that agreement memorialized as Modification No. P00021.[62]

71.    The Extension Act also included revisions to the Proposal Submission Instructions that Joby was required to complete, including a specific disclosure regarding foreign affiliations: "[t]he following documents are required for all proposal submissions . . . Disclosures of Foreign Affiliations or Relationships to Foreign Countries webform in Volume 7 of the DSIP proposal submission."[63]    This means that, by submitting its proposal and certifying compliance with the SBIR disclosure requirements, Joby Aero necessarily represented that it had fully and accurately disclosed all material relationships, affiliations, subsidiaries, and sources of support involving a "foreign country of concern," including China, thereby enabling the U.S. Air Force to conduct the foreign-influence, cybersecurity, ownership, and due-diligence review required by the AFWERX Agility Prime program.

72.    Joby Aero's executed U.S. Air Force agreements also imposed technology-control and national-security obligations that were specifically aimed at preventing foreign access to U.S.-funded defense-relevant research.    Joby Aero agreed that "access to important technology developments under this Agreement by Foreign Firms or Institutions must be carefully controlled," and that Joby would comply with ITAR, NISPOM, and EAR.    Joby Aero also agreed to provide notice of any change in foreign ownership, control, or influence.

73.    The SBIR Proposal Submission Instructions further state that the U.S. Air Force "will review all proposals submitted in response to this BAA to assess security risks presented by

---

[62] SBIR Phase III Agreement No. FA8614-22-9-0003, attached as Ex. 10.1 to Joby Aviation, Inc.'s Quarterly Report (Form 10-Q) (Nov. 4, 2022), https://www.sec.gov/Archives/edgar/data/1819848/000181984822000187/joby-20220930xex10_1.htm (last visited June 26, 2026); *see also* Modification No. P00021 to SBIR Phase III Agreement No. FA8614-22-9-0003, attached as Ex. 10.1 to Joby Aviation, Inc.'s Quarterly Report (Form 10-Q) (Nov. 4, 2025), https://www.sec.gov/Archives/edgar/data/1819848/000181984825000596/joby-20250930x10qxexx10_1.htm (last visited June 26, 2026).

[63] Dep't of the Air Force, *SBIR Phase I Proposal Submission Instructions*, Air Force 23.3 Solicitation, amend. 2 (implementing the SBIR and STTR Extension Act of 2022) Vol. 2 (Disclosures of Foreign Affiliations or Relationships to Foreign Countries) (2023), https://media.defense.gov/2023/Aug/22/2003285631/-1/-1/0/AF_SBIR_233.PDF (last visited June 26, 2026).

small business concerns seeking a Federally funded award. The [US]AF will use information provided by the small business concern in response to the Disclosure of Foreign Affiliations or Relationships to Foreign Countries and the proposal to conduct a risk-based due diligence review on the cybersecurity practices, patent analysis, employee analysis, and foreign ownership of a small business concern, including the small business concern and employees of the small business concern to a foreign country, foreign person, foreign affiliation, or foreign entity."[64]  The Disclosure of Foreign Affiliations or Relationships to Foreign Countries form—which Joby was therefore required to answer—specifically asks whether the applicant has a "parent company, joint venture, or subsidiary, of the applicant or awardee that is based in or receives funding from, any foreign country of concern," which includes "the People's Republic of China."[65]

74.    Further, Joby Aviation's third quarter of 2022 Form 10-Q filed with the U.S. Securities and Exchange Commission ("SEC") includes the executed July 28, 2022 SBIR contract between Joby Aero and the U.S. Air Force committing almost $20 million in funds to Joby Aero in which Joby Aero agreed, among other things, that "access to important technology developments under this Agreement by Foreign Firms or Institutions must be carefully controlled," and that Joby Aero "shall comply with all applicable provisions of the International Traffic in Arms Regulations (22 C.F.R. Part 120, *et seq.*), the National Security Program Operating Manual (NISPOM) (DoD 5220.22-M), and the Department of Commerce's Export Administration Regulations (15 C.F.R. Part 730, *et seq.*)."[66]  Joby Aero likewise agreed that it would "immediately deliver to the cognizant security office and [Agreements Officer], a written notice of any change in the extent and nature of foreign ownership, control or influence over [Joby]" and to concurrently provide the Agreements

---

[64] Dep't of the Air Force, SBIR Phase I Proposal Submission Instructions, Air Force 23.3 Solicitation, amend. 2, at 1 (2023), https://media.defense.gov/2023/Aug/22/2003285631/-1/-1/0/AF_SBIR_233.PDF (last visited June 26, 2026).

[65] U.S. Small Bus. Admin., *Small Business Innovation Research (SBIR) & Small Business Technology Transfer (STTR) Program Policy Directive—Appendices app. III*, at 42-43 (May 2023), https://www.sbir.gov/sites/default/files/SBA%20SBIR_STTR_FINAL_APPENDICES_MAY2023.pdf (last visited June 26, 2026).

[66] *See* Joby Aviation, Inc., Quarterly Report (Form 10-Q), at 32 (Nov. 4, 2022), https://ir.jobyaviation.com/sec-filings/quarterly-reports/content/0001819848-22-000187/0001819848-22-000187.pdf (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

Officer any changes reportable to the SEC, FTC, or DOJ. [67]  This provision—signed by Joby Aviation and Joby Aero CEO JoeBen Bevirt—created an affirmative obligation for Joby Aero to inform the government of any changes of foreign influence over Joby's operations, even after the agreement was signed.

