*[Different first page setting changed from on in original to off in modified.].*

JOSH KREVITT, SBN 208552
  jkrevitt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, CA 94301-1744
Telephone:    650.849.5300
Facsimile:    650.849.5333

*Attorneys for Defendant and Counterclaimant
Archer Aviation Inc.*

ORIN SNYDER, *(pro hac vice)*
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:    212.351.4035

JAMES L. ZELENAY JR., SBN 237339
  jzelenay@gibsondunn.com
MICHAEL H. DORE, SBN 227442
  mdore@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:    213.229.7000

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

JOBY AERO, INC.,

      Plaintiff,

  v.

ARCHER AVIATION INC. and George Kivork.

      Defendants.

_____

ARCHER AVIATION INC.,

      Counterclaimant,

  v.

JOBY AERO, INC.

    and

JOBY AVIATION, INC.,

      Counter-Defendants.

Case No.: 5:25-CV-10703-SVK

**DEFENDANT ARCHER AVIATION INC.'S** ~~ANSWER TO COMPLAINT AND~~**AMENDED COUNTERCLAIMS AGAINST JOBY AERO, INC. AND JOBY AVIATION, INC. FOR:**

1) **VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.***

2) **FALSE ~~ADVERTISING~~PROMOTION UNDER THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)(B)**

**DEMAND FOR JURY TRIAL**

**Judge:** Hon. Susan van Keulen

*[Different first page setting changed from on in original to off in modified.].*

Gibson, Dunn & Crutcher LLP

## ARCHER AVIATION'S COUNTERCLAIMS

Counterclaimant Archer Aviation Inc. ("Archer") brings these counterclaims against plaintiff and counterclaim defendant Joby Aero, Inc. ("Joby Aero"), and against counterclaim defendant Joby Aviation, Inc. (together"Joby Aviation," and collectively with Joby Aero, "Joby") and alleges as follows:

1. This action arises from a calculated, years-long scheme by Joby Aero, Inc. and Joby Aviation, Inc. (collectively, "Joby") to defraud the U.S. government, the public, and its main competitor. Joby has falsely presented itself as a domestically rooted,Joby's pattern of false and/or misleading statements to U.S. government decisionmakers concerning Joby's domestic manufacturing, vertical integration, and supply-chain practices. Joby portrays itself to government decision-makers responsible for government funding and resource deployment as an American-made, fully vertically integrated aviation company while covertly relying on its Chinese manufacturing subsidiary, sourcing critical components from Chinese suppliers—including its own subsidiary—that have apparent Chinese Communist Party ("CCP") ties, and receiving through its Chinese subsidiary technology-development grants directly from the Chinese government. As part of its efforts to conceal its deep ties to China, based on information and belief, Joby and/or its agents fraudulently misclassified thousands of pounds of Chinese-origin aircraft materials as consumer goods—labeling them "hair clips," "socks," and "photo albums"—in an apparent effort to evade U.S. tariffs and foreign-influence oversight. . Yet Joby omits and obfuscates its extensive ties to China, its reliance on parts from China and suppliers in China for critical components in its electric vertical take-off and landing ("eVTOL") aircraft, and the extent of the role of its wholly owned Chinese subsidiary, Joby Metal Shenzhen Co. Ltd. ("Joby China"), in Joby Aviation's manufacturing and supply chain.

2. If Joby had been honest with the government, it would not have received the government resources and funding that it did—which instead would have been available to and gone to competitor Archer. In short, Joby's misstatements and misleading omissions to the

government in connection with government programs had the capacity, likelihood, and tendency to mislead and deceive relevant decision-makers. Based on information and belief, Joby Aviation and Joby Aero knew or should have known their statements were false or, at the least, misleading in light of their China-based manufacturing operations and suppliers. Archer has been injured as a result of Joby's illegal misconduct, including through lost government-program opportunities, diversion of finite governmental resources, and lost business.

3.    Moreover, in the limited universe of only two companies who have made the most progress in the Federal Aviation Administration's ("FAA") eVTOL type certification process and are thus competing to be the first to commercialize eVTOL aircraft in the U.S. market, Joby's misstatements have enabled it to obtain government backing, which has led to a variety of anticompetitive effects. Joby's government backing provided it with foundational public-sector support, such as funding and access to test ranges and technical expertise that have aided its aircraft development program. Joby's obtaining such funding and resources—under false pretenses—has improperly influenced investors, regulators, and the public to Joby's benefit and Archer's material disadvantage.

2.    Wrapping itself in the American flag and marketing its aircraft as "Committed to American Innovation," Joby has secured hundreds of millions of dollars in funding from the United States government, including U.S. Air Force contracts, and has positioned itself to be a key player in President Trump's effort to accelerate the integration of air taxis in the United States under the 2025 "Unleashing American Drone Dominance" Executive Order. It accomplished this while scrubbing its website of evidence of its extensive ties to China and suppressing information that would have triggered additional national-security scrutiny. Archer, on the other hand, has spent the last seven years investing billions in domestic engineering, manufacturing, and supply-chain infrastructure in genuine alignment with U.S. national-security priorities. Joby's unlawful conduct has inflicted direct, concrete, and ongoing competitive harm on Archer—including artificial cost disadvantages, lost regulatory standing, and diminished access to government programs. Archer

Gibson, Dunn & Crutcher LLP

3

brings these counterclaims to expose Joby's fraud, halt its anticompetitive misconduct, and obtain full relief.

**INTRODUCTION**

3.     The electric vertical take-off and landing ("eVTOL") aircraft market represents a transformative segment of the next generation of aviation technology, with the current focus on commercializing battery-powered aircraft for short-range passenger transport as air taxis. These advanced aircraft combine helicopter-like vertical lift with airplane efficiency through the use of distributed electric propulsion. Distributed electric propulsion is an innovative approach to designing an aircraft-propulsion system that uses multiple electrically powered propulsors (such as propellers) distributed across the airframe, rather than relying on one or only a few large engines and propellors. This approach leverages electric motors, batteries, or hybrid systems to generate thrust, allowing for greater design flexibility, improved aerodynamic efficiency, and enhanced control. Distributed electric propulsion can be fully electric, turboelectric (where gas turbines generate electricity for motors), or hybrid.

4.     The United States government, through the National Aeronautics and Space Administration ("NASA"), has been at the forefront of the research and development work around distributed electric propulsion, focusing on reducing fuel consumption, emissions, and noise while enabling new aircraft configurations. Key contributions from the U.S. government include conceptual designs, testbeds, and flight demonstrators that have paved the way for today's budding commercial applications.

5.     The U.S. Air Force has also been pivotal in advancing eVTOL technology, primarily through its AFWERX innovation arm and the Agility Prime program. Launched in April 2020, Agility Prime represented a collaborative initiative to accelerate the commercial eVTOL industry by bridging government resources with private-sector innovation.

6.     Over the last decade, the sector has evolved into a geopolitical race between the United States and China, mirroring other technology industry competitions between the two countries, such as electric vehicles ("EVs"), drones, and semiconductors. Similar to these other

industries, China holds advantages in speed-to-market and in the ability to scale production volume, while the United States has led in terms of innovation and safety standards. The U.S. leaders in this space face supply challenges as they look to commercialize this technology. China, by contrast, has surged ahead, fueled by subsidies and tolerance for high-volume experimentation. By mid-2025, China's operational head start—routine flights vs. U.S. trials—sparked warnings of a "sky race" that China is winning. These concerns have required eVTOL technology companies to choose their allegiances carefully. In an attempt to ensure that the United States leads in the "third revolution in aerospace" (following the fixed-wing and rotorcraft eras), the U.S. government has put forth several initiatives.

7. For example, the United States's Advanced Air Mobility ("AAM") National Strategy, announced in December 2025, envisions exporting U.S.-built aircraft to allies, combatting China's lead in EVs and drone production. Amid rising U.S.-China tensions, the U.S. government has focused on ensuring that the U.S. companies building eVTOL technology are not susceptible to vulnerabilities that result from Chinese-sourced components (*e.g.*, batteries with potential backdoors), as it is paramount that eVTOLs used by the United States and its allies, whether in urban air mobility, logistics, or defense, are not compromised.

8. Additionally, in 2025, the Trump Administration pushed for U.S. eVTOL companies to conduct their research and development and their production domestically due to national-security concerns over China's dominance in drone and related component supply chains (such as batteries and electronics). The June 2025 Unleashing American Drone Dominance Executive Order required federal agencies to prioritize eVTOL aircraft and technologies developed or offered by U.S.-based entities in programs like the eVTOL Integration Pilot Program ("eIPP"), which explicitly favors domestic manufacturing to reduce reliance on foreign—especially Chinese—sources that could pose risks of theft of U.S. technology or supply disruptions. Furthermore, the December 2025 AAM National Strategy put forth by the U.S. Department of Transportation ("DOT") and Federal Aviation Administration ("FAA") further reinforces this by encouraging U.S.-based supply chains for avionics, advanced composites, batteries, and other

components, aiming to enhance economic competitiveness, create high-skilled jobs, and secure critical infrastructure amid broader restrictions on Chinese tech imports and procurement bans.

9. Archer and Joby are the two leading U.S.-based developers of eVTOL technology, racing to launch commercial air-taxi services and win programs of record with the U.S. military and its allies to purchase these advanced aircraft for military-use cases.

10. Archer has raised and spent billions of dollars premised on this strategy: a U.S.-centric focus to research and development, supply chain, and manufacturing capabilities—aligning its approach with U.S. national-security priorities. Archer's key U.S. facilities and operations include its engineering headquarters and initial manufacturing capabilities in Silicon Valley, California; its flight-test facilities in Central California; an airport and advanced composite manufacturing facility in Southern California; and a high-volume manufacturing facility just outside Atlanta, Georgia.

11. Joby—a U.S. government contractor—has led the market and U.S. government to think it is doing the same while trying to hide its key dependency on China. Joby publicly wraps itself in claims of vertically integrated domestic manufacturing, repeatedly emphasizing facilities in Ohio and California and asserting that it "designs, builds, and tests its aircraft in the US." Joby further markets itself as "Committed to American Innovation," representing to the public—and to the U.S. government in connection with defense contracting—that it is "ready to make sure that the commercial and defense aircraft that define the future of flight are built right here in America." These representations are, at best, misleading. In reality, Joby depends heavily on Chinese-sourced components that it uses to reduce costs and accelerate production in pursuit of commercial advantage. Joby omits from these public representations its Chinese factory facilities and its use of Chinese components sourced from Joby Aviation's subsidiary, Joby Metal Shenzhen Co. Ltd. ("Joby China"), a company with apparent CCP ties. Knowing the U.S. government subjects foreign-sourced military technology to additional scrutiny, Joby has, on information and belief, attempted to conceal the origin of certain of its imports. Joby has removed webpages documenting its ties to China, suppressed information concerning its Chinese supply dependency in order to gain

Gibson, Dunn & Crutcher LLP

advantage over Archer, and, on information and belief, knowingly benefited from the tariff misclassification of aircraft-related imports from China as ordinary consumer goods.

12. While some of the imports Joby has received from its Chinese subsidiary appear consistent with imports from a metal supplier, others raise alarm bells. The following chart shows the tons of imports Joby has received, including those from its Chinese subsidiary, Joby China:

*Note: The source of this information is from third-party shipping records aggregators and public import databases last visited March 7, 2026.*

| Joby China's Shipments to Joby in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Date | Suppliers | Product Description | HS Code | Weight (approx.) | Country of Origin | Bills of Lading |
| 12/19/2025 | Wuxi Jiaqing Youpin E Commerce Co | Aluminum Honeycomb Panel | N/A | 278 kg | China | House: EXDO6396009731 Master: COSU6436363773 |
| 10/11/2025 | Tuv Rheinland China Ltd | Joby Charge Handle | 9303.90 - Arms and ammunition; parts and accessories thereof; Other firearms and similar devices which operate by the firing of an explosive charge (for example, sporting shot guns and rifles, muzzle loading firearms, Very pistols and other devices designed to project only signal flares, pistols and revolvers for firing blank ammunition, captive-bolt humane killers, line-throwing guns); Other | 104 kg | China | House: DMERDFS037003934 Master: CMDUTJN0752490 |
| 9/9/2025 | Shenzhen Infypower Co. Ltd. | Charger Charger Module | 8414.59 - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Air or vacuum pumps, air or other gas compressors and fans; ventilating or | 1,031 kg | China | House: DMERDFS045088893 Master: EGLV149505373467 |

Gibson, Dunn & Crutcher LLP

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | recycling hoods incorporating a fan, whether or not fitted with filters; gas-tight biological safety cabinets, whether or not fitted with filters; parts thereof; Fans; Other | | | |
| 9/2/2025 | Taizhou Dehao Technology Co. Ltd. | Floating DockFloating Dock | 8909.0 - Ships, boats and floating structures ; Vessels and other floating structures for breaking up (scrapping) | 9,790 kg | China | House: SZLOVLSZ25080086 Master: COSU6426585630 |
| 08/10/2025 | Joby Metal Shenzhen Co. Ltd. | Napkin | 4803.00 - Toilet or facial tissue stock, towel or napkin stock and similar paper of a kind used for household or sanitary purposes, cellulose wadding and webs of cellulose fibers, whether or not creped, crinkled, embossed, perforated, surface-colored, surface-decorated or printed, in rolls or sheets | 2,549 lbs (1,156 kg) | China | House: WMIDMAY25071260 Master: MATS3450990000 - |
| 1/5/2025 | Joby Metal Shenzhen Co. Ltd. | Socks | 6115.99 - Pantyhose, tights, stockings, socks and other hosiery, including graduated compression hosiery (for example, stockings for varicose veins), and footwear without applied soles, knitted or crocheted - Other - Of other textile materials | 10,849 lbs (4,921 kg) | China | House: WMIDMAY24120748 Master: MATS5465630000 |
| 03/27/2024 | Joby Metal Shenzhen Co. Ltd. | Mold | 8480.41 - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Molding boxes for metal foundry; mold bases; molding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics; Molds for metal or metal | 2,965 lbs (1,345 kg) | China | House: KYSILSAP2400150 Master: ONEYSZPE33182400 |

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | ~~carbides; Injection or compression types~~ | | | |
| ~~01/02/2024~~ | ~~Joby Metal Shenzhen Co. Ltd.~~ | ~~Hair Clip~~ | ~~3305.30 – Essential oils and resinoids; perfumery, cosmetic or toilet preparations – Preparations for use on the hair – Hair lacquers~~ | ~~6,138 lbs (2,784 kg)~~ | ~~China~~ | ~~House: WMIDMAY23120554~~<br><br>~~Master: MATS4534366000~~ |
| ~~11/15/2023~~ | ~~Joby Metal Shenzhen Co. Ltd.~~ | ~~Aisi Stainless Steel Aluminum~~ | ~~7219.14 – Flat-rolled products of stainless steel, of a width of 600 mm or more – Not further worked than hot-rolled – Of a thickness of less than 4.75 mm~~ | ~~6,634 lbs (3,009 kg)~~ | ~~China~~ | ~~House: NAQANAP2300112~~<br><br>~~Master: HDMUSZPM63461800~~ |
| ~~11/13/2022~~ | ~~Joby Metal Shenzhen Co. Ltd.~~ | ~~Bed Canopy~~ | ~~6302.10 – Bed linen, table linen, toilet linen and kitchen linen – Bed linen – Of cotton~~ | ~~5,335 lbs (2,420 kg)~~ | ~~China~~ | ~~House: WMIDMAY22110124~~<br><br>~~Master: MATS3522874000~~ |
| ~~01/26/2022~~ | ~~Joby Metal Shenzhen Co. Ltd.~~ | ~~Photo Albums~~ | ~~4820.50 – Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles – Albums for samples or for collections~~ | ~~5,666 lbs (2,570 kg)~~ | ~~China~~ | ~~House: MNQOSHA012200333~~<br><br>~~Master: MATS3896222004~~ |
| ~~05/02/2021~~ | ~~Joby Metal Shenzhen Co. Ltd.~~ | ~~Battery Explosion Proof Test Chamber~~ | ~~9031.20 – Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof; Measuring or checking instruments, appliances and machines, not specified or included elsewhere in this chapter; profile projectors; parts and accessories thereof; Test benches~~ | ~~5,952 lbs (2,700 kg)~~ | ~~China~~ | ~~House: MLQDSHA042100367~~<br><br>~~Master: MATS6734406010~~ |

Gibson, Dunn & Crutcher LLP

9

| 06/17/2020 | Joby Metal Shenzhen Co. Ltd. | Metal Printer | 8471.60 - Automatic data processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data - Input or output units, whether or not containing storage units in the same housing | 4,941 lbs (2,241 kg) | China | House: CHKMSOA005082205 Master: ONEYHKGA62017300 |
| 08/30/2019 | Joby Metal Shenzhen Co. Ltd. | Polishing Machine Microscopes Precision Cutting Machine Ultrasonic Cleaner Electronic Scale Vacuum Chamber | 8456.20 - Machine tools for working any material by removal of material, by laser or other light or photon beam, ultrasonic, electro-discharge, electro-chemical, electron beam, ionic-beam or plasma arc processes - Operated by ultrasonic processes | 933 lbs (423 kg) | China | House: CHKMSOA907040976 Master: ONEYHKGVC2567600 |
| 06/13/2019 | Joby Metal Shenzhen Co. Ltd. | Printing Machine | 9006.10 - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof; Photographic (other than cinematographic) cameras; photographic flashlight apparatus and flashbulbs other than discharge lamps of heading 8539; parts and accessories thereof | 5,357 lbs (2,430 kg) | China | House: HYSLFSZX19051259 Master: ONEYHKGV89063900 |
| 12/03/2018 | Joby Metal Shenzhen Co. Ltd. | Pkgs Ceramic Fiber Paper | 6914.90 - Ceramic products; Other ceramic articles; Other | 990 lbs (449 kg) | China | House: NAQA1817819S Master: APLU751058352 |

13.     There is no reasonable explanation for Joby to have imported thousands of pounds of napkins, hosiery, hair clips, bed canopies, and photo albums from its Chinese metal supplier subsidiary. Based on information and belief, Joby and/or agents acting on its behalf and for its benefit has misclassified imports from its Chinese subsidiary and thereby hidden its use of Chinese

Gibson, Dunn & Crutcher LLP

10

components and avoided higher tariff duties. Misclassification of imports to avoid tariffs and other import controls is both anticompetitive and criminal, under 19 U.S.C. § 1592 and 18 U.S.C. § 545, among other statutes (*e.g.*, 18 U.S.C. § 1001). These apparent false statements and acts of tariff evasion constitute unfair competition, as Joby has obtained an unlawful benefit in not paying required duties on materials imported from China, giving Joby an illegal, unfair advantage over Archer.

14. Not only has Joby sourced components from China, and done so under false and misleading pretenses, but it has been building and continues to develop key manufacturing capabilities in China. Joby has been investing in these capabilities in China for almost 15 years through its Chinese subsidiary Joby China. This is not surprising, as Joby was founded by JoeBen Bevirt, who reportedly started Joby as a side project when he was trying to learn about manufacturing in China.

15.1. Joby China has applied for and, on information and belief, received numerous grants from the Chinese government aimed at supporting its research and development and manufacturing operations in China. Joby China also employs at least one individual designated in China as "returned overseas-educated personnel," who, on information and belief, received housing and living subsidies from the Chinese government following study in the United States reflecting government involvement and influence. The Chinese government has a track record of intellectual property theft through these types of avenues. Once U.S. companies operate in China, aggressive efforts to access proprietary technology routinely follow. The below images are from Joby China's website before Joby attempted to erase it from the internet as it prepared to go public.



Gibson, Dunn & Crutcher LLP

4.    Archer brings these claims to seek redress and halt Joby's misconduct.

(Deleted)



16.2.    Over the last couple of years, Joby has doubled down on its work in China as it fails to build out its promised state-of-the-art facility in Dayton, Ohio.

(Deleted)



17.3.    In September 2023, Joby promised to spend over $475 million to build out that state-of-the-art facility (artist rendering depicted above) in Dayton, Ohio by 2025.  It was supposed to employ over 2,000 workers.  But as of 2026 Joby has made hardly any progress on the promised facility.  Depicted below is a satellite image of the location of the promised facility.

(Deleted)



Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS  CASE NO.: 5:25-CV-10703-SVK

18.    Rather than constructing its promised facility, Joby has leased a former U.S. Postal Service facility for less than $15,000 per year.[1]

19.    None of this is surprising.  Joby's go-public transaction was led by Reid Hoffman, who once said that "I believe that the next Silicon Valley is … undoubtedly China."  Hoffman joined Joby's board of directors upon the deal's completion in August 2021 and remained on that board until mid-2024 leading up to the Trump Administration taking office.

20.4.    In 2009 JoeBen Bevirt founded Joby, which the *San Francisco Business Times* reported "began as a side project in which Bevirt was trying to learn about manufacturing in China."[2]Bevirt has publicly supported China's development of its low-altitude economy over the last couple years.  In November 2024, he spoke at the International Electric Aviation (Kunshan) Forum under the theme "Low Altitude Pioneers, Leading the Future."[3]

**(Deleted)**



---

[1] *See* Cornelius Frolik and Lynn Hulsey, *Under agreement, Joby Aviation would lease former post office facility at Dayton airport*, Dayton Daily News (Feb. 20, 2024), https://www.daytondailynews.com/local/joby-aviation-wants-to-lease-former-post-office-facility-at-dayton-international-airport/XBWTPGK3IRDS7NFGSKXPYKGFRI/ (last visited Mar. 7, 2026).

[2] Patrick Hoge, *Inveterate Inventor JoeBen Bevirt Makes Good*, San Francisco Bus. Times (Mar. 22, 2009), https://www.bizjournals.com/sanfrancisco/stories/2009/03/23/story6.html (last visited Mar. 7, 2026).

[3] *See Joby et al. Take the Stage at the International Electric Aviation (Kunshan) Forum*, China eVTOL News (Nov. 27, 2024), https://www.chinaevtolnews.com/p/joby-et-al-take-the-stage-at-

Gibson, Dunn & Crutcher LLP

21.5.    More recently, it was reported online that Mr. Bevirt visited China and spent time meeting with XPeng AeroHT, an affiliate of XPeng Motors, which is a leading Chinese EV manufacturer founded in 2014, headquartered in Guangzhou, Guangdong.  XPeng specializes in EVs integrated with advanced autonomous driving technology, but has branched out into humanoid

(Deleted)



robotics and eVTOL technology.[4]

22.    Bevirt has been quoted in a Chinese-language article published on *Zhihu*, one of China's largest online knowledge communities, that "China is not only the largest market, but also the starting point for redefining future transportation," and reportedly described Joby's strategy to include technical cooperation with China's top battery manufacturers; having an established

the (last visited Mar. 7, 2026).

[4]    *See*    @pazjj1987,    X    (Nov.    18,    2024,    3:12    PM), https://x.com/pazjj1987/status/2021251169344205091 (last visited Mar. 7, 2026); Phillip Klein, Post on LinkedIn (Feb. 11, 2026, 1:42 PM), https://www.linkedin.com/posts/phillipklein_how-one-visit-in-china-exposed-a-major-opportunity-activity-7427467092251205632-WoMk (last visited Mar. 7, 2026).

research-and-development center in Shenzhen, China; and building a localized China supply chain system.[5]

23.    Through deliberate deception, Joby has cultivated a misleading "Made in the USA" image, securing at least $131 million in contracts through the U.S. Air Force's AFWERX Agility Prime program, and being further considered for the eIPP, established by President Trump's "Unleashing American Drone Dominance" Executive Order in June 2025,[6] while circumventing heightened national-security and foreign-influence standards.  This Executive Order and the eIPP are intended to protect against foreign control or exploitation of the U.S. eVTOL and drone supply chain; protect critical infrastructure, military installations, and public spaces from the "weaponization" of unmanned aircraft systems; and accelerate the safe, lawful, and secure deployment of AAM aircraft, such as air taxis and cargo drones.

24.    Yet, not only does Joby's supply chain apparently include its manufacturing subsidiary in Shenzhen, China, on information and belief Joby China has received direct technology-development grants from the Chinese government and employs and is currently hiring engineers in China, demonstrating a profound, undisclosed foreign dependency.  Specifically, on information and belief, Joby China was designated by the Chinese government as a "National High and New Technology Enterprise" ("NHNTE"), with associated tax breaks and funding.  The U.S. District Court for the District of Columbia upheld the designation of drone-maker DJI's Shenzhen, China subsidiary  SZ DJI Technology Co.  as a "Chinese Military Company" under Section 1260H of the National Defense Authorization Act based on similar Chinese national-level recognition, where DJI had been recognized as a National Enterprise Technology Center ("NETC") by China's National Development and Reform Commission ("NDRC").

---

[5] *Joby Aviation: Opening the Chinese Market, How Aircraft Will Reshape Future Mobility*, Zhihu (Jan. 11, 2025), https://zhuanlan.zhihu.com/p/17762289713 (last visited Mar. 7, 2026) (a certified English translation is attached hereto as Exhibit A).

[6] Exec. Order No. 14,307, *Unleashing American Drone Dominance*, 90 Fed. Reg. 24,727 (June 6, 2025),    https://www.whitehouse.gov/presidential-actions/2025/06/unleashing-american-drone-dominance (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS  CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

25. The Chinese NETC and NHNTE and the U.S. eIPP both fundamentally reflect a government-led approach to supporting the domestic, high-end, next-generation transport sector, and both aim to increase the speed of technological adoption. Joby China's designation and benefit under the NHNTE is at odds with its participation under the eIPP and with its applications for and contracts with other U.S. government and military programs. Joby's calculated, anticompetitive, and illegal actions have inflicted concrete, direct, and substantial financial and competitive injury upon Archer in the regulator-gated, effectively zero-sum eVTOL market, in which competitors must compete for finite regulatory approvals, governmental attention, and institutional support. On information and belief, by fraudulently manipulating its cost basis and unlawfully avoiding tariffs, Joby obtained artificial advantages in cost, timing, and regulatory positioning that directly impaired Archer's certification progress, government engagement, and competitive standing. Joby's regulatory gain, born from its deception and fraud, is Archer's material, demonstrable loss, even while Joby seeks to benefit from both U.S. and Chinese government programs, obscuring and hiding its relationship with and reliance on China.

26. These unlawful advantages diverted regulatory focus away from Archer, negatively impacted Archer's certification and commercialization timeline, distorted investor and partner perceptions, and forced Archer to incur additional costs and expenses while losing business opportunities. Joby's conduct therefore did not merely benefit Joby; it foreseeably and proximately harmed Archer by distorting competition in a market where regulatory advancement by one participant necessarily disadvantages others.

27. On information and belief, Joby has relied on Chinese-sourced components and materials—including, most significantly, the batteries that power its aircraft—because of cost, availability, and technical constraints that make domestic substitution difficult or impractical in the near term. Joby understood that if customers—particularly the United States government—were aware of how integral Chinese components and supply-chain dependencies are to Joby's aircraft, such disclosure would trigger substantially heightened national-security diligence, sourcing

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

scrutiny, and regulatory review. That additional scrutiny would slow Joby's progress and jeopardize its eligibility for certain programs, elevating the other leading competitor: Archer.

28. Faced with that reality, Joby chose concealment over disclosure. On information and belief, Joby has covered up the depth of its China ties by removing webpages referencing its fourteen-year-old manufacturing subsidiary in Shenzhen and removing any reference to Joby China from its annual SEC reporting, while simultaneously amplifying promotional materials focused on its U.S. facilities. At the same time, Joby continued to market itself as a "proudly American" and vertically integrated aerospace company, omitting any meaningful disclosure of its Chinese supply-chain dependencies.

29. The FAA's oversight of aviation in general and more specifically eVTOLs is resource-constrained: increased regulatory attention to one applicant necessarily reduces the attention available to its direct competitors because the FAA has a finite amount of resources it deploys to its priorities. In fact, the FAA path for certification for this new form of aircraft is as a "powered lift" aircraft, which is the first completely new category of civil aircraft since helicopters were introduced in the 1940s.[7] By misrepresenting or failing to fully and accurately disclose its China-based sourcing and relationships, Joby has positioned itself to advance through the certification process more quickly than it otherwise could, thereby gaining a material advantage over Archer—its misconduct has diverted scarce FAA resources away from Archer and towards Joby. Joby's gains, in this regulatory environment, are Archer's losses.

30. As will be shown at trial, Joby's anticompetitive campaign has been deceitful. It has been coordinated. And it has been illegal. What Joby could not win in the marketplace, Joby has attempted to win through illegality, going so far as to put U.S. national security at risk by covering up its dependence on China manufacturing of China-sourced components

---

[7] FAA, With New Rule, *FAA is Ready for Air Travel of the Future* (Oct. 22, 2024), https://www.faa.gov/newsroom/new-rule-faa-ready-air-travel-future (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

**Parties**

31.5.    Counterclaimant Archer is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 190 W. Tasman Dr., San Jose, California 95134.

32.6.    On information and belief, Joby Aero, Inc. is a corporation organized under the laws of Delaware.  Joby Aero, Inc.'s principal place of business is 333 Encinal St., Santa Cruz, CA 95060.  Joby Aero is the operating subsidiary of Joby Aviation that entered into contracts and agreements with U.S. government agencies, including the U.S. Air Force, and participated in regulatory filings and government-program submissions concerning its aircraft, manufacturing, and supply-chain practices.

