UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOBY AERO, INC.,
Plaintiff,
v.
ARCHER AVIATION INC., et al.,
Defendants.

Case No. 25-cv-10703-SVK

**ORDER GRANTING IN PART AND DENYING IN PART THE PARTIES' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT AND FIRST AMENDED COUNTERCLAIMS**

Re: Dkt. Nos. 86, 87, 89

Plaintiff and Counter-Defendant Joby Aero, Inc. ("Joby" or "Joby Aero")[1] and Counter-Defendant Joby Aviation, Inc. ("Joby Aviation") are in the business of developing electrical vertical takeoff and landing (eVTOL) aircraft. Defendant and Counterclaimant Archer Aviation, Inc. ("Archer"), the other major player in the eVTOL business, hired former Joby employee, Mr. George Kivork ("Kivork," collectively "Defendants"). At the heart of Joby's First Amended Complaint is an allegation that Kivork and Archer misappropriated trade secrets owned by Joby. *See* Dkt. 76 ("FAC"). Also at issue are Archer's First Amended Counterclaims, which allege that Joby Aviation has violated both the Lanham Act and California's Unfair Competition Law ("UCL") by making false and misleading statements to representatives of the U.S. government. *See* Dkt. at ¶ 84 ("FACC").

In June of 2026, the Court ruled on three Motions to Dismiss filed by Joby, Archer, and Kivork, granting-in-part and dismissing-in-part the originally filed claims and counterclaims. Dkt. 69 ("Prior Order"). In response, Joby filed the First Amended Complaint (Dkt. 76) and Archer

[1] In their briefs and the amended complaint, the Parties refer to Joby Aero simply as "Joby," and the counterclaims refer to Joby Aero and Joby Aviation as "Joby," collectively. *See* Dkt. 89 at 3. For clarity and to match the pleadings and papers, the Court will refer to Joby Aero, individually *or* together with Joby Aviation, as "Joby," except when quoting the parties.

United States District Court
Northern District of California

filed its First Amended Counterclaims (Dkt. 84) now at issue. Before the Court are three new Motions to Dismiss. Kivork's Motion to Dismiss argues that Joby fails to state claims for (1) breach of contract (Count I) or (2) violation of the Defend Trade Secrets Act ("DTSA") (Count III). Dkt. 87 ("Kivork MTD") at 1. Archer's Motion to Dismiss presents different yet related arguments, specifically that Joby fails to state claims for (1) DTSA trade-secret misappropriation, (2) inducement of breach of contract or (3) violations of the California UCL. Dkt. 86 ("Archer MTD") at 7. Joby's Motion to Strike and Dismiss makes several arguments for dismissing or striking Archer's FACC, including that (1) Archer's claims are all barred by the *Noerr-Pennington* Doctrine (2) Archer fails to state a Lanham Act claim, (3) Archer fails to state a UCL claim under any of its theories and (4) Archer's UCL claim should be stricken under California's Anti-SLAPP law. Dkt. 89 ("Joby MTD") at 1.

All Parties have consented to magistrate judge jurisdiction. Dkts. 15-17, 46. The Court determines that these matters may be resolved without oral argument. Civil L.R. 7-1(b). Having considered the Parties' submissions, the relevant law and the Court's Prior Order, the Court **GRANTS IN PART** and **DENIES IN PART** the Kivork MTD and the Archer MTD and **GRANTS** the Joby MTD.

# I. BACKGROUND

## A. Incorporation of Law and Facts Explained in Prior Order

The Court incorporates by reference the facts and analysis included in the Prior Order. There, the Court laid out the governing law regarding motions to dismiss as well as the facts on which the Parties agreed and the facts relevant to the first motions to dismiss, drawn from Joby's Complaint and Archer's Counterclaims. Dkt. 69 at 2-6. While both Parties have included additional facts in their amended claims and counterclaims, the core arguments and facts in dispute remain the same. The Court addresses any newly-identified facts in the course of its discussion.

## B. Procedural History

Joby filed its suit in California state court on November 18, 2025. Dkt. 1-1, Ex. B. Defendants removed the case to this District on December 16, 2025 and filed the notice of

removal with the state court on December 19, 2025. Dkts. 1, 13. On January 23, 2026, Defendants each filed a motion to dismiss. Dkts. 23-24. Shortly thereafter, on March 9, 2026, Archer answered the Complaint and asserted its Counterclaims. Dkt. 38. Joby filed a motion to dismiss on April 6, 2026. Dkt. 44. On June 5, 2026, the Court issued an Order Granting in Part and Denying in Part Parties' Motions to Dismiss. Dkt. 69.

In response, Joby filed its First Amended Complaint on June 22, 2026 and Archer filed its First Amended Counterclaims on June 29, 2026. Dkts. 76, 84. On July 6, 2026, Archer and Kivork filed their Motions to Dismiss Joby's FAC. Dkts. 86-87. Both the Archer and Kivork MTDs were fully briefed on July 27, 2026. Dkts. 86-87, 91-92, 94-95. On July 13, 2026, Joby filed its Motion to Strike and Motion to Dismiss Archer's FACC. Dkt. 89. The Joby MTD was fully briefed on August 3, 2026. Dkts. 89, 93, 98. The matters are now ripe for resolution.

## II. DISCUSSION

### A. Kivork's and Archer's Motions to Dismiss Joby's FAC Are Granted in Part and Denied in Part

The Kivork and Archer MTDs include both different and closely related arguments. Dkts. 86-87. These arguments are: (1) Joby fails to state a claim for breach of contract (Count I) (Dkt. 87 at 4-6) as well as the related claim for inducement of breach of contract (Count II) (Dkt. 86 at 17-21), (2) Joby fails to state a claim for trade-secret misappropriation for either Kivork or Archer (Count III) (Dkts. 86 at 7-17, 87 at 6-9) and (3) Joby fails to state a claim under the California UCL (Count IV) (Dkt. 86 at 21-23).

#### 1. Breach of Contract by Kivork (Count I)

As explained in the Prior Order, Section 16600(a) of the California Business & Professions Code provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600(a). This provision "shall be read broadly in accordance with *Edwards v. Arthur Andersen LLP* (2008) 44 Cal. 4th 937," which explained that "section 16600 represents a strong public policy of the state." *Id.* § 16600(b)(1); *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 949 (2008). The Court then analyzed two provisions from the "Proprietary Information and Inventions

Agreement" ("PIIA") that Kivork signed when he began his employment with Joby and upon which Joby based its claims of breach: the confidentiality provision (PIIA, §§ 4, 8) and the Item Return provision (PIIA, § 4). The Court found that under Section 16600(a) and *Edwards*, the confidentiality provision of the PIIA was invalid, but the Item Return provision of the PIIA was not. Dkt. 69 at 19-22.

Citing the Prior Order, Kivork now challenges two portions of the FAC's breach of contract claims that are not tied to the PIIA's Item Return provision.

First, Kivork challenges Paragraph 93 of the FAC, which reads:

> Kivork breached the PIIA by failing to return Joby's confidential and proprietary information, including the files he downloaded and emailed to his personal email account on July 18, 2025; by disclosing Joby's confidential information to Archer, a direct competitor of Joby, or its consultants without legal justification or excuse; by using Joby's confidential information for purposes outside his Joby employment and for the benefit of Archer; by falsely certifying that he had not taken any Joby documents; and by refusing Joby's demand that he return the exfiltrated and retained files even after these issues came to light.

FAC at ¶ 93. Kivork argues that some of the allegations in this paragraph, which were presented in the original complaint, "are not allegations of a failure to *return* items, but rather a claim for breach of the PIIA's confidentiality provision, which the Court determined to be an 'unenforceable de facto noncompete clause.'" Dkt. 87 at 5 (citing Dkt. 69 at 19, 33). Specifically, he points to the allegation "that Mr. Kivork breached the PIIA 'by disclosing Joby's confidential information to Archer, a direct competitor of Joby, or its consultants without legal justification or excuse; by using Joby's confidential information for purposes outside his Joby employment and for the benefit of Archer." *Id*. (citing FAC at ¶ 93).

As noted above, the Prior Order addressed the confidentiality provision found in Section 4 of the PIIA. Dkt. 69 at 20 ("The disputed provision, upon which Joby's claim is based, is Section 4 (and Section 8 to the extent it supplies the length of the term for Section 4)."). Kivork's argument against the entirety of Paragraph 93 goes too far to the extent that he seeks to exclude claims not limited to confidentiality. In its opposition, Joby makes a general disclaimer of "any language in Paragraph 93 [that] could be read to invoke the confidentiality clause." Dkt. 92 at 5. The Court finds Joby's response insufficient.

Accordingly, Kivork's motion to dismiss the challenged portions of Paragraph 93 of the FAC is **GRANTED in part**. The challenged portions of Paragraph 93 of the FAC are hereby **STRICKEN.** Joby must amend to remove all phrases in Paragraph 93 that refer to "confidential information," leaving only the first and last two phrases. No further amendments to Paragraph 93 are permitted.