75.    In 2025, the U.S. Air Force and Joby Aero executed a modification of Joby Aero's SBIR Phase III Agreement, continuing Joby's participation in the AFWERX program while incorporating updated contractual requirements and reaffirming Joby Aero's ongoing obligations under the Agreement.[68]  Joby Aero's Head of Government Affairs, Gregory Bowles, signed the agreement on Joby Aero's behalf.[69]  This included prohibitions on Joby using any equipment related to an "unmanned aircraft system" from, among other covered foreign countries, "The People's Republic of China."[70]

### 4.    Joby Failed to Disclose Its China Ties

76.    Based on information and belief, Joby Aero provided false information or failed to disclose material information to the U.S. Air Force to participate in AFWERX Agility Prime. While the exact content of Joby Aero's statements to the U.S. Airforce beyond those above are known only to Joby and the United States, based on information and belief, Joby Aero falsely represented to the U.S. Air Force in connection with AFWERX Agility Prime that (i) it had truthfully disclosed its foreign affiliations, foreign subsidiaries, PRC-related funding or influence, supply-chain dependencies, cybersecurity risks, and foreign access to technology, and that (ii) it would carefully control access to U.S. Air Force-funded technology by foreign firms or institutions. On information and belief, Joby did not make full and accurate disclosures to the Air Force in connection with the Agility Prime program with respect to these matters, as it did not fully disclose

---

[67] *Id.* at 35.

[68] Modification No. P00021 to SBIR Phase III Agreement No. FA8614-22-9-0003, attached as Ex. 10.1 to Joby Aviation, Inc.'s Quarterly Report (Form 10-Q) (Nov. 4, 2025), https://www.sec.gov/Archives/edgar/data/1819848/000181984825000596/joby-20250930x10qxexx10_1.htm (last visited June 26, 2026).

[69] *Id.* at 2.

[70] *See* Joby Aviation, Inc., Exhibit 10.1 to Quarterly Report (Form 10-Q), at 88 (Nov. 4, 2025), https://ir.jobyaviation.com/sec-filings/all-sec-filings/content/0001819848-25-000596/joby-20250930x10qxexx10_1.htm (last visited June 26, 2026).

its connection to China or the PRC. This includes Joby failing to disclose the risks created by Joby's reliance on its Chinese subsidiary and other Chinese suppliers for critical components and manufacturing inputs.

77. The precise content of Joby Aero's certifications, disclosure forms, and submissions to the U.S. Air Force in connection with AFWERX Agility Prime—including the Disclosure of Foreign Affiliations or Relationships to Foreign Countries webform and the SBIR proposal volumes—is information peculiarly within the possession and control of Joby and the United States Government and is not publicly available to Archer. Archer's allegations on information and belief are based on specific factual information that makes the inference of falsity plausible, including: Joby's contemporaneous and ongoing operation of Joby China; Joby's documented reliance on China-based suppliers and manufacturing inputs detailed above; Joby China's receipt of Chinese-government grants and CCP-linked designations; and Joby's affirmative, public efforts to conceal its China ties—including taking down the Joby China website—which are irreconcilable with the truthful, complete foreign-affiliation disclosures that AFWERX participation required. Furthermore, Joby could not simultaneously have made the truthful disclosures the program demanded and been admitted into it on the terms it obtained; accordingly, Joby either affirmatively misrepresented or unlawfully omitted its China ties.

78. As outlined above, Joby has publicly presented itself as a vertically integrated entity that manufactures its aircraft domestically, describing itself as "an American Company" whose eVTOL aircraft are "[d]esigned, engineered, built and tested in America" and "We're vertically integrated, meaning we design and develop our aircraft from the ground up and in-house. Right here in the USA!"[71] (*See supra* Section III). It would have been entirely inconsistent with this public persona and profile—upon which the market and industry participants have acted—for Joby to disclose to the U.S. Air Force the truth: that Joby is deeply dependent on China for its supply chain, including reliant on a subsidiary in China that has received funding and grants from the PRC. (*See supra* Section II.A).

---

[71] *See* Joby Aviation, *Technology*, https://www.jobyaviation.com/technology (last visited June 27, 2026); @jovyaviation, X (July 4, 2025, 2:48 AM), https://x.com/jobyaviation/status/1941147231773765729 (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

40

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

**5.**     **Joby's Failure to Disclose Its China Ties Was Material to the U.S. Air Force**

79.     Given the importance AFWERX Agility Prime places on a risk-based due diligence review of the cybersecurity practices, patent analysis, employee analysis, and foreign ownership of a small business concern, based on information and belief, the U.S. Air Force would not have approved AFWERX Agility Prime for Joby had it known the truth.  Indeed, the extent of Joby's connection to the PRC would raise serious concerns in the eyes of any U.S. government agency or regulator.