33.7.    On information and belief, Joby Aviation, Inc. is a publicly traded corporation organized under the laws of Delaware.  Joby Aviation, Inc.'s principal place of business is 333 Encinal St., Santa Cruz, CA 95060.

34.    Joby Aviation, Inc. is a publicly traded Delaware corporation and is the ultimate parent company of a consolidated group of companies.  This includes, including wholly owned subsidiaries Joby Aero, Inc. and Joby Metal Shenzhen Co., Ltd. ("Joby China"), organized under the laws of the People's Republic of China.[8]As  Joby Aviation is directly liable for the false and/or misleading statements alleged herein.

8.    In August 2021, Joby Aero was taken public on the New York Stock Exchange via a merger with a special purpose acquisition company led by LinkedIn founder Reid Hoffman.  Joby's plans to go public were announced months after Archer announced its own plans to do so.  As part of that transaction, Joby Aero and Reinvent Technology Partners ("RTP"), a Cayman Islands exempted company and special purpose acquisition company, completed a merger and other transactions pursuant to which a subsidiary of RTP was merged with and into Joby Aero, and Joby Aero survived as a wholly owned subsidiary of RTP.  Then, in connection with the transactions,

---

[8] See Joby Aviation, Inc., Annual Report (Form 10-K) at Ex. 21.1 (Feb. 27, 2025) (listing significant subsidiaries).

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

RTP changed its name to Joby Aviation, Inc., with Joby Aero now a wholly owned subsidiary of Joby Aviation.

1.9.    As reflected in the 2024 Annual Report on Form 10-K, Joby Aviation consolidates the results, assets, and liabilities of Joby Aero and Joby China, among others, in its financial statements.[9][1]

35.10.  Joby Aviation, Inc. is the parent and alter ego and/or successor in interest to Joby Aero, Inc., and is properly joined as an additional party to these counterclaims pursuant to Fed. R. Civ. P. 13(h), 19, and 20 because it participated in, directed, authorized, ratified, and benefited from the conduct alleged herein.  In the alternative, and to the extent applicable, Joby Aviation and Joby Aero operated as a single enterprise with respect to the challenged conduct.

36.11.  Joby Aviation, Joby Aero, and Joby China have acted in concert and as a unified enterprise in carrying out the conduct alleged herein.  Joby Aviation, as the parent company, directs and controls the operations of Joby Aero and Joby China, including manufacturing, sourcing, and import activities.  Joby Aero and Joby China function as instrumentalities of Joby Aviation, executing corporate strategy and supply-chain operations under common ownership.  Joby Aviation also controls and directs the representations Joby Aero makes to the applicable government agencies, as outlined herein.  The coordinated conduct of these entities was undertaken for their shared commercial benefit and is properly attributable to each of them.  Public sources indicate that JoeBen Bevirt serves as the Chief Executive Officer of both Joby Aviation and Joby Aero—reflecting his executive control over both the parent company and its operating subsidiary.[10][2] Likewise, Gregory Bowles serves as the Head of Government Affairs for Joby Aero and Chief Policy Officer for Joby Aviation.

**Jurisdiction and Venue**

37.    Counterclaimant Archer is and at all times mentioned in this countercomplaint was a Delaware corporation, with its principal place of business in San Jose, California.

---

[9] ~~Id~~[1] *See* Joby Aviation, Inc., Annual Report (Form 10-K) at 42 (Feb. 27, 2025).

[10][2] *See* JoeBen Bevirt, MarketScreener, https://www.marketscreener.com/insider/JOEBEN-BEVIRT-A07XNU (last visited ~~Mar. 7~~June 26, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

38.12.  This Court has ~~subject matter~~subject-matter jurisdiction under 28 U.S.C. § 1331 of this countercomplaint, as this is a civil case arising under the Lanham Act, 15 U.S.C. § 1121, and has supplemental jurisdiction over ~~all other claims~~Archer's claims brought under California Business and Professions Code § 17200 pursuant to 28 U.S.C. § 1367 because all claims herein form part of the same case or controversy under Article III of the United States Constitution.

39.13.  Further, because this Court has original jurisdiction over ~~Joby's~~Joby Aero's third claim for relief, a claim asserted under federal ~~trade secret~~trade-secret law, it may exercise supplemental jurisdiction over all counterclaims that are part of the same case or controversy under 28 U.S.C. § 1367(a).

40.14.  Joby Aviation is joined as an additional counterclaim defendant pursuant to Fed. R. Civ. P. 13(h) and 20, as the claims asserted arise out of the same transactions and occurrences and involve common questions of law and fact.

41.15.  Archer is informed and believes and thereon alleges that jurisdiction over both Joby Aviation and Joby Aero is proper because Joby Aviation and Joby Aero at all times mentioned in this Complaint have maintained their principal place of business in Santa Cruz, California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

42.16.  Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Joby Aviation and Joby Aero are residents of the State of California and residents of this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District.

43.17.  This action is properly assigned to the San Jose Division of this District under Civil Local Rule 3-2(c) because a substantial part of the events or omissions giving rise to Archer's claims occurred in Santa Clara County, which is served by the San Jose Division.

## FACTS COMMON TO ALL CLAIMS

44.18.  As set forth herein, on information and belief, Joby ~~has~~Aviation and Joby Aero have engaged in unfair competition ~~through apparent tariff evasion of imports from China.  Additionally,~~

Gibson, Dunn & Crutcher LLP

20

Joby has engaged in false and misleading advertising regarding its~~and deceptive trade practices by making false and/or misleading statements regarding their supply chain to government regulators with respect to the U.S. Air Force AFWERX Agility Prime program and the White House and FAA's eVTOL Integration Pilot Program ("eIPP"), and by failing to disclose to those same entities their pervasive connections to and reliance on China for ~~its~~their equipment's component parts. ~~Archer brings these counterclaims to seek redress for, and halt, Joby's misconduct.~~

## I.    The Emerging eVTOL Industry

### ~~A.~~    : An ~~The~~ Opportunity ~~To~~to Revolutionize Urban Transportation and National Defense

~~45.~~19.  The eVTOL market represents a transformative segment of the next generation of aviation technology.  Once certified by the FAA, ~~eVTOLs stand~~eVTOL aircraft are poised to transform travel through cities by providing a means of transportation akin to ~~an air~~a taxi of the skies.  Instead of sitting in traffic or relying on public transportation and ride-sharing services, city dwellers will be able to hail an air taxi to bring them to their destination.

~~46.~~20.  eVTOL vehicles take off and land vertically like a helicopter~~,~~ but fly horizontally with wings like a plane, utilizing battery power.  While different companies have built various eVTOL configurations, all companies remain pre-certification and ~~commercialization~~pre-commercialization in the United States.  eVTOL technologies aim to revolutionize aviation and defense, providing quiet, efficient, and safe modes of vertical-lift aerial transportation in urban and other locations. ~~Analysts have estimated that the eVTOL market will be worth $1.5 trillion by 2040.¹¹~~

~~47.~~21.  The emerging eVTOL industry stands to transform short-haul transportation by enabling safe, quiet, zero-operational-emissions aircraft to connect people and goods across and between cities.  Air-taxi services are intended to complement existing transit—linking airports, business districts, medical centers, and communities—while reducing time lost to traffic

---

[11] ~~*See Flying Cars Market Size, Share & Industrial Analysis, By Product Type (Flying Cars and Passenger Drones), By Application Type (Military, Commercial and Civil), and Regional Forecast, 2024-2040*, Fortune Business Insights (Feb. 9, 2026), https://www.fortunebusinessinsights.com/flying-cars-market-105378 (last visited Mar. 7, 2026).~~

~~DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK~~

Gibson, Dunn & Crutcher LLP

congestion.  The promise is faster, more reliable aerial mobility at a fraction of the footprint and noise of legacy helicopters.

48.22.  ~~eVTOLs~~eVTOL aircraft have military applications as well.  For instance, they can transport troops, goods, and other supplies.  Further, the promise of unmanned eVTOL aircraft creates the opportunity for numerous defense applications.  For this reason, the ~~United States~~U.S. government has been focused on advancing eVTOL technology to develop distributed electric propulsion ~~to~~and enable new advanced aircraft configurations that provide for greater operational flexibility at a much lower cost than existing legacy options.  For example, the U.S. Air Force has advanced eVTOL technology through its AFWERX innovation arm and the Agility Prime program, an initiative promoting collaboration with the commercial eVTOL industry.

49.23.  Moreover, the eVTOL sector has become a geopolitical race between the United States and China.  China holds advantages in its ability to authorize products for market and in its ability to scale production volume, while the United States has led in terms of innovation and safety standards.  ~~The U.S. companies leading in this area face supply challenges as they endeavor to commercialize this technology.  China, by contrast, has relied on subsidies and tolerated experimental designs.~~  In an attempt to ensure that the United States leads in the eVTOL market, the President ~~put forth~~issued the June 2025 Unleashing American Drone Dominance Executive Order.  And the United States's Advanced Air Mobility ("AAM") National Strategy, launched in December 2025, envisions exporting U.S.-built aircraft to allies, undercutting China's lead in ~~EVs~~electric vehicles and drone production.[123]  The U.S. government has also focused on ensuring that the U.S. companies building eVTOL technology are not susceptible to vulnerabilities that result from ~~Chinese-sourced~~China-sourced components, as it is essential that eVTOLs used by the United States and its allies are not vulnerable to such risks.  It is critical to the U.S. government and government agencies that they deal with honest brokers in this sector, and understand the role or influence China may have on manufacturing or technology.

---

[123] *See* Dept. of Transp., *The Advanced Air Mobility National Strategy: A Bold Policy Vision for 2026-2036* (Dec. 17, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-12/AAM%20National%20Strategy%202025.pdf (last visited ~~Mar. 7~~June 26, 2026).

Gibson, Dunn & Crutcher LLP

50.24. Realizing that the eVTOL opportunity requires extraordinary investment, engineering rigor, and public-private coordination, numerous entities—including manufacturers, suppliers, airlines, airports, and infrastructure partners—are building an industrial base around eVTOL production and operations, subject to stringent safety certification and operational approvals. The result is a rapidly developing ecosystem with the potential to create high-skilled jobs, catalyze advanced manufacturing, expand regional connectivity, and deliver tangible consumer and environmental benefits.

51.25. This new global eVTOL market is destined to be highly profitable. Market analysts estimateA market analysis estimates the global eVTOL market will be worth as much asnearly $30 billion by 2030.[4] By 2040, the industry could eclipse $1.5 trillion in value.[5]

26. Since eVTOL aircraft have not yet been approved for private, commercial use, the domestic market for the aircraft and related services is currently dominated by government actors. The portion of the public that currently purchases eVTOL aircraft and services in the United States consists in large part of a pool of government agencies, namely the U.S. Air Force, the Department of War, and the Department of Transportation. To promote products and services in this market, eVTOL manufacturers proceed through submissions, proposals, and presentations to the relevant government agencies, as well as through corporate websites, press releases, investor materials, and social media. Use of these channels ensures that eVTOL promotions reach all or virtually all customers in the market.

52.27. The manufacturer that achieves certification first - or even maintains expected progress toward certification - secures decisivegovernment-program sponsorship secures not only the benefits of that program, but also other competitive advantages in capital access, strategic partnerships, regulatory credibility, customer commitments, and market share. Conversely, any

[4] *eVTOL Aircraft Market (2024-2030)*, Grand View Rsch. (July 2024), https://www.grandviewresearch.com/industry-analysis/evtol-aircraft-market-report (last visited June 26, 2026).

[5] *See Flying Cars Market Size, Share & Industrial Analysis, By Product Type (Flying Cars and Passenger Drones), By Application Type (Military, Commercial and Civil), and Regional Forecast, 2024-2040*, Fortune Business Insights (June 8, 2026), https://www.fortunebusinessinsights.com/flying-cars-market-105378 (last visited June 26, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

~~unexpected delay in the certification timeline can undermine an eVTOL manufacturer's business, as investors, commercial partners, and regulators turn their attention to perceived frontrunners. In this environment, a disruption to expected certification progress can cause irreparable reputational, financial, and competitive harm.~~Government acceptance in a program sends a message to interested parties that the business subject to the government program is credible and worthy of investment.

~~53.~~28.   Thus, for eVTOL manufacturers like Archer in this ~~winner-take-most~~ race to be the first to commercialize this technology, misconduct by ~~a~~its competitor ~~like Joby that hinders its certification progress~~that is dueling for that crown enables Joby to obtain unearned government program entry which imposes irreversible damage on ~~their market position, enterprise value, and ability to commercialize their aircraft~~Archer.

**~~B.~~II.    ~~Archer's Position in the eVTOL Industry~~Joby's Undisclosed China-Dependent Supply Chain**

29.     Based on information and belief, Joby's misrepresentations and omissions to the U.S. government in connection with the U.S. Air Force AFWERX Agility Prime program and the White House and FAA's eIPP program as discussed below in Sections IV.A and IV.B are part and parcel of Joby's and its executives' ongoing attempts to deceptively cast the company and its aircraft as an "American" company that is vertically integrated, with U.S.-based manufacturing that does not substantially rely on foreign manufacturing by its subsidiary or imports from third parties. The reality is very different.

**A.    Joby's Connections to China, Including Joby Aviation's Wholly Owned Chinese Subsidiary with Ties to the People's Republic of China ("PRC"), That Joby Has Sought to Conceal**

~~54.     Archer is a U.S. aviation company founded in 2018, established with the core focus of finding the most efficient path to commercializing eVTOL technology. Archer is headquartered in San Jose, California, with its manufacturing and flight-test operations based in the United States.~~

Gibson, Dunn & Crutcher LLP

24

55.    Since its inception, Archer has outpaced many pre-existing players — assembling a world-class engineering team, securing strategic partners and suppliers, investing in U.S. manufacturing, and designing a practical, certifiable aircraft optimized for near-term service.

56.    Archer's flagship eVTOL aircraft, Midnight, is designed to carry four passengers and a pilot across urban corridors of up to roughly 100 miles, with a focus on safe, quick, quiet, and zero-emission operation. Midnight (pictured below) employs its proprietary "12-tilt-6" configuration — six tilting rotors at the front for both lift and forward thrust and six fixed rotors at the rear for vertical lift. It is designed to cruise at speeds of up to 150 miles per hour. The aircraft is powered by Archer's proprietary distributed electric-propulsion system with redundant power and fly-by-wire flight-control systems for enhanced safety. Constructed primarily of lightweight composite materials, Midnight is targeted to carry up to a 1,000-pound payload and quickly recharge between flights, supporting high-frequency urban air taxi operations.

(Deleted)



57.6.    To bring its aircraft to market, Archer is pursuing a dual-track strategy combining manufacturing and commercial air-mobility operations. It is currently working through the FAA certification process for Midnight, with flight testing and data collection underway at its facilities in the United States.

58.    Beyond its manufacturing partnerships, Archer has established strategic relationships with major transportation and aerospace players, including United Airlines, which has placed conditional orders for hundreds of Midnight aircraft and plans to integrate them into its regional mobility network.

59. Archer has also announced plans and partnerships with a number of other leading brands to launch its air-taxi operations in the United Arab Emirates, India, Japan, and Korea.

60. Archer plans to generate revenue from both selling aircraft to partners such as airlines and operating its own aerial ridesharing service. Archer's competitive strategy emphasizes a combination of its proprietary advanced electric propulsion technology, safety-driven design, and partnerships with government and private stakeholders to support infrastructure, regulation, and adoption.

61. On September 17, 2021, Archer became a public company through merger with a special purpose acquisition company, and trades on the New York Stock Exchange under the symbol ACHR.

**C. Archer Progresses Toward FAA Certification in A Fraction of the Time as Joby**

62. Although Archer is a relatively young company, its Midnight aircraft has achieved multiple developmental and regulatory milestones and is engaged in partnerships with major aerospace, automotive, and airline partners. Archer's rapid progress, high-profile partnerships, and regulatory momentum, when not hindered by Joby's diversion of scarce regulatory resources, directly challenge Joby's first-mover advantage.

63. Before eVTOL aircraft designers can commercialize their aircraft, they must go through the FAA type-certification process. The FAA's type-certification process for powered-lift aircraft includes different stages, with the Type Inspection Authorization ("TIA") marking the entry to the for-credit testing phase with FAA participation, after which a type certification would be issued if successfully completed.

64. Archer has advanced from initial design to full-scale flight testing, progressed through FAA type-certification gates, and obtained multiple operational approvals that position it to be one of the first companies in the United States to launch air-taxi service using an eVTOL aircraft.

Gibson, Dunn & Crutcher LLP

65.     In May 2024, Archer achieved a major milestone when the FAA issued the final airworthiness criteria for Midnight, making Archer one of only two eVTOL companies to reach this critical stage of the FAA's type-certification process (with Joby being the other who reached it, doing so just months ahead of Archer).  In June 2024, Archer received its Part 135 Air Carrier Certificate, legally authorizing it to operate on-demand commercial passenger flights and allowing the Company to develop and refine critical processes that it will employ when its Midnight aircraft is able to enter into service following type certification by the FAA.  And in February 2025, Archer's pilot-training academy was certified under Part 141, letting the Company train and qualify pilots in an FAA-approved curriculum ahead of Midnight's entry into service.

66.     Archer is backed by strategic relationships with, among others, the U.S. Air Force, United Airlines, and Anduril Industries, Inc.  Operating at the critical intersection of national security, technological innovation, and commercial aviation, Archer is positioning the United States to lead the global race to deploy advanced air-mobility solutions.

67.     Joby, by contrast, has existed for nearly twenty years and has yet to find a path to commercialize its eVTOL technology.  Founded in 2009, Joby is still stuck trying to get through to certification of its eVTOL aircraft and still does not have an eVTOL product that can carry passengers.  Joby sees Archer getting its aircraft to type certification first as an existential threat.  Since Archer was founded in 2018, Archer has rapidly closed the gap between itself and Joby in the race to obtain final FAA type certification and be the first eVTOL on the U.S. market—a critical inflection point and an achievement that may determine market success.  In fact, in less than half the time it took Joby, Archer achieved flight of a final subscale aircraft, built a pre-production prototype, acquired critical FAA certifications, and conducted flight-test campaigns that tested the aircraft's performance and safety for future urban air mobility.  The chart below shows the comparative progress of the two companies against certain key milestones:

| Milestone | Years from Founding to Completion[13] | Relative Velocity |
|---|---|---|

---

[13] The numbers in this chart are approximate and derived from publicly available information.

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| | (Del) Joby  Founded in 2009 | (Del) ARCHER  Founded in 2018 | |
|---|---|---|---|
| Full scale demonstrator first flight | 8 years | 3 years | Archer 2.67X faster |
| Pre-Production prototype | 10 years | 5 years | Archer 2X faster |
| First piloted flight | 14 years | 7 years | Archer 2X faster |
| G-1 Certification Basis signed | 11 years | 3 years | Archer 3.67X faster |
| Part 135 Certificate received | 13 years | 6 years | Archer 2.17X faster |
| Part 141 Certificate received | 15 years | 7 years | Archer 2.14X faster |
| Part 145 Certificate received | 15 years | 6 years | Archer 2.5X faster |

68.     Meanwhile, Joby has faced criticism and self-inflicted setbacks.  In 2022, a Joby prototype crashed due to a propeller blade separation during testing, which triggered a cascading failure of multiple motor assemblies and loss of control.  It remains unclear to this day whether Joby has solved this propeller issue and who manufactures Joby's propellers.  And Joby has been repeatedly sued by former employees for retaliation in response to whistleblowing unsafe and unethical behavior, including relating to "Joby's departures from FAA safety regulations and its own safety protocols" and "concerns that Joby was making dangerous sacrifices to pilot and passenger safety to meet unreasonable deadlines" because Joby is chiefly "interested in releasing products quickly and with fanfare."[14]

69.     By late 2022, only four years after Archer was founded, Joby had taken notice of Archer's tremendous progress.  Seeing Archer as a serious competitor, Joby CEO JoeBen Bevirt approached Archer CEO Adam Goldstein about Joby purchasing Archer.  Goldstein, not believing Bevirt had the financial backing and seeing nothing to gain from selling the rapid progress it was

---

[14] Complaint at ¶¶ 1-2, 16, *Eastwood v. Joby Aviation, Inc.*, No. 25CV03794 (Cal. Super. Ct. Santa Cruz Cnty.); *see also Gesellschap v. Joby Aero, Inc.*, No. 5:25-cv-09905 (N.D. Cal.).

DEFENDANT'S ANSWER AND COUNTERCLAIMS  CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

making and would continue to make, declined Joby's proposal. Archer wants to be its own company and bring what it believes is a superior product to market.

70. Joby did not take rejection well. It could not buy Archer. And, on information and belief, growing more and more concerned that it would not be able to out-compete in the market, Joby took a different tack—it doubled down on illegal conduct to try to slow down Archer's progress.

71. As a result, Archer's superiority still exceeds the pace of its regulatory progress because Joby's false and misleading statements have enabled it to divert government resources away from Archer and instead to Joby.

D. Joby—The Legacy Player Threatened By Archer's Rise

72.30. For years Joby has been developing its eVTOL concept since 2009, when it was formed in the mountains outside Santa Cruz, California. Since its early years, the company has been known to focus more on research and development than actual commercialization, including operating from a commune-like environment in its early years.reliant upon—and connected to—activity in China. While Joby now attempts to walk away from and conceal these deep connections and, in the case of U.S. government programs, has deceptively failed to disclose the breadth and scope of these connections based on information and belief, Joby's ties to China have existed for more than a decade.

73. Joby's progress since 2009 has been slow relative to Archer. It was not until 2017 that Joby moved to flying a fullscale demonstrator prototype, still in an experimental phase. In 2020, Joby signed a certification basis agreement for its S-4 eVTOL aircraft with the FAA.

74. In August 2021, Joby was taken public on the New York Stock Exchange via a merger with a special purpose acquisition company led by LinkedIn founder Reid Hoffman. Joby is presently operated in substantial part by Hoffman's close partner and associate, Joby director Michael Thompson. On information and belief, Thompson works closely with JoeBen Bevirt,

Oliver Walker Jones, Joby's Head of Marketing, Communications & Brand, and Greg Bowles, Joby's Chief Policy Officer.[15]

75.    Joby's plans to go public were announced months after Archer announced its own plans to do so; indeed, Joby's approach was extremely similar to Archer's. As part of that transaction, Joby and Reinvent Technology Partners ("RTP"), a Cayman Islands exempted company and special purpose acquisition company, completed a merger and other transactions pursuant to which a subsidiary of RTP was merged with and into Joby Aero, and Joby Aero survived as a wholly owned subsidiary of RTP. Then, in connection with the transactions, RTP changed its name to Joby Aviation, Inc., with Joby Aero now a wholly owned subsidiary of Joby Aviation.

76.    Since that time, Joby's early-mover market position relative to Archer has eroded—and, on information and belief, prompted Joby to engage in illegal conduct to regain the advantage.

77.    As of today, more than sixteen years after its founding, Joby has yet to commercialize its eVTOL technology.

**H.    Joby's Business Relies on China**

78.    This case arises from Joby's systematic effort to conceal and misrepresent its deep operational, manufacturing, and supply-chain ties to China while simultaneously holding itself out as an American-made, vertically integrated aerospace company. In a regulator-gated, zero-sum eVTOL market—where access to FAA resources, defense eligibility, and government credibility are finite—Joby's China misconduct was not incidental. It was strategic.

79.    As detailed below, Joby has maintained and relied upon a Chinese subsidiary and China-based manufacturing capabilities for years, and on information and belief has been importing large volumes of aircraft-related materials and components from China while obscuring their true nature through false and misleading classifications. At the same time, Joby affirmatively markets itself to U.S. regulators, investors, customers, and government agencies as a domestic manufacturer

---

[15] *See* Citizens Podcast, Ep. 277, "Michael Thompson," at 35:07, https://youtu.be/k-pLgJR_gq8?si=EMYIksXGzGImtZpf ("This is a very active Board … . It's almost like an operating committee, frankly.") (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

30

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

with a secure, vertically integrated U.S. supply chain—statements that are materially misleading in light of Joby's actual dependence on China.

### A.    Joby's Longstanding and Pervasive Ties To China

80.7.    Joby's deep ties to China did not arise recently; rather, they trace back to the company's earliest years under the leadership of founder and CEO JoeBen Bevirt.  For more than a decade, Bevirt and Joby publicly embraced and promoted China-facing technological development, manufacturing relationships, and international collaboration when doing so aligned with Joby's commercial and engineering objectives.  On information and belief, Bevirt was living in China and developing his business when in 2007 he posted on X (then Twitter): "[C]hina is locked and loaded."[16]

(Del)

(Del)

(Del)

81.    Bevirt was again in China in 2009 developing his business ties when he was interviewed for a *Stanford Magazine* profile discussing Joby's founding and its initial technologies.[17]

82.    And more recently, Bevirt is quoted in a Chinese-language article published in *Zhihu* stating that "China is not only the largest market, but also the starting point for redefining future

---

[16] *See* @joeben, X (May 14, 2007, 12:33 PM), https://x.com/joeben/status/88362922 (last visited Mar. 7, 2026); @joeben, X (Jan. 12, 2009, 10:23 PM), https://x.com/joeben/status/165789362 (last visited Mar. 7, 2026); and @joeben, X (Mar. 8, 2010, 8:17 PM), https://x.com/joeben/status/410220222 (last visited Mar. 7, 2026).

[17]    *See Flexible Thinking*, Stanford Magazine (January/February 2009), https://stanfordmag.org/contents/flexible-thinking (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

transportation."[18]The *Zhihu* article reports that Joby's plans for the Chinese market include "By 2025, deploy[ing] 1,000 aircraft in China by 2025; [b]uilding a charging network in 5 major city clusters; [r]ecruit[ing] the first batch of 3,000 pilots," and selecting its first four cities for aircraft deployment in Shenzhen, Hainan, Chengdu, and Hangzhou.[19]

83.    But the article stated that, because of what Bevirt termed "China speed," Joby has had to "make rapid adjustments to its Chinese market strategy," including "technical cooperation with top Chinese battery manufacturers; [e]stablish[ing] an R&D center in Shenzhen; [and] [b]uild[ing] a localized supply chain system."[20]And it noted that Joby is "utilizing China's BeiDou Satellite Navigation System to enhance aircraft precision" and "announced that it has reached a strategic cooperation with a Chinese technology giant."[21]

84.31.  Indeed, for more than a decade, Joby has operated a wholly owned Chinese subsidiary, Joby China.  First registered on February 9,in 2012, Joby China is a wholly owned subsidiary of Joby Aviation that, according to an archived version of its website, ishas been engaged in "research and development work on motor, toy plane, electronic products, [and] machinery manufacturing equipment," and has developed power "generator equipment [that] has been exported to Europe and the United States."[22]Joby China's website has since been taken down, but based [6] Based on information and belief, the business remains active, having published and/or updated over fifteen new job postings between February and December 2025 in Shenzhen and beinghaving been named in public bidding records in 2025.

---

[18] *Joby Aviation: Opening the Chinese Market, How Aircraft Will Reshape Future Mobility*, Zhihu (Jan. 11, 2025), https://zhuanlan.zhihu.com/p/17762289713 (last visited Mar. 7, 2026) (a certified English translation is attached hereto as Exhibit A).

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] Joby Metal (Shenzhen) Co., Ltd., Internet Archive Wayback Machine (June 20, 2018, 10:12 AM), https://web.archive.org/web/20180620101234/http://www.jobymetal.com/ (last visited Mar. 7, 2026).

[6] Joby Metal (Shenzhen) Co., Ltd., Internet Archive Wayback Machine (June 20, 2018, 10:12 AM), https://web.archive.org/web/20180620101234/http://www.jobymetal.com/ (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

32.    The images below are from the archives of Joby China's website, since-taken-down by Joby Aviation based on information and belief in an attempt to obscure Joby China's presence.  They show a glimpse into Joby's China manufacturing operations, including the production of component parts that, on information and belief, it exports to the United States and that include vital components of Joby's eVTOL aircraft.

(Added)



(Added)



33.    Since 2018, Joby China's only exports to the U.S. appear to have been to its sister company, Joby Aero, in the United States.

34.    The chart below indicates the imports Joby Aero has directly received from Joby China, showing Joby Aviation's and Joby Aero's deep reliance on materials from China.  It also shows various other suppliers and entities in China from which Joby Aero has received imports, contrary to Joby's "American" manufacturing claims.  and this chart does not even include the unknown number of imports of goods from China that Joby Aero may have received through other

Gibson, Dunn & Crutcher LLP

33

means (such as air imports) or indirectly, such as importation through other countries. The full scope of Joby Aero's imports from China will be the subject of discovery.