Kivork's second challenge to the breach of contract claim is found in Paragraph 94. Dkt. 87 at 6.

Paragraph 94 reads:

> Kivork further breached the PIIA by adding his personal email address as an owner to hundreds of documents stored on Drive, which he did while still employed by Joby. By adding his personal email address as an owner to certain documents stored on Drive, Kivork would be able to access those documents even after leaving Joby's employ. Additionally, on information and belief, Kivork added his personal email address as an owner to those documents so that he could assist his future employer—Archer—in competing against Joby. Accordingly, Kivork further breached his obligation not to "assist any other person or organization in competing or preparing to compete with any business or demonstrably anticipated business of [Joby.]"

FAC at ¶ 94. Though not clear from the FAC, the language quoted in Paragraph 94 is not from Section 4 of the PIIA, which was the subject of the Prior Order, but instead from Section 6, which is subject to different limitations and which is not addressed in the Prior Order. Section 6 of the PIIA provides:

> 6. I agree that during the term of my employment with Company (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Company, and I will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company.

PIIA, § 6. Section 6 expressly limits itself to Kivork's actions *while he was employed at Joby* and therefore is not an unenforceable non-compete and does not run afoul of the Court's Prior Order.[2] California courts have clarified that "[t]he public policy behind Section 16600 is to ensure 'that every citizen shall retain the right to pursue any lawful employment and enterprise of

[2] For ease of reference, the Court refers to Section 6 as the "Restrictions During Employment" provision.

their choice' (*Metro Traffic Control, Inc. v. Shadow Traffic Network* 27 Cal. Rptr. 2d 573, 577 (1994)) and to encourage 'open competition and employee mobility' (*Edwards v. Arthur Andersen LLP* (2008) 81 Cal. Rptr. 3d 282, 288)." *Techno Lite, Inc. v. Emcod, LLC*, 257 Cal. Rptr. 3d 643, 651–52 (2020) (citations modified). Restrictions to competition ***during*** employment do not run afoul of this policy. Thus, the Court finds that this provision is not void *ab initio* and unenforceable pursuant to Section 16600(a).

In making this finding, the Court notes that Joby's FAC still includes the language that "[t]he PIIA expressly provided that these obligations 'shall continue in effect after the termination of [Kivork's] employment, regardless of the reason or reasons for termination." FAC at ¶ 90. The Court notes that this provision expressly applies to Sections 2-5 of the PIIA, ***not*** Section 6. Dkt. 75-1 (Ex. A to FAC). Insofar as Joby now attempts to extend Kivork's contractual obligations not to compete beyond the last day of his employment, with no end to his obligation, such efforts are invalid. However, to the extent Joby alleges that Kivork's actions of downloading and emailing confidential information "so that he could assist his future employer – Archer – in competing against Joby" are covered by his contractual obligations not to compete *during* his employment, the Court finds that 1) the contractual term is valid and 2) the allegations plausible given the timing of when Joby alleges he made changes to ownership of and downloaded documents. *See, e.g.*, FAC at ¶ 7 ("Two days before Kivork announced his resignation from Joby, Kivork downloaded dozens of files from Joby's systems. That same day, Kivork also sent additional files to one of his personal email accounts."); *see also id*. at ¶¶ 8-9, 39, 94.

Accordingly, Kivork's motion to dismiss the challenged portions of Paragraph 94 of the FAC is **DENIED**. The allegations found in Paragraph 94 remain to the extent they are limited to actions while Kivork was employed at Joby.

In sum, the Court **GRANTS** Kivork's motion to dismiss the portion of Count I that includes the challenged portions of Paragraph 93 that invoke the unenforceable confidentiality provision found in Section 4 of the PIIA. Joby's allegations found in Paragraph 93 are **STRICKEN with limited leave to amend**. The Court **DENIES** Kivork's motion to dismiss the allegations found in Paragraph 94; these allegations are limited to Kivork's actions while

United States District Court
Northern District of California

employed at Joby.

**2. Inducement of Breach of Contract Against Archer (Count II)**

As explained in the Prior Order, a claim for inducement of breach of contract by Archer requires a plausible allegation that "the contract was in fact breached by the contracting party." Dkt. 69 at 22 (citing *X Corp. v. Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948, 985 (N.D. Cal. 2024)). Joby has satisfied this requirement. *See,* section II.A.1, above. However, the Prior Order also explained that to plausibly allege inducement of breach of contract, Joby must allege (1) facts that support the conclusion that Archer had knowledge of the relevant provisions of the contract; and (2) facts that support the allegation that Archer acted in a way that was designed to induce breach. Dkt. 69 at 22.

For the reasons stated below, the Court finds that Joby has adequately pleaded inducement for breach of contract for the Item Return provision but not for inducement of breach of contract for the Restrictions During Employment provision.

**a. The Item Return Provision**

First, the Court finds that Joby has adequately pleaded facts supporting the inference that Archer had knowledge of the specific provisions in Kivork's contract with Joby. Specifically, Joby pleads that Archer had previously hired employes from Joby and that Archer's Chief Legal Officer explained (via email) that Archer's onboarding procedures "assist onboarding employees in understanding any post-employment obligations they may have to their prior employers." FAC at ¶ 97. Archer's email and its previous hiring of Joby employees creates a plausible inference that Archer had knowledge of the specific provisions in Kivork's contract, including the Item Return provision, at the time Kivork allegedly violated the Item Return provision. *See* FAC at ¶¶ 97-98. While Joby and Archer dispute the meaning of the email sent by Archer's CEO explaining its onboarding process (*compare* FAC at 97 ("Archer has admitted…Archer knew or should have known the terms of Joby's PIIA, including the item return provision") *with* Dkt. 86 at 5 (Archer pointing to this same email explaining its onboarding process to explain "how that onboarding process prevents the type of misappropriation Joby claims")), the Court determines that, accepting, as it must, the facts as presented in Joby's FAC, the onboarding process described by Archer is

sufficient to support the inference that Archer had knowledge of the specific Item Return provision before Kivork's alleged breach.

The Court also finds that Joby has adequately pleaded facts that give rise to a plausible inference that Archer took action designed to induce Kivork to breach the Item Return provision. The Court does so with the understanding that specific conversations between Archer and Kivork are outside the knowledge of Joby. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (allowing allegations to be pled on information and belief where the plaintiff did not have access to information possessed by the defendant). Furthermore, the Court finds that, since Archer has plausibly pleaded misappropriation by Archer of the Developer trade secrets (Dkt. 69 at 17-19), it is reasonable to infer from those facts that Archer also induced Kivork's breach of the Item Return provision, which allowed Archer access to the trade secret Archer and Kivork allegedly misappropriated.

Accordingly, the Court **DENIES** Archer's motion to dismiss the portion of Count II that relates to Joby's claims of inducement of breach of contract as to the Item Return provision.

**b. The Restrictions During Employment Provision**

Archer's knowledge of the Restrictions During Employment provision at the time of Kivork's alleged breach is less clear because Archer's onboarding procedures of Kivork would supposedly have happened after Kivork stopped working for Joby and therefore after the breach occurred.

However, even were Joby to have pleaded enough facts to raise a plausible inference that Archer knew of this provision, Joby does not plead any facts relating to actions by Archer occurring *before* Kivork's alleged "add[ition of] his personal email address as an owner to hundreds of documents stored on Drive…" while still employed by Joby. FAC at ¶ 104. Without facts supporting action by Archer prior to Kivork's alleged breach of contract, this allegation fails, for reasons discussed in the Prior Order. Dkt. 69 at 22 (citing *X Corp.*, 724 F. Supp. 3d at 985 to explain that inducement requires "defendant had knowledge of the contract and intended to induce its breach.").

Accordingly, the Court **GRANTS** Archer's motion to dismiss Joby's claims of inducement

of breach of contract as to the Restrictions During Employment provision. That portion of Joby's claim is **DISMISSED with leave to amend**.

### 3. California UCL (Count IV) against Archer

Consistent with the Prior Order, Joby and Archer agree that Joby's California UCL claim relies on the sufficiency of its inducement claim. Dkt. 86 at 21; Dkt. 91 at 23; Dkt. 69 at 27. The only addition in the FAC to the previously-dismissed UCL claims appears to be a paragraph detailing why "Archer is incentivized to induce Kivork to not return what was stolen." *See* FAC at ¶ 124. Therefore, the issue before the Court is the legality and sufficiency of Joby's UCL claim only as it relates to inducement of breach of the Item Return provision. Since the Court now finds that Joby has sufficiently pleaded inducement of breach of contract as to the Item Return provision of the PIIA (*see* section II.A.2, *infra*), the Court also holds that Joby has sufficiently pleaded a UCL claim.

Accordingly, the Court **DENIES** Archer's motion to dismiss Joby's California UCL claim insofar as it relates to the Item Return provision.