80.     The government's treatment of foreign-affiliation issues in *Kayhan Space Corp. v. United States* provides an example.  There, an applicant for an U.S. Air Force/SBIR award was not selected after DoW's risk-based review identified foreign-affiliation concerns, including prior employment and affiliations connected to Iranian entities—which Kayhan had not disclosed in its SBIR application.[72]  The Court of Federal Claims decision describes the SBIR due-diligence process as assessing risk factors including foreign ownership or control, foreign affiliations, foreign talent-program participation, and other indicia of potential foreign influence.[73]  The U.S. Air Force's review assigned Kayhan a very high foreign-risk rating and the company was ultimately notified that it had not been selected for the U.S. Air Force/SBIR award.[74]

81.     The Government Accountability Office's ("GAO") recent review of SBIR/STTR foreign-risk controls confirms the materiality of these matters to the government.  The GAO explained that programs subject to SBIR/STTR controls, such as AFWERX, focus on foreign ownership, foreign affiliations, employee relationships, patent activity, cybersecurity vulnerabilities, foreign funding, and other indicators of foreign influence.[75]  The GAO further found

---

[72] *Kayhan Space Corp. v. United States*, No. 25-cv-104, slip op. at 2–8, 12–18 (Fed. Cl. May 28, 2026) (published June 8, 2026).

[73] *Id.*

[74] *Id.*

[75] U.S. Gov't Accountability Office, Small Business Research Programs: Agencies Identified Foreign Risks, but Some Due Diligence Programs Lack Clear Procedures, GAO-25-107402 (Nov. 21, 2024), available at https://files.gao.gov/reports/GAO-25-107402/index.html (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

that agencies rely on foreign-affiliation disclosures and related due-diligence reviews because Congress determined that foreign adversaries, including the PRC, pose material risks to federally funded research and technology-development programs.[76] The categories of information identified by the GAO as material to agency due diligence overlaps with Joby Aviation's undisclosed China-related activities alleged herein, including its Chinese subsidiary, Chinese-government support, China-based engineering activities, Chinese patent development, foreign-affiliated personnel, and information-technology integration between U.S. and Chinese operations.

82. Accordingly, based upon information and belief, Joby made false statements to the U.S. Air Force in connection with AFWERX Agility Prime or, at the least, failed to disclose the full extent of its connections to China, which resulted in Joby obtaining government funding and benefits that it would not have received had it fully disclosed to the U.S. Air Force its material connections to China. Joby's misconduct worked to the material detriment and harm of Archer, as discussed in Section V below.

**B.    Joby Aviation's False and/or Misleading Statements in Connection with the White House eIPP**

**1.    The eIPP Program Was Established to Promote American-Made eVTOL Aircraft**

83. On June 6, 2025, the President of the United States issued the "Unleashing American Drone Dominance" Executive Order establishing a comprehensive federal policy governing unmanned aircraft systems ("UAS"), including eVTOL aircraft and other AAM technologies.[77] The Executive Order expressly links the development, certification, and commercialization of eVTOL aircraft to national economic security, domestic manufacturing capacity, and protection of the United States supply chain.

84. The Executive Order declares that UAS and eVTOL aircraft "enhance United States productivity, create high-skilled jobs, and are reshaping the future of aviation," and identifies eVTOL aircraft as "[e]merging technologies" that "promise to modernize methods for cargo

---

[76] *See id.*

[77] Exec. Order No. 14,307, 90 Fed. Reg. 24727 (June 11, 2025).

delivery, passenger transport, and other advanced air mobility capabilities."[78]  The Order further states that "[b]uilding a strong and secure domestic drone sector is vital to reducing reliance on foreign sources, strengthening critical supply chains, and ensuring that the benefits of this technology are delivered to the American people."[79]

85.    As a matter of binding federal policy, the Executive Order directs U.S.-government agencies, including the FAA, to ensure continued American leadership in UAS and eVTOL aircraft development by:

a)    "accelerating the safe integration of UAS into the National Airspace System";

b)    "advancing the domestic commercialization of UAS technologies at scale, including their safe and secure manufacturing, production, and integration"; and

c)    "strengthening the domestic drone industrial base and promoting the export of trusted, American-manufactured UAS."[80]

86.    To implement these policies, the Executive Order directs the DOT, acting through the FAA, to establish the eIPP.  The eIPP is designed to accelerate real-world eVTOL operations through structured public-private partnerships and operational testing.  The Executive Order mandates that, within specified timeframes, the FAA must select at least five pilot projects, and that selection criteria "shall include, at a minimum, the use of eVTOL aircraft and technologies developed or offered by a United States-based entity."[81]

87.     When asked how the DOT/FAA will ensure that companies disclose the "types of details and evaluate proposals from companies that have established subsidiaries in China and/or received financial support from the Chinese government, and/or lack segregated data infrastructure to ensure sensitive information is not subject to foreign access or influence" and whether "such factors [will] be treated as disqualifying under the U.S.-based entity requirement and the EO's supply chain security mandate," DOT responded that "[t]he awarded OTAs will bar selected

---

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.* at 24728.

participants from working with adversarial nations and data protections language will also be included in the OTA.  The definition of [a] United States based company for purposes of this requirement is identified in the SIR."[82]

88.    The SIR defines a "United States based company" as an entity that (1) "[i]s organized or incorporated under the laws of a State, territory, or possession of the United States or the District of Columbia"; (2) "[h]as its principal place of business in the United States"; and (3) "[i]s not directly or indirectly owned or controlled by a foreign entity."[83]  This definition makes clear that companies seeking to participate in the eIPP must demonstrate not only formal U.S. incorporation, but also freedom from foreign ownership or control—criteria specifically designed to ensure that eVTOL aircraft developed under the eIPP are genuinely American and insulated from foreign-adversary influence.  Indeed, the Executive Order made clear that the government must "secure the United States drone supply against foreign control or exploitation," which cannot be done if the eIPP participants are in reality subject to the influence and control of adversarial nations.