*Note: The sources of this information are from third-party shipping records aggregators and public import databases last visited June 26, 2026.*

| | | | Representative China-Origin Shipments Received by Joby Aero Relevant to Joby's eVTOL Supply Chain | | | |
|---|---|---|---|---|---|---|
| **Date** | **Suppliers** | **Reported Item or Shipment** | **HS Code** | **Weight (approx.)** | **Country of Origin** | **Shipment Records** |
| 12/19/2025 | Wuxi Jiaqing Youpin E Commerce Co | Aluminum Honeycomb Panel | **3926.90 -** Plastics and articles thereof; Other articles of plastics and articles of other materials of headings 3901 to 3914 | 613 lbs (278 kg) | China | **House:** EXDO6396009731 **Master:** COSU6436363773 |
| 10/11/2025 | Tuv Rheinland China Ltd | Joby Charge Handle | **8504.40 -** Electrical machinery and equipment and parts thereof; sound recorders and reproducers, television image and sound recorders and reproducers, and parts and accessories of such articles; Electrical transformers, static converters (for example, rectifiers) and inductors; parts thereof; Static converters | 229 lbs (104 kg) | China | **House:** DMERDFS037003934 **Master:** CMDUTJN0752490 |
| 9/9/2025 | Shenzhen Infypower Co. Ltd. | Charger Charger Module | **8504.40 -** Electrical machinery and equipment and parts thereof; sound recorders and reproducers, television image and sound recorders and reproducers, and parts and accessories of such articles; Electrical transformers, static | 2,273 lbs (1,031 kg) | China | **House:** DMERDFS045088893 **Master:** EGLV149505373467 |

34

Gibson, Dunn & Crutcher LLP

| | | | converters (for example, rectifiers) and inductors; parts thereof; Static converters | | | |
|---|---|---|---|---|---|---|
| 9/2/2025 | Taizhou Dehao Technology Co. Ltd. | Floating Dock | **3926.90** - Plastics and articles thereof; Other articles of plastics and articles of other materials of headings 3901 to 3914; Other | 21,583 lbs (9,790 kg) | China | **House:** SZLOVLSZ25080086 **Master:** COSU6426585630 |
| 08/10/2025 | Joby Metal Shenzhen Co. Ltd. | Napkin Or Aluminum Plating[7] | **4818.30** - Paper and paperboard; articles of paper pulp, of paper or of paperboard; Toilet paper and similar paper, cellulose wadding or webs of cellulose fibers, of a kind used for household or sanitary purposes, in rolls of a width not exceeding 36 cm, or cut to size or shape; handkerchiefs, cleansing tissues, towels, tablecloths, table napkins, bed sheets and similar household, sanitary or hospital articles, articles of apparel and clothing accessories, of paper pulp, paper, cellulose wadding or webs of cellulose fibers; Tablecloths and table napkins Or **7606.12** – Of aluminum alloys | 2,549 lbs (1,156 kg) | China | **House:** WMIDMAY25071260 **Master:** MATS3450990000 |
| 04/17/2025 | Qingdao Cc International Trade Co | Power Cable | **8544.42** - Electrical machinery and equipment and parts thereof; sound recorders and | 1129 lbs (512 kg) | China | **House:** EXDO62Y0269633 |

[7] The public record indicates this shipment consisted of "napkins," but Joby's Motion to Dismiss claims this was instead "aluminum plates." *See* Dkt. 44 at 9-10.

DEFENDANT'S ANSWER AND COUNTERCLAIMS – CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| Date | Shipper | Product | HTS Code | Weight | Country | Bill of Lading |
|---|---|---|---|---|---|---|
| | | | reproducers, television image and sound recorders and reproducers, and parts and accessories of such articles; Insulated (including enameled or anodized) wire, cable (including coaxial cable) and other insulated electric conductors, whether or not fitted with connectors; optical fiber cables, made up of individually sheathed fibers, whether or not assembled with electric conductors or fitted with connectors; Other electric conductors, for a voltage not exceeding 1,000 V; Fitted with connectors | | | **Master:** COSU9501607260 |
| 1/5/2025 | Joby Metal Shenzhen Co. Ltd. | Socks Or Plastic Photo Albums[8] | **6115.96** - Articles of apparel and clothing accessories, knitted or crocheted; Panty hose, tights, stockings, socks and other hosiery, including graduated compression hosiery (for example, stockings for varicose veins) and footwear without applied soles, knitted or crocheted; Other; Of synthetic fibers  Or  **3926.90** - Other articles of plastics and articles of other materials of headings 3901 to 3914; other | 10,849 lbs (4,921 kg) | China | **House:** WMIDMAY24120748  **Master:** MATS5465630000 |
| 09/22/2024 | Shenzhen Hanstar | Quilt | **9404.90** - Furniture; bedding, mattresses, mattress supports, cushions | 505 lbs (229 kg) | China | **House:** WMIDMAY24090494 |

[8]  The public record indicates this shipment consisted of "socks," but Joby's Motion to Dismiss claims this was instead "photo albums." *See* Dkt. 44 at 9-10.

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| | | | | | | |
|---|---|---|---|---|---|---|
| | Technologies Co | | and similar stuffed furnishings; lamps and lighting fittings, not elsewhere specified or included; illuminated sign illuminated nameplates and the like; prefabricated buildings; Mattress supports; articles of bedding and similar furnishing (for example, mattresses, quilts, eiderdowns, cushions, pouffes and pillows) fitted with springs or stuffed or internally fitted with any material or of cellular rubber or plastics, whether or not covered; Other | | | **Master:** MATS6797304000 |
| 07/31/2024 | Shenzhen Infypower Co Ltd | Charger | **8504.40** - Electrical machinery and equipment and parts thereof; sound recorders and reproducers, television image and sound recorders and reproducers, and parts and accessories of such articles; Electrical transformers, static converters (for example, rectifiers) and inductors; parts thereof; Static converters | 1455 lbs (660 kg) | China | **House:** EXDO61N0861139 <br><br> **Master:** EGLV149404486843 |
| 03/27/2024 | Joby Metal Shenzhen Co. Ltd. | Mold | **8480.41** - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Molding boxes for metal foundry; mold bases; molding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics ; Molds for metal or metal carbides; Injection or compression types | 2,965 lbs (1,345 kg) | China | **House:** KYSILSAP2400150 <br><br> **Master:** ONEYSZPE33182400 |

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

| 01/22/2024 | Hanstar Tec[h]nologies Co Ltd | Mold | 8480.71 - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Molding boxes for metal foundry; mold bases; molding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics; Molds for rubber or plastics; Injection or compression types | 1202 lbs (545 kg) | China | House: MGNGOAK23C21104 Master: EGLV010301144182 |
| 01/02/2024 | Joby Metal Shenzhen Co. Ltd. | Hair Clip Or Notebooks[9] | 3926.90 - Plastics and articles thereof ; Other articles of plastics and articles of other materials of headings 3901 to 3914; Other Or 4820.10 – Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles | 6,138 lbs (2,784 kg) | China | House: WMIDMAY23120554 Master: MATS4534366000 |
| 11/15/2023 | Joby Metal Shenzhen Co. Ltd. | Aisi Stainless Steel Aluminum | 7219.14 - Flat-rolled products of stainless steel, of a width of 600 mm or more – Not further worked than hot-rolled – Of a thickness of less than 3 mm | 6,634 lbs (3,009 kg) | China | House: NAQANAP2300112 Master: HDMUSZPM63461800 |
| 04/03/2023 | Hanstar Tec[h]nologies Co Ltd | Key Chain | 3926.90 - Plastics and articles thereof; Other articles of plastics and articles of other materials of headings 3901 to 3914; Other | 1649 lbs (748 kg) | China | House: WMIDMAY23030677 Master: MATS1176624000 |

[9] The public record indicates this shipment consisted of "hair clips," but Joby's Motion to Dismiss claims this was instead "registers, accounting books, notebooks." *See* Dkt. 44 at 9-10.

Gibson, Dunn & Crutcher LLP

| 11/13/2022 | Joby Metal Shenzhen Co. Ltd. | Bed Canopy Or Industrial Mold Frames[10] | 6306.12 - Other made up textile articles; sets; worn clothing and worn textile articles; rags; Tarpaulins, awnings and sunblinds; tents (including temporary canopies and similar articles); sails for boats, sailboards or landcraft; camping goods; Tarpaulins, awnings and sunblinds ; Of synthetic fibers (669) Or 8480.41 - Molding boxes for metal foundry; mold bases; molding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics; Molds for metal or metal carbides; Injection or compression types | 5,335 lbs (2,420 kg) | China | House: WMIDMAY22110124 Master: MATS3522874000 |
| 08/10/2022 | Dongguan Xin Bao Instrument Co Ltd | Temperature Test Chamber | 0803.90 - Edible fruit and nuts; peel of citrus fruit or melons ; Bananas and plantains, fresh or dried ; Other | 4407 lbs (1,999 kg) | China | House: CHKMSOA207004602 Master: EGLV010200630252 |
| 07/27/2022 | Shiny Balls Ltd | Aisi Stainless Steel Hollow Ball | 7326.90 - Articles of iron or steel ; Other articles of iron or steel ; Other | 143 lbs (65 kg) | China | House: BNXCOAK2261088 Master: EGLV010200705529 |
| 05/19/2022 | Neware Technology Limited | Testing Equipment | 9024.80 - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof ; | 4299 lbs (1,950 kg) | China | House: MGNGOAK22413221 Master: EGLV010200304371 |

[10] The public record indicates this shipment consisted of "bed canopies," but Joby's Motion to Dismiss claims this was instead "injection/compression mold frames." *See* Dkt. 44 at 9-10.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Machines and appliances for testing the hardness, strength, compressibility, elasticity or other mechanical properties of materials (for example, metals, wood, textiles, paper, plastics), and parts and accessories thereof ; Other machines and appliances | | | |
| 03/08/2022 | Dongguan Xinbao Instrument Co Ltd | Battery Explosion Proof Test Chamber | 7326.90 - Articles of iron or steel ; Other articles of iron or steel ; Other | 10,582 lbs (4,800 kg) | China | **House:** FEVMSZXF22010222 **Master:** EGLV149116337159 |
| 01/26/2022 | Joby Metal Shenzhen Co. Ltd. | Photo Albums | 3926.90 - Plastics and articles thereof ; Other articles of plastics and articles of other materials of headings 3901 to 3914 ; Other | 5,666 lbs (2,570 kg) | China | **House:** MNQOSHA012200333 **Master:** MATS3896222004 |
| 12/07/2021 | Dongguan Xinbao Instrument Co Ltd | Battery Explosion Proof Test Chamber | 7326.90 - Articles of iron or steel ; Other articles of iron or steel ; Other | 10,582 lbs (4,800 kg) | China | **House:** BSVJBSI21110264 **Master:** CMDUSHZ4371046 |
| 05/18/2021 | Neware Technology Limited | Alibration Kit Bts | 9030.39 - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof ; Oscilloscopes, spectrum analyzers and other instruments and apparatus for measuring or checking electrical quantities, excluding meters of heading 9028; instruments and apparatus for measuring or detecting alpha, beta, gamma, X-ray, cosmic or other ionizing | 505 lbs (229 kg) | China | **House:** NAQASZX2107833 **Master:** EGLV149101760395 |

Gibson, Dunn & Crutcher LLP

40

DEFENDANT'S ANSWER AND COUNTERCLAIMS  CASE NO.: 5:25-CV-10703-SVK

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | radiations; parts and accessories thereof: | | | |
| 05/02/2021 | Joby Metal Shenzhen Co. Ltd. | Battery Explosion Proof Test Chamber | **7326.90** - Articles of iron or steel ; Other articles of iron or steel ; Other | 5,952 lbs (2,700 kg) | China | **House:** MLQDSHA042100367  **Master:** MATS6734406010 |
| 11/25/2020 | Neware Technology Limited | Battery Test Machine Solid Wood | **3926.90** - Plastics and articles thereof ; Other articles of plastics and articles of other materials of headings 3901 to 3914 ; Other | 2,835 lbs (1,286 kg) | China | **House:** AMIGSZX2017734  **Master:** HDMUHKWB8530390 |
| 11/02/2020 | Dongguan Xinbao Instrument Co Ltd | Battery Explosion Proof Test Chamber Temp Humidity Chamber | **7326.90** - Articles of iron or steel ; Other articles of iron or steel ; Other | 7857 lbs (3,564 kg) | China | **House:** PPILSZX27459  **Master:** ZIMUSHH30316235 |
| 06/17/2020 | Joby Metal Shenzhen Co. Ltd. | Metal Printer | **8443.99** - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof ; Printing machinery used for printing by means of plates, cylinders and other printing components of heading 8442; other printers, copying machines and facsimile machines, whether or not combined; parts and accessories thereof ; Parts and accessories ; Other | 4,941 lbs (2,241 kg) | China | **House:** CHKMSOA005082205  **Master:** ONEYHKGA62017300 |
| 09/20/2019 | Dongguan Xinbao Instrument Co Ltd | Battery Explosion Proof Test Chamber | **7326.90** - Articles of iron or steel ; Other articles of iron or steel ; Other | 617 lbs (280 kg) | China | **House:** CHKMSOA909008006  **Master:** ONEYHKGVE3773800 |
| 08/30/2019 | Joby Metal Shenzhen Co. Ltd. | Polishing Machine Microscopes Precision | **7326.90** - Articles of iron or steel ; Other articles of iron or steel ; Other | 933 lbs (423 kg) | China | **House:** CHKMSOA907040976 |

Gibson, Dunn & Crutcher LLP

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Cutting Machine Ultrasonic Cleaner Electronic Scale Vacuum Chamber | | | | **Master:** ONEYHKGVC2567600 |
| 06/13/2019 | Joby Metal Shenzhen Co. Ltd. | Printing Machine | **8443.99** - Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof ; Printing machinery used for printing by means of plates, cylinders and other printing components of heading 8442; other printers, copying machines and facsimile machines, whether or not combined; parts and accessories thereof ; Parts and accessories ; Other | 5,357 lbs (2,430 kg) | China | **House:** HYSLFSZX19051259 **Master:** ONEYHKGV89063900 |
| 03/02/2019 | Dongguan Xinbao Instrument Co Ltd | Salt Spray Tester | **3926.90** - Plastics and articles thereof ; Other articles of plastics and articles of other materials of headings 3901 to 3914 ; Other | 816 lbs (370 kg) | China | **House:** MGNGOAK911615 **Master:** HDMUYNWB1851588 |
| 12/03/2018 | Joby Metal Shenzhen Co. Ltd. | Pkgs Ceramic Fiber Paper | **6907.21** - Ceramic products ; Ceramic flags and paving, hearth or wall tiles; ceramic mosaic cubes and the like, whether or not on a backing; finishing ceramics ; Flags and paving, hearth or wall tiles, other than those of subheading 6907.30 and 6907.40 ; Of a water absorption coefficient by weight not exceeding 0.5% | 990 lbs (449 kg) | China | **House:** NAQA1817819S **Master:** APLU751058352 |
| 03/19/2017 | Shenzhen Second Intelligent Equipme[nt] | Potting Machine | **9403.60** - Furniture; bedding, mattresses, mattress supports, cushions and similar stuffed | 1080 lbs (490 kg) | China | **House:** CHKMSOA702024506 |

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | furnishings; lamps and lighting fittings, not elsewhere specified or included; illuminated sign illuminated nameplates and the like; prefabricated buildings ; Other furniture and parts thereof ; Other wooden furniture | | | **Master:** MOLU13020687480 |

85.35. TheseJoby China's recent job postings include a number of highly technical engineering positions which require "Good English" to "[i]nterface with overseas engineers regarding aircraft parts and new tooling"[23]and "participate the design and execution of the manufacturing processes in China," [11] as these new employees located in China "help [Joby] build the future of urban air mobility" and develop the "technological backbone of Joby's operations" by "participat[ing in] the design and execution of the manufacturing processes in China, Germany and the United States."[2412]

86.36. Joby China is also actively developing intellectual property in China related to its aircraft manufacturing activities occurring there, based on information and belief. Public patent records show that Joby China has been granted multiple utility model patents in China as recently as November and December 2025, including CN223643298U, CN223616768U, CN223604109U, and CN223610836U, each issued by the China National Intellectual Property Administration in late 2025.[2513] These patents cover manufacturing and measurement technologies relevant to aerospace component production—including clamping devices, additive-manufacturing support

---

[23] Senior Manufacturing Engineer (高级数控工程师), Joby Metal (Shenzhen) Co., Ltd., Liepin (猎聘), https://www.liepin.com/job/1978092495.shtml (last visited Mar. 7, 2026).

[11] Senior Manufacturing Engineer (高级数控工程师), Joby Metal (Shenzhen) Co., Ltd., Liepin (猎聘), https://www.liepin.com/job/1978092495.shtml (last visited June 26, 2026) (based on courtesy machine-generated English translation).

[2412] Power Platform Developer/Engineer (制造工程师), Job Posting, Joby Metal (Shenzhen) Co., Ltd., Liepin (猎聘), https://www.liepin.com/job/1978060035.shtml (last visited Mar. 7June 26, 2026) (based on courtesy machine-generated English translation).

[2513] *See* CN223643298U (issued Dec. 9, 2025), CN223616768U (issued Dec. 2, 2025), CN223604109U (issued Nov. 28, 2025), CN223610836U (issued Nov. 28, 2025), China Nat'l Intell. Prop. Admin. (CNIPA) Patent Publication System, https://epub.cnipa.gov.cnhttps://english.cnipa.gov.cn (last visited Mar. 7June 26, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

structures, and precision measurement instruments for use in testing of aeronautical components.[2614]

37.    Based on information and belief, Joby China personnel utilize "jobyaviation.com" email addresses, indicating overlap in the company's information technology infrastructure between the U.S. Joby Aviation parent entity and its Chinese subsidiary.

~~87.~~8.    ~~Indeed, Joby's effort to take down the Joby China website illustrates the lengths to which Joby has gone in recent years to mask its ties to China. The images below are from the archives of Joby China's since-taken-down website. They show Joby's China manufacturing operations, producing component parts that, on information and belief, it exports to the United States and that include vital components of Joby's eVTOL aircraft.~~

(Deleted)

(Deleted)

~~88.    Since 2018, Joby China's only customer appears to have been its parent, Joby, in the United States.~~

---

[2614] *Id.*

89. It also appears that Joby has not complied with the mandate that it protect U.S. technologies from undue influence or access by China. Based on information and belief, Joby personnel operating out of Joby China utilize "jobyaviation.com" email addresses, indicating that there is overlap in the company's information technology infrastructure between the U.S. Joby parent entity and its Chinese subsidiary, making it susceptible to access by the Chinese government. Such an approach is inconsistent with best practices for U.S. companies operating in China, which typically do full segregation. Joby's apparent lack of industry-accepted safeguards in its China operations makes it an easier target for cyber theft and, on information and belief, likely puts Joby in violation of its contracts with the U.S. Government.

90. Moreover, based on information and belief, Joby's deep ties to China have been foundational to its progress towards developing its aircraft, and Joby China is deeply ingrained with the Chinese government and the CCP. PRC Company Law, Article 18, requires companies in China to permit the establishment of CCP organizations ("party branches"). Additionally, the CCP Constitution (Chapter V, Article 30) requires the formation of a party branch if three or more CCP members are employed in a private enterprise. CCP party branches are installed to ensure the company follows CCP directives and may report back to party superiors. The potentially current or future presence of a party committee within Joby China could give the CCP insight into internal operations or leverage over strategic decisions.

91. China commentators have confirmed that Shenzhen is at the "forefront" of the Chinese government's initiative to develop what its State Council has termed the "low-altitude economy."[27]

92. At the national level, China's NDRC—an "organ of the [Chinese State Council's] military industrial planning apparatus," according to the Department of War ("DoW"),[28] has an entire department dedicated to formulating, organizing, and implementing China's "strategic" plans

---

[27] Fan Yang, *City in the Sky: Drones, Shenzhen, and the 'Low-Altitude Economy'*, 10 Made in China J. 38 (2025), https://madeinchinajournal.com/2025/08/12/city-in-the-sky-drones-shenzhen-and-the-low-altitude-economy/ (last visited Mar. 7, 2026).

[28] *SZ DJI Tech. Co. v. U.S. Dep't of Def.*, 2025 WL 2761210, at *8 (D.D.C. Sept. 26, 2025).

Gibson, Dunn &
Crutcher LLP

for the "low-altitude economy."[29] In addition to the NDRC, China's "Ministry of Industry and Information Technology," "Ministry of Science and Technology," "Ministry of Finance," and "Civil Aviation Administration" are reportedly engaged in similar efforts to implement the State Council's directive.[30]

93. At the local level, no municipal government has "heeded the [State Council's] call to develop the low-altitude economy" more than Shenzhen's,[31] which has engaged Chinese government actors, including the local outpost of the NDRC, to "position Shenzhen as a 'Global Leading City for the Low-Altitude Economy.'"[32]

94. In sum, the eVTOL "manufacturing powerhouse of the Shenzhen cluster" reflects, on information and belief, a "tightly coordinated public policy" directed by China's military-industrial planning apparatus.[33]

95. 38. Based on information and belief, Joby China is, unsurprisingly, enmeshed in this military-industrial public policy deeply ingrained with the Chinese government and the Chinese Communist Party ("CCP"), undisclosed to U.S. government agencies. Joby China has, on information and belief, received direct technology grants and support from the Chinese government and is listed in Shenzhen's Prospective Technology-Based Small Medium Enterprise Registry—a registry specifically designed to align private enterprises with CCP-directed innovation and military-civil fusion programs.

---

[29] Press Release, Xinhua, *China's Top Economic Planner Sets Up Department to Boost Low-Altitude Economy*, State Council P.R.C. (Dec. 28, 2024), https://english.www.gov.cn/news/202412/28/content_WS676fb6afc6d0868f4e8ee567.html (last visited Mar. 7, 2026).

[30] Yang, *supra, City in the Sky*.

[31] *See id.*

[32] China eVTOL News, *Shenzhen Low-Altitude Aircraft Takeoff and Landing Facilities Layout Plan (2026-2035)*, China eVTOL News (Nov. 1, 2025), https://www.chinaevtolnews.com/p/shenzhen-low-altitude-aircraft-takeoff (last visited Mar. 7, 2026).

[33] Enrique Dans, *The Low-Altitude Leap: How China Is Owning the Sky Below 1,000 Meters*, Medium (Oct. 23, 2024), https://medium.com/enrique-dans/the-low-altitude-leap-how-china-is-owning-the-sky-below-1-000-meters-322c35bbbf0f (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

96.39.  Further, on information and belief, the CCP's Ministry of Industry and Information Technology, Ministry of Commerce, and Ministry of Finance have provided Joby China with multiple monetary grants as well as tax incentives, subsidized interest on bank loans, extended loss carry-forward allowances, preferential treatment in innovation projects, and brand promotion.

97.40.  Moreover, based on information and belief, one of Joby China's employees is listed as number 214 on an official Shenzhen government roster of "returned overseas-educated personnel" who received housing and living subsidies from the State after studying in the United States—an indicator of CCP-linked talent recruitment and technology acquisition programs.[34][15]

41.    China commentators have confirmed that Shenzhen, where Joby China is located, is at the "forefront" of the Chinese government's initiative to develop what its State Council has termed the "low-altitude economy."[16]  No municipal government has "heeded the [State Council's] call to develop the low-altitude economy" more than Shenzhen's,[17] which has engaged Chinese government actors, including the local outpost of China's National Development and Reform Commission ("NDRC"), to "position Shenzhen as a 'Global Leading City for the Low-Altitude

---

[34][15] *See* Alex Joske, *Hunting the Phoenix: The Chinese Communist Party's Global Search for Technology and Talent*, Australian Strategic Policy Institute (Aug. 20, 2020), https://www.aspi.org.au/report/hunting-phoenix/ (last visited Mar. 7, 2026)NATIONAL ACADEMIES OF SCIS., ENG'G & MED., INTERNATIONAL TALENT PROGRAMS IN THE CHANGING GLOBAL ENVIRONMENT 144 (Mark A. Barteau & Sarah M. Rovito eds., 2024), https://doi.org/10.17226/27787.  Further, PRC Company Law, Article 18, requires companies in China to permit the establishment of CCP organizations ("party branches"). The CCP Constitution (Chapter V, Article 30) requires the formation of a party branch if three or more CCP members are employed in a private enterprise.  CCP party branches are installed to ensure the company follows CCP directives and may report back to party superiors.  The potential current or future presence of a party committee within Joby China would also raise concerns to U.S. regulators.

[16] Fan Yang, *City in the Sky: Drones, Shenzhen, and the 'Low-Altitude Economy'*, 10 Made in China J. 38 (2025), https://madeinchinajournal.com/2025/08/12/city-in-the-sky-drones-shenzhen-and-the-low-altitude-economy/ (last visited June 26, 2026).

[17] *See id.*

Gibson, Dunn & Crutcher LLP

Economy.'"[18]  The eVTOL "manufacturing powerhouse of the Shenzhen cluster" reflects a "tightly coordinated public policy" directed by China's military-industrial planning apparatus.[19]

42.    At the national level, China's NDRC—an "organ of the [Chinese State Council's] military industrial planning apparatus," according to the Department of War ("DoW"),[20] has an entire department dedicated to formulating, organizing, and implementing China's "strategic" plans for the "low-altitude economy."[21]  In addition to the NDRC, China's "Ministry of Industry and Information Technology," "Ministry of Science and Technology," "Ministry of Finance," and "Civil Aviation Administration" are reportedly engaged in similar efforts to implement the State Council's directive.[22]

43.    Joby China also has been designated by the Chinese government as a "National High and New Technology Enterprise" ("NHNTE"), with associated tax breaks and funding.

~~98.~~44.  ~~These~~Notably, these types of ~~red flags~~activities by Joby China have caused other companies in the aerospace industry to be proscribed by the DoW as "Chinese military companies," unsuitable for grants, contracts, loans, partnerships, or other support from the federal government.~~35~~23  For example, the U.S. District Court for the District of Columbia upheld DoW's designation of drone-maker DJI's Shenzhen, China subsidiary—SZ DJI Technology Co.—as a "Chinese Military Company" under Section 1260H of the National Defense Authorization Act

---

[18] China eVTOL News, *Shenzhen Low-Altitude Aircraft Takeoff and Landing Facilities Layout Plan (2026–2035)*, China eVTOL News (Nov. 1, 2025), https://www.chinaevtolnews.com/p/shenzhen-low-altitude-aircraft-takeoff (last visited June 26, 2026).

[19] Enrique Dans, *The Low-Altitude Leap: How China Is Owning the Sky Below 1,000 Meters*, Medium (Oct. 23, 2024), https://medium.com/enrique-dans/the-low-altitude-leap-how-china-is-owning-the-sky-below-1-000-meters-322c35bbbf0f (last visited June 26, 2026).

[20] *SZ DJI Tech. Co. v. U.S. Dep't of Def.*, 2025 WL 2761210, at *8 (D.D.C. Sept. 26, 2025).

[21] Press Release, Xinhua, *China's Top Economic Planner Sets Up Department to Boost Low-Altitude Economy*, State Council P.R.C. (Dec. 28, 2024), https://english.www.gov.cn/news/202412/28/content_WS676fb6afc6d0868f4e8ee567.html (last visited June 26, 2026).

[22] Yang, *supra* note 16, City in the Sky.

~~35~~23 *SZ DJI Tech. Co.,* 2025 WL 2761210, at *~~1–4~~1–4, *21; see also William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1260H, 134 Stat. 3388, 3965 (2021) (codified as a note to 10 U.S.C. § 113).

Gibson, Dunn & Crutcher LLP

based on similar Chinese national-level recognition, where DJI had been recognized as a National Enterprise Technology Center ("NETC") by the NDRC. The drone manufacturer had received "assistance" from the Chinese government (*e.g.*, subsidies, tax breaks, favorable treatment).[24]

~~99.    For example, a drone manufacturer based in Shenzhen has been proscribed as a "Chinese military company" for years owing to the "assistance" (*e.g.*, subsidies, tax breaks, favorable treatment, *etc.*) it has received "through science and technology efforts" of "Chinese governmental entities" associated with the "Chinese military industrial planning apparatus," such as the NDRC.[36]~~

### B.    Joby's Connections to China Continue

45.    Based on bills of lading data, the most recent of Joby Aero's imports from PRC-connected Joby China occurred just last year, in August 2025. And Joby Aero's most recent import from any supplier in China based on the same information occurred in December 2025. Joby's connections to China in general and Joby China in particular thus continue.

~~100.~~46.    ~~Apparently unconcerned by these ever-present risks, Joby has continued to develop its close China ties—even as it obscures and omits them in its actions and statements on this side of the Pacific Ocean. In~~Further, in November 2024, Joby Aviation and Joby Aero CEO JoeBen Bevirt presented at a conference held in China—the International Electric Aviation Forum in Kunshan—where he shared information about Joby's technologies and programs.

47.    And in 2025, Bevirt was quoted in a Chinese-language article published in *Zhihu* as stating that "China is not only the largest market, but also the starting point for redefining future transportation."[25] The *Zhihu* article reports that Joby's plans for the China market include "deploy[ing] 1,000 aircraft in China by 2025; [b]uilding a charging network in 5 major city clusters; [r]ecruit[ing] the first batch of 3,000 pilots," and selecting its first four cities for aircraft deployment

---

[24] *SZ DJI Tech.*, 2025 WL 2761210, at *3, *11.

~~[36] *SZ DJI Tech.*, 2025 WL 2761210, at *3, *7–11.~~

[25] Chang Tai, *Joby Aviation: Opening the Chinese Market, How Aircraft Will Reshape Future Mobility*, Zhihu (Jan. 11, 2025), https://zhuanlan.zhihu.com/p/17762289713 (last visited Mar. 7, 2026) (a certified English translation can be found at Dkt. 38-1).