### 4. Kivork's and Archer's Alleged Violation of DTSA (Count III)

#### a. Identification of Trade Secrets with Sufficient Particularity and Misappropriation (Kivork and Archer MTDs)

Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret ... by improper means; or (B) disclosure or use of [the] trade secret...." 18 U.S.C. § 1839(5). As discussed in the Prior Order, the Parties do not argue that Kivork wrongfully acquired any of the trade secrets, all of which he learned during the course of his employment with Joby. Dkt. 69 at 16. The question for the Court is whether Joby has (1) properly identified its alleged trade secrets and (2) plausibly pleaded improper disclosure or use of the identified trade secrets by Kivork or wrongful acquisition by Archer.

In the Prior Order, the Court evaluated Joby's trade secret allegations, carefully balancing the guidance of *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1085 (9th Cir. 2025) with Federal Rules of Civil Procedure 8 and 12, dismissing those allegations which only generally described categories of trade secrets. Dkt. 69 at 13-15. The Court allowed a fourth,

more specific category of trade secrets that pointed to materials related to Joby's agreement with the Developer. *Id*. In the FAC, Joby now alleges specific trade secrets and identifies specific files alleged to contain those trade secrets. FAC at ¶¶ 48-60. The Court finds that these allegations are sufficient to identify trade secrets at the pleading stage.

Turning to the question of pleading misappropriation of these trade secrets by either Kivork or Archer, the Court finds that Joby does not plausibly plead misappropriation of most of its alleged trade secrets. However, the Court finds that Joby does allege a plausible threat of misappropriation for all identified trade secrets by both Kivork and Archer. Defendants' motions to dismiss Claim III of the FAC are therefore **GRANTED in part and DENIED in part**. The Court explains its reasoning for each trade secret category before giving Joby one final chance at repleading the dismissed trade secret claims.[3]

**Hawthorne Airport**

The Court finds that Joby has sufficiently alleged that Kivork and Archer misappropriated trade secrets regarding leasing space at the Hawthorne airport in Los Angeles. The relevant allegations are:

- Joby identifies two specific files taken by Kivork, a contact list and a strategy document, both of which are identified in its list of relevant trade secrets. FAC at ¶ 70; *see id.* at ¶¶ 48 (Joby's Analysis of Target Markets for an Air Taxi Service), 49 (Joby's Site Analyses for Potential Vertiports), 50 (Joby's Infrastructure Development Plans), 51 (Joby's Vertiport Business Plan).
- "As early as 2023, Joby developed contacts at the Hawthorn airport in Los Angeles County." *Id*. at ¶ 70.
- At some point in 2024, "Archer [] publicly released a map of its intended 'air taxi network' in Los Angeles which showed various intended facilities in the area, but ***did not*** include any facility in Hawthorne." *Id*. at ¶ 71 (emphasis added).
- "In February and March of 2025, [while Kivork was still employed at Joby] Joby

[3] Because the Court has already determined that trade secrets connected with the Developer agreement were adequately pleaded, information related to that category of use is not addressed.

United States District Court
Northern District of California

reached out to its contacts and discussed the possibility of using the Hawthorne airport as a vertiport for maintenance, repair, and operations ('MRO')." *Id*. at ¶ 70.

- On July 18, 2025, "two days before informing Joby that he intended to resign, Kivork secretly downloaded dozens of Joby's files from Joby's electronic Microsoft SharePoint ('SharePoint') repository…and emailed certain Joby files to a personal email account that is not within Joby's control," including a contact list including Joby's contacts at the Hawthorne airport and a list of strategies that included Hawthorne as an option for a "Southern California airport[] that could host vertiports." FAC at ¶¶ 39, 70.
- In August of 2025, Kivork began working for Archer. *Id*. at ¶ 71.
- On November 5, 2025, "Archer purchased a long-term lease for the Hawthorne airport, and later announced that it would be used as an MRO vertiport." *Id*.

Additionally, in its opposition to the Archer MTD, Joby emphasizes "Archer's leasing of the Hawthorne Airport shortly after hiring Kivork, who had taken documents identifying Joby's Hawthorne Airport contact." Dkt. 91 at 4 (citing FAC at ¶¶ 70-71).

In allowing these allegations to stand, the Court relies upon circumstantial evidence. *See Auris Health, Inc.*, 2023 WL 7284156, at *4 (N.D. Cal. Nov. 3, 2023). At the pleading stage, Joby is allowed to plead allegations related to timing and circumstances that lead to the plausible inference that confidential information was shared in making certain decisions. Here, Joby's allegations amount to more than just the idea of leasing space at an airport and the identification of one point of contact. Rather, the circumstantial evidence (Joby's efforts directed to the airport during Kivork's employment; the absence of the airport in Archer's plans prior to Kivork joining Archer; Kivork's downloading contacts and strategies directed to the airport; Archer's subsequent efforts directed to the airport) raises above the level of speculation the inference that trade secrets were used. Thus, Joby sufficiently alleges use by Kivork and Archer of trade secrets related to leasing of space from the Hawthorne airport. Accordingly, the Court **DENIES** the Kivork and Archer MTDs as to misappropriation of this trade secret.

////

**Los Angeles Dodgers**

The Court finds that Joby has not sufficiently alleged that Kivork and Archer misappropriated trade secrets related to sponsorship discussions with the Los Angeles Dodgers. The relevant allegations are:

- Joby alludes to only one specific file taken by Kivork, a contact list, which is identified in its earlier list of relevant trade secrets. FAC at ¶ 58.
- "[I]n June and July of 2025, Joby began discussing a possible sponsorship with the Los Angeles Dodgers." *Id.* at ¶ 72.
- On July 18, 2025, "two days before informing Joby that he intended to resign, Kivork secretly downloaded dozens of Joby's files from Joby's electronic Microsoft SharePoint ('SharePoint') repository…and emailed certain Joby files to a personal email account that is not within Joby's control," including "confidential contact information for a Dodgers executive." *Id.* at ¶¶ 39, 72.
- "On October 2, 2025…the Dodgers contacted Joby and informed them that they had been outbid by a competitor who had 'recently expressed interest'–which turned out to be Archer." *Id.* at ¶ 72.
- "The Dodgers contacted Joby again in January of 2026, stated that Archer's sponsorship had not actually gone through, and invited Joby to make a further bid." *Id.*

As evidence that "Archer acquired and used Joby's trade secrets in relation to this attempt at a sponsorship deal," Joby points to an allegedly exfiltrated "tailored" contact list "which shows personal contact information of at least one Dodgers executive not listed on the webpage Archer cites"[4] and that "Archer's pursuit of a Dodgers sponsorship only after hiring Kivork plausibly suggests that Archer used information in the contact list to facilitate its bid to the Dodgers and undercut Joby's sponsorship." Dkt. 91 at 12.

Joby's confidential contact lists are pleaded with sufficient particularity to raise a plausible

[4] This webpage https://www.mlb.com/dodgers/sponsorship is first mentioned in Archer's MTD. Dkt. 86 at 12.

United States District Court
Northern District of California

inference that they do in fact contain protectable trade secrets given Joby's representation that the lists "represent years of effort" and "cannot be replicated merely by consulting a directory." FAC at ¶ 58; *compare CTC Glob. Corp. v. Huang*, 2019 WL 4148184, at *6 (C.D. Cal. July 29, 2019) (denying summary judgment on trade secret identified as "distribution list of contacts including partners and customers" because "a list of persons who have shown some interest in [the plaintiff] and might become business contacts or partners in some other capacity" has economic value) *with Am. Paper & Packaging Prods., Inc. v. Kirgan*, 228 Cal. Rptr. 713, 717 (Ct. App. 1986) (finding "lists of customers who operate manufacturing concerns and who need shipping supplies to ship their products to market" to not be a protectable trade secrets in part because "[t]he compilation process…is neither sophisticated nor difficult nor particularly time consuming."). However, for a claim of misappropriation by Kivork to survive, Joby must plausibly allege that Kivork either improperly disclosed the confidential contact lists to Archer or used them himself. Similarly, for a claim of misappropriation by Archer to survive, Joby must allege that Archer used Joby's confidential contact lists. Joby's FAC alleges this contact list was used for Archer's bidding for possible sponsorship with the Los Angeles Dodgers only because "one of the contact lists exfiltrated by Kivork ***contains*** confidential contact information for a Dodgers executive." FAC at ¶ 72 (emphasis added). The mere existence of a single Dodgers contact on Joby's confidential contact lists, without evidence that this contact information was used as part of the bidding process, cannot support an allegation of misappropriate. *See Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 966 (S.D. Cal. 2021) (dismissing misappropriation claims where "Plaintiff's allegations fail[ed] to allege any non-conclusory facts that plausibly suggest [] Defendant used Plaintiff's alleged trade secret…").