89.    On or about March 9, 2026, the FAA announced the selection of participants in the eIPP.[84]  Five projects in which Joby was included as a partner were selected.[85]  It is currently unknown whether Joby Aviation was the party who made the submission, or Joby Aero—as Joby Aero has traditionally been the contracting party for Joby but Joby Aviation promoted Joby's receipt of an eIPP award.   Based on information and belief, Joby Aviation's Chief Policy Officer Gregory Bowles submitted the information on behalf of Joby.  Three projects in which Archer was included as a partner were also selected.

---

[82] U.S. Gen. Servs. Admin., SAM.gov Contract Opportunity, *eIPP Questions and Answers*, https://sam.gov/workspace/contract/opp/4a6bff2fbfd8415b99f65f8a771df136/view (last visited June 26, 2026).

[83] *Id.*

[84] Press Release, FAA, *The Future of Aviation Is Here: Trump's Transportation Secretary Sean P. Duffy and FAA Unveil Eight Selections for Pilot Program Testing Next-Gen Aircraft in America's Skies* (March 9, 2026) https://www.faa.gov/newsroom/future-aviation-here-trumps-transportation-secretary-sean-p-duffy-and-faa-unveil-eight (last visited June 26, 2026).

[85] The FAA's press release does not identify the specific Joby entity that was selected to participate in the eIPP, simply referring to it as "Joby."

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

### 2.    Joby Failed to Disclose Its China Ties

90.    Based on information and belief, Joby provided false or misleading information to, or at least intended it to be relied upon by, the FAA acting through the DOT in connection with the eIPP program or failed to disclose information material to the FAA/DOT's decision to select participants in the eIPP program.  Joby has described itself as an "American Company" whose products are "[d]esigned, engineered, built and tested in America."  And, indeed, Joby Aviation promoted itself in this manner in connection with the eIPP.  Joby Aviation publicly announced that it planned to participate in the eIPP based on its promise that it pursues a "vertical integration strategy" under which it "designs, tests and builds nearly every aspect of its aircraft and air taxi service in-house."[86]

91.    Based on information and belief, Joby provided information intended to be relied upon by FAA in selection of eIPP participation that was false or omitted material information. While the exact details of Joby's submissions are known only to Joby and the government, Joby has taken great efforts to conceal its relationship with China, including scrubbing Joby China's webpage and removing references to Joby China from Joby's public materials.  There is no reason to believe Joby was honest with the FAA about its connections to China, including the facts that it has and is reliant upon a Chinese subsidiary that has received direct technology grants from the Chinese government, is listed in Shenzhen's Prospective Technology-Based Small Medium Enterprise Registry aligned with CCP-directed innovation programs, and employs individuals designated as "returned overseas-educated personnel" receiving government subsidiaries.  Nor, based on information and belief, would Joby have been allowed to participate in the eIPP programs had it provided full and complete disclosures.

---

[86] Joby Aviation, Press Release, *Joby Plans to Jumpstart US Operations through White House eVTOL Integration Program* (Sept. 12, 2025), https://ir.jobyaviation.com/news-events/press-releases/detail/144/joby-plans-to-jumpstart-us-operations-through-white-house (last visited June 26, 2026).

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

### 3. Joby's Failure to Disclose Its China Ties Was Material to the FAA and DOT

92. Had Joby disclosed this information and the scope of its connections to China in connection with the eIPP program, it would have been contrary to Joby's public presentation to date of an "American-made" company. (*See supra* Section III). It also would have resulted in Joby not being allowed to participate in the eIPP, based on information and belief, due to the importance that the eIPP program places on domestic security and disclosure of foreign affiliation or involvement. The Executive Order and eIPP expressly linked the development, certification, and commercialization of eVTOL aircraft to national economic security, American-made manufacturing capacity, and protection of the United States supply chain. And DOT explicitly stated that "[t]he awarded OTAs will bar selected participants from working with adversarial nations . . . ."[87] For these reasons, based on information and belief, Joby would not have been eligible for eIPP participation had it disclosed its China-related ties.

## V. Archer's Injuries From Joby's Misstatements to the Government

93. The nascent eVTOL industry is not a conventional environment in which competitors can scale independently without constraint. Rather, it is a regulator-gated market in which companies are competing for finite regulatory attention and government resources.

94. The federal programs described above were not ordinary research grants or regulatory initiatives. They were targeted government investments intended to accelerate the commercialization of trusted American eVTOL manufacturers, strengthen the domestic aerospace industrial base, reduce reliance on foreign-adversary supply chains, and position selected companies to become leaders in the emerging advanced-air-mobility industry. Participation in these programs conferred not only direct funding, but also access to finite government resources, testing facilities, engineering expertise, military and regulatory engagement, public credibility, and market validation. Because only a small number of companies qualified for these programs—and because Archer and Joby have emerged as the two leading domestic eVTOL competitors—

---

[87] U.S. Gen. Servs. Admin., SAM.gov Contract Opportunity, eIPP Questions and Answers, https://sam.gov/workspace/contract/opp/4a6bff2fbfd8415b99f65f8a771df136/view (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

government resources devoted to Joby necessarily diminished the resources, opportunities, and competitive advantages available to Archer. Joby's false and misleading statements distorted that competitive process.