~~Gibson, Dunn & Crutcher LLP~~

in Shenzhen, Hainan, Chengdu, and Hangzhou.[26]  The article also stated that, because of what Bevirt termed "China speed," Joby has had to "make rapid adjustments to its Chinese market strategy," including "technical cooperation with top Chinese battery manufacturers; [e]stablish[ing] an R&D center in Shenzhen; [and] [b]uild[ing] a localized supply chain system."[27]  The article further noted that Joby Aviation is "utilizing China's BeiDou Satellite Navigation System to enhance aircraft precision" and had "announced that it has reached a strategic cooperation with a Chinese technology giant."[28]

101.48.    A February 910, 2026 post on the social media platform X by account "GUTE_RachelHan" (claiming to be a curator of tech and industry data and CEO of LabX) further reported that Bevirt recently visited the Chinese eVTOL developer XPeng, which is developing a "Land Aircraft Carrier" modular flying car and is expected to start deliveries in late 2026.[3729]  A video included in the post showed Bevirt flying in the XPeng prototype.  The X post posited that Bevirt's visit to the Chinese company was "not just a simple visit, but a strategic exploration with the possibility of future collaborationcooperation in mind."[38]

102.    [30]  The post noted that "the current situation is a ""reverse consideration,"" with Joby seeking solutions from China with "the possibility of combining China's strong manufacturing and supply chain capabilities with the US certification framework, [to create] a synergysinergy [sic] that is viewed as further accelerating the commercialization of the flying car industry."[3931]  The post further reported that the "most likely" reason behind Joby's visit to XPeng was "to secure the supply chain" for Joby's own eVTOL aircraft.[4032]

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[3729]    @guteslax, X (February 910, 2026, 11:04 PM), https://x.com/guteslax/status/2021118046438621248 (last visited Mar. 7, 2026) (a certified English translation is attached hereto as Exhibit B)can be found at Dkt. 38-2).

[38] *Id.*

[30] *Id.*

[3931] *Id.*

[4032] *Id.*

Gibson, Dunn & Crutcher LLP

103.49.        The following is a screenshot of the video included with the @guteslax X post showing Bevirt flying in the XPeng prototype.



### B.    Playing Both Sides of the Pacific

104.    Joby has attempted to play both sides of the Pacific — presenting one narrative to Chinese regulators and partners while simultaneously advancing a contradictory narrative to U.S. regulators, defense stakeholders, and the investing public. When engaging in China, Joby has been candid about its openness to Chinese manufacturing, technological development, and collaboration. But when seeking U.S. government certification and military-adjacent opportunities, Joby has portrayed itself as a "vertically integrated" American aerospace company. It repeatedly highlights vertically integrated manufacturing operations in Ohio and California and represents that it "designs, builds, and tests" its aircraft in the United States through a "vertically integrated" supply chain. These statements were crafted to convey to the U.S. government, business partners, and investors that Joby's aircraft are fundamentally American-made and domestically sourced, thereby positioning Joby as a secure, compliant, and preferred U.S. aviation partner — particularly for government and defense programs, including at least $131 million in contracts awarded through the U.S. Air Force's AFWERX Agility Prime program. Participation in AFWERX and similar programs carries an implicit national-security endorsement

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn &
Crutcher LLP

and signals compliance with U.S. sourcing requirements, supply-chain integrity standards, and foreign-influence safeguards.

105.    This bifurcated strategy allowed Joby to extract benefits from both regulatory regimes while concealing the extent to which its aircraft and supply chain depend on China, thereby distorting competition and undermining the integrity of U.S. regulatory and procurement processes.

106.    Most recently, Joby has tried to bury its ties to China.  As noted previously, Joby has taken down the Joby China website.  And beginning with its most recent annual filing, Joby altered the way it identifies its subsidiaries in its SEC disclosures.  In its Form 10-K for the year ended December 31, 2025 (filed Feb. 27, 2026), Joby's list of "Significant Subsidiaries" in Exhibit 21.1 identifies only Joby Aero and no longer lists Joby China—which had appeared in the same exhibit for the previous four years.[41] This abrupt change—removing the Shenzhen manufacturing entity from Joby's public subsidiary list, and stating in only one buried reference that Joby has operations in Shenzhen, China—further evinces Joby's efforts to obscure its ties to China.

### C.    Joby Relies Upon China for Its Batteries

50.    Joby's ties to China are not limited to Joby China.  Based on information and belief, Joby also imports batteries that power its aircraft—arguably the single most important component in an electric vehicle—from suppliers in China.  Chinese media articles have reported that Jiangsu Zenergy Battery Technologies Group Co., Ltd. ("Zenergy") became "an important battery partner" of Joby in 2023.[33]  On information and belief, Zenergy—like Joby China—has deep ties to the CCP.

### III.    Joby Aviation Has Sought to Conceal its China Connections in Crafting its Public and Government-Facing Image as a Domestic eVTOL Company

51.    Joby's misrepresentations and omissions to the government (*see* infra at Sections IV.A and IV.B), based on information and belief are consistent with the actions Joby has taken writ

[41] *See* Joby Aviation, Inc., Annual Report (Form 10-K) Ex. 21.1 (Feb. 27, 2026); *cf*. Joby Aviation, Inc., Annual Report (Form 10-K) Ex. 21.1 (Feb. 27, 2025).

[33] *See, e.g., Serving eVTOL Air Taxis!  This TOP10 Power Battery Company Is About to Take To the Skies*, Sohu.com (Sept. 22, 2023), https://www.sohu.com/a/722671975_121124483 (last visited Mar. 7, 2026) (a certified English translation can be found at Dkt. 38-3).

DEFENDANT'S ANSWER AND COUNTERCLAIMS – CASE NO.: 5:25-CV-10703-SVK

large to promote itself as an "American" company and obfuscate its connections to and reliance on China.  These actions by Joby became particularly prominent over the last several years when the U.S. Administration began taking a more critical look at relations with China.

52.    *First*, Joby has engaged in a carefully orchestrated, but deceptively false, image campaign, advertising and promoting itself as a "Made in America" company when the facts are to the contrary.  On its website, in press releases, and through statements by Joby Aviation and Joby Aero CEO JoeBen Bevirt, Joby Aviation's Chief Policy Officer and Joby Aero's Head of Government Affairs Gregory Bowles, and other executives, Joby has advanced a false profile of a vertically integrated, domestically sourced American manufacturer.  For instance:

- Since at least February 2026, Joby Aviation's website at JobyAviation.com/technology identifies Joby Aviation as "An American Company" whose eVTOL aircraft are "[d]esigned, engineered, built and tested in America."[34]  This statement is false and, at the least, misleading based upon Joby's substantial operations in China.

- In a January 7, 2026 press release, Joby Aviation CEO JoeBen Bevirt stated: "we're ready to make sure that the commercial and defense aircraft that define the future of flight are built right here in America."[35]  This statement is also false and, at the least, misleading, given Joby's substantial reliance on China-based suppliers and manufacturing inputs

107.•    At the same time, Joby has repeatedly proclaimed to the world—and in particular to the U.S. government—that its manufacturing of eVTOLs is and will be vertically integrated, producing its component parts and aircraft domestically in the United States.  It has publicly asserted that it plans to participate in the White House eIPP based on its promise that JobyIn a September 12, 2025 press release, Joby Aviation stated it pursues a "vertical integration strategy" under which "Joby designs, tests and builds nearly every aspect of its aircraft and

---

[34] Joby Aviation, *Technology*, https://www.jobyaviation.com/technology (last visited June 26, 2026).

[35] Joby Aviation, Press Release, *Joby to Expand Manufacturing Footprint with Acquisition of Second Ohio Facility* (Jan. 7, 2026), https://www.jobyaviation.com/news/joby-to-expand-manufacturing-footprint-with-acquisition-of-second-ohio-facility/ (last visited June 26, 2026).

air taxi service in-house."[42][36]  This statement by Joby Aviation, disseminated through Joby Aviation's investor-relations website, is at minimum likely to mislead.  Joby Aero's materials are not made "in-house."  Joby imports critical components from China-based suppliers, including those with CCP ties, and relies on its Shenzhen-based subsidiary for manufacturing and engineering support.

108.•    ~~Bevirt claimed in May 2025 that Joby's air taxi "is designed, manufactured and assembled here in the US, and we are a proudly American company, employing engineers and other experts across 40 different US states."[43]On July 15, 2025, Joby announced expansion of its manufacturing facilities in California and Ohio, claiming that,~~In a July 15, 2025 press release announcing manufacturing expansion, Joby Aviation stated: "[d]rawing on top talent at its California and Ohio facilities, Joby designs, builds, and tests its aircraft in the US," and ~~again touting~~touted the "[a]dvantage[s] of [its] Vertical Integration" through which "Joby handles nearly every aspect of its aircraft and air taxi service in-house, from design and manufacturing to pilot training and operations."[44]~~And on January 7, 2026, Bevirt reiterated: "we're ready to make sure that the commercial and defense aircraft that define the future of flight are built right here in America."[45]For his part, Reid Hoffman has claimed Joby is "creating a vehicle that could be a pinnacular example of American innovation."[46][37]~~

---

[42][36] Joby Aviation, Press Release, *Joby Plans to Jumpstart US Operations through White House eVTOL Integration Program* (Sept. 12, 2025), https://ir.jobyaviation.com/news-events/press-releases/detail/144/joby-plans-to-jumpstart-us-operations-through-white-house (last visited ~~Mar. 7~~June 26, 2026).

[43] ~~Joby Aviation, Press Release, *Joby Flies Two Aircraft Simultaneously in Testing Milestone* (May 11, 2025), https://www.jobyaviation.com/news/joby-flies-two-aircraft-simultaneously/ (last visited Mar. 7, 2026).~~

[44] ~~Joby Aviation, Press Release, *Joby Expands Manufacturing Capacity in California and Ohio, Adds New Aircraft to Its Fleet* (July 15, 2025) https://ir.jobyaviation.com/news-events/press-releases/detail/133/joby-expands-manufacturing-capacity-in-california-and-ohio (last visited Mar. 7, 2026).~~

[45] ~~Joby Aviation, Press Release, *Joby to Expand Manufacturing Footprint with Acquisition of Second Ohio Facility* (Jan. 7, 2026), https://www.jobyaviation.com/news/joby-to-expand-manufacturing-footprint-with-acquisition-of-second-ohio-facility/ (last visited Mar. 7, 2026).~~

[46][37] Joby Aviation, ~~Inc., Registration Statement (Form S-1) 146 (Aug. 2, 2021), https://www.sec.gov/Archives/edgar/data/1819848/000119312521225907/d145933ds1.htm~~Press Release, *Joby Expands Manufacturing Capacity in California and Ohio, Adds New Aircraft to Its*

~~Gibson, Dunn & Crutcher LLP~~

This statement is false and/or misleading.  Joby's "California and Ohio" framing omits Joby Aviation's Chinese manufacturing footprint and the role of Joby China and other China-based suppliers in Joby's aircraft program.

109.    The "technology" section of Joby's website still asserts the misleading claim that "Joby is a vertically-integrated company, meaning we design, engineer, test and manufacture our critical aircraft components in-house" and that it is "An American Company" whose eVTOL aircraft is "[d]esigned, engineered, built and tested in America."  Website, Joby Aviation, https://www.jobyaviation.com/technology (last visited Mar. 7, 2026).  These misleading statements intentionally create the false impression that Joby is a fully vertically integrated American company.  These proclamations, however, are designed to conceal the truth that Joby is still reliant on China-sourced technology and components and a Chinese subsidiary, even as it publicly obscures that dependence.

110.    Indeed, the available data on Joby China's imports to Joby in the United States present a concerning picture: Joby has imported some shipments from Joby China that appear in line with Joby's aviation business and Joby China's metals business, such as stainless steel and aluminum goods.  But, on information and belief, other import records indicate Joby has engaged in tariff evasion.

III.    Joby Has Engaged in Unlawful Tariff Evasion As Part Of Its Unlawful Competition

111.    An importer must classify merchandise in accordance with the Harmonized Tariff Schedule ("HTS") of the United States (19 U.S.C. § 1202).  Misclassification and misdeclaration of HTS codes by an importer is a violation of 19 C.F.R. Part 152.11, as an evasion of tariffs.  This includes both knowingly or negligently providing false descriptions or incorrect HTS codes to secure lower duty rates (or duty-free treatment), and is classified as Import-Misclassification Fraud.  Importers engaged in import-misclassification fraud face civil liability under, among other statutes, 19 U.S.C. § 1592 (Section 592 of the Tariff Act of 1930) for civil penalties (negligence, gross negligence, or fraud).  An importer may also be criminally charged with smuggling under 18

*Fleet* (July 15, 2025)  https://ir.jobyaviation.com/news-events/press-releases/detail/133/joby-expands-manufacturing-capacity-in-california-and-ohio (last visited Mar. 7June 26, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS  CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

U.S.C. § 545 for importing merchandise through the customhouse using any false, forged, or fraudulent invoice, or other document or paper. 18 U.S.C. § 1001 also criminalizes false statements and falsifying, concealing, or covering up by any trick, scheme, or device a material fact in a matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States.

112. Upon information and belief, public records reveal that Joby is in violation of 19 U.S.C. § 1592 and 18 U.S.C. §§ 545 and 1001, and that Joby violated these civil and criminal statutes and used its connections with its Chinese subsidiary to unfairly compete with Archer. Specifically, publicly available records within the global Harmonized System ("HS") that subsume the more specific U.S. HTS codes show that, on information and belief, Joby has imported from Joby China what appear to be thousands of pounds of fraudulently labeled goods. This includes thousands of pounds of products imported by Joby from Joby China that, upon information and belief, have been fraudulently misclassified by Joby and/or its agents as "photo albums," "bed canopies," "hair clips," and "socks." The following chart (reproduced above) shows the tons of imports Joby has received, including from its Chinese subsidiary:

*Note: The source of this information is from third-party shipping records aggregators and public import databases last visited March 7, 2026.*

| Joby China's Shipments to Joby in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Date | Suppliers | Product Description | HS Code | Weight (approx.) | Country of Origin | Bills of Lading |
| 12/19/2025 | Wuxi Jiaqing Youpin E Commerce Co | Aluminum Honeycomb Panel | N/A | 278 kg | China | **House:** EXDO6396009731 **Master:** COSU6436363773 |
| 10/11/2025 | Tuv Rheinland China Ltd | Joby Charge Handle | **9303.90** - Arms and ammunition; parts and accessories thereof; Other firearms and similar | 104 kg | China | **House:** DMERDFS037003934 |

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | devices which operate by the firing of an explosive charge (for example, sporting shot guns and rifles, muzzle-loading firearms, Very pistols and other devices designed to project only signal flares, pistols and revolvers for firing blank ammunition, captive-bolt humane killers, line-throwing guns); Other | | | Master: CMDUTJN0752490 |
| 9/9/2025 | Shenzhen Infypower Co. Ltd. | Charger Charger Module | 8414.59   Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Air or vacuum pumps, air or other gas compressors and fans; ventilating or recycling hoods incorporating a fan, whether or not fitted with filters; gas-tight biological safety cabinets, whether or not fitted with filters; parts thereof; Fans; Other | 1,031 kg | China | House: DMERDFS045088893  Master: EGLV149505373467 |
| 9/2/2025 | Taizhou Dehao Technology Co. Ltd. | Floating Dockfloating Dock | 8909.0   Ships, boats and floating structures; Vessels and other floating structures for breaking up (scrapping) | 9,790 kg | China | House: SZLOVLSZ25080086  Master: COSU6426585630 |
| 08/10/2025 | Joby Metal Shenzhen Co. Ltd. | Napkin | 4803.00   Toilet or facial tissue stock, towel or napkin stock and similar paper of a kind used for household or sanitary purposes, cellulose wadding and webs of cellulose fibers, whether or not creped, crinkled, embossed, perforated, surface-colored, surface-decorated or printed, in rolls or sheets | 2,549 lbs (1,156 kg) | China | House: WMIDMAY25071260  Master: MATS3450990000 |

Gibson, Dunn & Crutcher LLP

57

| | | | | | | |
|---|---|---|---|---|---|---|
| 1/5/2025 | Joby Metal Shenzhen Co. Ltd. | Socks | 6115.99 – Pantyhose, tights, stockings, socks and other hosiery, including graduated compression hosiery (for example, stockings for varicose veins), and footwear without applied soles, knitted or crocheted – Other – Of other textile materials | 10,849 lbs (4,921 kg) | China | **House:** WMIDMAY24120748 **Master:** MATS5465630000 |
| 03/27/2024 | Joby Metal Shenzhen Co. Ltd. | Mold | 8480.41 – Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof; Molding boxes for metal foundry; mold bases; molding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics; Molds for metal or metal carbides; Injection or compression types | 2,965 lbs (1,345 kg) | China | **House:** KYSILSAP2400150 **Master:** ONEYSZPE33182400 |
| 01/02/2024 | Joby Metal Shenzhen Co. Ltd. | Hair Clip | 3305.30 – Essential oils and resinoids; perfumery, cosmetic or toilet preparations – Preparations for use on the hair – Hair lacquers | 6,138 lbs (2,784 kg) | China | **House:** WMIDMAY23120554 **Master:** MATS4534366000 |
| 11/15/2023 | Joby Metal Shenzhen Co. Ltd. | Aisi Stainless Steel Aluminum | 7219.14 – Flat rolled products of stainless steel, of a width of 600 mm or more – Not further worked than hot rolled – Of a thickness of less than 4.75 mm | 6,634 lbs (3,009 kg) | China | **House:** NAQANAP2300112 **Master:** HDMUSZPM63461800 |
| 11/13/2022 | Joby Metal Shenzhen Co. Ltd. | Bed Canopy | 6302.10 – Bed linen, table linen, toilet linen and kitchen linen – Bed linen – Of cotton | 5,335 lbs (2,420 kg) | China | **House:** WMIDMAY22110124 **Master:** MATS3522874000 |
| 01/26/2022 | Joby Metal Shenzhen Co. Ltd. | Photo Albums | 4820.50 – Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles – Albums for samples or for collections | 5,666 lbs (2,570 kg) | China | **House:** MNQOSHA012200333 **Master:** MATS3896222004 |

Gibson, Dunn & Crutcher LLP

58

DEFENDANT'S ANSWER AND COUNTERCLAIMS – CASE NO.: 5:25-CV-10703-SVK

| | | | | | | |
|---|---|---|---|---|---|---|
| 05/02/2021 | Joby Metal Shenzhen Co. Ltd. | Battery Explosion Proof Test Chamber | 9031.20 - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof; Measuring or checking instruments, appliances and machines, not specified or included elsewhere in this chapter; profile projectors; parts and accessories thereof; Test benches | 5,952 lbs (2,700 kg) | China | **House:** MLQDSHA042100367 <br><br> **Master:** MATS6734406010 |
| 06/17/2020 | Joby Metal Shenzhen Co. Ltd. | Metal Printer | 8471.60 - Automatic data-processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data - Input or output units, whether or not containing storage units in the same housing | 4,941 lbs (2,241 kg) | China | **House:** CHKMSOA005082205 <br><br> **Master:** ONEYHKGA62017300 |
| 08/30/2019 | Joby Metal Shenzhen Co. Ltd. | Polishing Machine Microscopes Precision Cutting Machine Ultrasonic Cleaner Electronic Scale Vacuum Chamber | 8456.20 - Machine tools for working any material by removal of material, by laser or other light or photon beam, ultrasonic, electro-discharge, electro-chemical, electron beam, ionic-beam or plasma are processes - Operated by ultrasonic processes | 933 lbs (423 kg) | China | **House:** CHKMSOA907040976 <br><br> **Master:** ONEYHKGVC2567600 |
| 06/13/2019 | Joby Metal Shenzhen Co. Ltd. | Printing Machine | 9006.10 - Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof; Photographic (other than cinematographic) cameras; photographic flashlight apparatus and flashbulbs other than discharge lamps of heading 8539; parts and accessories thereof | 5,357 lbs (2,430 kg) | China | **House:** HYSLFSZX19051259 <br><br> **Master:** ONEYHKGV89063900 |

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

| 12/03/2018 | Joby Metal Shenzhen Co. Ltd. | Pkgs Ceramic Fiber Paper | 6914.90    Ceramic products; Other ceramic articles; Other | 990 lbs (449 kg) | China | **House:** NAQA1817819S **Master:** APLU751058352 |
|---|---|---|---|---|---|---|

113.    There is no reasonable explanation for Joby to have imported thousands of pounds of products described as napkins, socks, hair clips, bed canopies, and photo albums from its Chinese metal-supplier subsidiary.

114.    Based on information and belief, Joby and/or its agents have misclassified imports from its Chinese subsidiary to conceal Joby's imports of metal, technical, or other parts from China.

115.    Joby's apparent tariff evasion constitutes acts of unfair competition. On information and belief, Joby has obtained an unlawful benefit in not paying required duties on materials imported from China, giving Joby an illegal, unfair competitive advantage.

- In a June 4, 2025 post on X, Joby stated: "'We're an American company. We've designed, built and tested this aircraft here.' Today with @JTLonsdale on @AmOptimistShow, Joby CEO JoeBen Bevirt talks how we're building quieter, faster, and more efficient ways to move, and doing it in America. #MadeInAmerica."[38]  These statements are false and/or misleading, given Joby's substantial ties to China.

- In a May 11, 2025 press release, Joby Aviation CEO JoeBen Bevirt stated that Joby's air taxi "is designed, manufactured and assembled here in the US, and we are a proudly American company, employing engineers and other experts across 40 different US states."[39]  This statement is false and/or misleading based upon the facts above.

---

[38]    @Jobyaviation, X (June 4, 2025, 10:01 PM), https://x.com/jobyaviation/status/1930384552624562484 (last visited June 26, 2026).

[39] Joby Aviation, Press Release, *Joby Flies Two Aircraft Simultaneously in Testing Milestone* (May 11, 2025), https://www.jobyaviation.com/news/joby-flies-two-aircraft-simultaneously/ (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

- In its January 17, 2024 investor presentation, Joby Aviation claimed that it had a "vertically-integrated business model that sees us both manufacturing and operating the aircraft."[40] This statement is false and/or misleading. Joby's "vertically-integrated" framing omits the role of Joby China and other China-based suppliers in Joby's aircraft program.

- In its February 26, 2024 Annual Report on Form 10-K for fiscal year 2023, Joby Aviation stated: "Our commitment to vertical integration and in-house development has allowed us to optimize systems and components across the aircraft, resulting in better energy efficiency, range, and speed than what would otherwise be available using commercial-off-the-shelf components."[41] This statement is false and/or misleading. Joby's "vertical integration" and "in-house development" framing omits Joby Aviation's Chinese manufacturing footprint and the role of Joby China and other China-based suppliers in Joby's aircraft program.

- In its March 28, 2022 Annual Report on Form 10-K for fiscal year 2021, Joby Aviation stated: "Our commitment to vertical integration and in-house development has allowed for optimization of systems and components across the aircraft, resulting in better energy efficiency, range, and speed than what would otherwise be available using commercial-off-the-shelf ('COTS') componentry."[42] This statement is false and/or misleading based upon the facts above.

- In its August 16, 2021 S-1 Registration Statement, Joby Aviation stated that: "Our commitment to vertical integration and in-house development has allowed for optimization

[40] Joby Aviation, *Joby AAM Presentation* slide 8 (presented to the Los Angeles Board of Airport Commissioners, Jan. 17, 2024), https://www.lawa.org/sites/lawa/files/documents/1-17-24%20Joby%20AAM%20Presentation.pdf (last visited June 26, 2026).

[41] Joby Aviation, Inc., Annual Report (Form 10-K) (Feb. 26, 2024), https://www.sec.gov/Archives/edgar/data/1819848/000181984824000125/joby-20231231.htm (last visited June 26, 2026).

[42] Joby Aviation, Inc., Annual Report (Form 10-K) (Mar. 28, 2022), https://www.sec.gov/Archives/edgar/data/1819848/000095017022004706/joby-20211231.htm (last visited June 26, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

of systems and components across the aircraft."[43]  This statement is false and/or misleading based upon the facts above.

- During its 2026 Electric Skies Tour through which Joby Aviation is conducting a public demonstration campaign throughout the U.S., Joby's convention-like product display features the large, contrasting banner: "Designed, engineered, manufactured, tested in America."  During the tour stop at the Reindustrialize Conference 2026 held in Detroit, Michigan, Joby Aviation's Chief Policy Officer and Joby Aero's Head of Government Affairs Gregory Bowles appeared in a video describing a conversation Joby Aviation Board member Michael Thompson had with Under Secretary of War for Research and Engineering Emil Michael where they discussed "reindustrializing the manufacturing base of the United States," and Bowles asserted that, "[a]t Joby, this is something that has been top of mind since the very beginning.  We make almost everything.  We're extremely vertical in nature with our own batteries, our own motors, our own high-power electronics."[44]  The video was posted by Joby Aviation, stating: "[w]e came to Reindustrialize 2026 to show what American aerospace manufacturing looks like up close."[45]  These statements are false and misleading.  Joby Aviation's materials are not made "in-house."  Based on information and belief, Joby imports critical components from China-based suppliers, including batteries, and relies on its Shenzhen-based subsidiary for manufacturing and engineering support.

53.    *Second,* showing the lengths Joby is willing to go to obfuscate its connection to China, Joby Aviation silently took down the Joby China website.  This website, formerly at www.jobymetal.com, had for years documented Joby Aviation's subsidiary's manufacturing

---

[43]  Joby Aviation, Inc., Registration Statement (Form S-1) (Aug. 16, 2021), https://ir.jobyaviation.com/sec-filings/all-sec-filings/content/0001193125-21-248186/0001193125-21-248186.pdf  (last visited June 26, 2026).

[44]  Joby Aviation, *We Came to Reindustrialize 2026 to Show What American Aerospace Manufacturing Looks Like* (Facebook video), Facebook, https://www.facebook.com/JobyAviation/videos/we-came-to-reindustrialize-2026-to-show-what-american-aerospace-manufacturing-lo/2404688899943354/ (last visited June 26, 2026).

[45]  *Id.*

Gibson, Dunn & Crutcher LLP

operations in Shenzhen—including photographs of its factory floor, descriptions of its metal-manufacturing and precision-machining capabilities, and statements that its "generator equipment has been exported to Europe and the United States." On information and belief, the website was taken down as a result of increasing public and governmental scrutiny of U.S.-China technology and supply-chain relationships, eliminating the most accessible public evidence of Joby China's active manufacturing operations and direct supply relationship with Joby Aero in the United States.

54. *Third*, Joby has systematically scrubbed references to Joby China from its investor-facing and public marketing materials. Joby Aviation's website, press releases, and corporate presentations now highlight only its U.S. facilities—in California, Ohio, and other domestic locations—while making no mention of Joby China's Shenzhen operations, its Chinese patent portfolio, its engineering workforce in China, or its receipt of government grants in China. Based on information and belief, this selective presentation of Joby Aviation's geographic footprint was designed to create the false and/or misleading impression that Joby's design-to-manufacturing pipeline is domestic.

55. *Fourth*, this litigation shows the three-card monte Joby is willing to play as to its operations in China. In Archer's original pleading, Archer cited publicly available bills of lading and import records reflecting that certain shipments from Joby China to Joby Aero were described as items such as socks, photo albums, hair products, napkins, and similar consumer goods—thousands of pounds of products that were inconsistent with being received from a metal supplier in China. *See* Dkt. 38 ¶¶ 12–13. Archer asserted that these public import records raised serious questions regarding the accuracy and transparency of Joby's import practices and disclosures.

56. Joby and its senior executives did not explain these records; instead, they embraced them. Joby Aviation and Joby Aero CEO JoeBen Bevirt and other Joby-affiliated personnel launched a social-media campaign, repeatedly suggesting that the shipments in question from Joby China—Joby Aviation's China metal subsidiary—really were "socks" and related consumer products. Using the hashtag "#showusyoursocks," Joby personnel mocked the allegations that the

Gibson, Dunn &
Crutcher LLP

shipment descriptions were inaccurate and encouraged others to do the same.[46]  In one such post made right after Archer's counterclaims were filed, Bevirt posed beside a fireplace displaying socks, and his post was then re-posted by the official Joby Aviation account the following day: "[w]e can officially confirm that the only thing these socks are hiding is how incredibly comfortable



(Added)

they are."[47]

57.    Joby's story does not hold together.  At least some of the Joby "socks" are purportedly made in the U.S.A.[48]

---

[46] *See* @oliwalkerjones, X (March 10, 2026, 2:26 PM), https://x.com/oliwalkerjones/status/2031376256525386136?s=20 (last visited June 26, 2026); @blueskiesup, X (Mar. 10, 2026, 4:16 AM), https://x.com/blueskiesup/status/2031222632301953385 (last visited June 26, 2026).

[47] *See* @joeben, X (Mar, 10, 2026, 4:04 AM), https://x.com/joeben/status/2031219623740453087?s=20 (last visited June 26, 2026); @jobyaviation, X (Mar. 10, 2026, 2:26 PM), https://x.com/jobyaviation/status/2031376126111563988 (last visited June 26, 2026).