Accordingly, the Court finds that Joby has failed to plausibly allege misappropriation of trade secrets related to Archer's sponsorship negotiations with the Dodgers. Thus, the Court **GRANTS** the Kivork and Archer MTDs as to misappropriation of this trade secret. Joby's claims related to misappropriation of trade secrets by Kivork and Archer as they relate to the Dodgers are **DISMISSED with leave to amend**.

////

**Japan and South Korea**

The Court finds that Joby does not sufficiently allege that Kivork and Archer misappropriated trade secrets related to entry into markets in Japan and South Korea. The relevant allegations are:

- Joby identifies only one specific file taken by Kivork, instructions for operating eVTOL aircraft within the regulatory environments, which is found in its earlier list of relevant trade secrets. FAC at ¶ 53 (Joby's Blueprint for APAC Flight Demonstrations).
- In or around summer of 2024, Archer "had announced that it [would] participate in the 2024 K-UAM Grand Challenge" but dropped out before the challenge. *Id.* at ¶ 73.
- Archer scheduled a demonstration at the Osaka World Expo in Japan in July of 2025. *Id.*
- On July 18, 2025, "two days before informing Joby that he intended to resign, Kivork secretly downloaded dozens of Joby's files from Joby's electronic Microsoft SharePoint ('SharePoint') repository…and emailed certain Joby files to a personal email account that is not within Joby's control," including "instructions for operating eVTOL aircraft within the regulatory environments of South Korea and Japan." FAC at ¶¶ 39, 74.
- "Just two and three months after Kivork left to join Archer, Archer suddenly made progress in APAC and announced new partnerships intended to bring eVTOL business to South Korea and Japan." *Id.* at ¶ 74.
- As of June 2026, "Archer has yet to conduct a single exhibition flight in either South Korea or Japan." *Id.* at ¶ 73.

In support of its allegation that "Archer acquired and used Joby's trade secrets," Joby points to "Archer's prior failures in the APAC market followed by rapid success shortly after hiring Kivork, who had exfiltrated documents specifically addressing APAC strategy." Dkt. 91 at 4 (citing FAC at ¶¶ 73-74).

Joby only points to one presentation to support this alleged misappropriation that is described as including "extensive logistical and regulatory plans that enabled it to showcase its eVTOL aircraft through two historic flight demonstrations, one in south Korea, and another in Japan." While regulations are not themselves trade secrets, the Court finds that a particularized strategy for navigating complex regulations and other logistics can rise to the level of a trade secret in some instances, and that here, Joby has plausibly alleged the existence of a trade secret related to regulatory strategies for flight demonstrations in South Korea and Japan.

However, the question of whether Joby has plausibly alleged misappropriation is another matter. Joby's only pleaded facts to support Kivork's disclosure/use and/or Archer's use of Joby's internal plans and strategies connected with navigating the regulatory systems of South Korea and Japan are that "just two and three months after Kivork left to join Archer, Archer suddenly made progress in APAC and announced new partnerships intended to bring eVTOL business to South Korea and Japan." FAC at ¶ 74. However, Joby also acknowledges that Archer "had announced that it [would]…participate in the 2024 K-UAM Grand Challenge," but dropped out of that demonstration in South Korea as well as a different demonstration at the Osaka World Expo in Japan scheduled for July 2025. FAC at ¶ 73. Thus, Joby's FAC acknowledges that Archer's intentions to act in Japan and South Korea existed prior to Kivork joining Archer in August of 2025. *Id*. at ¶ 74. Joby suggests that Archer's "rapid success" is evidence of misappropriation (Dkts. 91 at 4; 92 at 3), but it also acknowledges that, as of June 2026, "Archer has yet to conduct a single exhibition flight in either South Korea or Japan." (FAC at ¶ 73).

Even if Archer's alleged progress navigating APAC's regulatory schemes was a result of Joby hiring Kivork, Joby's allegations do not point to any evidence that this questionable progress in APAC is a result of any trade secret contained in their blueprint for flight demonstrations.

Thus, the Court **GRANTS** the Kivork and Archer MTDs as to misappropriation of this trade secret. Accordingly, Joby's claims of misappropriation of trade secrets by Kivork and Archer as they relate to APAC are **DISMISSED with leave to amend**.

**Hydrogen Technology**

The Court finds that Joby does not sufficiently allege that Kivork and Archer

United States District Court
Northern District of California

misappropriated trade secrets related to hydrogen technology. The relevant allegations are:

- Joby identifies only one specific file taken by Kivork, which is found in its earlier list of relevant trade secrets. FAC at ¶ 59 (Technical Aspects of Joby's Prototype Hydrogen Electric eVTOL Aircraft).
- In January 2023, Archer announced that "it was making a deliberate decision to only develop all-electric aircraft and not pursuing hydrogen as a possible power source." *Id.* at ¶ 75.
- On July 18, 2025, "two days before informing Joby that he intended to resign, Kivork secretly downloaded dozens of Joby's files from Joby's electronic Microsoft SharePoint ('SharePoint') repository…and emailed certain Joby files to a personal email account that is not within Joby's control," including "technical information about Joby's hybrid electric aircraft, including a hydrogen electric eVTOL prototype." *Id.* at ¶¶ 39, 75.
- In April 2026, "the aviation press reported that Archer Aviation was 'said to be exploring' hydrogen aircraft after all." *Id.* at ¶ 75.

While technical aspects of Joby's prototype hydrogen electric eVTOL aircraft may well be protectable as a trade secret, Joby's allegations only set forth that, after stating in January 2023 that "it was making a deliberate decision to only develop all-electric aircraft and not pursuing hydrogen as a possible power source," in 2026 "the aviation press reported that Archer Aviation was 'said to be exploring' hydrogen aircraft after all." FAC at ¶ 75. The exploration of development of hydrogen-powered aircraft is not a trade secret, and Joby presents no facts to support a plausible inference of any actual development of hydrogen aircraft by Archer, let alone any development that is the result of trade secrets misappropriated by Kivork and/or Archer. Unlike *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, the case upon which Joby relies, Joby does not allege that Archer announced sudden changes to the design of its hydrogen-powered aircraft or that misappropriated information has been used to advance any required certification. *See Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1180-81 (W.D. Wash. 2019). Rather, Joby simply alleges that "Archer became convinced of the feasibility of it entering the

hydrogen-electric aircraft market after viewing Joby's technical documents," in what Joby acknowledges to be "Archer's shifts in strategy." Dkt. 91 at 14-15. Encouragement to explore options not considered two years earlier or a shift in strategy alone are too generalized to amount to misappropriation of a trade secret. Simply put, Joby points to no evidence that Archer's announcement of plans to explore hydrogen-powered vehicles are a sign of the rapid developments that supported the allegations of misappropriation in *Bombardier*. *Bombardier Inc.*, 383 F. Supp. 3d at 1180-81. The fact that Kivork has access to these alleged trade secrets is not enough on its own to prove misappropriation. *See, e.g., Apple Inc. v. Rivos, Inc.*, 2023 WL 5183034, at *7. The Court finds that Joby does not plausibly allege misappropriation of trade secrets by Kivork and/or Archer as they relate to the technical aspects of Joby's prototype hydrogen electric eVTOL aircraft.

Accordingly, the Court **GRANTS** the Kivork and Archer MTDs as to misappropriation of this trade secret. Joby's DTSA claims of misappropriation by Kivork and Archer as they relate to hydrogen technology are **DISMISSED with leave to amend**.

**b. Threat of Misappropriation of Trade Secrets**

Count III of Joby's FAC includes allegations of threatened misappropriation of trade secrets. FAC at ¶¶ 119-20. Threatened misappropriation involves either trade secrets that "remain in the possession of a defendant [] who actually has misused or disclosed some of those trade secrets in the past" or "are held by a defendant [] who intends to improperly use or disclose some of those trade secrets." *SolarPark Korea Co. v. Solaria Corp*., No. 23-CV-01181-AMO, 2023 WL 4983159, at *7 (N.D. Cal. Aug. 2, 2023) (citing *Cent. Valley Gen. Hosp. v. Smith*, 75 Cal. Rptr. 3d 771, 791 (2008)). "[T]he issuance of an injunction based on a claim of threatened misappropriation requires a greater showing than mere possession by a defendant of trade secrets where the defendant acquired the trade secret by proper means." *Power Integrations, Inc. v. De Lara*, No. 20-CV-410-MMA (DEB), 2020 WL 4582675, at *12 (S.D. Cal. Aug. 10, 2020) (citing *Cent. Valley Gen. Hosp.*, 75 Cal. Rptr. 3d at 792).

Joby presents two theories for threat of misappropriation in the FAC: (1) Kivork's alleged refusal "to return the trade secrets after Joby demanded their return" and (2) Archer's past

misappropriation of "several of Joby's trade secrets, including its trade secrets regarding the Developer." FAC at ¶¶ 119-20. In its opposition, Joby focuses on the argument that "[Kivork] possesses trade secrets and . . . actually has misused or disclosed some of those trade secrets in the past." Dkt. 92 at 11 (citing *Power Integrations*, 2020 WL 4582675, at *12); *see also* Dkt. 91 at 5 ("Archer misappropriated multiple trade secrets, and [] Archer is threatening to misappropriate remaining trade secrets in Kivork's possession.").