95. **AFWERX Agility Prime.** Joby's false and/or misleading statements enabled it to obtain and retain AFWERX Agility Prime contracts and related SBIR and OTA awards that, on information and belief, totaled at least $131 million. The awards also provided Joby with access to military testing facilities, operational flight testing, Air Force engineering expertise, government flight-test resources, and opportunities to mature its aircraft for both military and commercial applications. In addition to the limited amount of total funds available under the program (which necessarily means funds allocated to Joby meant they were no longer available to other parties like Archer), those awards also served as powerful endorsements of Joby's technology and substantially enhanced Joby's credibility with investors, commercial partners, suppliers, regulators, and the marketplace. Had Joby truthfully disclosed the extent of its China-based operations, China-dependent supply chain, Chinese-government-supported activities, and other foreign affiliations, Joby would not have received the same level of government funding, support, or participation, based on information and belief. Joby's receipt of those benefits materially damaged Archer, as it prevented Archer from obtaining that financing and resources.

96. **White House eIPP.** Although Archer was also allowed to participate in these projects, the eIPP does not provide unlimited opportunities. Rather, it allocates finite pilot projects, operational authorizations, government attention, regulatory engagement, and public endorsement among a limited number of participants. Joby was allowed to participate in five pilot projects, while Archer was allowed to participate in three. Upon information and belief, had Joby truthfully disclosed its China-related operations and foreign affiliations, Joby would not have received the same level of participation or government endorsement. In fact, on information and belief, had Joby fully disclosed its China-related ties, Joby likely would not have been allowed to participate at all given the eIPP's purpose to "continue[] DOT's efforts to integrate eVTOL and other AAM

Gibson, Dunn & Crutcher LLP

aircraft developed or offered by a United States-based entity into the National Airspace System."[88] Joby's misconduct therefore directly harmed Archer, as Archer would have had the opportunity to participate in additional projects under the eIPP that were instead taken by Joby based upon its misconduct.

97.    Beyond the direct benefits associated with each individual program, participation in these government initiatives carried substantial collateral commercial value.  Government selection served as a powerful signal to investors, customers, suppliers, airlines, strategic partners, regulators, and other government agencies regarding which companies are leading the race toward certification and commercialization.  Each additional government award strengthened Joby's reputation, increased confidence in Joby's technology, facilitated additional commercial relationships, improved access to capital, and enhanced Joby's market position.  Those same government endorsements necessarily diminished Archer's relative competitive standing in the race to commercialize eVTOL aircraft in the United States.

98.    Joby's misconduct likewise diverted finite governmental attention and regulatory resources away from Archer.  FAA certification resources, Air Force engineering support, and other governmental expertise available to support advanced-air-mobility programs are limited.  On information and belief, by obtaining participation in these programs through false and/or misleading statements and material omissions, Joby consumed government attention, technical assistance, operational support, and institutional resources that otherwise would have been available to Archer.

99.    As a direct and proximate result of Joby's misconduct, Archer has suffered and continues to suffer concrete economic and competitive injury, including lost government-program opportunities; diversion of finite government funding, testing resources, and technical support; diminished regulatory opportunities; lost commercial and strategic partnerships; loss of goodwill; diminished market position; reduced enterprise value; and other damages to be proven at trial.

**First Counterclaim**

[88] Electric Vertical Takeoff and Landing and Advanced Air Mobility Integration Pilot Program—Announcement of Establishment of Program and Request for Proposals, 90 Fed. Reg. 44,751, 44,751 (Sept. 16, 2025).

Gibson, Dunn & Crutcher LLP

48

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

UNLAWFUL AND UNFAIR COMPETITION UNDER CALIFORNIA

BUSINESS & PROFESSIONS CODE § 17200 et seq.

100.    Archer realleges and incorporates the preceding paragraphs as if fully set forth herein.

101.    Joby Aero, Inc., as the operating subsidiary of Joby Aviation, submitted the false and/or misleading statements, and/or failed to make necessary disclosures, to the applicable government agencies in connection with the AFWERX Agility Prime and eIPP programs, as alleged above, based on information and belief.  Joby Aviation, Inc., as the parent company of Joby Aero, directed and authorized the false and misleading statements and/or material omissions.  Joby Aviation also was a co-participant in Joby Aero's false statements, as demonstrated by Joby Aviation's control of Joby Aero and that Joby Aviation issued the false and misleading press releases, investor communications, and website representations that were in coordination with Joby Aero's false and/or misleading statements to government agencies.  Joby Aviation and Joby Aero acted in concert, and both are liable for the unlawful and unfair conduct alleged herein.  There is further substantial overlap of officers and employees of Joby Aviation and Joby Aero, including, for example, both Joby Aviation and Joby Aero CEO JoeBen Bevirt and Joby Aviation Chief Policy Officer and Joby Aero Head of Government Affairs Gregory Bowles, who based on information and belief were responsible for the submissions at issue in this matter.