[48] *See* @eVTOLbuzz, X (Oct. 5, 2025, 12:11 PM), https://x.com/eVTOLbuzz/status/1974915475651125637 (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

58.     Moreover, when filing a pleading with this Court, Joby took yet another approach. In its Motion to Dismiss, Joby argued that Archer's pleading was incorrect because the shipments it received from China were *not* socks after all, and instead were aircraft-related manufacturing items that Joby claims it properly paid import duties on.  *See* Dkt. 44 at 9–10 ("Archer then shifts to arguing that Joby has made 'misrepresentations' on customs forms to avoid paying tariffs, allegedly describing its imports as 'socks,' 'bed linens,' and 'hair clips.'  But the Customs and Border Protection ('CBP') Form 7501s that Archer points to directly contradict the countercomplaint's allegations by showing Joby properly declared its imports as industrial molds, aluminum plating, and photo albums.").  Nor did Joby ever explain CBP's "census warning" on Joby's Form 7501 for its January 5, 2025 import from China, which indicated a potential product misclassification.  *See* Dkt. 61 at 16 (citing Dkt. 47-7).

59.     Joby thus has at least three different versions of its story regarding imports from China: what is on publicly available bills of lading data, what Joby says on X, and what Joby says in court filings.  Joby's willingness to advance whichever explanation is most advantageous to the audience of the moment—regardless of whether it is consistent with its prior statements or truthful—demonstrates Joby's deceptive and misleading conduct.

**IV.   Joby Aviation's and Joby Aero's Materially False and/or Misleading Statements to the U.S. Government and Program Decisionmakers**

116.   Joby is, and at all relevant times has been, a U.S. government contractor, having entered into multiple contracts and agreements with agencies of the United States government, including the U.S. Air Force and agencies within the DoW, pursuant to federally administered programs for advanced aerospace research, testing, and evaluation.

117.   Joby has publicly represented to investors, regulators, and the market that these government contracts validate its technology and competitive standing, and Joby has relied upon its status as a U.S. government contractor to obtain credibility, funding, and strategic advantage.

Gibson, Dunn & Crutcher LLP

65

60.    Joby's deception and misconduct is particularly present in its government contracting work, leading to the claims at issue here.

61.    Joby Aviation and its operating subsidiary, Joby Aero, are, and at all relevant times have been, U.S. government contractors.  As a condition of eligibility for and continued participation in these programs, on information and belief they were required to make representations concerning manufacturing practices, supply chains, foreign affiliations, and corporate structure.

62.    Joby made these representations about its eVTOL products and services principally to advance its economic interests and influence the purchasing decisions of U.S. agencies, directing government contracts and awards toward Joby and away from its direct competitor, Archer.

63.    These representations had their desired effect. Joby's participation in U.S. government programs has been essential to its development, its advancement toward FAA certification, and its ultimate commercialization strategy.  In a February 2022 press release, Joby Aviation described both the breadth and depth of its "close" relationship with the Department of War's Defense Innovation Unit ("DIU").[49]  Joby Aviation touted that its "relationship with DIU began in 2016" and that this contract with DIU provided Joby Aviation with "uninterrupted access to testing facilities" and allowed Joby Aviation "to conduct over a thousand test flights across multiple sub- and full-scale prototypes, enabling rapid iteration and validation of our design."[50] Joby Aviation noted that this "[a]ccess to DoD expertise, feedback, and facilities has and will continue to be an invaluable resource towards developing and certifying the Joby aircraft for broad DoD and commercial use."[51]  All of this was allegedly done by Joby Aviation to "help[] position the United States as the global leader in the eVTOL industry."[52]

---

[49] Joby Aviation, Press Release, *Joby and the US Government Kickstart the Air Mobility Revolution* (Feb. 8, 2022), https://www.jobyaviation.com/news/joby-and-the-us-government-kickstart-the-air-mobility-revolution (last visited June 26, 2026).

[50] *Id.*

[51] *Id.*

[52] *Id.*

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

64.    Joby's involvement with U.S. government agencies only grew through Joby's subsequent participation in the U.S. Air Force's AFWERX Agility Prime program, and most recently the White House's eIPP.  In December 2023, Joby Aviation's Chief Policy Officer Gregory Bowles explained that these U.S. government contracts were critical in helping Joby overcome the "valley of death"—the notoriously difficult chasm a startup faces when trying to transition a prototype into a commercially available product or DoW procurement contract: "DIU and Agility Prime together have kind of shown us a pathway to work with the government that doesn't take us directly over the valley of death. I think it kind of takes us around the valley of death."[53]

65.    As discussed below, in its procurement of each contract, based on information and belief, Joby made and relied upon false and/or misleading statements about its sourcing and supply chain, its "in house" vertical integration, and independence from foreign influences.  Based on information and belief, what Joby did not disclose to these government agencies—and what would have mattered for purposes of government program and resource dedication—is that Joby is heavily connected to manufacturing in China, including reliant on a masked subsidiary in China that has imported thousands of pounds of materials to Joby in the U.S.  Had the government been aware of the facts Joby concealed, Joby would not have received the same government benefits and resource allocation which would have instead gone to entities such as Archer.  Each of these programs that Joby participated in were public-private programs designed to accelerate trusted American advanced-air-mobility technology, protect U.S. national-security interests, strengthen domestic supply chains, and prevent foreign-adversary influence—especially from the PRC.  Thus, Joby's lack of disclosure was particularly critical.

---

[53] Courtney Albon, *Pentagon's Commercial Tech Arm To Ramp Up Role in Military Innovation*, Beacon Global Strategies (Dec. 4, 2023), https://bgsdc.com/news_article/bgs-in-the-news-pentagons-commercial-tech-arm-to-ramp-up-role-in-military-innovation/ (last visited June 26, 2026) (brackets omitted).

Gibson, Dunn & Crutcher LLP

A.      ~~U.S. Air Force~~ **Joby Aviation's and Joby Aero's False and/or Misleading Statements in Connection with** AFWERX Agility Prime ~~Programs~~

1.      **The Purpose of AFWERX Agility Prime Was to Combat Foreign Influence and Advance American Technologies**

~~118.~~66.      Launched in April 2020, AFWERX Agility Prime is the U.S. Air Force's collaborative initiative to work with the industrial base on testing and experimentation, accelerating development of the commercial eVTOL industry, and enabling resilient distributed logistics and sustainable mobility.[47]~~Agility Prime's goal is~~ [54]  The AFWERX program was not merely a grant program; it was a deliberate national-security and industrial-base initiative designed to use government testing resources, flight-test infrastructure, military use-case analysis, and early operational evaluation to accelerate the ~~development of eVTOL aircraft through~~domestic AAM sector.  AFWERX's purpose included funding ~~for~~ early flight testing and experimentation, providing access to facilities such as wind tunnels ~~or~~and airspace, ~~and~~giving participants access to uniquely capable DoW aerospace subject-matter experts ~~of the DoW~~, and assessing military use cases including logistics, cargo transport, and personnel movement.

67.      A major purpose of the program is to combat foreign influence, particularly from China.  AFWERX has described its mission in terms of connecting "American ingenuity" with U.S. Air Force challenges, expanding the defense industrial base for advanced technologies, creating a domestic industry and supply chain for AAM aircraft, bolstering U.S. technological advantage and supporting the U.S. defense industrial base against strategic competitors including China.[55]  Thus,

[47] ~~Air Force Research Laboratory, *AFWERX Agility Prime — A New Era of Aerospace* (Nov. 22, 2012), https://www.afrl.af.mil/News/Article/2850369/afwerx-agility-prime-a-new-era-of-aerospace (last visited Mar. 7, 2026); Air Force, *Agility Prime to hold virtual launch event* (Apr. 14, 2020), https://www.af.mil/News/Article-Display/Article/2147892/agility-prime-to-hold-virtual-launch-event/ (last visited Mar. 7, 2026).~~

[54] Air Force Rsch. Lab'y ("AFRL"), *AFWERX Agility Prime – A New Era of Aerospace* (Nov. 22, 2021), https://www.afrl.af.mil/News/Article/2850369/afwerx-agility-prime-a-new-era-of-aerospace (last visited June 26, 2026); Daryl Mayer, *Agility Prime to Hold Virtual Launch Event, Air Force,* (Apr. 14, 2020), https://www.af.mil/News/Article-Display/Article/2147892/agility-prime-to-hold-virtual-launch-event/ (last visited June 26, 2026).

[55] AFWERX, *2023 Annual Report* (2024), at 4, 58 https://afwerx.com/wp-content/uploads/AFWERX_2023-Annual-Report-Final_CLEARED_AFRL-2024-4054_WEB.pdf.

AFWERX Agility Prime was particularly concerned with competition with (and therefore influence by) China. According to a 2021 U.S. Air Force press release, AFWERX Agility Prime seeks to "create a domestic industry and supply chain" to support the development and production of advanced air mobility aircraft, including eVTOL.[56]

### 2. Joby Aero Secures Multiple AFWERX Agility Prime Contracts

~~119.~~68.    In or about October 2020, the U.S. Air Force, through AFWERX and the Agility Prime program, first selected Joby Aero[57] to participate in Agility Prime. ~~AFWERX~~(Joby Aero entered into a number of additional AFWERX Agility Prime agreements over the next five years, as discussed more fully below.) AFWERX thereby "entered [into] an agreement with Joby Aviation to gain insight into and ultimately support flight testing and FAA certification of the Joby eVTOL aircraft."[~~48~~58] Joby Aviation and Joby Aero's CEO, JoeBen Bevirt, signed this next agreement on behalf of Joby Aero.[59] "This agreement supports Joby's commercial business goals while simultaneously assessing utility against a variety of future Government use cases."[~~49~~60] As part of ~~Joby's~~Joby Aero's participation, ~~Joby~~it entered into Small Business Innovation Research ("SBIR") and/or Other Transaction Authority ("OTA") agreements with the U.S. Air Force, thereby formally becoming a DoW contractor. The purpose and scope of these agreements were ~~limited to~~the research, testing, modeling, simulation, and demonstration of Joby's aircraft for exploratory military use cases, including logistics, cargo transport, and personnel movement. The AFWERX

---

[56] AFRL, *supra* note 59.

[57] The AFWERX agreement names Joby Aero as the counterparty. The U.S. Air Force's press release announced the deal with "Joby Aviation."

[~~48~~ ~~Air Force Research Laboratory, Press Release~~58] Katie Milligan, *As AFWERX Agility Prime ~~celebrates two years, partner~~Celebrates Two Years, Partner* Joby Aviation ~~announces acoustic data~~Announces Acoustic Data *from NASA ~~testing~~Testing*, AFRL (May 17, 2022), https://www.afrl.af.mil/News/Article-Display/Article/3034496/as-afwerx-agility-prime-celebrates-two-years-partner-joby-aviation-announces-ac/ (last visited ~~Mar. 7~~June 26, 2026).

[59] SBIR Phase III Agreement No. FA8614-22-9-0003, attached as Ex. 10.1 to Joby Aviation, Inc.'s Quarterly Report (Form 10-Q) (Nov. 4, 2022), https://www.sec.gov/Archives/edgar/data/1819848/000181984822000187/joby-20220930xex10_1.htm (last visited June 26, 2026),

[~~49~~ ~~Id~~60] Kenneth McNulty, *AFWERX Agility Prime Partner Joby Aviation Announces Acoustic Data from NASA Testing*, Air Force Rsch. Lab'y (May 18, 2022), AFWERX Agility Prime partner Joby Aviation announces acoustic data from NASA testing | Air Force Research Laboratory (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

agreements, which have been amended several times through at least 2025, identified both Joby Aero and Joby Aviation as the "Performer" or "Contractor" under the agreements; thus, the obligations under the agreements applied to Joby enterprise-wide and to both Joby Aviation and Joby Aero.[61]

120.69.    These early agreements involved incremental, task-based funding, subject to performance milestones and government discretion.  UponOon information and belief, Joby'sJoby Aero's obligations under these agreements included, among other things: providing access to aircraft, simulations, and technical data; conducting flight tests and demonstrations under military oversight; and complying with DoW safety, reporting, and data-rights requirements.

### 3.    These AFWERX Agility Prime Contracts Required Joby to Certify It Had No China Influences

121.70.    ParticipationCritically, participation in the AFWERX Agility Prime Program required Joby Aero to complete the U.S. Air Force's SBIR Proposal Submission Instructions.  The Proposal Submission Instructions include a specific disclosure regarding its foreign affiliations: "[s]mall business concerns must complete the Disclosures of Foreign Affiliations or Relationships to Foreign Countries webform in Volume 7 of the DSIP proposal submission."[50], as modified over time.  The SBIR and STTR Extension Act of 2022 ("Extension Act"), Public Law 117–183 (Sep. 30, 2022), amended section 9 of the Act, 15 U.S.C. § 638(g)(13)–(17), (o)(17)–(21), and (vv), to require small businesses applying for SBIR or Small Business Technology Transfer program awards to disclose information about the applicant's investment and foreign ties and specifically identify ties to "foreign countries of concern."  Per the Extension Act, the term "foreign country of concern" has been defined to include at present four countries, one of which is the PRC.  These requirements applied to all AFWERX Agility Prime Program awards

---

[61] *See* SBIR Phase III Agreement No. FA8614-22-9-0003, attached as Ex. 10.1 to Joby Aviation, Inc.'s Quarterly Report (Form 10-Q), at 5 (Nov. 4, 2022), https://www.sec.gov/Archives/edgar/data/1819848/000181984822000187/joby-20220930xex10_1.htm (last visited June 26, 2026).

[50] Dep't of the Air Force, *SBIR Phase I Proposal Submission Instructions*, Air Force 25.4 Solicitation, Vol. 7 (Disclosures of Foreign Affiliations or Relationships to Foreign Countries) (2025), https://www.dodsbirsttr.mil/submissions (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

applied for after the passing of the Extension Act, including at least Joby's 2022 SBIR Phase III Agreement and 2025 amendment of that agreement memorialized as Modification No. P00021.[62]

71.    The Extension Act also included revisions to the Proposal Submission Instructions that Joby was required to complete, including a specific disclosure regarding foreign affiliations: "[t]he following documents are required for all proposal submissions . . . Disclosures of Foreign Affiliations or Relationships to Foreign Countries webform in Volume 7 of the DSIP proposal submission."[63]  This means that, by submitting its proposal and certifying compliance with the SBIR disclosure requirements, Joby Aero necessarily represented that it had fully and accurately disclosed all material relationships, affiliations, subsidiaries, and sources of support involving a "foreign country of concern," including China, thereby enabling the U.S. Air Force to conduct the foreign-influence, cybersecurity, ownership, and due-diligence review required by the AFWERX Agility Prime program.

72.    Joby Aero's executed U.S. Air Force agreements also imposed technology-control and national-security obligations that were specifically aimed at preventing foreign access to U.S.-funded defense-relevant research.  Joby Aero agreed that "access to important technology developments under this Agreement by Foreign Firms or Institutions must be carefully controlled," and that Joby would comply with ITAR, NISPOM, and EAR.  Joby Aero also agreed to provide notice of any change in foreign ownership, control, or influence.

~~122.~~73.    The SBIR Proposal Submission Instructions further state that the U.S. Air Force "will review all proposals submitted in response to this BAA to assess security risks

---

[62] SBIR Phase III Agreement No. FA8614-22-9-0003, attached as Ex. 10.1 to Joby Aviation, Inc.'s Quarterly Report (Form 10-Q) (Nov. 4, 2022), https://www.sec.gov/Archives/edgar/data/1819848/000181984822000187/joby-20220930xex10_1.htm (last visited June 26, 2026); *see also* Modification No. P00021 to SBIR Phase III Agreement No. FA8614-22-9-0003, attached as Ex. 10.1 to Joby Aviation, Inc.'s Quarterly Report (Form 10-Q) (Nov. 4, 2025), https://www.sec.gov/Archives/edgar/data/1819848/000181984825000596/joby-20250930x10qxexx10_1.htm (last visited June 26, 2026).

[63] Dep't of the Air Force, *SBIR Phase 1 Proposal Submission Instructions*, Air Force 23.3 Solicitation, amend. 2 (implementing the SBIR and STTR Extension Act of 2022) Vol. 2 (Disclosures of Foreign Affiliations or Relationships to Foreign Countries) (2023), https://media.defense.gov/2023/Aug/22/2003285631/-1/-1/0/AF_SBIR_233.PDF (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

presented by small business concerns seeking a Federally funded award. The [US]AF will use information provided by the small business concern in response to the Disclosure of Foreign Affiliations or Relationships to Foreign Countries and the proposal to conduct a risk-based due diligence review on the cybersecurity practices, patent analysis, employee analysis, and foreign ownership of a small business concern, including the small business concern and employees of the small business concern to a foreign country, foreign person, foreign affiliation, or foreign entity."[51][64] The Disclosure of Foreign Affiliations or Relationships to Foreign Countries form—which Joby was therefore required to answer—specifically asks whether the applicant has a "parent company, joint venture, or subsidiary, of the applicant or awardee that is based in or receives funding from, any foreign country of concern," which includes "the People's Republic of China."[52][65]

123. The SBIR and STTR Extension Act of 2022 ("Extension Act"), Public Law 117-183 (Sep. 30, 2022), amended section 9 of the Act, 15 U.S.C. § 638(g)(13)–(17), (o)(17)–(21), and (vv), to require small businesses applying for SBIR or Small Business Technology Transfer program awards to disclose information about the applicant's investment and foreign ties and specifically identify ties to "foreign countries of concern." Per the Extension Act, the term "foreign country of concern" has been defined to include at present four countries, one of which is the PRC.

124. Thus, as a participant in the U.S. Air Force's AFWERX Agility Prime Program, Joby had an affirmative obligation to disclose all ties to the PRC.

125.74. Joby'sFurther, Joby Aviation's third quarter of 2022 Form 10-Q filed with the U.S. Securities and Exchange Commission ("SEC") includes the executed July 28, 2022 SBIR contract between Joby Aero and the U.S. Air Force committing almost $20 million in funds to Joby

---

[51] Id. ([64] Dep't of the Air Force Proposal Evaluations) (emphasis added), SBIR Phase I Proposal Submission Instructions, Air Force 23.3 Solicitation, amend. 2, at 1 (2023), https://media.defense.gov/2023/Aug/22/2003285631/-1/-1/0/AF_SBIR_233.PDF (last visited June 26, 2026).

[52][65] U.S. Small Bus. Admin., *Small Business Innovation Research (SBIR) & Small Business Technology Transfer (STTR) Program Policy Directive—Appendices* app. III *(Required Disclosures of Foreign Affiliations or Relationships to Foreign Countries)*, at 42-43 (May 2023), https://www.sbir.gov/sites/default/files/SBA%20SBIR_STTR_FINAL_APPENDICES_MAY2023.pdf (last visited Mar. 7June 26, 2026).

Gibson, Dunn & Crutcher LLP

Aero in which Joby Aero agreed, among other things, that "access to important technology developments under this Agreement by Foreign Firms or Institutions must be carefully controlled," and that Joby Aero "shall comply with all applicable provisions of the International Traffic in Arms Regulations (22 C.F.R. Part 120, *et seq.*), the National Security Program Operating Manual (NISPOM) (DoD 5220.22-M), and the Department of Commerce's Export Administration Regulations (15 C.F.R. Part 730, *et seq.*)."[~~53~~66] Joby Aero likewise agreed that it ~~was required to~~would "immediately deliver to the cognizant security office and [Agreements Officer], a written notice of any change in the extent and nature of foreign ownership, control or influence over [Joby]."[~~54~~] ~~On information and belief, Joby did not fully and accurately make required disclosures concerning China's access to technology developed under the SBIR contract or China's influence over Joby, which Joby obfuscated through its apparent misclassification of imports from China and failure to properly disclose the risks created by its reliance on its Chinese subsidiary.~~ " and to concurrently provide the Agreements Officer any changes reportable to the SEC, FTC, or DOJ.[67] This provision—signed by Joby Aviation and Joby Aero CEO JoeBen Bevirt—created an affirmative obligation for Joby Aero to inform the government of any changes of foreign influence over Joby's operations, even after the agreement was signed.

~~126.~~75.    ~~Another executed SBIR contract between Joby and~~In 2025, the U.S. Air Force ~~prohibits Joby from~~ and Joby Aero executed a modification of Joby Aero's SBIR Phase III Agreement, continuing Joby's participation in the AFWERX program while incorporating updated contractual requirements and reaffirming Joby Aero's ongoing obligations under the Agreement.[68] Joby Aero's Head of Government Affairs, Gregory Bowles, signed the agreement on Joby Aero's

---

[~~53~~66] *See* Joby Aviation, Inc., Quarterly Report (Form 10-Q), at 32 (Nov. 4, 2022), https://ir.jobyaviation.com/sec-filings/quarterly-reports/content/0001819848-22-000187/0001819848-22-000187.pdf (last visited ~~Mar. 7~~June 26, 2026).

[~~54~~] *Id.* at 35.

[67] *Id.* at 35.

[68] Modification No. P00021 to SBIR Phase III Agreement No. FA8614-22-9-0003, attached as Ex. 10.1 to Joby Aviation, Inc.'s Quarterly Report (Form 10-Q) (Nov. 4, 2025), https://www.sec.gov/Archives/edgar/data/1819848/000181984825000596/joby-20250930x10qxexx10_1.htm (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

behalf.[69]  This included prohibitions on Joby using any equipment related to an "unmanned aircraft system" from, among other covered foreign countries, "The People's Republic of China."[55] On information and belief, Joby did not fully and accurately disclose its use of equipment related to an unmanned aircraft system that it imported from China, including through the apparent misclassification of the true nature of the imported materials and products[70]

### 4.  Joby Failed to Disclose Its China Ties

76.  Based on information and belief, Joby Aero provided false information or failed to disclose material information to the U.S. Air Force to participate in AFWERX Agility Prime. While the exact content of Joby Aero's statements to the U.S. Airforce beyond those above are known only to Joby and the United States, based on information and belief, Joby Aero falsely represented to the U.S. Air Force in connection with AFWERX Agility Prime that (i) it had truthfully disclosed its foreign affiliations, foreign subsidiaries, PRC-related funding or influence, supply-chain dependencies, cybersecurity risks, and foreign access to technology, and that (ii) it would carefully control access to U.S. Air Force-funded technology by foreign firms or institutions. On information and belief, Joby did not make full and accurate disclosures to the Air Force in connection with the Agility Prime program with respect to these matters, as it did not fully disclose its connection to China or the PRC.  This includes Joby failing to disclose the risks created by Joby's reliance on its Chinese subsidiary and other Chinese suppliers for critical components and manufacturing inputs.

77.  The precise content of Joby Aero's certifications, disclosure forms, and submissions to the U.S. Air Force in connection with AFWERX Agility Prime—including the Disclosure of Foreign Affiliations or Relationships to Foreign Countries webform and the SBIR proposal volumes—is information peculiarly within the possession and control of Joby and the United States

---

[69] *Id.* at 2.

[55]  *See* Joby Aviation, Inc., Exhibit 10.1 to Quarterly Report (Form 10-Q) (Nov. 4, 2025), https://ir.jobyaviation.com/sec-filings/all-sec-filings/content/0001819848-25-000596/joby-20250930x10qxexx10_1.htm (last visited Mar. 7, 2026).

[70] *See* Joby Aviation, Inc., Exhibit 10.1 to Quarterly Report (Form 10-Q), at 88 (Nov. 4, 2025), https://ir.jobyaviation.com/sec-filings/all-sec-filings/content/0001819848-25-000596/joby-20250930x10qxexx10_1.htm (last visited June 26, 2026).

Gibson, Dunn & Crutcher LLP

Government and is not publicly available to Archer.  Archer's allegations on information and belief are based on specific factual information that makes the inference of falsity plausible, including: Joby's contemporaneous and ongoing operation of Joby China; Joby's documented reliance on China-based suppliers and manufacturing inputs detailed above; Joby China's receipt of Chinese-government grants and CCP-linked designations; and Joby's affirmative, public efforts to conceal its China ties—including taking down the Joby China website—which are irreconcilable with the truthful, complete foreign-affiliation disclosures that AFWERX participation required. Furthermore, Joby could not simultaneously have made the truthful disclosures the program demanded and been admitted into it on the terms it obtained; accordingly, Joby either affirmatively misrepresented or unlawfully omitted its China ties.

78.    As outlined above, Joby has publicly presented itself as a vertically integrated entity that manufactures its aircraft domestically, describing itself as "an American Company" whose eVTOL aircraft are "[d]esigned, engineered, built and tested in America" and "We're vertically integrated, meaning we design and develop our aircraft from the ground up and in-house. Right here in the USA!"[71]  (*See supra* Section III).  It would have been entirely inconsistent with this public persona and profile—upon which the market and industry participants have acted—for Joby to disclose to the U.S. Air Force the truth: that Joby is deeply dependent on China for its supply chain, including reliant on a subsidiary in China that has received funding and grants from the PRC. (*See supra* Section II.A).

127.**5.  Joby's** ~~omissions allowed it to bypass the heightened scrutiny to which it otherwise would have been subject by~~**Failure to Disclose Its China Ties Was Material to** the U.S. Air Force ~~in reviewing its applications.~~

79.    Given the importance AFWERX Agility Prime places on a risk-based due diligence review of the cybersecurity practices, patent analysis, employee analysis, and foreign ownership of a small business concern, based on information and belief, the U.S. Air Force would not have

---

[71] *See* Joby Aviation, *Technology*, https://www.jobyaviation.com/technology (last visited June 27, 2026); @jovyaviation, X (July 4, 2025, 2:48 AM), https://x.com/jobyaviation/status/1941147231773765729 (last visited June 26, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

approved AFWERX Agility Prime for Joby had it known the truth. Indeed, the extent of Joby's connection to the PRC would raise serious concerns in the eyes of any U.S. government agency or regulator.

80. The government's treatment of foreign-affiliation issues in *Kayhan Space Corp. v. United States* provides an example. There, an applicant for an U.S. Air Force/SBIR award was not selected after DoW's risk-based review identified foreign-affiliation concerns, including prior employment and affiliations connected to Iranian entities—which Kayhan had not disclosed in its SBIR application.[72] The Court of Federal Claims decision describes the SBIR due-diligence process as assessing risk factors including foreign ownership or control, foreign affiliations, foreign talent-program participation, and other indicia of potential foreign influence.[73] The U.S. Air Force's review assigned Kayhan a very high foreign-risk rating and the company was ultimately notified that it had not been selected for the U.S. Air Force/SBIR award.[74]

81. The Government Accountability Office's ("GAO") recent review of SBIR/STTR foreign-risk controls confirms the materiality of these matters to the government. The GAO explained that programs subject to SBIR/STTR controls, such as AFWERX, focus on foreign ownership, foreign affiliations, employee relationships, patent activity, cybersecurity vulnerabilities, foreign funding, and other indicators of foreign influence.[75] The GAO further found that agencies rely on foreign-affiliation disclosures and related due-diligence reviews because Congress determined that foreign adversaries, including the PRC, pose material risks to federally funded research and technology-development programs.[76] The categories of information identified by the GAO as material to agency due diligence overlaps with Joby Aviation's undisclosed China-

---

[72] *Kayhan Space Corp. v. United States*, No. 25-cv-104, slip op. at 2–8, 12–18 (Fed. Cl. May 28, 2026) (published June 8, 2026).

[73] *Id.*

[74] *Id.*

[75] U.S. Gov't Accountability Office, Small Business Research Programs: Agencies Identified Foreign Risks, but Some Due Diligence Programs Lack Clear Procedures, GAO-25-107402 (Nov. 21, 2024), available at https://files.gao.gov/reports/GAO-25-107402/index.html (last visited June 26, 2026).

[76] *See id.*

Gibson, Dunn & Crutcher LLP

related activities alleged herein, including its Chinese subsidiary, Chinese-government support, China-based engineering activities, Chinese patent development, foreign-affiliated personnel, and information-technology integration between U.S. and Chinese operations.

82.     Accordingly, based upon information and belief, Joby made false statements to the U.S. Air Force in connection with AFWERX Agility Prime or, at the least, failed to disclose the full extent of its connections to China, which resulted in Joby obtaining government funding and benefits that it would not have received had it fully disclosed to the U.S. Air Force its material connections to China.  Joby's misconduct worked to the material detriment and harm of Archer, as discussed in Section V below.

**B.     Expanded U.S. Air Force – AFWERX Agility Prime Contracts**

128.    On April 25, 2023, Joby publicly announced that it had been awarded an expanded Agility Prime contract with the U.S. Air Force, described by Joby as having a value of $55 million and potentially expanding Joby's total AFWERX Agility Prime contracts "up to [approximately] $131 million" (which Joby has publicly characterized as even higher in total value when aggregated with prior phases).[56] This award constituted an OTA framework agreement with a maximum funding ceiling, not a guaranteed or fully funded contract.

129.    At the time of the deal's announcement, Joby publicly represented that the new agreement "provides the company with access to testing facilities, early operational experience for government customers, as well as a partial offset to its research and development costs."[57]

130.    In or about August 2024, Joby announced that it had delivered an eVTOL aircraft to the U.S. Air Force.  In February 2025, Joby announced that a second aircraft was delivered to Edwards Air Force Base in January to expand ongoing flight testing with the U.S. Air Force.[58] Joby

---

[56] Joby Aviation, Press Release, *Joby Aviation to Deliver Aircraft to Edwards Air Force Base as Part of Department of Defense Contract Valued up to $131 Million* (Apr. 25, 2023), https://ir.jobyaviation.com/news-events/press-releases/detail/60/joby-aviation-to-deliver-aircraft-to-edwards-air-force-base (last visited Mar. 7, 2026).