Kivork offers two theories for why Joby's allegations are insufficient, both of which fail. First, Kivork argues that "threatened misappropriation is derivative of actual misappropriation," yet fails to account for the Court's ruling in the Prior Order that misappropriation has been adequately pleaded for at least the trade secrets related to the Developer Agreement. Dkt. 95 at 9; Dkt. 69 at 16-19. Second, Kivork contests the representation that he refused to return the trade secrets, providing his own facts that "his counsel subsequently offered to delete them, an offer Joby rejected." Dkt. 87 at 3 (citing FAC at 81). The Court notes that the characterization and meaning of this exchange between Kivork's counsel and Joby is not a matter to be decided at the pleading stage. Contrary to Kivork's representation in its reply, the FAC ***does*** "allege that Mr. Kivork has…refused to return materials…[and] taken [] post-employment action suggesting imminent misappropriation." Dkt. 96 at 9; *see also* FAC at ¶¶ 119-20. Accordingly, the Court finds Joby has adequately pleaded threatened misappropriation by Kivork of all identified trade secrets.

Archer alludes to similar theories for why Joby's allegations are insufficient. First, Archer states that the "Court did not grant Joby leave to amend to advance this theory, and it should be rejected on this ground alone." Dkt. 94 at 7. This point is not well taken. Second, Archer argues that Joby has not adequately alleged that "Archer 'possesses' the alleged trade secrets at issue." *Id*. (citing *Power Integrations, Inc.*, 2020 WL 4582675, at *12). Given the overall context, explained in this and the Prior Order, including the timing of Kivork's departure from Joby, facts relating to the Developer Agreement and Joby's allegation that Archer induced Kivork to breach the Item Return provision, Joby's allegations raise a plausible inference that Archer is likewise in possession of the other trade secrets. Third, Archer implies that Joby's theory relies completely on

the pleaded facts that "[Archer] hired an employee who once allegedly possessed trade secret information." Dkt. 94 at 7. The Court notes that Joby has pleaded facts that indicate that Archer hired an employee, not just "who once allegedly possessed trade secret information" (Dkt. 94 at 7), but who ***currently*** possesses such information. Fourth, Archer argues that the Developer claim does not demonstrate enough of a pattern to indicate "Archer engaged in any conduct that justifie[s] wide-ranging discovery into events entirely unrelated to the Developer claim…" *Id*. at 8. For the reasons the Court finds Joby has adequately pleaded threatened misappropriation by Kivork of all identified trade secrets, the Court also finds that Joby has adequately pleaded misappropriation of all identified trade secrets by his employer, Archer. *See Power Integrations*, 2020 WL 4582675, at *12 (allowing "threatened misappropriation" claim to proceed on related secrets).

Thus, the Court **DENIES** the Kivork and Archer MTDs as to the claims of threatened misappropriation of all trade secrets identified in the FAC.

In sum, the Court **GRANTS** the Kivork and Archer MTDs and **DISMISSES with leave to amend** Count III of the FAC insofar as it is based on misappropriation of all categories of trade secrets that are not related to the Developer Agreement or the lease of Hawthorne airport. The Court **DENIES** the Kivork and Archer MTDs targeting Count III of the FAC insofar as they challenge misappropriation of trade secrets related to the Developer Agreement or the lease of Hawthorne airport or threats of misappropriation by Kivork or Archer of any of the identified categories of trade secrets.

#### c. Adequate Pleading of Damages (Kivork and Archer MTDs)

The Court agrees with Joby that its claims should not be dismissed for failure to adequately plead damages. The elements of a DTSA claim are "(1) the existence of a trade secret; and (2) the misappropriation of that trade secret." *JTH Tax LLC v. D'Souza*, 2021 WL 4353099, at *19 (D. Haw. Sept. 24, 2021) (citing *Attia v. Google LLC*, 983 F.3d 420, 424 (9th Cir. 2020). "Misappropriation," in turn, does not require a specific showing of actual damages. *See Attia*, 983 F.3d at 424. Further, DTSA clearly allows various remedies, including injunctive relief for threat of improper use of a trade secret by a defendant. 18 U.S.C. § 1836(b)(3). Injury from a

misappropriated trade secret may often be tied to unjust enrichment, which, in a competitive environment, can lead to exactly the harm Joby has alleged, e.g., lost infrastructure opportunity, disruption of contractual relationships, lost commercial opportunity, etc. Dkt. 92 at 16; *Sonoma Pharms., Inc. v. Collidion Inc.*, 2018 WL 3398940, at *6 (N.D. Cal. June 1, 2018 (denying summary judgement on plaintiff's DTSA claims, which included the allegation that defendants had "been unjustly enriched in the form of cost savings in research and development and an accelerated entrance on the market.") Thus, while portions of Count III have been dismissed on other grounds, the Court notes that this is not for failure to plead damages.

### B. Joby's Motion to Dismiss Archer's Amended Counterclaims

Next, the Court turns to the Joby MTD which raises the following challenges to Archer's counterclaims: (1) Archer's claims are barred by *Noerr-Pennington*; (2) Archer fails to state a Lanham Act claim and (3) Archer fails to state a California UCL claim. Dkt. 89 at 1. Although Archer's counterclaims are more clearly stated in Archer's amended pleading, the Court finds that they are deficient under the *Noerr-Pennington* Doctrine and fail to state a claim under either the Lanham Act or the UCL. Furthermore, because Archer's claims depend upon statements made to the U.S. Government in applications for contracts, such claims will always be barred by *Noerr-Pennington* and therefore it would be futile to allow Archer an opportunity to amend. *See, e.g., AmeriCare MedServices, Inc. v. City of Anaheim*, 2017 WL 5592892, at *4 (C.D. Cal. Apr. 21, 2017) *aff'd,* 735 F. App'x 473 (9th Cir. 2018) (dismissing claims barred by *Noerr-Pennington* with prejudice, because they cannot be cured). Therefore, as reasoned below, Archer's Amended Counterclaims are **DISMISSED without leave to amend**.

#### 1. Archer's Counterclaims

Archer's counterclaims arise out of Joby's alleged misrepresentations to the U.S. Government regarding its ties to China allegedly made while Joby was petitioning the Government for contracts relating to the U.S. Air Force AFWERZ Agility Prime program and the White House and FAA's eIPP program at unspecified points in time. FACC at ¶ 29. Specifically, Archer alleges that "Joby['s portrayal of] itself to government decision-makers responsible for government funding and resource deployment as [] American-made [and] vertically integrated" is

United States District Court
Northern District of California

false and/or misleading because "Joby omits and obfuscates its extensive ties to China, its reliance on parts from China and suppliers in China for critical components in its…aircraft, and the extent of the role of its wholly owned Chinese subsidiary…" in its supply chain[5] and that Joby would not have been selected for either program were it not for this misrepresentation. FACC at ¶¶ 1, 77, 91. Archer further alleges, "If Joby had been honest with the government, it would not have received the government resources and funding that it did—which instead would have been available to and gone to competitor Archer." *Id.* at ¶ 2. However, Archer repeatedly acknowledges an inability to cite specific false statements or omissions by Joby, instead pointing to the following facts to support its allegation that Joby has strong ties to China that it is actively attempting to conceal: (1) recent job postings by Joby China with "highly technical engineering positions which require 'Good English'" (*id.* at ¶ 35), (2) Joby China's Chinese patents (*id.* at ¶ 36), (3) Joby China's location being in a city considered "at the 'forefront of Chinese government's initiative to develop what the State Council has termed the 'low-altitude economy'" (*id.* at ¶ 41), (4) the existence of China having "'strategic' plans for the 'low-altitude economy'" (*id.* at ¶ 42), (5) Joby China being named by the Chinese government as a "National High and New Technology Enterprise" ("NHNTE") with tax breaks and funding (*id.* at ¶ 43) and (6) the fact that "other companies in the aerospace industry [have been] proscribed by the DoW[6] as 'Chinese military companies,' unsuitable for grants, contracts, loans, partnerships, or other support from the federal government" based on similar activities (*id.* at ¶ 44).

### 2. *Noerr-Pennington* Doctrine Protects a Party's Right to Petition the Government for Contracts

Archer's claims are barred by *Noerr-Pennington* Doctrine. Courts in the Ninth Circuit have confirmed that "[t]he *Noerr-Pennington* doctrine is broad; it 'protects petitions to all departments of the government.'" *AmeriCare MedServices, Inc*, 2017 WL 5592892, at *3 (citing *Sanders v. Brown*, 504 F.3d 903, 912 (9th Cir. 2007)). Courts in this Circuit have further established that this protection extends to petitions to government agencies for contracts. *Id.*

[5] According to the FACC, Joby China was "first registered in 2012" and "is a wholly owned subsidiary of Joby Aviation." FAC at ¶ 30. Joby does not contest this. *See* Dkts. 89, 98.
[6] Archer's use of DoW refers to the Department of War. *See* FACC at ¶ 42.