102.    As outlined more fully above (*see supra* Sections IV.A and IV.B), based on information and belief, Joby Aero and Joby Aviation (JoeBen Bevirt and Gregory Bowles for AFWERX Agility Prime and, based on information and belief, Gregory Bowles for the eIPP) made representations or omissions to U.S. government agencies regarding Joby's aircraft and supply-chain as part of Joby's application to participate in government-funded programs that had the capacity, likelihood, and tendency to deceive or mislead those U.S. government agencies:

    a)    **AFWERX Agility Prime.**  To participate in AFWERX Agility Prime and receive SBIR and OTA awards from the U.S. Air Force, Joby Aero represented, expressly or by necessary implication, that (i) it had truthfully disclosed its foreign affiliations, foreign subsidiaries, PRC-related funding or influence, supply-chain dependencies,

Gibson, Dunn &
Crutcher LLP

cybersecurity risks, and foreign access to technology, and that (ii) it would carefully control access to U.S. Air Force-funded technology by foreign firms or institutions. Joby Aviation and Joby Aero CEO JoeBen Bevirt and Joby Aviation Chief Policy Officer and Joby Aero Head of Government Affairs Gregory Bowles made these representations on Joby Aero's behalf. The AFWERX agreements identified both Joby Aero and Joby Aviation as the "Performer" or "Contractor" under the agreements; thus, the obligations under the agreements applied to Joby enterprise-wide and to both Joby Aviation and Joby Aero. On information and belief, these representations were false or misleading as Joby Aero did not fully and accurately disclose its reliance on and association with activities in China, including that Joby Aviation simultaneously operated Joby China, a wholly owned Chinese subsidiary that employed engineering and manufacturing personnel, held China-issued patents, was on information and belief tied to CCP-directed innovation programs and Chinese government grants, supplied or supported Joby's China-dependent aircraft development and manufacturing program, and potentially placed technical data at issue. These misstatements and omissions were material to and influenced the U.S. Air Force because AFWERX Agility Prime was designed to build a trusted domestic AAM industry and supply chain. Based on information and belief, the U.S. Air Force relied on Joby Aero's false statements and omissions, as it selected Joby Aero for Agility Prime, entered SBIR and OTA agreements with Joby Aero, awarded Joby Aero expanded contracts valued at up to approximately $131 million, and continued supporting Joby's flight trials. Based on information and belief, the U.S. Air Force was deceived into believing that Joby was a domestically controlled, vertically integrated, foreign-adversary-free eVTOL developer whose technology and supply chain did not present undisclosed PRC-related risks. Joby Aero's omissions allowed it to bypass the heightened scrutiny to which it otherwise would have been subject by the U.S. Air Force in reviewing its applications.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

b) **White House eIPP.** To participate in the eIPP, Joby represented, expressly or by necessary implication, that it was a United States-based company for eIPP purposes, was not directly or indirectly owned or controlled by a foreign entity, would not work with adversarial nations in the awarded OTA agreement, would protect data from foreign access, and could participate consistent with the Executive Order's domestic manufacturing and supply-chain-security mandates, based on information and belief. Based on information and belief, Joby's submissions in support of the eIPP program were made by Gregory Bowles, Joby Aviation's Chief Policy Officer and Joby Aero's Head of Government Affairs. Whether it was Joby Aviation or Joby Aero that made these representations is information peculiarly within the possession and control of Joby and the United States Government and is not available to Archer; however, Joby Aviation issued press statements relating to Joby's receipt of eIPP benefits and Joby Aero has historically been the contracting party with government agencies. Based on information and belief, these representations or omissions were false and/or misleading because Joby Aviation operated Joby China; concealed Joby China's active engineering and manufacturing role and receipt of Chinese government grants and CCP-linked benefits; relies on China-sourced components, equipment, and suppliers for its eVTOL aircraft program; and potentially placed technical data at issue, based on information and belief. These statements were material and likely to influence the FAA. The Executive Order and eIPP criteria required use of eVTOL aircraft and technologies developed or offered by a United States-based entity, and DOT/FAA guidance specifically addressed China subsidiaries, Chinese government support, adversarial nations, and data protections in the eIPP Q&A. The FAA relied on Joby's statements, as Joby was allowed to participate in the eIPP. Based on information and belief, the FAA was deceived into conferring finite operational authorizations, regulatory fast-tracking, and government endorsement of Joby and did not exclude Joby from participating in the program based on the false impression that Joby's

aircraft program, supply chain, data practices, and corporate structure were materially domestic and free from undisclosed PRC-related access, control, or influence.

103.    Joby intentionally concealed the extent of its China ties and its reliance on Joby China and other Chinese suppliers for parts, materials, and manufacturing inputs, based on information and belief.  As set forth above, Joby Aviation took affirmative steps to obscure these ties, including taking down the Joby China website, and removing substantive references to China from Joby Aviation's public marketing materials.  This was designed to conceal the true extent of Joby's reliance on Chinese manufacturing and suppliers, based on information and belief.

104.    Each of the foregoing government representations constitutes an unlawful, unfair, or fraudulent business practice under California Business and Professions Code Section 17200 because each statement had the capacity, likelihood, and tendency to deceive or confuse the relevant population.  Each statement was made for the purpose of obtaining or inducing government contracts and regulatory approvals, and each statement was directed at an actual or potential customer, purchaser, investor, partner, or government decisionmaker.

105.    This conduct constituted an "unfair" business practice under Section 17200 because it violated the policy and spirit of antitrust laws by distorting the information environment in this government-contracting field.  It was "unlawful" because it violated the Lanham Act by constituting deceptive, material, and factual commercial statements that were likely to influence the commercial decisions of the governmental entities and were injurious to Archer.  And it was fraudulent because the statements amounted to business acts that were likely to deceive.