[57] *Id.*

[58] *See* Joby Aviation, Press Release, *Joby Reports Record Certification Progress and Delivery of Second Aircraft to US Air Force at Edwards Air Force Base* (Feb. 25, 2025), https://www.jobyaviation.com/news/joby-reports-record-certification-progress-delivery-second-aircraft-edwards/ (last visited Mar. 7, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS – CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

also announced that it completed a training program covering the maintenance of its aircraft, having previously trained four U.S. Air Force pilots to fly it.

131. On September 3, 2025, the Air Force Research Laboratory issued a public statement confirming that "AFWERX awarded Small Business Innovation Research [SBIR] Phase II and III contracts to support flight trials of Joby's autonomous technology."[59]

132. The AFWERX Phase II contract, which is memorialized through the execution of an Other Transaction Prototype Agreement ("OTPA"), incorporates by reference a number of Federal Acquisition Regulation ("FAR") and Defense Federal Acquisition Regulation Supplement ("DFARS") terms which require defense contractors like Joby to comply with additional contractual terms focusing on national security, data protection, and cybersecurity.

133. For example, Article VIII of the OTPA titled "Foreign Access to Technology" states that "[t]he Parties agree that research findings and technology developments arising under this Agreement may constitute a significant enhancement to the national defense, and to the economic vitality of the United States. Accordingly, access to important technology developments under this Agreement by Foreign Firms or Institutions must be carefully controlled."

134. Article IX of the OTPA titled "Foreign Ownership, Control, or Influence" states that "Foreign Ownership, Control, or Influence (FOCI) means the situation where the degree of ownership, control, or influence over a Performer by a foreign interest is such that a reasonable basis exists for concluding that compromise of classified information may result. The Performer shall immediately deliver to the cognizant security office and AO, a written notice of any change in the extent and nature of foreign ownership, control or influence over the Performer. In addition, any notice of changes in ownership or control which are required to be reported to the Securities and Exchange Commission, the Federal Trade Commission, or the Department of Justice, shall also be furnished concurrently to the Agreements Officer."

---

[59] Press Release, Air Force Research Laboratory, *Autonomous aircraft capabilities showcased by AFWERX, Joby at Department-Level Exercise* (Sept. 3, 2025), https://www.afrl.af.mil/News/Article-Display/Article/4291163/autonomous-aircraft-capabilities-showcased-by-afwerx-joby-at-department-level-e (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS – CASE NO.: 5:25-CV-10703-SVK

135.    The AFWERX Phase II OTPA also expressly confirms that Joby must comply with applicable U.S. national-security and export-control regimes, including the International Traffic in Arms Regulations ("ITAR"), the National Industrial Security Program Operating Manual ("NISPOM"), and the Export Administration Regulations ("EAR") (collectively, the "Export Control and Security Requirements").  These Export Control and Security Requirements restrict the access, transfer, and disclosure of controlled technical data and technology – including to foreign persons and foreign affiliates – and impose affirmative safeguarding, monitoring, and reporting obligations in connection with performance of the AFWERX-funded work.

136.    Again, Joby's continued participation in the U.S. Air Force's AFWERX Agility Prime Program created an affirmative obligation to accurately disclose ties to China within Joby's business, and Joby's deliberate concealment allowed it to bypass the heightened scrutiny to which it otherwise would have been subject by the U.S. Air Force and/or SBIR in reviewing its applications.  They likewise obligated Joby to comply with DoW's and the U.S. Air Force's FAR and DFARS requirements as well as Export Control and Security Requirements such as ITAR, NISPOM, and EAR.  If Joby was and is sharing via deemed exports and technology transfers to Joby China for the design and development of aircraft parts, batteries, and manufacturing equipment, among other things, that could require export licenses to authorize transfer.  On information and belief, Joby provided information to Joby's China subsidiary in violation of U.S. export requirements and failed to fully and accurately disclose its ties to China, thereby avoiding additional compliance costs and delays it would have incurred if it had been forthcoming about its use of aircraft components manufactured in and sourced by Joby from China.

C.    **Joby's NASA Research Collaboration**

137.    Joby has also participated in research collaborations with NASA, including programs related to AAM, noise testing, and airspace integration.  Joby itself stated that it was the "first company to fly an all-electric vertical takeoff and landing (eVTOL) aircraft as part of NASA's Advanced Air Mobility (AAM) National Campaign."[60]

---

[60] Joby Aviation, Press Release, *Joby and NASA Collaborate to Measure Noise Footprint of Electric Air Taxi* (Sept. 1, 2021), https://ir.jobyaviation.com/news-events/press-

DEFENDANT'S ANSWER AND COUNTERCLAIMS – CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

138. Joby's public representations regarding its NASA collaboration further underscore the materiality of its regulatory and export-control compliance obligations. Under its Umbrella Nonreimbursable Space Act Agreement with NASA Ames Research Center (SAA2-403721) ("Space Act Agreement"), Joby expressly agreed—pursuant to Article 16—to comply with all applicable United States export control laws and regulations, including ITAR (22 C.F.R. Parts 120–130), and EAR (15 C.F.R. Parts 730–774).[61] These obligations require strict controls on the access, transfer, and disclosure of technical data, defense articles, and dual-use technologies, including restrictions on access by foreign nationals, foreign subsidiaries, and foreign-controlled entities. Specifically, Joby agreed that "technical data" which is "subject to the export laws and regulations of the United States provided to Partner … must not be given to foreign persons or transmitted outside the United States without proper U.S. Government authorization."[62] Joby's Space Act Agreement further incorporates federal compliance expectations concerning export classification, licensing, technology transfer controls, and the safeguarding of sensitive aerospace data. By entering into this Space Act Agreement, Joby represented to NASA that it maintains and enforces robust export-control compliance procedures, including mechanisms to prevent unauthorized foreign access to controlled technical information.

139. These export-control commitments are not isolated to NASA engagement; they mirror the compliance obligations that attach to participation in federal procurement and defense-adjacent programs, including obligations under ITAR, EAR, and regulations administered by OFAC, as well as supply-chain integrity requirements applicable to government contractors. Engagement with NASA and other federal agencies necessarily implicates heightened scrutiny of foreign ownership, control, influence, and sourcing—particularly where aerospace

---

releases/detail/17/joby-and-nasa-collaborate-to-measure-noise-footprint-of (last visited Mar. 7, 2026).

[61] Nonreimbursable Space Act Umbrella Agreement Between the National Aeronautics and Space Administration Ames Research Center and Joby Aero, Inc., SAA2-403721 (Dec. 20, 2022), https://www.nasa.gov/wp-content/uploads/static/saa/domestic/37414_SAA2-403721_Joby_Aero_NRUSAA_Agreement_Fully_Executed_122022.pdf (last visited Mar. 7, 2026).

[62] *Id.* § 10(G).

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

technology with potential defense applications is involved. Joby's public portrayal of itself as a fully domestic, vertically integrated aerospace manufacturer was material in this context.

### D.B.    TheJoby Aviation's False and/or Misleading Statements in Connection with the White House eVTOL Executive Order and Announcement of the eIPP

#### 1.    The eIPP Program Was Established to Promote American-Made eVTOL Aircraft

140.83.    On June 6, 2025, the President of the United States issued the "Unleashing American Drone Dominance" Executive Order establishing a comprehensive federal policy governing unmanned aircraft systems ("UAS"), including eVTOL aircraft and other AAM technologies.[6377] The Executive Order expressly links the development, certification, and commercialization of eVTOL aircraft to national economic security, domestic manufacturing capacity, and protection of the United States supply chain.

141.84.    The Executive Order declares that UAS and eVTOL aircraft "enhance United States productivity, create high-skilled jobs, and are reshaping the future of aviation," and identifies eVTOL aircraft as "emerging[e]merging technologies" that "promise to modernize methods for cargo delivery, passenger transport, and other advanced air mobility capabilities."[6478] The Order further states that "[t]he United States must accelerate the safe commercialization of drone technologies and fully integrate UAS into the National Airspace System," and it emphasizes that "[b]uilding a strong and secure domestic drone sector is vital to reducing reliance on foreign sources, strengthening critical supply chains, and ensuring that the benefits of this technology are delivered to the American people."[6579]

142.85.    As a matter of binding federal policy, the Executive Order directs U.S.-government agencies, including the FAA, to ensure continued American leadership in UAS and eVTOL aircraft development by:

---

[6377] Exec. Order No. 14,307, *Unleashing American Drone Dominance,* 90 Fed. Reg. 24,72724727 (June 611, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/unleashing-american-drone-dominance (last visited Mar. 7, 2026).

[6478] *Id. § 1.*

[6579] *Id.*

Gibson, Dunn & Crutcher LLP

a)      "accelerating the safe integration of UAS into the National Airspace System";

b)      "advancing the domestic commercialization of UAS technologies at scale, including their safe and secure manufacturing, production, and integration"; and

c)      "strengthening the domestic drone industrial base and promoting the export of trusted, American-manufactured UAS."[80]

143.    The Executive Order contains express mandates prioritizing U.S. manufacturing and supply-chain security.  Section 7(a) provides that: "[a]ll agencies shall prioritize the integration of UAS manufactured in the United States over those made abroad to the maximum extent permitted by law."[67] Section 7(b) further explains that, "[i]n order to protect the integrity of America's drone supply chain and ensure our technology remains secure from undue foreign influence and exploitation," the federal government must identify foreign entities that pose supply-chain risks and take affirmative steps to secure domestic control over vital components.[68] Consistent with that objective, the Executive Order directs the Secretary of Commerce to take actions "to secure the United States drone supply chain against foreign control or exploitation."[69]

144. 86.        To implement these policies, the Executive Order directs the DOT, acting through the FAA, to establish the eIPP.  The eIPP is designed to accelerate real-world eVTOL operations through structured public-private partnerships and operational testing.  The Executive Order mandates that, within specified timeframes, the FAA must select at least five pilot projects, and that selection criteria "shall include, at a minimum, the use of eVTOL aircraft and technologies developed or offered by a United States-based entity."[70] The eIPP is an integral part of the White House's directive that eVTOL development should be free from the influence of foreign interests. [81]

---

[80] *Id.* § 3(a)–(c).

[67] *Id.*

[68] *Id.* (emphasis added).

[69] *Id.* § 7(c).

[70] *Id.* § 6(a)(ii).

[81] *Id.* at 24728.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

145.    In addition, the Executive Order updates DoW federal procurement eligibility by authorizing the DoW to "procure, integrate, and train using low-cost, high-performing drones manufactured in the United States" and update the Defense Innovation Unit's Blue UAS List to enable all authorized platforms to operate on military installations or ranges.  It also directs the DoW to prioritize the procurement of drones made by U.S. companies that are compliant with Section 848 of the FY 2020 National Defense Authorization Act.[71] Section 848 generally restricts the DoW from procuring UAS that are manufactured in China or which contain components, data storage or network connectivity linked to China.  On information and belief, Joby is circumventing this restriction through its material misrepresentations and omissions concerning its heavy reliance on China components, making Joby aircraft sitting on some of the U.S.'s most strategically important Air Force bases a Trojan Horse threatening to compromise U.S. national security.

146.87.    When asked how the DOT/FAA will ensure that companies disclose the "types of details and evaluate proposals from companies that have established subsidiaries in China and/or received financial support from the Chinese government, and/or lack segregated data infrastructure to ensure sensitive information is not subject to foreign access or influence" and whether "such factors [will] be treated as disqualifying under the U.S.-based entity requirement and the EO's supply chain security mandate," DOT responded that "[t]he awarded OTAs will bar selected participants from working with adversarial nations and data protections language will also be included in the OTA.  The definition of [a] United States based company for purposes of this requirement is identified in the SIR."[7282]

147.88.    Critically, theThe SIR defines a "United States based company" as an entity that (1) is"[i]s organized or incorporated under the laws of a State, territory, or possession of the United States or the District of Columbia"; (2) has"[h]as its principal place of business in the United

---

[71] National Defense Authorization Act for Fiscal Year 2020 § 848, Pub. L. No. 116-92, 133 Stat. 1198, 1508 (2019).

[7282] U.S. Gen. Servs. Admin., SAM.gov Contract Opportunity, *eIPP Questions and Answers*, https://sam.gov/workspace/contract/opp/4a6bff2fbfd8415b99f65f8a771df136/view (last visited Mar. 7June 26, 2026).

Gibson, Dunn & Crutcher LLP

States"; and (3) is"[i]s not directly or indirectly owned or controlled by a foreign entity."[83]  This definition makes clear that companies seeking to participate in the eIPP must demonstrate not only formal U.S. incorporation, but also freedom from foreign ownership or control—criteria specifically designed to ensure that eVTOL aircraft developed under the eIPP are genuinely American and insulated from foreign-adversary influence.  Indeed, the Executive Order made clear that the government must "secure the United States drone supply against foreign control or exploitation," which cannot be done if the eIPP participants are in reality subject to the influence and control of adversarial nations.

148.    The FAA's response underscores that eIPP participation hinges on whether an applicant is "directly or indirectly owned or controlled by a foreign entity."  Given Joby's wholly owned Chinese subsidiary, Joby China, the assistance Joby China has received from the Chinese government, and Joby's reliance on China-sourced components and manufacturing, there is substantial reason to question whether Joby can satisfy this threshold eligibility criteria under the SIR's definition.  If Joby's operations, supply chain, or critical aircraft components are directly or indirectly controlled or influenced by a foreign entity—including through Joby China's deep integration with CCP-linked programs—Joby should not qualify as a "United States based company" for purposes of the eIPP.

149.    These provisions make clear that the federal government views reliance on foreign-manufactured UAS or eVTOL components—particularly those with ties to China—as a material economic and national-security concern, and that regulatory and operational approvals are intended to reinforce domestic production and ensure trusted supply chains.

---

[83] *Id.*

Gibson, Dunn & Crutcher LLP

### E.    Joby's Intended Participation in the eIPP

89.    On or about March 9, 2026, the FAA announced the selection of participants in the eIPP.[84]   Five projects in which Joby was included as a partner were selected.[85]   It is currently unknown whether Joby Aviation was the party who made the submission, or Joby Aero—as Joby Aero has traditionally been the contracting party for Joby but Joby Aviation promoted Joby's receipt of an eIPP award.   Based on information and belief, Joby Aviation's Chief Policy Officer Gregory Bowles submitted the information on behalf of Joby.  Three projects in which Archer was included as a partner were also selected.

### 2.    Joby Failed to Disclose Its China Ties

150.90.    As noted above, Joby has publicly asserted that it plansBased on information and belief, Joby provided false or misleading information to, or at least intended it to be relied upon by, the FAA acting through the DOT in connection with the eIPP program or failed to disclose information material to the FAA/DOT's decision  to select participants in the eIPP program.  Joby has described itself as an "American Company" whose products are "[d]esigned, engineered, built and tested in America."  And, indeed, Joby Aviation promoted itself in this manner in connection with the eIPP.  Joby Aviation publicly announced that it planned to participate in the eIPP based on its promise that it pursues a "vertical integration strategy" under which it "designs, tests and builds nearly every aspect of its aircraft and air taxi service in-house."[73]This assertion of "vertical integration" combined with Joby's repeated public pronouncements about its manufacturing and design work in the U.S. intentionally conveys specific, testable facts about domestic sourcing and

---

[84] Press Release, FAA, *The Future of Aviation Is Here: Trump's Transportation Secretary Sean P. Duffy and FAA Unveil Eight Selections for Pilot Program Testing Next-Gen Aircraft in America's Skies* (March 9, 2026) https://www.faa.gov/newsroom/future-aviation-here-trumps-transportation-secretary-sean-p-duffy-and-faa-unveil-eight (last visited June 26, 2026).

[85] The FAA's press release does not identify the specific Joby entity that was selected to participate in the eIPP, simply referring to it as "Joby."

[73] Joby Aviation, Press Release, *Joby Plans to Jumpstart US Operations through White House eVTOL Integration Program* (Sept. 12, 2025), https://ir.jobyaviation.com/news-events/press-releases/detail/144/joby-plans-to-jumpstart-us-operations-through-white-house (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

in-house manufacturing that are contradicted by Joby's reliance on China-sourced components and its Chinese subsidiary. [86]

151.91.    Yet the FAA's December 2025 Q&A guidance confirms that eligibility for the eIPP requires that an applicant be "not directly or indirectly owned or controlled by a foreign entity." Joby operates a wholly owned Chinese subsidiary that, upon information and belief,Based on information and belief, Joby provided information intended to be relied upon by FAA in selection of eIPP participation that was false or omitted material information. While the exact details of Joby's submissions are known only to Joby and the government, Joby has taken great efforts to conceal its relationship with China, including scrubbing Joby China's webpage and removing references to Joby China from Joby's public materials. There is no reason to believe Joby was honest with the FAA about its connections to China, including the facts that it has and is reliant upon a Chinese subsidiary that has received direct technology grants from the Chinese government, is listed in Shenzhen's Prospective Technology-Based Small Medium Enterprise Registry aligned with CCP-directed innovation programs, and employs individuals designated as "returned overseas-educated personnel" receiving government subsidiaries. These extensive ties to the Chinese government and CCP-linked programs raise serious questions as to the extent to which Joby is directly or indirectly owned or controlled by a foreign entity within the meaning of the SIR, and thus whether Joby can lawfullyNor, based on information and belief, would Joby have been allowed to participate in the eIPP at allprograms had it provided full and complete disclosures.

### 3.    Joby's Failure to Disclose Its China Ties Was Material to the FAA and DOT

92.    Had Joby disclosed this information and the scope of its connections to China in connection with the eIPP program, it would have been contrary to Joby's public presentation to date of an "American-made" company. (*See supra* Section III). It also would have resulted in Joby not being allowed to participate in the eIPP, based on information and belief, due to the importance

---

[86] Joby Aviation, Press Release, *Joby Plans to Jumpstart US Operations through White House eVTOL Integration Program* (Sept. 12, 2025), https://ir.jobyaviation.com/news-events/press-releases/detail/144/joby-plans-to-jumpstart-us-operations-through-white-house (last visited June 26, 2026).

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

Gibson, Dunn & Crutcher LLP

that the eIPP program places on domestic security and disclosure of foreign affiliation or involvement.  The Executive Order and eIPP expressly linked the development, certification, and commercialization of eVTOL aircraft to national economic security, American-made manufacturing capacity, and protection of the United States supply chain.  And DOT explicitly stated that "[t]he awarded OTAs will bar selected participants from working with adversarial nations . . . ."[87]  For these reasons, based on information and belief, Joby would not have been eligible for eIPP participation had it disclosed its China-related ties.

152.  As set forth more fully above, upon information and belief Joby and/or its agents have misclassified imports from its Chinese subsidiary in order to hide its reliance on these China-sourced materials and ties to the CCP.

153.  Joby's public-facing materials  including its website, press releases, investor communications, and statements by management  repeatedly and prominently emphasize California, Ohio, and the United States generally as the locations of its design, manufacturing, testing, workforce, and corporate identity.  Joby frequently describes itself as an "American" aviation company committed to U.S. manufacturing, U.S. jobs, and the domestic industrial base.  By contrast, Joby's public marketing materials and SEC filings no longer contain any substantive references to Joby China, despite the existence of a China-based subsidiary located in Shenzhen.  And any discussion of supply-chain geography is limited to vague references to "global suppliers" in SEC risk disclosures that do not identify China by name.[74]

154.  This pronounced mismatch whereby Joby publicly highlights its U.S. locations while omitting any mention of China creates a clear implied narrative that Joby's aircraft and supply chain  including its technology  are almost exclusively domestic, such that, if Joby were shown

---

[87] U.S. Gen. Servs. Admin., SAM.gov Contract Opportunity, eIPP Questions and Answers, https://sam.gov/workspace/contract/opp/4a6bff2fbfd8415b99f65f8a771df136/view (last visited June 26, 2026).

[74] *See, e.g.*, Joby Aviation, Inc., Annual Report (2025 Form 10-K), at 22 (Feb. 25, 2026) ("Despite our high degree of vertical integration, we still rely on purchased parts and materials for aircraft production and manufacturing equipment which we source from suppliers globally … ."), https://ir.jobyaviation.com/sec-filings/all-sec-filings/content/0001819848-26-000160/0001819848-26-000160.pdf (last visited Mar. 7, 2026).

to materially import components from China or rely on China-based manufacturing, the omission of those facts would be materially misleading to investors, government partners, and other stakeholders evaluating Joby's supply-chain integrity, regulatory suitability, and national-security posture.

### F.    These U.S. Government Contracts Were Possible Only Because of Joby's Assurances That It Was Not Reliant on Chinese Imports

155.    On information and belief, Joby's contracts and research collaborations with U.S. agencies, including the U.S. Air Force, the DoW, and NASA, would not have occurred absent Joby's express and implied representations that it was vertically integrated, domestically controlled, and not reliant on China-sourced components, manufacturing, or infrastructure.

156.    As described above, the federal programs in which Joby participated – AFWERX Agility Prime, OTPA and SBIR agreements with the U.S. Air Force, NASA research collaborations, and Joby's anticipated participation in the eIPP – are governed by statutory, regulatory, and policy frameworks that prioritize U.S.-manufactured aircraft, trusted domestic supply chains, and the exclusion of foreign adversary influence, particularly from China. Participation in these programs necessarily requires contractors to make representations concerning their manufacturing practices, supply chains, data handling, and corporate structure, either expressly or as a condition of eligibility.

157.    Consistent with those requirements, Joby repeatedly represented to government agencies, investors, and the public that it pursued a "vertical integration strategy" under which it "designs, tests and builds nearly every aspect of its aircraft in-house." Joby further represented that its technology, manufacturing, and operations were domestically based and aligned with U.S. national-security and industrial-base priorities. These representations were not incidental; they were material to Joby's eligibility for participation in government-sponsored programs designed to foster trusted, American-developed aviation technologies and to avoid reliance on foreign supply chains.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS – CASE NO.: 5:25-CV-10703-SVK

158.   Upon information and belief, these representations are material to the selection of Joby for participation in Agility Prime and related OTA and SBIR agreements, to granting Joby access to sensitive facilities, airspace, data-sharing arrangements, and government expertise, and to engaging in ongoing testing and evaluation of Joby's aircraft.

159.   The materiality of Joby's representations is underscored by the June 6, 2025 Executive Order directing federal agencies to "prioritize the integration of UAS manufactured in the United States over those made abroad," to secure the U.S. drone and eVTOL supply chain against "foreign control or exploitation," and to exclude from federal programs aircraft and components tied to China.  In this regulatory and policy environment, a company that is materially reliant on China-sourced manufacturing, components, or subsidiaries will face heightened scrutiny, potential ineligibility, or disqualification from the very programs on which Joby relies to advance its technology and business.

160.   Nevertheless, as alleged herein, Joby's assurances of vertical integration and domestic sourcing were deliberately false and misleading.  Upon information and belief, Joby was reliant on imports from its Chinese subsidiary and other China-linked sources, and it affirmatively concealed that reliance through misclassification of imports.  Had Joby accurately and completely disclosed its China-related supply-chain dependencies, on information and belief it would not have been awarded funding in the DoW- and NASA-affiliated programs, nor could it credibly present itself as a preferred candidate for future federal initiatives such as the eIPP.  Indeed, given the FAA's confirmation that eIPP participants must not be "directly or indirectly owned or controlled by a foreign entity," Joby's concealment of its Chinese subsidiary and extensive reliance on China-sourced components suggests that Joby would fail to qualify for eIPP participation altogether if its true foreign dependencies were disclosed.

161.   Joby's concealment of its China-based supply chain allowed it to cut regulatory and diligence corners and move more quickly through the FAA's certification process than it otherwise could have.  And it likewise aided Joby's application for, and acquisition of, AFWERX funding.  Both of these processes are heavily influenced by representations concerning domestic

Gibson, Dunn & Crutcher LLP

manufacturing, supply-chain security, and freedom from foreign dependence. By falsely presenting itself as a vertically integrated, all-American manufacturer, Joby avoided heightened scrutiny that would have slowed its applications, delayed funding, or otherwise rendered it less competitive. In doing so, Joby secured AFWERX funding and related government resources that, absent its concealment, would have been directed to Archer—the only other viable American eVTOL competitor operating transparently within the same regulator-gated and zero-sum funding environment.

162. Upon information and belief, each of Joby's government contracts and collaborations were not merely coincidental to its public narrative of domestic, vertically integrated manufacturing; they were awarded to Joby *because of* Joby's misrepresentations and omissions concerning its supply chain and its freedom from reliance on China.

V. **Joby Depends on a China Supplier with Significant Ties to the CCP**

163. On information and belief, Joby imports batteries that power its aircraft—arguably the single most important component in an electric vehicle—from suppliers in China. If this were widely known, it would expose the material falsity of Joby's frequently repeated claim that its research and development and manufacturing are vertically integrated and based in the United States. Several Chinese media articles have reported, for example, that Jiangsu Zenergy Battery Technologies Group Co., Ltd. ("Zenergy") became a battery partner of Joby in 2023.[75] On information and belief, Zenergy has deep ties to the CCP.

164. Zenergy's chairperson of the Board, Fang Cao, served as a director of Fuyao Glass Industry Group ("Fuyao Glass") from 1994 to 2014 and is the sister of Fuyao Glass's founder Dewang Cao. Referred to in the Oscar-winning documentary *American Factory* as "Chairman Cao," Dewang Cao is an indirect investor in Zenergy.[76] Zenergy's general manager Jicheng Chen

---

[75] *See, e.g., Serving eVTOL Air Taxis! This TOP10 Power Battery Company Is About to Take To the Skies*, Sohu.com (Sept. 22, 2023), https://www.sohu.com/a/722671975_121124483 (last visited Mar. 7, 2026) (a certified English translation is attached hereto as Exhibit C).

[76] Lemon Zhao, *De Wang Cao's Indirectly Invested Company Goes Public in Hong Kong, Battery Capacity Expected to Reach 505 GWh by 2026*, Metal.com (Feb. 7, 2023), https://news.metal.com/newscontent/103165341-De-Wang-Caos-Indirectly-Invested-Company-

90

Gibson, Dunn & Crutcher LLP

also held high-level positions at Fuyao from 2003 through 2016.[77] Public reports indicate that the CCP has a longstanding presence at Fuyao Glass, a major Chinese automotive glass manufacturer with a significant plant in Moraine, Ohio that extends from the company's trade union to the highest echelons of its senior management.[78] In 2024, federal law enforcement agents executed search warrants at dozens of Fuyao locations in Ohio related to potential money laundering, labor, and tax crimes.[79]

## VI.   But for Joby's Concealment of Its Relationship to China, the FAA Would Devote More Resources to Archer

165.   Joby's concealment of its China-based sourcing and relationships has artificially distorted the eVTOL competitive landscape along the FAA's type-certification process.

166.   Joby and Archer are the only two eVTOL manufacturers to have achieved the level of progress they have with the FAA as part of their efforts to achieve type certification of an eVTOL aircraft to allow them to enter into service.  On information and belief, all the other eVTOL developers are still well behind the FAA progress Joby and Archer have achieved.  Thus, this has been reduced to a two-horse race between Archer and Joby, and they compete directly and continuously for the FAA's limited pool of specialized personnel, technical expertise, and regulatory attention.  In this environment, the allocation of FAA resources is inherently zero-sum: time and attention devoted to Joby necessarily diminishes the resources available to Archer.

Goes-Public-in-Hong-Kong-Battery-Capacity-Expected-to-Reach-505-GWh-by-2026 (last visited Mar. 7, 2026).

[77] *Report on Zenergy (3677 HK)*, China Merchants Bank Int'l Co., Ltd. (Sept. 12, 2025), https://www.cmbi.com.hk/upload/202509/20250912610291.pdf (last visited Mar. 7, 2026).

[78] Zhang Hong, *Service for Influence? The Chinese Communist Party's Negotiated Access to Private Enterprises*, Made in China Journal (2019), https://www.proquest.com/openview/b88924f1f05c6bfeeaebb04cf9be5210/1?pq-origsite=gscholar&cbl=6464396 (last visited Mar. 7, 2026); *Setting an Employee Model for a Globalized Enterprise—Exploration by the Party Committee of Fuyao Group in Building the "Exemplary Strength of Party Members,"* People's Daily Online–CPC News Network (July 21, 2016), http://dangjian.people.com.cn/n1/2016/0721/c399425-28573726.html (last visited Mar. 7, 2026) (a certified English translation is attached hereto as Exhibit D).

[79] U.S. Dep't of Just., U.S. Att'y's Off. for the S. Dist. of Ohio, *United States Seizes Assets Related to $126 Million Illegal Staffing, Money Laundering Investigation* (Apr. 14, 2025), https://www.justice.gov/usao-sdoh/pr/united-states-seizes-assets-related-126-million-illegal-staffing-money-laundering (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

167. On information and belief, Joby has mischaracterized, minimized, or failed to disclose to the FAA the extent and significance of its connection to China, including the sourcing of materials, components, or manufacturing inputs from Chinese entities.

168. On information and belief, had Joby fully and accurately disclosed these China-based relationships, it would not consume nearly as much of the FAA's limited attention as it currently does. As a result, Joby would not advance through the FAA's certification process as quickly as it has. Meanwhile, Archer would progress through the regulatory process more quickly, commanding more of the FAA's attention if Joby's connection to China had properly come to light.