United States District Court
Northern District of California

While *Noerr-Pennington* Doctrine was originally crafted in the context of antitrust suits, courts in this District have specified that "[t]his immunity applies to common law and statutory claims under state and federal law, including unfair competition claims under the Lanham Act and California's Unfair Competition Law." *AbCellera Biologics Inc. v. Bruker Cellular Analysis*, 2024 WL 37213, at *4 (N.D. Cal. Jan. 2, 2024) (collecting cases).

Archer's arguments to the contrary are unconvincing. Archer points to *Practice Management Information Corp. v. American Medical Association* to support its argument that discussions related to the creation of government contracts are not protected. Dkt. 93 at 20. However, *Practice Management Information Corp.* involved a federal agency entering into a contract to acquire a license to the American Medical Association's copyrighted material, which illustrates a federal agency seeking a contract from a private party, not a private party petitioning the Government. *See* 121 F.3d 516, 521 (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir. 1998). Similarly, the authority relied upon by Archer in support of the argument that "private commercial activity" automatically falls outside the scope of *Noerr-Pennington* is not as far reaching as Archer suggests. *See* Dkt. 98 at 2-3. For example, Archer cites *Hynix Semiconductor Inc. v. Rambus, Inc.* for the proposition that "the Supreme Court has long made clear that *Noerr-Pennington* does not apply to allegations that a party was 'engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws.'" Dkt. 93 at 20 (citing *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1090 (N.D. Cal. 2007) (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962)). However, the Court in *Hynix* cites this portion of *Continental* only to explain why the *Continental* court "did not have the opportunity to address whether such conduct could form part of an 'unlawful scheme' under the antitrust laws." *Hynix Semiconductor Inc.*, 527 F. Supp. 2d at 1090. Additionally, *Continental* attacked a broader antitrust scheme that only tangentially involved dealings with the Canadian Government. *See Cont'l Ore Co.*, 370 U.S. at 700 (1962) (detailing several monopolistic and restrictive practices). These cases simply do not support a broad exception to *Noerr-Pennington* for all private commercial activity.

Archer also suggests that its allegations are saved by the sham litigation exception to

*Noerr-Pennington*. Dkt. 93 at 21. However, Archer's pleading falls short because this exception "is confined to 'situations in which persons use the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon." *AmeriCare*, 2017 WL 5592892, at *3 (citing *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991)). Specifically, it "applies when petitioning activity 'is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Id*. Archer has not alleged that any statements made to the U.S. Government by Joby in its pursuit of government contracts were made for any purpose other than to obtain the contracts. While Archer attempts to frame Joby's alleged misrepresentations as harmful to the bidding process (Dkt. 93 at 17), this argument fails for reasons explained below regarding Archer's UCL allegations. *See*, section II.B.5, *infra*.

Thus, Archer's Amended Counterclaims, all of which depend upon Archer's allegations that Joby misrepresented its ties with China in petitioning U.S. government agencies for contracts, are **DISMISSED without leave to amend**.

### 3. Archer Fails to State a Claim Under the Lanham Act

As reasoned below, although Joby's petitions to the Government for government contracts satisfy the requirements for "commercial advertising or promotion" under the Lanham Act, Archer's Lanham Act claim fails because the pleading lacks sufficient particularity and a plausible showing of proximate cause.

#### a. Joby's Petitions to the Government Could Plausibly Constitute Commercial Speech

Under the Lanham Act, "[a] false advertising claim only applies to 'commercial advertising or promotion,' 15 U.S.C. § 1125(a)(1)(B), which is defined by the Ninth Circuit as (1) commercial speech by the defendant; (2) for the purpose of influencing consumers to buy defendant's goods or services; and (3) that is disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Realtek Semiconductor Corp. v. MediaTek*, Inc., 769 F. Supp. 3d 1067, 1095 (N.D. Cal. 2025) (citation omitted).

In support of its counterclaims, Archer argues that Joby's statements to the Government constitute commercial speech because (1) "[t]hose representations were made 'principally to

advance [Joby's] economic interests and influence the purchasing decisions of U.S. agencies" (Dkt. 93 at 7 (citing FACC at ¶ 62)), (2) they were allegedly made to "direct[] government contracts and awards towards Joby and away from…Archer" (*id*. at 7-8) and (3) the current domestic market is dominated by "the U.S. Air Force, DoW, and DoT[7]" so "even a single promotional presentation to an individual purchaser may be enough to trigger the…[Lanham Act]" (*id*. at 8 (citing *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999))).

The Court agrees that statements made to government agencies for the purpose of obtaining government contracts plausibly constitute commercial speech under the Lanham Act. *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 574 (E.D. Va. 2004); *see also Lockheed Martin Corp. v. Boeing Co.*, 2005 WL 729685, at *3 (M.D. Fla. Mar. 21, 2005) (statements "to the Air Force in order to obtain contracts which Boeing would have otherwise retained" plausibly constituted "commercial speech"); *Am. Traffic Sols., Inc. v. Redflex Traffic Sys., Inc.*, 2010 WL 1640975, at *3 (D. Ariz. Apr. 22, 2010) ("disseminating contract proposals to eleven governmental entities" could constitute "promotion in defendant's industry").

Here, the conclusion that Joby's alleged statements to governmental entities plausibly constitute commercial speech is supported by Archer's allegations that the "relevant purchasing public includes U.S. government agencies" (FACC at ¶ 116) and that the alleged "false or misleading" "representations" were made in the process of bidding for or finalizing agreements in connection with government contracts through the AFWERX Agility Prime and White House eIPP programs. *See id*. at ¶ 102. The Court finds that such representations, if made by Joby to the Government, could plausibly allege "commercial speech." However, Archer's allegations of any such misrepresentations to the Government are too vague and speculative to state a claim for violation of the Lanham Act.

////

[7] Archer's use of DoT refers to the Department of Transportation.

**b. Archer's Allegations Lack the Specificity Required by Rule 9(b) to State a Claim under the Lanham Act**

"District courts in the Ninth Circuit have held that the heightened pleading standard of [Rule 9(b)] applies to false advertising claims and requires the plaintiff to plead the 'time, place, and specific content of the false representations,' the identities of the parties to the misrepresentation, and what about the statement is claimed to be misleading." *Corsair Gaming, Inc. v. Choice Elecs. Inc.*, 2025 WL 2822691, at *5 (N.D. Cal. Oct. 3, 2025) (citing *Seoul Laser Dieboard Sys. Co. v. Serviform, S.r.l.*, 957 F. Supp. 2d 1189, 1200 (S.D. Cal. 2013)); *see Brosnan v. Tradeline Sols., Inc*., 2009 WL 10695119, at *4 (N.D. Cal. Feb. 13, 2009) (dismissing Lanham Act false advertising claim because, in addition to other flaws, "[n]or has Plaintiff alleged when the allegedly misleading statements were made and to whom"); *Choon's Design, LLC v. ContextLogic Inc*., 2020 WL 6891824, at *5 (N.D. Cal. Nov. 24, 2020) (granting motion to dismiss Lanham Act false advertising claim where "the complaint is devoid of specifics about when and where the [allegedly false] statements were made").

While even the high standards required for allegations of fraud "may be relaxed with respect to matters within the opposing party's knowledge…this exception does not nullify 9(b); a plaintiff who makes allegations on information and belief must state the factual basis for the belief." *Neubronner v. Miken*, 6 F.3d 666, 672 (9th Cir. 1993) (internal citations omitted). Courts have dismissed allegations based entirely on "suspicious circumstances" as not providing a sufficient factual basis. *See id*. at 672 ("Neubronner essentially admits…that he has alleged no more than 'suspicious circumstances'; those circumstances—i.e., that Milken was an investment banker for Gibralter and that Gibralter eventually sank into financial trouble—do not constitute a sufficient factual basis for allegations of insider trading."). Here, Archer's allegations that Joby made misrepresentations to the Government in its bids for government contracts, and that such representations caused the Government to select Joby over Archer for said contracts, rely solely on facts that are best described as "suspicious circumstances."

In sum, dismissal of claims is appropriate in cases where a party "ma[kes] only conclusory allegations, or allegations founded 'upon information and belief,' without providing any factual basis upon which its 'information and belief' is based." *Diamond State Ins. V. Marin Mountain*

*Bikes, Inc.*, 2012 WL 6680259, at *15 (N.D. Cal. Dec. 21, 2012) (quoting *Neubronne*, 6 F.3d at 672). Accordingly, the Court analyzes the sufficiency of Archer's counterclaims based on the ***underlying facts*** pleaded by Archer and determines that, after stripping Archer's counterclaims of "facts" based solely on information and belief, Archer fails to plead claims that are not merely conceivable but plausible.[8] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

Unable to point to specific false statements made by Joby to the Government, Archer asks the Court to infer that such false statements exist based on (1) facts suggesting that Joby is attempting to conceal its ties with China from the public and (2) facts related to the bidding process for the government contracts in question. The Court finds both sets of facts insufficient to support such an inference for the reasons stated below.