106.    As a direct and proximate result of Joby Aero's statements and omissions, Joby wrongfully obtained government programs, commercial opportunities, investor credibility, and regulatory advantages that it would not otherwise have received, and that would have instead gone in whole or in part to Archer.  Specifically, Joby secured at least $131 million in AFWERX Agility Prime contracts and selection for the White House eIPP based on a misleading domestic-manufacturing narrative that omitted Joby's China dependencies.

Gibson, Dunn & Crutcher LLP

107.    Joby's misleading representations also enabled it to divert limited FAA-certification resources, government attention, and market credibility away from Archer and toward Joby.  As set forth above, the FAA's oversight of eVTOL certification is resource-constrained, and Joby and Archer are the only two manufacturers to have reached the advanced stages of the type-certification process.  By misrepresenting its domestic manufacturing and omitting its China-based sourcing, Joby avoided additional scrutiny and compliance requirements that would have slowed its certification progress and preserved scarce government resources and attention for Archer.

108.    As a result of Joby's unlawful and unfair statements and omissions, Archer has suffered losses in the programs above—money and government resources that would have gone to Archer instead went to Joby.  Further, Archer has lost market position, lost business, and lost partnership opportunities.

109.    Archer will continue to suffer harm as a result of Joby Aviation's and Joby Aero's actions, and legal damages are inadequate as to the forward-looking, non-monetary harm that Archer is suffering, including lost regulatory standing, distortion of a competitive market, ongoing diminishment of market position, and goodwill injury.  Archer seeks preliminary and permanent injunctive relief prohibiting Joby Aviation and Joby Aero from continuing their unlawful and unfair business practices in violation of California's Unfair Competition Law and all other equitable relief that the Court deems just and proper.

**Second Counterclaim**

FALSE PROMOTION UNDER THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)(B)

110.    Archer realleges and incorporates the preceding paragraphs as if fully set forth herein.

111.    Joby Aero's and Joby Aviation's actions constitute false promotion in violation of the Lanham Act.  15 U.S.C. § 1125(a)(1)(B).

112.    Joby Aero and Joby Aviation made, authorized, and disseminated in interstate commerce false and/or misleading statements about Joby's eVTOL aircraft, domestic manufacturing, vertical integration, and supply-chain integrity.

Gibson, Dunn & Crutcher LLP

113.    Joby Aero and Joby Aviation made representations to U.S. government agencies evaluating Joby's aircraft and supply-chain as part of Joby's application to participate in government-funded programs that had the capacity, likelihood, and tendency to deceive or confuse those U.S. government agencies:

a)    **AFWERX Agility Prime.**  To participate in AFWERX Agility Prime and receive SBIR and OTA awards from the U.S. Air Force, Joby Aero represented, expressly or by necessary implication, that (i) it had truthfully disclosed its foreign affiliations, foreign subsidiaries, PRC-related funding or influence, supply-chain dependencies, cybersecurity risks, and foreign access to technology, and that (ii) it would carefully control access to U.S. Air Force-funded technology by foreign firms or institutions. Joby Aviation and Joby Aero CEO JoeBen Bevirt and Joby Aviation Chief Policy Officer and Joby Aero Head of Government Affairs Gregory Bowles made these representations on Joby Aero's behalf.  The AFWERX agreements identified both Joby Aero and Joby Aviation as the "Performer" or "Contractor" under the agreements; thus, the obligations under the agreements applied to Joby enterprise-wide and to both Joby Aviation and Joby Aero.  On information and belief, these representations were false or misleading as Joby Aero did not fully and accurately disclose its reliance on and association with activities in China, including that Joby Aviation simultaneously operated Joby China, a wholly owned Chinese subsidiary that employed engineering and manufacturing personnel, held China-issued patents, was on information and belief tied to CCP-directed innovation programs and Chinese government grants, supplied or supported Joby's China-dependent aircraft development and manufacturing program, and potentially placed technical data at issue.  These misstatements and omissions were material to and influenced the U.S. Air Force because AFWERX Agility Prime was designed to build a trusted domestic AAM industry and supply chain.  Based on information and belief, the U.S. Air Force relied on Joby Aero's false statements and omissions, as it selected Joby Aero for Agility Prime, entered SBIR and OTA agreements with Joby Aero, awarded Joby

Aero expanded contracts valued at up to approximately $131 million, and continued supporting Joby's flight trials. Based on information and belief, the U.S. Air Force was deceived into believing that Joby Aviation was a domestically controlled, vertically integrated, foreign-adversary-free eVTOL developer whose technology and supply chain did not present undisclosed PRC-related risks. Joby Aero's omissions allowed it to bypass the heightened scrutiny to which it otherwise would have been subject by the U.S. Air Force in reviewing its applications.