## VII.V. Archer's Injuries From Joby's Misstatements to the Government

169.93. The nascent eVTOL industry is not a conventional environment in which competitors can scale independently without constraint. Rather, it is a regulator-gated, zero-sum market in which a small number of companies—chiefly Archer and Joby—are competing for finite regulatory attention and government resources. This includes FAA type-certification bandwidth, specialized FAA policy and flight-test personnel, access to limited conformity and testing pathways, and participation in discrete DoW and other federal programs. Progress toward certification, operational approval, and government adoption depends not only on a company's internal execution, but on the allocation of scarce regulatory attention and institutional capacity.

94. The federal programs described above were not ordinary research grants or regulatory initiatives. They were targeted government investments intended to accelerate the commercialization of trusted American eVTOL manufacturers, strengthen the domestic aerospace industrial base, reduce reliance on foreign-adversary supply chains, and position selected companies to become leaders in the emerging advanced-air-mobility industry. Participation in these programs conferred not only direct funding, but also access to finite government resources, testing facilities, engineering expertise, military and regulatory engagement, public credibility, and market validation. Because only a small number of companies qualified for these programs—and because Archer and Joby have emerged as the two leading domestic eVTOL competitors—government resources devoted to Joby necessarily diminished the resources, opportunities, and

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

competitive advantages available to Archer.  Joby's false and misleading statements distorted that competitive process.

95.    **AFWERX Agility Prime.**  Joby's false and/or misleading statements enabled it to obtain and retain AFWERX Agility Prime contracts and related SBIR and OTA awards that, on information and belief, totaled at least $131 million.  The awards also provided Joby with  access to military testing facilities, operational flight testing, Air Force engineering expertise, government flight-test resources, and opportunities to mature its aircraft for both military and commercial applications.  In addition to the limited amount of total funds available under the program (which necessarily means funds allocated to Joby meant they were no longer available to other parties like Archer), those awards also served as powerful endorsements of Joby's technology and substantially enhanced Joby's credibility with investors, commercial partners, suppliers, regulators, and the marketplace.  Had Joby truthfully disclosed the extent of its China-based operations, China-dependent supply chain, Chinese-government-supported activities, and other foreign affiliations, Joby would not have received the same level of government funding, support, or participation, based on information and belief.  Joby's receipt of those benefits materially damaged Archer, as it prevented Archer from obtaining that financing and resources.

96.    **White House eIPP.**  Although Archer was also allowed to participate in these projects, the eIPP does not provide unlimited opportunities.  Rather, it allocates finite pilot projects, operational authorizations, government attention, regulatory engagement, and public endorsement among a limited number of participants.  Joby was allowed to participate in five pilot projects, while Archer was allowed to participate in three.  Upon information and belief, had Joby truthfully disclosed its China-related operations and foreign affiliations, Joby would not have received the same level of participation or government endorsement.  In fact, on information and belief, had Joby fully disclosed its China-related ties, Joby likely would not have been allowed to participate at all given the eIPP's purpose to "continue[] DOT's efforts to integrate eVTOL and other AAM

Gibson, Dunn &
Crutcher LLP

93

aircraft developed or offered by a United States-based entity into the National Airspace System."[88] Joby's misconduct therefore directly harmed Archer, as Archer would have had the opportunity to participate in additional projects under the eIPP that were instead taken by Joby based upon its misconduct.

97.    Beyond the direct benefits associated with each individual program, participation in these government initiatives carried substantial collateral commercial value.  Government selection served as a powerful signal to investors, customers, suppliers, airlines, strategic partners, regulators, and other government agencies regarding which companies are leading the race toward certification and commercialization.  Each additional government award strengthened Joby's reputation, increased confidence in Joby's technology, facilitated additional commercial relationships, improved access to capital, and enhanced Joby's market position.  Those same government endorsements necessarily diminished Archer's relative competitive standing in the race to commercialize eVTOL aircraft in the United States.

170.    As a result, advantages unlawfully obtained by one eVTOL manufacturer necessarily impose corresponding delays and burdens on its direct competitors.  In this environment, misconduct that accelerates one firm's regulatory progress or reduces its scrutiny does not merely confer a private benefit—it directly and predictably harms the rival firm competing for the same limited regulatory resources.

171.    Joby's misconduct has caused, and continues to cause, concrete and particularized injury to Archer.  Joby's concealment of its Chinese manufacturing footprint, misrepresentation of its supply chain, and unlawful avoidance of tariffs and regulatory scrutiny have distorted competition in the eVTOL market and conferred upon Joby unlawful cost, timing, and regulatory advantages at Archer's expense.

172.    *First*, Joby's misconduct has inflicted direct competitive and economic injury on Archer.  By improperly mischaracterizing or concealing the sourcing of components and

---

[88] Electric Vertical Takeoff and Landing and Advanced Air Mobility Integration Pilot Program—Announcement of Establishment of Program and Request for Proposals, 90 Fed. Reg. 44,751, 44,751 (Sept. 16, 2025).

manufacturing support through its China-based operations, Joby reduced its production and development costs below lawful market levels. Thus, on information and belief, Joby avoided tariffs and other trade-related costs that Archer has borne or would be required to bear if it engaged in similar conduct. These unlawful cost savings enabled Joby to allocate additional capital to engineering, testing, marketing, lobbying, and regulatory engagement—thereby distorting their relative progress.

173. *Second*, Joby's conduct caused regulatory and competitive displacement injury. The FAA's certification resources, DoW engagement, and related government attention are finite. By misrepresenting the origin and nature of its supply chain and obscuring China-based involvement that would have triggered heightened scrutiny, Joby unlawfully diverted scarce regulatory bandwidth and agency resources to itself. That diversion has necessarily delayed and burdened Archer's own certification progress, regulatory engagement, and access to government programs in a way that would not have occurred but for Joby's misconduct—imposing costs on Archer that it would not have had to expend through ordinary market competition.

174. *Third*, Archer has suffered reputational and goodwill harm. Joby publicly positions itself as a domestic, secure, and compliant aerospace manufacturer while privately relying on China-based manufacturing and support inconsistent with those representations. In doing so, Joby falsely holds itself out to regulators, defense stakeholders, commercial partners, investors, and the public. Archer—whose operations and supply chain are transparent and domestically oriented—is unfairly disadvantaged by Joby's deception, losing goodwill, credibility, and competitive standing it otherwise would have retained.

175.98. *Fourth*, Joby's misconduct caused lost business opportunities and increased costs to Archer. Joby's ill-gotten cost and timing advantages have enabled it to secure partnerships, demonstrations, and government engagements at Archer's expense.likewise diverted finite governmental attention and regulatory resources away from Archer. FAA certification resources, Air Force engineering support, and other governmental expertise available to support advanced-air-mobility programs are limited. On information and belief, by obtaining participation in these

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

programs through false and/or misleading statements and material omissions, Joby consumed government attention, technical assistance, operational support, and institutional resources that otherwise would have been available to Archer.

~~176.~~99.    As a direct and proximate result of Joby's misconduct, Archer has suffered ~~damages including, but not limited to: lost competitive position; unduly delayed regulatory progress; increased compliance and operational costs; lost business and partnership opportunities; diversion of management and engineering resources; and diminution of goodwill and market valuation. Archer seeks injunctive relief, restitution, disgorgement, and all other relief necessary to restore fair competition and prevent Joby from retaining the benefits of its unlawful conduct.~~and continues to suffer concrete economic and competitive injury, including lost government-program opportunities; diversion of finite government funding, testing resources, and technical support; diminished regulatory opportunities; lost commercial and strategic partnerships; loss of goodwill; diminished market position; reduced enterprise value; and other damages to be proven at trial.

~~177.    Joby's unlawful actions have caused and continue to cause significant financial damages and harm to Archer going forward, the actual and final amounts of which will be proven at trial.~~

### First Counterclaim

UNLAWFUL~~,~~ AND UNFAIR~~, AND FRAUDULENT~~ COMPETITION UNDER CALIFORNIA

BUSINESS & PROFESSIONS CODE § 17200 et seq.

~~178.~~100.    Archer realleges and incorporates the preceding paragraphs as if fully set forth herein.

101.    Joby Aero, Inc., as the operating subsidiary of Joby Aviation, submitted the false and/or misleading statements, and/or failed to make necessary disclosures, to the applicable government agencies in connection with the AFWERX Agility Prime and eIPP programs, as alleged above, based on information and belief. Joby Aviation, Inc., as the parent company of Joby Aero, directed and authorized the false and misleading statements and/or material omissions. Joby Aviation also was a co-participant in Joby Aero's false statements, as demonstrated by Joby

Gibson, Dunn & Crutcher LLP

~~DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK~~

Aviation's control of Joby Aero and that Joby Aviation issued the false and misleading press releases, investor communications, and website representations that were in coordination with Joby Aero's false and/or misleading statements to government agencies.  Joby Aviation and Joby Aero acted in concert, and both are liable for the unlawful and unfair conduct alleged herein.  There is further substantial overlap of officers and employees of Joby Aviation and Joby Aero, including, for example, both Joby Aviation and Joby Aero CEO JoeBen Bevirt and Joby Aviation Chief Policy Officer and Joby Aero Head of Government Affairs Gregory Bowles, who based on information and belief were responsible for the submissions at issue in this matter.

102.    As outlined more fully above (*see supra* Sections IV.A and IV.B), based on information and belief, Joby Aero and Joby Aviation (JoeBen Bevirt and Gregory Bowles for AFWERX Agility Prime and, based on information and belief, Gregory Bowles for the eIPP) made representations or omissions to U.S. government agencies regarding Joby's aircraft and supply-chain as part of Joby's application to participate in government-funded programs that had the capacity, likelihood, and tendency to deceive or mislead those U.S. government agencies:

a)    **AFWERX Agility Prime.**  To participate in AFWERX Agility Prime and receive SBIR and OTA awards from the U.S. Air Force, Joby Aero represented, expressly or by necessary implication, that (i) it had truthfully disclosed its foreign affiliations, foreign subsidiaries, PRC-related funding or influence, supply-chain dependencies, cybersecurity risks, and foreign access to technology, and that (ii) it would carefully control access to U.S. Air Force-funded technology by foreign firms or institutions.  Joby Aviation and Joby Aero CEO JoeBen Bevirt and Joby Aviation Chief Policy Officer and Joby Aero Head of Government Affairs Gregory Bowles made these representations on Joby Aero's behalf.  The AFWERX agreements identified both Joby Aero and Joby Aviation as the "Performer" or "Contractor" under the agreements; thus, the obligations under the agreements applied to Joby enterprise-wide and to both Joby Aviation and Joby Aero.  On information and belief, these representations were false or misleading as Joby Aero did not fully and

accurately disclose its reliance on and association with activities in China, including that Joby Aviation simultaneously operated Joby China, a wholly owned Chinese subsidiary that employed engineering and manufacturing personnel, held China-issued patents, was on information and belief tied to CCP-directed innovation programs and Chinese government grants, supplied or supported Joby's China-dependent aircraft development and manufacturing program, and potentially placed technical data at issue.  These misstatements and omissions were material to and influenced the U.S. Air Force because AFWERX Agility Prime was designed to build a trusted domestic AAM industry and supply chain.  Based on information and belief, the U.S. Air Force relied on Joby Aero's false statements and omissions, as it selected Joby Aero for Agility Prime, entered SBIR and OTA agreements with Joby Aero, awarded Joby Aero expanded contracts valued at up to approximately $131 million, and continued supporting Joby's flight trials.  Based on information and belief, the U.S. Air Force was deceived into believing that Joby was a domestically controlled, vertically integrated, foreign-adversary-free eVTOL developer whose technology and supply chain did not present undisclosed PRC-related risks.  Joby Aero's omissions allowed it to bypass the heightened scrutiny to which it otherwise would have been subject by the U.S. Air Force in reviewing its applications.

b)      **White House eIPP.**  To participate in the eIPP, Joby represented, expressly or by necessary implication, that it was a United States-based company for eIPP purposes, was not directly or indirectly owned or controlled by a foreign entity, would not work with adversarial nations in the awarded OTA agreement, would protect data from foreign access, and could participate consistent with the Executive Order's domestic manufacturing and supply-chain-security mandates, based on information and belief.  Based on information and belief, Joby's submissions in support of the eIPP program were made by Gregory Bowles, Joby Aviation's Chief

Gibson, Dunn & Crutcher LLP

Policy Officer and Joby Aero's Head of Government Affairs. Whether it was Joby Aviation or Joby Aero that made these representations is information peculiarly within the possession and control of Joby and the United States Government and is not available to Archer; however, Joby Aviation issued press statements relating to Joby's receipt of eIPP benefits and Joby Aero has historically been the contracting party with government agencies. Based on information and belief, these representations or omissions were false and/or misleading because Joby Aviation operated Joby China; concealed Joby China's active engineering and manufacturing role and receipt of Chinese government grants and CCP-linked benefits; relies on China-sourced components, equipment, and suppliers for its eVTOL aircraft program; and potentially placed technical data at issue, based on information and belief. These statements were material and likely to influence the FAA. The Executive Order and eIPP criteria required use of eVTOL aircraft and technologies developed or offered by a United States-based entity, and DOT/FAA guidance specifically addressed China subsidiaries, Chinese government support, adversarial nations, and data protections in the eIPP Q&A. The FAA relied on Joby's statements, as Joby was allowed to participate in the eIPP. Based on information and belief, the FAA was deceived into conferring finite operational authorizations, regulatory fast-tracking, and government endorsement of Joby and did not exclude Joby from participating in the program based on the false impression that Joby's aircraft program, supply chain, data practices, and corporate structure were materially domestic and free from undisclosed PRC-related access, control, or influence.

103. Joby intentionally concealed the extent of its China ties and its reliance on Joby China and other Chinese suppliers for parts, materials, and manufacturing inputs, based on information and belief. As set forth above, Joby Aviation took affirmative steps to obscure these ties, including taking down the Joby China website, and removing substantive references to China

Gibson, Dunn & Crutcher LLP

99

from Joby Aviation's public marketing materials. This was designed to conceal the true extent of Joby's reliance on Chinese manufacturing and suppliers, based on information and belief.

104. Each of the foregoing government representations constitutes an unlawful, unfair, or fraudulent business practice under California Business and Professions Code Section 17200 because each statement had the capacity, likelihood, and tendency to deceive or confuse the relevant population. Each statement was made for the purpose of obtaining or inducing government contracts and regulatory approvals, and each statement was directed at an actual or potential customer, purchaser, investor, partner, or government decisionmaker.

105. This conduct constituted an "unfair" business practice under Section 17200 because it violated the policy and spirit of antitrust laws by distorting the information environment in this government-contracting field. It was "unlawful" because it violated the Lanham Act by constituting deceptive, material, and factual commercial statements that were likely to influence the commercial decisions of the governmental entities and were injurious to Archer. And it was fraudulent because the statements amounted to business acts that were likely to deceive.

106. As a direct and proximate result of Joby Aero's statements and omissions, Joby wrongfully obtained government programs, commercial opportunities, investor credibility, and regulatory advantages that it would not otherwise have received, and that would have instead gone in whole or in part to Archer. Specifically, Joby secured at least $131 million in AFWERX Agility Prime contracts and selection for the White House eIPP based on a misleading domestic-manufacturing narrative that omitted Joby's China dependencies.

107. Joby's misleading representations also enabled it to divert limited FAA-certification resources, government attention, and market credibility away from Archer and toward Joby. As set forth above, the FAA's oversight of eVTOL certification is resource-constrained, and Joby and Archer are the only two manufacturers to have reached the advanced stages of the type-certification process. By misrepresenting its domestic manufacturing and omitting its China-based sourcing, Joby avoided additional scrutiny and compliance requirements that would have slowed its certification progress and preserved scarce government resources and attention for Archer.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

179. On information and belief, Joby has a wholly owned subsidiary in China called Joby China Metal Shenzhen Co. Ltd. ("Joby China"), which supplies metal parts for Joby's eVTOL aircraft. On information and belief, Joby is the sole customer of Joby China. As alleged above, Joby imported several shipments from Joby China that, on information and belief, fraudulently misclassify the contents of those shipments in documents submitted to the federal government.

a) On November 13, 2022, Joby imported from Joby China 2,420 kilograms of goods classified under the HS code 6302.10 ("bed linen, knitted or crocheted").

b) On January 2, 2024, Joby imported from Joby China Joby 2,784 kilograms of goods classified under the HS code 3305.30 ("hair lacquers").

c) On January 5, 2025, Joby imported from Joby China 4,921 kilograms of goods classified under the HS code 6115.99, which is part of the section covering "panty hose, tights, stockings, socks and other hosiery."

d) On August 10, 2025, Joby imported from Joby China 1,156 kilograms of goods classified under the HS code, which includes "toilet or facial tissue stock."

180. On information and belief, Joby knowingly submitted a materially false CBP Form 7501 or similar document containing an incorrect HTS code, derived from and subsumed within the publicly available HS code describing the same category of goods, to the Department of Homeland Security ("DHS") for each of the above shipments. On information and belief, Joby and/or its agents knowingly submitted these false statements to DHS with the intent to defraud the United States by avoiding or defeating the U.S. customs laws. Accurate tariff classification is central to the admissibility of merchandise and determines whether the goods may lawfully enter the United States at all. Had Joby truthfully classified the imported shipments, they would have been assessed duties that Joby avoided through its apparent unlawful circumvention. As such, on information and belief, Joby's conduct violated 18 U.S.C. § 1001, 18 U.S.C. § 545, 18 U.S.C. § 541, and 19 U.S.C. § 1592.

181. Joby's conduct in violation of these statutes constitutes an unlawful business practice as defined by California Business and Professions Code Section 17200.

Gibson, Dunn &
Crutcher LLP

101

DEFENDANT'S ANSWER AND COUNTERCLAIMS – CASE NO.: 5:25-CV-10703-SVK

182.   Joby's misclassification of imports and underpayment of import duties is also an unfair business practice under California Business and Professions Code Section 17200.  Joby's acts pose a significant threat to competition by creating an uneven playing field within the U.S. eVTOL competitive landscape and the larger urban air mobility sector.

183.   Joby also deliberately, willfully, and intentionally has publicly disseminated and continues to publicly disseminate false and misleading statements regarding its vertical integration and domestic sourcing.

184.   Joby has publicly asserted that it plans to participate in the White House eVTOL Integration Pilot Program based on its promise that Joby pursues a "vertical integration strategy" under which "Joby designs, tests and builds nearly every aspect of its aircraft and air taxi service in-house."[80] JoeBen Bevirt claimed in May 2025 that Joby's air taxi "is designed, manufactured and assembled here in the US, and we are a proudly American company, employing engineers and other experts across 40 different US states."[81] On July 15, 2025, Joby announced expansion of its manufacturing facilities in California and Ohio, claiming that, "[d]rawing on top talent at its California and Ohio facilities, Joby designs, builds, and tests its aircraft in the US," and again touting the "[a]dvantage[s] of [its] Vertical Integration" through which "Joby handles nearly every aspect of its aircraft and air taxi service in-house, from design and manufacturing to pilot training and operations."[82] And on January 7, 2026, Bevirt reiterated: "we're ready to make sure that the commercial and defense aircraft that define the future of flight are built right here in

---

[80] Joby Aviation, Press Release, *Joby Plans to Jumpstart US Operations through White House eVTOL Integration Program* (Sept. 12, 2025), https://ir.jobyaviation.com/news-events/press-releases/detail/144/joby-plans-to-jumpstart-us-operations-through-white-house (last visited Mar. 7, 2026).

[81] Joby Aviation, Press Release, *Joby Flies Two Aircraft Simultaneously in Testing Milestone,* https://www.jobyaviation.com/news/joby-flies-two-aircraft-simultaneously (last visited Mar. 7, 2026).

[82] Joby Aviation, Press Release, *Joby Expands Manufacturing Capacity in California and Ohio, Adds New Aircraft to Its Fleet,* https://ir.jobyaviation.com/news-events/press-releases/detail/133/joby-expands-manufacturing-capacity-in-california-and-ohio (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

America."[83] The "technology" section of Joby's website asserts the misleading claim that "Joby is a vertically-integrated company, meaning we design, engineer, test and manufacture our critical aircraft components in-house" and that it is "An American Company" whose eVTOL aircraft are "[d]esigned, engineered, built and tested in America."[84] Each misleading statement intentionally creates the false impression that Joby is a vertically integrated American company when in fact Joby relies on China-sourced technology and components, even as it publicly obscures that dependence.

185.    These and the other statements by Joby outlined above in this complaint are unlawful, unfair, and fraudulent business acts and practices as defined by California Business and Professions Code Section 17200.   They are likely to deceive prospective business partners, investors and consumers and constitute false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); they are unfair in that they are substantially injurious to consumers and competition by misrepresenting Joby's business operations; and they are likely to deceive the public, as Joby intended, and are part of the total mix of information that the government and other actual and potential business customers have considered in transacting with Joby.

186.    On information and belief, Joby's tariff-related misclassifications and other false and materially misleading statements alleged herein are representations of fact about Joby's business operations, goods, or services that are made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, Joby's goods or services, or were made in the course of delivering Joby's goods or services.

187.    On information and belief, Joby's tariff-related misclassifications and other false and materially misleading statements alleged herein were made with the intended audience of an actual or potential buyer or customer (including the U.S. government), or a person likely to repeat

---

[83] Joby Aviation, Press Release, *Joby to Expand Manufacturing Footprint with Acquisition of Second Ohio Facility*, https://www.jobyaviation.com/news/joby-to-expand-manufacturing-footprint-with-acquisition-of-second-ohio-facility (last visited Mar. 7, 2026).

[84] Website, Joby Aviation, https://www.jobyaviation.com/technology (last visited Mar. 7, 2026).

Gibson, Dunn & Crutcher LLP

the statement to, or otherwise influence, an actual or potential buyer or customer, or arose out of or within the context of a regulatory approval process or proceeding.

188.    Archer suffered economic injury as a result of Joby's unlawful business practices of knowingly misclassifying goods that Joby imported into the United States and making false and misleading statements about Joby's purported vertical integration and domestic sourcing. On information and belief, the misclassification of Joby's imports allowed it to pay a lower duty to the federal government than would otherwise have been the case had it accurately classified the imports. On information and belief, underpaying the U.S. federal government conferred upon Joby an unwarranted economic benefit in the form of lower costs. Likewise, Joby's false and misleading presentation of its purported domestic sourcing and business was likely to deceive and did deceive the U.S. government and other business partners into choosing Joby for lucrative contracts at Archer's expense. Given that the U.S. eVTOL market consists of two companies leading the way — Archer and Joby — any unfair advantage that accrues to Joby has had, and will continue to have, a significant negative impact on Archer in its head-to-head competition with Joby.

189.108.    Moreover, asAs a result of Joby's conduct, Archer's share of the nascent eVTOL market, as defined by their respective market capitalizations, has been negatively impacted. Due in part to the unwarranted economic benefit and lower costs Joby has obtained by avoiding import duties owed, Joby's market capitalization has increased at a rate that outpaced Archer's, leaving Archer with a smaller share of the market in the wake of Joby's misconductunlawful and unfair statements and omissions, Archer has suffered losses in the programs above—money and government resources that would have gone to Archer instead went to Joby. Further, Archer has lost market position, lost business, and lost partnership opportunities.

190.109.    Archer will continue to suffer harm as a result of Joby's actionsJoby Aviation's and Joby Aero's actions, and legal damages are inadequate as to the forward-looking, non-monetary harm that Archer is suffering, including lost regulatory standing, distortion of a competitive market, ongoing diminishment of market position, and goodwill injury. Archer seeks preliminary and permanent injunctive relief prohibiting Joby Aviation and Joby Aero from

Gibson, Dunn & Crutcher LLP

continuing ~~its~~their unlawful~~,~~ and unfair~~, and fraudulent~~ business practices in violation of California's Unfair Competition Law~~, restitution of the profits that Joby gained from its unlawful conduct,~~ and all other equitable relief that the ~~court~~Court deems just and proper.

**Second Counterclaim**

FALSE ~~ADVERTISING~~PROMOTION UNDER THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)(B)

~~191.~~110.    Archer realleges and incorporates the preceding paragraphs as if fully set forth herein.

~~192.~~111.    ~~Joby's~~Joby Aero's and Joby Aviation's actions ~~were and are~~constitute false promotion in violation of ~~Section 43(a) of~~ the Lanham Act~~,~~. 15 U.S.C. § 1125(a)(1)(B).

~~193.    Joby deliberately, willfully, and intentionally has publicly disseminated and continues to publicly disseminate false and misleading statements regarding its vertical integration and domestic sourcing.~~

~~194.    These statements, disseminated in commerce, include Joby's repeated assurances to consumers, expressly and through omission, that its materials and manufacturing are domestically sourced and that Joby is *not* reliant on materials and manufacturing from China.~~

112.    Joby Aero and Joby Aviation made, authorized, and disseminated in interstate commerce false and/or misleading statements about Joby's eVTOL aircraft, domestic manufacturing, vertical integration, and supply-chain integrity.

113.    Joby Aero and Joby Aviation made representations to U.S. government agencies evaluating Joby's aircraft and supply-chain as part of Joby's application to participate in government-funded programs that had the capacity, likelihood, and tendency to deceive or confuse those U.S. government agencies:

a)    **AFWERX Agility Prime.** To participate in AFWERX Agility Prime and receive SBIR and OTA awards from the U.S. Air Force, Joby Aero represented, expressly or by necessary implication, that (i) it had truthfully disclosed its foreign affiliations, foreign subsidiaries, PRC-related funding or influence, supply-chain

dependencies, cybersecurity risks, and foreign access to technology, and that (ii) it would carefully control access to U.S. Air Force-funded technology by foreign firms or institutions. Joby Aviation and Joby Aero CEO JoeBen Bevirt and Joby Aviation Chief Policy Officer and Joby Aero Head of Government Affairs Gregory Bowles made these representations on Joby Aero's behalf. The AFWERX agreements identified both Joby Aero and Joby Aviation as the "Performer" or "Contractor" under the agreements; thus, the obligations under the agreements applied to Joby enterprise-wide and to both Joby Aviation and Joby Aero. On information and belief, these representations were false or misleading as Joby Aero did not fully and accurately disclose its reliance on and association with activities in China, including that Joby Aviation simultaneously operated Joby China, a wholly owned Chinese subsidiary that employed engineering and manufacturing personnel, held China-issued patents, was on information and belief tied to CCP-directed innovation programs and Chinese government grants, supplied or supported Joby's China-dependent aircraft development and manufacturing program, and potentially placed technical data at issue. These misstatements and omissions were material to and influenced the U.S. Air Force because AFWERX Agility Prime was designed to build a trusted domestic AAM industry and supply chain. Based on information and belief, the U.S. Air Force relied on Joby Aero's false statements and omissions, as it selected Joby Aero for Agility Prime, entered SBIR and OTA agreements with Joby Aero, awarded Joby Aero expanded contracts valued at up to approximately $131 million, and continued supporting Joby's flight trials. Based on information and belief, the U.S. Air Force was deceived into believing that Joby Aviation was a domestically controlled, vertically integrated, foreign-adversary-free eVTOL developer whose technology and supply chain did not present undisclosed PRC-related risks. Joby Aero's omissions allowed it to bypass the heightened scrutiny to

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS   CASE NO.: 5:25-CV-10703-SVK

which it otherwise would have been subject by the U.S. Air Force in reviewing its applications.

b)    **White House eIPP.**  To participate in the eIPP, Joby represented, expressly or by necessary implication, that it was a United States-based company for eIPP purposes, was not directly or indirectly owned or controlled by a foreign entity, would not work with adversarial nations in the awarded OTA agreement, would protect data from foreign access, and could participate consistent with the Executive Order's domestic manufacturing and supply-chain-security mandates, based on information and belief.  Based on information and belief, Joby's submissions in support of the eIPP program were made by Gregory Bowles, Joby Aviation's Chief Policy Officer and Joby Aero's Head of Government Affairs.  Whether it was Joby Aviation or Joby Aero that made these representations is information peculiarly within the possession and control of Joby and the United States Government and is not available to Archer; however, Joby Aviation issued press relating to Joby's receipt of eIPP benefits and Joby Aero has historically been the contracting party with government agencies.  Based on information and belief, these representations or omissions were false and/or misleading because Joby Aviation operated Joby China; concealed Joby China's active engineering and manufacturing role and receipt of Chinese government grants and CCP-linked benefits, relies on China-sourced components, equipment, and suppliers for its eVTOL aircraft program; and potentially placed technological data at issue, based on information and belief.  These statements were material and likely to influence the FAA.  The Executive Order and eIPP criteria required use of eVTOL aircraft and technologies developed or offered by a United States-based entity, and DOT/FAA guidance specifically addressed China subsidiaries, Chinese government support, adversarial nations, and data protections in the eIPP Q&A.  The FAA relied on Joby's statements, as Joby was allowed to participate in the eIPP.  Based on information and belief, the FAA

Gibson, Dunn &
Crutcher LLP

was deceived into conferring finite operational authorizations, regulatory fast-tracking, and government endorsement of Joby and did not exclude Joby from participating in the program based on the false impression that Joby's aircraft program, supply chain, data practices, and corporate structure were materially domestic and free from undisclosed PRC-related access, control, or influence.