First, Archer persists in its allegation that Joby has made "misrepresentations and omissions to the government" because such misrepresentations would be "consistent with the actions Joby has taken writ large to promote itself as an 'American' company and obfuscate its connections to and reliance on China" (FACC at ¶ 51), as supported by the following facts, which Archer pleads outright:

- "Joby has engaged in a carefully orchestrated, but deceptively false, image campaign, advertising and promoting itself as a 'Made in America' company when the facts are to the contrary." FACC at ¶ 52.
- "Joby Aviation silently took down the Joby China website." *Id*. at ¶ 53.
- "Joby has systematically scrubbed references to Joby China from its investor-facing and public marketing materials." *Id*. at ¶ 54.
- Discrepancies in publicly available bills of lading and import records of shipments from China and Joby's public response to these discrepancies. *Id*. at ¶¶ 55-59.
- "Joby has described itself as an 'American Company' whose products are '[d]esigned, engineered, built and tested in America.'" *Id*. at ¶ 90.

[8] Joby further challenges Archer's counterclaims as failing to sufficiently allege proximate cause. Dkt. 89 at ¶¶ 16-18. Because the Court dismisses on other grounds, the Court does not address this argument.

While this set of facts might indicate an effort by Joby to downplay its reliance on Chinese manufacturing to the public generally, they do not support Archer's allegation that Joby made specific misrepresentation to the U.S. Government on "commercial submissions" made during the bidding process to obtain government contracts. *Id*. at 19.

In an apparent attempt to add the Government to the equation, Archer alleges the following facts related to the bidding process for the government contracts in question:

- The U.S. Air Force reviews proposals and "us[es] information provided by the small business concern in response to the Disclosure of Foreign Affiliations or Relationships to Foreign Countries and the proposal to conduct a risk-based due diligence review on the cybersecurity practices, patent analysis, employee analysis, and foreign ownership of a small business concern." FACC at ¶ 73.
- "The Disclosure of Foreign Affiliations or Relationships to Foreign Countries form—which Joby was therefore required to answer—specifically asks whether the applicant has a 'parent company, joint venture, or subsidiary, of the applicant or awardee that is based in or receives funding from, any foreign country of concern,' which includes 'the People's Republic of China.'" *Id*.
- Wording in "the executed July 28, 2022 SBIR contract between Joby Aero and the U.S. Air Force…in which Joby Aero agreed, among other things, that 'access to important technology developments under this Agreement by Foreign Firms or Institutions must be carefully controlled,' and that Joby Aero 'shall comply with all applicable provisions of the [certain regulations]." *Id*. at ¶ 74.
- "[The aforementioned] provision—signed by Joby Aviation and Joby Aero CEO JoeBen Bevirt—created an affirmative obligation for Joby Aero to inform the government of any changes of foreign influence over Joby's operations, even after the agreement was signed." *Id*.

Among this long list of allegations, the only alleged facts that pertain to false representations made to the U.S. Government are (1) the government submissions in question require a contracting party to disclose ties to certain foreign entities, including China and (2) Joby

was awarded government contracts despite having ties to China.[9] While these facts may support an inference that Joby was required to inform the Government of any ties it had to China, they say nothing about what Joby actually said to the Government and, therefore, cannot support the inference that Joby misrepresented its ties to China in any of its disclosures to the Government.

In sum, Archer alleges facts supporting its claims that Joby has publicly downplayed its ties with China and that Joby was required to disclose ties to China in its application for the government contracts in question, but even together these facts do not support the following allegations pleaded by Archer on information and belief:

- "Joby Aero provided false information or failed to disclose material information to the U.S. Air Force to participate in AFWERX Agility Prime." FACC at ¶ 76.
- "Joby could not simultaneously have made the truthful disclosures the program demanded and been admitted into it on the terms it obtained; accordingly, Joby either affirmatively misrepresented or unlawfully omitted its China ties." *Id*. at ¶ 77.
- "Joby provided false or misleading information to, or at least intended it to be relied upon by, the FAA acting through the DOT in connection with the eIPP program or failed to disclose information material to the FAA/DOT's decision to select participants in the eIPP program."[10] *Id*. at ¶ 90.
- "Joby provided information intended to be relied upon by FAA in selection of eIPP participation that was false or omitted material information… There is no reason to believe Joby was honest with the FAA about its connections to China…" *Id*. at ¶ 91.

[9] Archer also relies on alleged parallels between Joby's submissions and the facts of one case, *Kayhan Space Corp. v. United States*, where a security review resulted in a party being excluded from similar government contracts. For the reasons discussed below, the Court does not find the facts of that case applicable to Archer's counterclaims.

[10] In support of this allegation, Archer states, "Joby Aviation publicly announced that it planned to participate in the eIPP based on its promise that it pursues a 'vertical integration strategy' under which it 'designs, tests and builds nearly every aspect of its aircraft and air taxi service in-house." *Id*. However, these alleged facts fail to support the allegation that any false statements were made *to the FAA/DOT*.

- "Joby would not have been allowed to participate in the eIPP programs had it provided full and complete disclosures." *Id.*

For reasons explained above, for these "on information and belief" allegations to support a plausible inference that Joby made false statements to the Government, each allegation would need to be based in fact. They are not. Instead, they are based almost entirely on Archer's speculation regarding Joby's actions and the Government's decision-making process.

Archer's keystone in support of the allegation that Joby's alleged misrepresentations can be inferred simply because Joby won government contracts is *Kayhan Space Corp. v. United States*, No. 25-cv-104 (Fed. Cl. May 28, 2026) (published June 8, 2026). However, Archer's reliance on *Kayhan Space Corp.* rests on several facts not present in the case at hand:

- The Air Force announced a "Solicitation" that "sought to fund research projects that, if successful, could enable the United States Space Force…to 'rapidly respond to on-orbit needs on operationally relevant timelines.'" *Id.* at 2.
- Kayhan Space Corporation submitted a "proposed software that is designed to deconflict space launches, so that rockets can safely travel from the ground past the atmosphere." *Id.*
- "On November 29, 2023, the Air Force congratulated Kayhan on its proposal's 'tentative selection for negotiations and award.'" *Id*. at 13
- "After notifying Kayhan of its tentative selection, the Air Force performed a due diligence review of Kayan's proposal." *Id.*
- AFWERX, "a division within the Air Force that conducts due diligence on SBIR proposals, conducted a review of Kayhan's proposal." *Id*. at 14.
- AFWERX's findings included details about Kayhan's CEO and CTO's ties to Iran, including: being born there, receiving "undergraduate degrees from a government-tied entity in Tehran [(Sharif University)] in 2004 and 2005," having relatives still in Iran, and being "previously employed at an entity owned and controlled by Pasargad Bank in Iran." *Id*. at 15-16.
- In the proposal, "Kayhan did not disclose the connection to Pasargad Bank or the



United States District Court
Northern District of California

connections to Sharif University on its foreign disclosure form." *Id*. at 17.

- Kayhan's proposal was determined to present a "Very High Risk." *Id*. at 15.
- "[O]n January 12, 2024, the Air Force declined to make an award to Kayhan…[because] the Air Force 'determined that [Kayhan's proposal] presented security risks…" *Id*. at 13.
- The Air Force considered "potential mitigation strategies," but ultimately determined that "Kayhan's proposal was not selected based 'on national security grounds.'" *Id*. at 16-17.

In *Kayhan Space Corp.*, the reviewing agencies uncovered personal ties to Iran that Kayhan had failed to disclose, thereby undermining Kayhan's proposal. Archer fails to explain why the Court should assume the Government did not conduct a similarly thorough review here. Instead, Archer asks the Court to assume not only that Joby lied to U.S. government agencies, but that a national security review was either not performed or unable to identify Joby's dealings with China. Archer asks the Court to further assume that any thorough investigation into Joby's China connections could not possibly have resulted in a finding that these ties raised no concerns of foreign influence or national security and/or that any such concerns could not have been alleviated through mitigation strategies.

In other words, Archer's allegations require the Court to infer that because Joby has allegedly downplayed its ties to China to the general public, and because close ties with China can trigger a strict security review that *could* potentially disqualify a company from government contracts *if* the security review results in a finding by the Government that the company poses a risk to national security, Joby *could not* have obtained certain government contracts unless it lied to the Government. *See* Dkt. 93 at 11 ("Complete and accurate disclosure at a minimum would have triggered the foreign-risk review that was prescribed and would have altered the scrutiny, terms, timing, level, or continuation of Joby's government support.). The Court is not willing to make these speculative leaps.