b) **White House eIPP.** To participate in the eIPP, Joby represented, expressly or by necessary implication, that it was a United States-based company for eIPP purposes, was not directly or indirectly owned or controlled by a foreign entity, would not work with adversarial nations in the awarded OTA agreement, would protect data from foreign access, and could participate consistent with the Executive Order's domestic manufacturing and supply-chain-security mandates, based on information and belief. Based on information and belief, Joby's submissions in support of the eIPP program were made by Gregory Bowles, Joby Aviation's Chief Policy Officer and Joby Aero's Head of Government Affairs. Whether it was Joby Aviation or Joby Aero that made these representations is information peculiarly within the possession and control of Joby and the United States Government and is not available to Archer; however, Joby Aviation issued press relating to Joby's receipt of eIPP benefits and Joby Aero has historically been the contracting party with government agencies. Based on information and belief, these representations or omissions were false and/or misleading because Joby Aviation operated Joby China; concealed Joby China's active engineering and manufacturing role and receipt of Chinese government grants and CCP-linked benefits, relies on China-sourced components, equipment, and suppliers for its eVTOL aircraft program; and potentially placed technological data at issue, based on information and belief. These statements were material and likely to influence the FAA. The Executive Order and eIPP criteria required use of eVTOL aircraft and technologies developed

or offered by a United States-based entity, and DOT/FAA guidance specifically addressed China subsidiaries, Chinese government support, adversarial nations, and data protections in the eIPP Q&A. The FAA relied on Joby's statements, as Joby was allowed to participate in the eIPP. Based on information and belief, the FAA was deceived into conferring finite operational authorizations, regulatory fast-tracking, and government endorsement of Joby and did not exclude Joby from participating in the program based on the false impression that Joby's aircraft program, supply chain, data practices, and corporate structure were materially domestic and free from undisclosed PRC-related access, control, or influence.

114. Based on information and belief, Joby Aviation intentionally and knowingly concealed the extent of its China ties and its reliance on its Chinese subsidiary and other Chinese suppliers. As set forth above, Joby took deliberate steps to obscure these dependencies, including taking down the Joby China website, and omitting Joby's China-based operations and suppliers from public-facing materials that promoted Joby as a vertically integrated American manufacturer.

115. Joby Aero's and Joby Aviation's representations to these governmental entities constitute commercial promotion in the nascent, government-dominated eVTOL market. The current market for eVTOL aircraft and services includes multiple government agencies including the U.S. Air Force and FAA. To promote their products and services, therefore, eVTOL manufacturers promote their products and services via submissions, proposals, presentations, and responses to government agencies.

116. Joby Aero's and Joby Aviation's promotional statements had the tendency to deceive a substantial segment of that relevant audience. In the regulator-gated eVTOL market, the relevant purchasing public includes U.S. government agencies whose decisions are directly influenced by representations regarding domestic manufacturing, vertical integration, supply-chain integrity, and freedom from foreign-adversary influence.

117. Joby Aero's and Joby Aviation's deception was likely to and did influence purchasing decisions, funding, contracting, regulatory, partnership, and investment decisions. Joby's false and/or misleading representations of domestic vertical integration enabled it to secure

Gibson, Dunn & Crutcher LLP

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

at least $131 million in AFWERX Agility Prime contracts through the U.S. Air Force and was allowed to participate in the White House eIPP—opportunities that would not have been awarded, or would have been subjected to heightened scrutiny and delay, had Joby truthfully disclosed its reliance on Chinese-sourced components, its Chinese subsidiary's CCP-linked designations, and its receipt of Chinese government grants.

118.    Archer, as a company competing with Joby to be the first to obtain FAA certification, has been, and is likely to continue to be, injured as a result of Joby's false and/or misleading statements by direct diversion of sales, government-program opportunities, partnerships, regulatory attention, and market credibility from Archer to Joby.  The government endorsements, FAA resources, customer opportunities, and partner relationships wrongfully obtained by Joby Aero and Joby Aviation based on its false and/or misleading statements would otherwise have been available to Archer.

119.    As a result of Joby Aero's and Joby Aviation's false and/or misleading promotion, Archer has suffered and continues to suffer economic injuries including lost government contracts and program opportunities wrongfully secured by Joby Aero and Joby Aviation, delayed FAA certification progress due to diverted regulatory resources, lost competitive position, increased compliance and operational costs, lost business and partnership opportunities, diversion of management and engineering resources, and diminished goodwill and market valuation.

120.    Archer has suffered—and will continue to suffer—irreparable harm as a result of Joby Aviation's and Joby Aero's false and/or misleading representations.  Archer seeks injunctive relief, compensatory damages, disgorgement of Joby's profits attributable to its false and/or misleading promotion, treble damages, attorneys' fees, costs, and all other relief available under 15 U.S.C. § 1117.

## DEMAND FOR JURY TRIAL

121.    Archer demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Archer prays for judgment in its favor and against Joby as follows:

a)    Dismiss Joby Aero's Complaint with prejudice;

Gibson, Dunn &
Crutcher LLP

b)     Enter a judgment in favor of Archer and against Joby Aero on all claims in Joby Aero's Complaint;

c)     An award of damages to Archer, including enhanced damages as is appropriate;

d)     Injunctive relief to enjoin Joby Aero and Joby Aviation from continuing their unlawful conduct, including false and/or misleading statements concerning domestic manufacturing, vertical integration, and reliance on China-based suppliers;

e)     An order awarding Archer compensation for any and all damages, injury, or harm;

f)     An order awarding Archer its costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure; and

g)     An order awarding Archer such further relief as the Court may deem appropriate under the circumstances.

Dated: June 29, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:    */s/ James L. Zelenay Jr.*
     James L. Zelenay Jr.
     Josh A. Krevitt
     Orin Snyder (admitted *PHV*)

*Attorney for Defendant and*
*Counterclaimant Archer Aviation Inc.*

DEFENDANT'S AMENDED COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn &
Crutcher LLP