114. Based on information and belief, Joby Aviation intentionally and knowingly concealed the extent of its China ties and its reliance on its Chinese subsidiary and other Chinese suppliers. As set forth above, Joby took deliberate steps to obscure these dependencies, including taking down the Joby China website, and omitting Joby's China-based operations and suppliers from public-facing materials that promoted Joby as a vertically integrated American manufacturer.

115. Joby Aero's and Joby Aviation's representations to these governmental entities constitute commercial promotion in the nascent, government-dominated eVTOL market. The current market for eVTOL aircraft and services includes multiple government agencies including the U.S. Air Force and FAA. To promote their products and services, therefore, eVTOL manufacturers promote their products and services via submissions, proposals, presentations, and responses to government agencies.

195.116. Joby Aero's and Joby Aviation's promotional statements had the tendency to deceive a substantial segment of that relevant audience. In the regulator-gated eVTOL market, the relevant purchasing public includes U.S. government agencies (including the U.S. Air Force), defense stakeholders, and commercial partners, whose contracting and fundingwhose decisions are directly influenced by government-facing materials and investor and public relations communications. Joby disseminated these statements for the purpose of influencing procurement, funding, and partnership decisions.representations regarding domestic manufacturing, vertical integration, supply-chain integrity, and freedom from foreign-adversary influence.

117. Joby Aero's and Joby Aviation's deception was likely to and did influence purchasing decisions, funding, contracting, regulatory, partnership, and investment decisions. Joby's false and/or misleading representations of domestic vertical integration enabled it to secure

at least $131 million in AFWERX Agility Prime contracts through the U.S. Air Force and was allowed to participate in the White House eIPP—opportunities that would not have been awarded, or would have been subjected to heightened scrutiny and delay, had Joby truthfully disclosed its reliance on Chinese-sourced components, its Chinese subsidiary's CCP-linked designations, and its receipt of Chinese government grants.

118.   Archer, as a company competing with Joby to be the first to obtain FAA certification, has been, and is likely to continue to be, injured as a result of Joby's false and/or misleading statements by direct diversion of sales, government-program opportunities, partnerships, regulatory attention, and market credibility from Archer to Joby.  The government endorsements, FAA resources, customer opportunities, and partner relationships wrongfully obtained by Joby Aero and Joby Aviation based on its false and/or misleading statements would otherwise have been available to Archer.

119.   As a result of Joby Aero's and Joby Aviation's false and/or misleading promotion, Archer has suffered and continues to suffer economic injuries including lost government contracts and program opportunities wrongfully secured by Joby Aero and Joby Aviation, delayed FAA certification progress due to diverted regulatory resources, lost competitive position, increased compliance and operational costs, lost business and partnership opportunities, diversion of management and engineering resources, and diminished goodwill and market valuation.

196.   These representations—e.g., that Joby "designs, tests and builds nearly every aspect of its aircraft and air taxi service in-house"—are specific, factual statements that are capable of empirical confirmation or contradiction based on supply-chain and sourcing data.

197.   These statements are false and misleading.  Joby's omissions regarding its China-based sourcing rendered its affirmative claims of "vertical integration," "American" manufacturing, and domestic sourcing materially misleading in their context, thereby deceiving the relevant purchasing public, including the U.S. government, business partners and investors.

198.   In reality, Joby is highly dependent on Chinese materials and manufacturing.  Indeed, Joby operates a wholly owned Chinese subsidiary in Shenzhen, China,

109

Gibson, Dunn & Crutcher LLP

that, on information and belief, supplies Joby with critical components of its eVTOL aircrafts and is deeply enmeshed with the Chinese government and the CCP—so much so that on information and belief it has affirmatively acted to conceal its reliance through misclassification and mischaracterization of its Chinese imports.

199. As a sophisticated company that holds itself out as an expert provider of eVTOL goods and services, Joby knows or should know that these statements are false and misleading. Joby knows, for example, that it operates a Chinese subsidiary that produces critical components of its eVTOL aircraft and therefore knows or should know that its representations to the contrary are untrue and are likely to mislead a reasonable consumer.

200. Yet Joby continues to disseminate these statements because it knows that such statements are necessary to induce certain consumers of eVTOL products and services to purchase (or otherwise enter into obligations relating to) Joby's products and services.

201. For example, the U.S. government, through programs like AFWERX, has adopted various measures to ensure that it does not purchase or otherwise enter into obligations relating to products or services that are dependent or otherwise influenced by foreign adversaries, such as China. And because the industry is nascent and closely intertwined with national security, many other consumers of eVTOL goods and services are similarly unwilling to enter into obligations for eVTOL products sourced from or otherwise influenced by foreign adversaries.

202. Likewise, the White House's eIPP is expressly designed to strengthen the domestic aerospace industrial base by prioritizing American manufacturers, U.S.-based supply chains, and secure, non-adversarial sourcing by creating operational pathways for the top American eVTOL companies. Participation in eIPP requires eVTOL manufactures to represent that a company's aircraft and core components are domestically manufactured or sourced in a manner consistent with U.S. national-security and industrial-policy objectives and to "ensure that vital components remain under American control and free from national security risks."

203. To evade these barriers and induce those consumers to enter into obligations regarding its eVTOL goods and services, Joby would have to disseminate false and misleading

Gibson, Dunn & Crutcher LLP

110

statements omitting its reliance on and embroilment with China.  And, on information and belief, that is what Joby has done.  For example, on April 25, 2023, Joby publicly announced that it had been awarded an expanded Agility Prime contract through AFWERX, allegedly expanding Joby's total Agility Prime contracts "up to approximately $131 million."  On information and belief, the U.S. government relied on Joby's representations as to its domestic sourcing and manufacturing, since that contract would not have been awarded, renewed, or maintained absent Joby's material misrepresentations and omissions about its sourcing from China.

204.  The challenged statements were made from within the United States and were received and acted upon by U.S.-based agencies and stakeholders, producing domestic effects in U.S. procurement, regulatory engagement, and competition.  The challenged statements have a tendency to deceive consumers, including the U.S. Government, whose purchasing decisions were and would be affected if they knew the full truth about the depth of Joby's reliance on China materials and technology.  On information and belief, it is not just Joby's China-dependency affecting those purchasing decisions but also Joby's efforts to mask that dependency through an apparent campaign of concealment, misdirection, and tariff evasion.

205.  As a result, Archer has suffered economic injuries.  The eVTOL market currently is functionally a zero-sum competition between two leading actors, Archer and Joby, so the economic benefit that Joby has secured through its false and misleading statements has necessarily come at Archer's expense.  Indeed, Joby's statements, by having a tendency to deceive and inducing consumers (including business partners and contracting entities like the U.S. government) to make purchases and enter into obligations they otherwise would not, have diverted sales, contracts, financing, and business opportunities away from Archer.  And those unwarranted economic benefits have caused further economic injury to Archer, since they have, in part, resulted in Joby's market capitalization increasing at a rate that has outpaced Archer's, leaving Archer with a smaller share of the market.

~~206.~~120.    Archer has suffered—and will continue to suffer—irreparable harm as a result of ~~Joby's~~Joby Aviation's and Joby Aero's false and/or misleading representations.  Archer

Gibson, Dunn & Crutcher LLP

111

seeks injunctive relief, compensatory damages, disgorgement of Joby's profits attributable to its false and/or misleading promotion, treble damages, attorneys' fees, costs, and all other relief available under 15 U.S.C. § 1117.

## DEMAND FOR JURY TRIAL

207.121.    Archer demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Archer prays for judgment in its favor and against Joby as follows:

a)    Dismiss Joby'sJoby Aero's Complaint with prejudice;

b)    Enter a judgment in favor of Archer and against Joby Aero on all claims in Joby'sJoby Aero's Complaint;

c)    An award of damages to Archer, including punitiveenhanced damages as is appropriate;

d)    Injunctive relief to enjoin Joby Aero and Joby Aviation from continuing itstheir unlawful conduct, including misclassifying importsfalse and/or misleading statements concerning domestic manufacturing, vertical integration, and reliance on China-based suppliers;

e)    An order awarding Archer compensation for any and all damages, injury, or harm;

f)    An order directing Joby to pay full restitution and/or disgorgement of all profits and benefits that may have been obtained as a result of its wrongful conduct;

g)f)    An order awarding Archer its costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure; and

h)    Finding this case to be exceptional under 35 U.S.C. § 285 and awarding Archer its costs and reasonable attorney fees; and

i)g)    An order awarding Archer such further relief as the Court may deem appropriate under the circumstances.

# ARCHER AVIATION'S ANSWER

## GENERAL DENIAL

Except as expressly admitted in this Answer, Archer denies each and every allegation in the Complaint, including, without limitation, any allegations in the introduction, headings, subheadings, or footnotes of the Complaint, and specifically denies any liability to Joby. Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, moreover, allegations in the Complaint to which responsive pleading is required shall be deemed to be denied. Archer expressly reserves the right to seek to amend and/or supplement its Answer as may be necessary.[85]

## RESPONSE TO SPECIFIC ALLEGATIONS[86]

## INTRODUCTION

1. To the extent Paragraph 1 of the Complaint implicates legal conclusions, no response is required. To the extent that a response is required, Archer admits that in summer 2025, George Kivork resigned from Joby and was hired by Archer. Archer denies the remaining allegations and characterizations contained in Paragraph 1.

2. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 2, and therefore denies them.

3. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 3, and therefore denies them.

4. Archer admits that it was founded in October 2018. Except as expressly admitted, Archer denies the remaining allegations and characterizations contained in Paragraph 4, and specifically denies that it has committed any act of trade secret misappropriation.

5. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 5, and therefore denies them.

---

[85] Answers to each paragraph of the Complaint are made by Archer without waiving, but expressly reserving, all rights Archer may have to seek relief by appropriate motions directed to the allegations in the Complaint or any subsequent amended complaint.

[86] Archer denies each and every allegation contained in any and all headings, subheadings, footnotes, and appendices in the Complaint, to the extent any allegations are contained therein.

Gibson, Dunn & Crutcher LLP

6. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 6, and therefore denies them.

7. Archer denies interference with Joby's business relationship with an unidentified developer or improper disclosure or use of confidential information. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in the remainder of Paragraph 7, and therefore denies them.

8. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 8, and therefore denies them.

9. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 9, and therefore denies them.

10. To the extent Paragraph 10 of the Complaint implicates legal conclusions, no response is required. To the extent that a response is required, Archer admits that it informed Joby that it had not engaged in any wrongdoing. Archer denies the remaining allegations and characterizations contained in Paragraph 10.

11. To the extent Paragraph 11 of the Complaint implicates legal conclusions, no response is required. Archer denies the remaining allegations and characterizations contained in Paragraph 11.

## PARTIES

12. Upon information and belief, Archer admits the allegations contained in Paragraph 12.

13. Upon information and belief, Archer admits the allegations contained in Paragraph 13.

14. Archer admits the allegations in Paragraph 14.

## JURISDICTION AND VENUE

15. Paragraph 15 implicates legal conclusions to which no response is required. To the extent a response is required, Archer admits that the United States District Court for the Northern District of California has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

1836, and supplemental jurisdiction pursuant to 18 U.S.C. § 1367. Archer denies the remaining allegations and characterizations contained in Paragraph 15.

16. To the extent Paragraph 16 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 16, and therefore denies them.

17. To the extent Paragraph 17 implicates legal conclusions, no response is required. To the extent a response is required, Archer admits that its principal office is located in San Jose, California. Archer denies that it has committed or is committing any act complained of in the Complaint, and therefore denies the remaining allegations and characterizations contained in Paragraph 17.

18. To the extent Paragraph 18 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 18, and therefore denies them.

19. To the extent Paragraph 19 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies that it has committed or is committing any act complained of in the Complaint, and therefore denies the remaining allegations and characterizations contained in Paragraph 19.

### FACTS COMMON TO ALL CLAIMS

20. Archer denies Joby's characterizations in paragraph 20. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations contained in Paragraph 20, and therefore denies them.

21. Archer denies Joby's characterizations in Paragraph 21. Archer admits that eVTOL aircrafts use electric power to take off, hover, and land vertically, and fly forward. Archer admits there is a large potential market for eVTOL aircraft. Archer otherwise denies the remaining allegations and characterizations contained in Paragraph 21.

22.     Archer denies the allegations and characterizations contained in Paragraph 22.

23.     Archer denies that it interfered with any contractual relationship as alleged in Paragraph 23. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations and characterizations contained in Paragraph 23, and therefore denies them.

24.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 24, and therefore denies them.

25.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 25, and therefore denies them.

26.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 26, and therefore denies them.

27.     To the extent Paragraph 27 implicates legal conclusions, no response is required. Archer denies Joby intellectual property is "at risk of misuse" by Archer. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations and characterizations contained in Paragraph 27, and therefore denies them.

28.     Archer admits that in summer 2025, Kivork joined Archer. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations and characterizations contained in Paragraph 28, and therefore denies them.

29.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 29, and therefore denies them.

30.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 30, and therefore denies them.

31.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 31, and therefore denies them.

32.     To the extent Paragraph 32 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a

Gibson, Dunn & Crutcher LLP

116

DEFENDANT'S ANSWER AND COUNTERCLAIMS  CASE NO.: 5:25-CV-10703-SVK

Case 5:25-cv-10703-SVK   Document 84-1   Filed 06/29/26   Page 117 of 137

belief regarding the truth of the allegations and characterizations contained in Paragraph 32, and therefore denies them.

33. To the extent Paragraph 33 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 33, and therefore denies them.

34. To the extent Paragraph 34 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 34, and therefore denies them.

35. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 35, and therefore denies them.

36. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 36, and therefore denies them.

37. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 37, and therefore denies them.

38. To the extent Paragraph 38 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 38, and therefore denies them.

39. To the extent Paragraph 39 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 39, and therefore denies them.

40. To the extent Paragraph 40 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

belief regarding the truth of the allegations and characterizations contained in Paragraph 40, and therefore denies them.

41.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 41, and therefore denies them.

42.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 42, and therefore denies them.

43.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 43, and therefore denies them.

44.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 44, and therefore denies them.

45.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 45, and therefore denies them.

46.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 46, and therefore denies them.

47.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 47, and therefore denies them.

48.     Archer denies Joby's characterizations in paragraph 48.  To the extent Paragraph 48 implicates legal conclusions, no response is required.  To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 48, and therefore denies them.

49.     To the extent Paragraph 49 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 49, and therefore denies them.

50.     Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 50, and therefore denies them.

Gibson, Dunn & Crutcher LLP

118

51. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 51, and therefore denies them.

52. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 52, and therefore denies them.

53. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 53, and therefore denies them.

54. To the extent Paragraph 54 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 54.

55. To the extent Paragraph 55 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 55, and therefore denies them.

56. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 56, and therefore denies them.

57. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 57, and therefore denies them.

58. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 58, and therefore denies them.

59. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 59, and therefore denies them.

60. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 60 regarding an unidentified developer, and therefore denies them. Archer otherwise denies the remaining allegations and characterizations contained in Paragraph 60.

61. To the extent Paragraph 61 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

belief regarding the truth of the allegations and characterizations contained in Paragraph 61 regarding an unidentified developer, and therefore denies them. Archer otherwise denies the remaining allegations and characterizations contained in Paragraph 61.

62. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 62, and therefore denies them.

63. Archer denies the allegations and characterizations contained in the first sentence of Paragraph 63. Archer lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations and characterizations contained in Paragraph 63, and therefore denies them.

64. Archer denies the allegations and characterizations contained in Paragraph 64.

65. Archer denies the allegations and characterizations contained in Paragraph 65.

66. To the extent Paragraph 66 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 66, and specifically denies that it has misappropriated Joby's trade secrets and that it has benefited from any trade secrets purportedly misappropriated from Joby.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against Kivork)

67. Archer incorporates by reference its responses to Paragraphs 1–66 of the Complaint.

68. To the extent Paragraph 68 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 68, and therefore denies them.

69. To the extent Paragraph 69 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 69, and therefore denies them.

Gibson, Dunn & Crutcher LLP

120

70.    To the extent Paragraph 70 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 70, and therefore denies them.

71.    To the extent Paragraph 71 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 71, and therefore denies them.

72.    To the extent Paragraph 72 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 72, and therefore denies them.

73.    To the extent Paragraph 73 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 73, and therefore denies them.

74.    To the extent Paragraph 74 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 74, and therefore denies them.

75.    To the extent Paragraph 75 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 75.

76.    To the extent Paragraph 76 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 76, and therefore denies them.

Gibson, Dunn & Crutcher LLP

121

77.    To the extent Paragraph 77 purports to summarize the damages sought by Joby, no response is required.  To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 77.

## SECOND CAUSE OF ACTION

### Inducement of Breach of Contract

### (Against Archer)

78.    Archer incorporates by reference its responses to Paragraphs 1–77 of the Complaint.

79.    To the extent Paragraph 79 implicates legal conclusions, no response is required.  To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 79.

80.    To the extent Paragraph 80 implicates legal conclusions, no response is required.  To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 80.

81.    To the extent Paragraph 81 implicates legal conclusions, no response is required.  To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 81.

82.    Archer denies the allegations and characterizations contained in Paragraph 82.

83.    To the extent Paragraph 83 implicates legal conclusions, no response is required.  To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 83.

84.    To the extent Paragraph 84 implicates legal conclusions, no response is required.  To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 84, and therefore denies them.

85.    To the extent Paragraph 85 implicates legal conclusions, no response is required.  To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 85.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

86.    To the extent Paragraph 86 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 86. Archer denies that it has caused any harm to Joby.

87.    To the extent Paragraph 87 purports to summarize the damages sought by Joby, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 87.

## THIRD CAUSE OF ACTION

### Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

### (Against Kivork and Archer)

88.    Archer incorporates by reference its responses to Paragraphs 1–87 of the Complaint.

89.    To the extent Paragraph 89 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 89, and specifically denies that it has committed or is committing any act of trade secret misappropriation.

90.    To the extent Paragraph 90 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 90, and specifically denies that it has committed or is committing any act of trade secret misappropriation.

91.    To the extent Paragraph 91 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 91, and therefore denies them.

92.    To the extent Paragraph 92 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 92, and therefore denies them.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS – CASE NO.: 5:25-CV-10703-SVK

93.    To the extent Paragraph 93 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 93.

94.    To the extent Paragraph 94 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 94.

95.    To the extent Paragraph 95 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 95.

96.    To the extent Paragraph 96 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 96, and specifically denies that it has committed or is committing any act of trade secret misappropriation.

### FOURTH CAUSE OF ACTION

### Violation of California Penal Code § 502

### (Against Kivork)

97.    Archer incorporates by reference its responses to Paragraphs 1–96 of the Complaint.

98.    To the extent Paragraph 98 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 98, and therefore denies them.

99.    To the extent Paragraph 99 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 99, and therefore denies them.

100.    To the extent Paragraph 100 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a

Gibson, Dunn & Crutcher LLP

124

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

belief regarding the truth of the allegations and characterizations contained in Paragraph 100, and therefore denies them.

101. To the extent Paragraph 101 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 101, and therefore denies them.

102. To the extent Paragraph 102 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 102, and therefore denies them.

103. To the extent Paragraph 103 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 103, and therefore denies them.

104. To the extent Paragraph 104 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 104, and therefore denies them.

105. To the extent Paragraph 105 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 105, and therefore denies them.

## FIFTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Kivork)

106. Archer incorporates by reference its responses to Paragraphs 1–105 of the Complaint.

Gibson, Dunn & Crutcher LLP

125

107. To the extent Paragraph 107 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 107, and therefore denies them.

108. To the extent Paragraph 108 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 108, and therefore denies them.

109. To the extent Paragraph 109 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 109, and therefore denies them.

110. To the extent Paragraph 110 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 110.

111. To the extent Paragraph 111 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 111, and therefore denies them.

112. To the extent Paragraph 112 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 112, and therefore denies them.

113. To the extent Paragraph 113 purports to summarize the damages sought by Joby, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 113.

## SIXTH CAUSE OF ACTION

### Aiding & Abetting Breach of Fiduciary Duty

### (Against Archer)

114. Archer incorporates by reference its responses to Paragraphs 1–113 of the Complaint.

115. To the extent Paragraph 115 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 115, and therefore denies them, and specifically denies the allegation that it has obtained or benefited from any confidential information purportedly misappropriated from Joby.

116. To the extent Paragraph 116 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 116.

117. To the extent Paragraph 117 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 117.

118. To the extent Paragraph 118 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 118.

119. To the extent Paragraph 119 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 119.

## SEVENTH CAUSE OF ACTION

### Breach of Duty of Loyalty

### (Against Kivork)

120. Archer incorporates by reference its responses to Paragraphs 1–119 of the Complaint.

Gibson, Dunn & Crutcher LLP

121. To the extent Paragraph 121 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 121, and therefore denies them.

122. To the extent Paragraph 122 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 122, and therefore denies them.

123. To the extent Paragraph 123 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 123.

124. To the extent Paragraph 124 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 124.

125. To the extent Paragraph 125 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 125, and therefore denies them.

## EIGHTH CAUSE OF ACTION

### Aiding & Abetting Breach of Duty of Loyalty

### (Against Archer)

126. Archer incorporates by reference its responses to Paragraphs 1–125 of the Complaint.

127. To the extent Paragraph 127 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 127, and therefore denies them.

Gibson, Dunn & Crutcher LLP

128

128.    To the extent Paragraph 128 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 128.

129.    To the extent Paragraph 129 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 129.

130.    To the extent Paragraph 130 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 130.

131.    To the extent Paragraph 131 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 131.

132.    To the extent Paragraph 132 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 132.

133.    To the extent Paragraph 133 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 133.

## NINTH CAUSE OF ACTION

### Tortious Interference with Contract

### (Against Kivork and Archer)

134.    Archer incorporates by reference its responses to Paragraphs 1–133 of the Complaint.

135.    To the extent Paragraph 135 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 135, and therefore denies them.

Gibson, Dunn & Crutcher LLP

129

136. To the extent Paragraph 136 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 136.

137. To the extent Paragraph 137 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 137.

138. To the extent Paragraph 138 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 138.

139. To the extent Paragraph 139 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 139.

140. To the extent Paragraph 140 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 140.

141. To the extent Paragraph 141 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 141.

142. To the extent Paragraph 142 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 142.

143. To the extent Paragraph 143 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 143.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS - CASE NO.: 5:25-CV-10703-SVK

**TENTH CAUSE OF ACTION**

**Tortious Interference with Prospective Economic Advantage**

**(Against Kivork and Archer)**

144. Archer incorporates by reference its responses to Paragraphs 1-143 of the Complaint.

145. To the extent Paragraph 145 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 145, and therefore denies them.

146. To the extent Paragraph 146 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 146.

147. To the extent Paragraph 147 implicates legal conclusions, no response is required. To the extent a response is required, Archer lacks knowledge or information sufficient to form a belief regarding the truth of the allegations and characterizations contained in Paragraph 147, and therefore denies them.

148. To the extent Paragraph 148 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 148.

149. To the extent Paragraph 149 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 149.

150. To the extent Paragraph 150 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 150.

151.   To the extent Paragraph 151 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 151.

152.   To the extent Paragraph 152 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 152.

153.   To the extent Paragraph 153 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 153.

## ELEVENTH CAUSE OF ACTION

### Unfair Competition Law

### (Against Archer)

154.   Archer incorporates by reference its responses to Paragraphs 1–153 of the Complaint.

155.   To the extent Paragraph 155 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 155.

156.   To the extent Paragraph 156 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 156.

157.   To the extent Paragraph 157 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 157.

158.   To the extent Paragraph 158 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 158.

159.    To the extent Paragraph 159 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 159.

160.    To the extent Paragraph 160 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 160.

161.    To the extent Paragraph 161 implicates legal conclusions, no response is required. To the extent a response is required, Archer denies the allegations and characterizations contained in Paragraph 161.

## PRAYER FOR RELIEF

162.    Paragraph 162 sets forth the statement of relief requested by Joby to which no response is required.  Archer denies that Joby is entitled to any relief against Archer and requests that the Court dismiss all claims with prejudice and order such further relief as the Court deems just and proper, including but not limited to attorneys' and expert fees pursuant to California Civil Code § 3426.4 and/or 18 U.S.C. § 1836(b)(3)(D).

## AFFIRMATIVE DEFENSES

163.    Archer asserts the following affirmative defenses, without assuming the burden of proving any fact, issue, or element of a claim where such burden properly belongs to Joby.  In addition to the affirmative defenses described below, Archer specifically reserves all rights to assert additional affirmative defenses as additional information becomes available.  Archer reserves the right to seek leave to amend its Answer to plead additional defenses and counterclaims and/or to supplement its existing defenses if information developed through discovery, trial, or otherwise, merits such additional defenses, counterclaims, or supplementation.  Pursuant to Federal Rule of Civil Procedure 8(c), Archer, without waiver, limitation, or prejudice, hereby asserts the following affirmative defenses:

### First Affirmative Defense

### Alleged Injury Caused by Others

Gibson, Dunn & Crutcher LLP

Joby's claims are barred because damages sustained by Joby, if any, were actually and proximately caused by the conduct or misconduct of persons other than Archer.

### Second Affirmative Defense

### Defendant's Good Faith

Joby's claims are barred because Archer acted in good faith with respect to its actions.

### Third Affirmative Defense

### Joby's Bad Faith

Joby's claims are frivolous, unreasonable, groundless, and in bad faith and therefore, Joby is barred from any recovery for such claims.

### Fourth Affirmative Defense

### Adequate Remedy at Law

Joby is not entitled to injunctive relief, because, at a minimum, it has no irreparable injury and it has an adequate remedy at law.

### Fifth Affirmative Defense

### Failure to Allege Harm

Joby has failed to demonstrate that it has suffered any damages resulting from the alleged wrongdoing, and even if it has, Joby fails to demonstrate that such damages were caused by any wrongdoing on the part of Archer.

### Sixth Affirmative Defense

### Failure to Mitigate

To the extent Joby may have suffered any damages, Joby has failed to take reasonable steps to mitigate such damages.

### Seventh Affirmative Defense

### Not Unlawful, Unfair, or Fraudulent

Joby's claims under California's Unfair Competition Law are barred in whole or in part because the alleged business practices are not unlawful, unfair, fraudulent, or likely to mislead consumers, within the meaning of Cal. Bus. & Prof. Code § 17200, or otherwise.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

## Eighth Affirmative Defense

### Failure to Plead with Particularity

Joby's claims are barred in whole or in part because Joby fails to plead its claims with sufficient particularity.

## Ninth Affirmative Defense

### No Willful or Knowing

Joby's claims are barred, in whole or in part, and/or recovery is precluded, because Archer's alleged conduct was not willful/knowingly wrongful.

## Tenth Affirmative Defense

### No Intentional Interference

Joby's claim against Archer for tortious interference with prospective economic advantage is barred, in whole or in part, because Archer did not intentionally interfere with Joby's relationship with an unidentified developer.

## Eleventh Affirmative Defense

### No Independently Wrongful Conduct

Joby's claim against Archer for tortious interference with prospective economic advantage is barred, in whole or in part, because Joby has not alleged any independently wrongful conduct by Archer.

## Twelfth Affirmative Defense

### Readily Ascertainable

Joby's alleged trade secrets do not qualify for trade secret protection because they are readily ascertainable by proper means.

## Thirteenth Affirmative Defense

### Unclean Hands

Joby's claims for relief are barred, in whole or in part, by the doctrine of unclean hands.

## Fourteenth Affirmative Defense

### No Entitlement to Interest, Attorney's Fees or Costs

Gibson, Dunn &
Crutcher LLP

Joby is not entitled to interest, attorneys' fees, or costs in connection with this action.

## Fifteenth Affirmative Defense

## Unjust Enrichment

Joby's right to relief is barred by the doctrine of unjust enrichment because Joby would be unjustly enriched if allowed to recover the relief claimed to be due.

## Sixteenth Affirmative Defense

## Independently Conceived

Joby's claim against Archer for misappropriation of trade secrets is barred, in whole or in part, because Archer independently conceived of, and/or developed, the information Joby alleges Archer misappropriated.

## Seventeenth Affirmative Defense

## No Legally Protected Trade Secrets

Joby's claim against Archer for misappropriation of trade secrets is barred, in whole or in part, because Joby has failed to identify any specific, legally protected trade secrets.

## Eighteenth Affirmative Defense

## No Independent Economic Value

Joby's claim against Archer for misappropriation of trade secrets is barred, in whole or in part, because the alleged trade secrets lack independent economic value.

## Nineteenth Affirmative Defense

## Failure to Ensure Secrecy

Joby's claim against Archer for misappropriation of trade secrets is barred, in whole or in part, because Joby has not exercised reasonable or sufficient efforts to keep the alleged trade secrets a secret.

## JURY DEMAND

Archer demands a trial by jury on all issues so triable.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S ANSWER AND COUNTERCLAIMS—CASE NO.: 5:25-CV-10703-SVK

Dated: ~~March 9~~June 29, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: ___/s/ James L. Zelenay Jr.___

James L. Zelenay Jr.
Josh A. Krevitt
Orin Snyder (admitted *PHV*)

*Attorney for Defendant and
Counterclaimant Archer Aviation Inc.*

DEFENDANT'S ANSWER AND COUNTERCLAIMS CASE NO.: 5:25-CV-10703-SVK