As discussed in section II.B.3.b above, Archer asks the Court to draw inferences upon inferences, without sufficient factual basis. Such a chain of inferences cannot support Archer's

theory that Joby's success at winning government contracts compels the inference that Joby lied in is submissions to the Government.

Further undermining the viability of Archer's allegations is the requirement that to be plausible, a party must plead facts that "tend[] to exclude the possibility that the [innocuous] explanation is true." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996-97 (9th Cir. 2014). Archer's FACC itself includes facts that not only cast doubt on Archer's allegation that Joby successfully hid its ties to China from the Government, but present innocuous explanations for Joby winning the contracts: (1) Joby China was first registered in 2012 and was listing new job postings as recently as 2025 (FACC at ¶¶ 31-35), (2) "Joby Aviation touted that its 'relationship with DIU began in 2016'" (*id*. at ¶ 63) despite still having a website for Joby China at least as of 2018 (*id*. at ¶32) and (3) the Government rejected Kayhan's application for a government grant when the company was "assigned…a very high foreign risk rating" ***after*** conducting "the SBIR due-diligence process" (*id*. at 80). In sum, the FACC itself describes Joby's long relationship with U.S. government agencies, starting ***before*** any attempts by Joby to obfuscate its relationship with Joby China, and points to a government review process that would likely have uncovered at least some of Joby's past or present ties to China. Given the facts in Archer's FACC, taken as true, the Court cannot ignore that Archer's allegations rely on the assumption that not only did the U.S. Government's SBIR due-diligence process miss Joby's long-standing ties to China that Archer was able to identify through public information, but that the more plausible explanation for Joby winning contracts with the Government over Archer is not tied to elements related to Joby's long-standing relationship with U.S. government agencies. [11]

Therefore, the Court **GRANTS** Joby's motion to dismiss Archer's amended counterclaims under the Lanham Act. Accordingly, the Court **DISMISSES** Archer's Lanham Act Claims **without leave to amend**.

**4. Failure Under Rule 8**

For the same reasons Archer's amended counterclaims fail under Rule 9(b), they fail under

[11] Archer also attempts to bolster its claims by framing Joby's alleged lies as corrupting the process itself. For reasons explained more fully below, this distinction fails.

Rule 8, which requires a party to allege facts that "state a claim to relief that is plausible," which requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (2009). Furthermore, "[w]hen faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation . . . . Something more is needed." *In re Century Aluminum Co. Sec. Litig*., 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). Again, Archer admits that it does not know of any misstatements made to the Government. FACC at ¶¶ 76, 91. Instead, Archer alleges that "Joby [made] misrepresentations and omissions to the government" "based on information and belief" because that would be "consistent with the actions Joby has taken writ large to promote itself as an 'American' company and obfuscate its connections to and reliance on China." *Id*. at ¶ 51. As Joby argues in its motion to dismiss, Archer cannot and does not attempt to exclude the possibility that there were no misrepresentations made at all or that any misrepresentations would not have swayed the actions of the U.S. Government. Dkt. 89 at 18-19; *See also, e.g*., FACC at ¶ 113 ("Based on information and belief, the U.S. Air Force relied on Joby Aero's false statements and omissions, as it selected Joby Aero for Agility Prime . . ."). Thus, these allegations fail to satisfy the requirements of Rule 8.

Thus, the Court **GRANTS** Joby's motion to dismiss Archer's amended counterclaims under the Lanham Act. Accordingly, the Court **DISMISSES** Archer's Lanham Act Claims **without leave to amend**.

### 5. Archer Fails to State a California UCL Claim

#### a. Failure to Allege "Unfair" Conduct under California's UCL

In response to Joby's motion to dismiss Archer's claims that Joby's actions amount to "unfair" conduct under the California UCL, Archer simply points out how Joby winning government contracts harmed Archer. *See, e.g*., Dkt. 93 at 15-16 ("U.S. government programs…are more than just a revenue stream," "the critical government resources that Joby obtained are limited and finite," describing the commercial advantage of being the first to make it to market in the eVTOL space.) Archer's reliance on *Bulletin Displays, LLC v. Regency Outdoor*

United States District Court
Northern District of California

*Advertisement, Inc*. in support of its position is misplaced. In *Bulletin Displays*, the court found that, because of bribes paid to the mayor, "Bulletin clearly had a reduced, if not nil, chance of receiving a contract if indeed Regency had purchased the ability to exclude all other bidders from the process." *Bull. Displays, LLC v. Regency Outdoor Advert., Inc*., 518 F. Supp. 2d 1182, 1191 (C.D. Cal. 2007). Archer neither claims that Joby bribed government officials nor that it was entirely excluded from the bidding process. Instead, Archer seems to claim that Joby should not have received *any* of these contracts and that any grants to Joby should have instead gone to Archer. Archer's reliance on *United States ex rel. University Loft Co. v. Avteq, Inc.* and *Morning Star Packing Co. v. SK Foods, L.P.* similarly fails; both cases involved a bid-rigging scheme not alleged here. *United States ex rel. University Loft Co. v. Avteq, Inc.*2015 WL 13548950, at *12 (W.D. Tex. Dec. 22, 2015), *report and recommendation adopted*, 2016 WL 9461763 (W.D. Tex. Jan. 8, 2016); *Morning Star Packing Co. v. SK Foods,* 754 F. Supp. 2d 1230, 1235-36 (E.D. Cal. 2010). In fact, in stark contrast to all three of these cases, Archer does not allege any distortion of the system itself, just a lie in a submission to the Government, the contents of which, as discussed above, are not actually known to Archer.

Accordingly, Joby's motion to dismiss Archer's counterclaims of "unfair" conduct under the UCL is **GRANTED**. The Court **DISMISSES** Archer's UCL Claims **without leave to amend**.

**b. "Fraudulent" UCL Allegations Fail to Satisfy Rule 9(b)**

When evaluating claims under the UCL's fraudulent prong, courts consider whether the false or misleading statements at issue have the tendency to deceive "the ordinary consumer within the target population." *Chapman v. Skype Inc*., 220 Cal. App. 4th 217, 226 (2013) (emphasis added) (quoting *Lavie v. Procter & Gamble Co*., 105 Cal. App. 4th 496, 510, (2003)). The Court agrees that, in this instance, the "ordinary consumer within the target population" appears to be government entities. However, as discussed above, Archer's claims fail to plausibly allege that Joby (1) made false statements to the Government that (2) deceived the Government.

Accordingly, Joby's motion to dismiss Archer's counterclaims of "fraudulent" conduct under the UCL is **GRANTED**. The Court **DISMISSES** Archer's UCL Claims **without leave to amend**.

United States District Court
Northern District of California

**c. "Unlawful" Allegations Fall with Lanham Act Claim**

As acknowledged by both Parties, a "UCL claim predicated on a Lanham Act violation rises and falls with the Lanham Act claim." Dkt. 89 at 21, Dkt. 93 at 18-19. Since the Court has already found that Archer has not adequately pleaded its claims under the Lanham Act, Archer's allegations of "unlawful conduct" under the UCL similarly fail.

Accordingly, Joby's motion to dismiss Archer's counterclaims of "unlawful" conduct under the UCL is **GRANTED**. These claims are **DISMISSED without leave to amend**.

**C. Joby's Motion to Strike Archer's California UCL Claim**

Along with its Motion to Dismiss, Joby argues that Archer's UCL claim is a Strategic Lawsuit Against Public Participation ("SLAPP") and should be stricken by the Court. Dkt. 89 at 1. Because the Court finds that Archer's counterclaims fail under *Noerr-Pennington*, Rule 8 and Rule 9(b), the Court need not opine on this issue. This argument is **MOOT**.

## III. CONCLUSION

For the reasons set forth in Section II.A, above, the Court hereby:

**DISMISSES** the following claims **with leave to amend**:

- Count II of Joby's FAC as to the Restrictions During Employment provision
- Count III of Joby's FAC for past misappropriation for all but claims related to the Developer Agreement and the Hawthorne airport deal

**DISMISSES** the following claims **without leave to amend**:

- Count I of Joby's FAC as to the confidentiality provision
- The entirety of Archer's FACC

**ALLOWS** the following claims:

- Count I of Joby's FAC as to the Restrictions During Employment provision
- Count II of Joby's FAC as to the Item Return provision
- Counts III of Joby's FAC for past misappropriation of trade secrets related to the Hawthorne airport deal and threatened misappropriation of all identified trade secrets
- Count IV of Joby's FAC

United States District Court
Northern District of California

Joby's amended pleading is due no later than **October 6, 2026**. Archer's and Kivork's responsive pleadings are due no later than **October 20, 2026**. The matter is set for a case management conference on **December 8, 2026**; a joint case management statement is due **December 1, 2026**.

**SO ORDERED.**

Dated: September 29, 2026

SUSAN VAN KEULEN
United States Magistrate Judge